UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ELISHA MERRITT,

                                      Plaintiff,


v.                                                        9:23-cv-1465
                                                         (DNH/TWD)


J. HICKS, et al.,

                                      Defendants.

_____

APPEARANCES:                                             OF COUNSEL:

ELISHA MERRITT
*Plaintiff, pro se*
21-B-0441
Five Points Correctional Facility
Caller Box 119
Romulus, NY 1454

NEW YORK STATE ATTORNEY GENERAL                          OLIVIA R. COX, ESQ.
Attorneys for Defendants
New York State Attorney General - Albany
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**REPORT-RECOMMENDATION AND ORDER**</u>

## I.      INTRODUCTION

        This matter has been referred for a report and recommendation by the Honorable David

N. Hurd, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

72.3(c).  Plaintiff Elisha Merritt ("Plaintiff") commenced this action pursuant to 42 U.S.C. §

1983 and the Adult Survivors Act ("ASA"), N.Y. C.P.L.R. § 214-j, based on events which

occurred while he was incarcerated in the custody of the New York State Department of

Corrections and Community Supervision ("DOCCS"). *See generally*, Dkt. Nos. 1, 21. Currently before the Court is Defendants Wolf, Gates, Fenlong, Helvie, Best, Coffey, and Marra's motion to dismiss and partial motion for summary judgment. Dkt. No. 58. For the reasons set forth below, the undersigned recommends the Defendants' motion to dismiss be granted.

## II.    BACKGROUND

Plaintiff commenced this action by filing a complaint dated November 16, 2023, *see* Dkt. No. 1 at 40,[1] against Sergeant Hicks and C.O. John Does A, B, C, D, and E, along with a motion to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1-2. By Decision and Order dated January 3, 2024, the Hon. Judge Hurd granted Plaintiff's application to proceed IFP; dismissed Plaintiff's Eighth and First Amendment claims against Sergeant Hicks as barred by *res judicata*, as the Court previously granted summary judgment and dismissed such claims against Hicks in *Merritt v. Hicks, et al.*, No. 9:18-CV-1067 (DNH/TWD) (N.D.N.Y. filed September 7, 2018), for failure to exhaust administrative remedies; and dismissed Plaintiff's Eighth Amendment claims against John Does A, B, C, D, and E, as barred by the statute of limitations. *See generally*, Dkt. No 6.

Plaintiff filed a motion for reconsideration of the portion of the Court's Decision and Order dismissing his Eighth Amendment claims as untimely. *See generally*, Dkt. No. 8. On March 11, 2024, the Hon. Judge Hurd granted Plaintiff's motion for reconsideration, concluding "[a]t this preliminary stage, plaintiff has sufficiently alleged facts to suggest that tolling" pursuant to the ASA, "applies with respect to his Eighth Amendment claims." Dkt. No. 9 at 3 (citation omitted). In so holding, the Court explicitly noted "[t]his preliminary finding does not

---

[1] Citations to the parties' submissions will refer to the pagination generated by CM/ECF, the Court's electronic filing system. Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

preclude defendants from filing motions related to the issue of timeliness." *Id.* at 3-4, n. 1.  The
Court also issued a *Valentin* Order directing the Attorney General's Office to attempt to ascertain
the name of the Doe defendants.  *Id.* at 5-6.

On August 14, 2024, Plaintiff filed an amended complaint wherein he named individuals
from Gouverneur Correctional Facility (hereinafter, "Gouverneur" or "Gouverneur C.F.")
including Sgt. J. Hicks and C.O.s M. Gates, S. Wolf, D. Fenlong, J. Coffey, D. Best, S. Helvie,
and J. Marra as defendants.  *See generally*, Dkt. No. 21.  By Decision and Order dated
September 12, 2024, the Hon. Judge Hurd accepted the amended complaint for filing and found
Plaintiff's Eighth Amendment claims against Defendants Wolf, Gates, Fenlong, Coffey, Best,
Helvie, and Marra, who had been substituted for the Doe Defendants, survived *sua sponte* review
and required a response.  Dkt. No. 22 at 5-6.  The Court dismissed Plaintiff's claims against
Hicks for the reasons set forth in the January 3, 2024, Decision and Order.  *Id.* at 4-5.

On July 30, 2025, counsel filed a motion to dismiss and partial motion for summary
judgment on behalf of Defendants Wolf, Gates, Fenlong, Helvie, Best, Coffey, and Marra
(hereinafter, "Defendants"), pursuant to Rules 12(b)(6) and 56(a) of the Federal Rules of Civil
Procedure, seeking to dismiss Plaintiff's Eighth Amendment excessive force, failure to intervene,
and racial discrimination claims in the amended complaint with prejudice.  Dkt. No. 58; *see also*
Dkt. Nos. 59-61.  Defendants argue Plaintiff's claims concerning events which occurred on
September 12, and 13, 2017, are time barred; the ASA does not revive Plaintiff's claims; and,
even assuming, *arguendo*, Plaintiff's claims concerning the final incident that occurred on
September 13, 2017,[2] could be revived by the ASA, Plaintiff's remaining distinct claims alleging

---

[2] During the incident which both Defendants, *see*, *e.g.*, Dkt. No. 58-1 at 5-6, and Plaintiff, *see*,
*e.g.*, Dkt. No. 64 at 6-8, refer to as the "Third Incident in the small SHU," Plaintiff avers

excessive force, failure to intervene, and racial discrimination during the September 12, 2017, incident and the September 13, 2017, incidents in the infirmary and small SHU cannot be revived. *See* Dkt. No. 58-1 at 8-15. Defendants further aver Plaintiff failed to exhaust his available administrative remedies as required by the Prison Litigation Reform Act ("PLRA") prior to commencing this action, therefore, summary judgment should be granted in favor of the Defendants with respect to Plaintiff's claims concerning the September 12, 2017, incident as well as the First and Second September 13, 2017, incidents. *See id.* at 15-19.[3]

Plaintiff filed a response in opposition to the Defendants' motion to dismiss and for summary judgment. *See generally*, Dkt. No. 64. He first contends his § 1983 claims are not time barred as his claims were timely filed within the one-year revival period set forth in the ASA, and the ASA's broad scope encompasses all of his discrete claims. *See id.* at 8-18. Plaintiff also asserts he was exempt under the ASA from the PLRA's exhaustion requirement. *See id.* at 18.

The Defendants submitted a reply in further support of the motion to dismiss and for partial summary judgment. *See generally*, Dkt. No. 68. Plaintiff filed two additional submissions with the court, *see generally*, Dkt. Nos. 70, 69, which were construed as a request to submit a sur-reply and a sur-reply, respectively. Dkt. No. 71.

---

Defendant "c.o. S. wolf . . . nodded for c.o. D. best to open the [door to Plaintiff's SHU] cell" and "said, 'open it up'," and when the cell door opened, "4 or 5" officers "rushed into the cell . . . ." Dkt. No. 21 at 18. Defendant "c.o. J. coffey . . . started stomping [on Plaintiff's] thigh and hip;" "C.o.[s] M. gates & S. wolf were punching [Plaintiff] non-stop around [the] head and face/ear area;" "c.o. D. fenlong . . . str[uck Plaintiff] repeatedly in the ribs and chest area," and "punched [Plaintiff] in the penis/scrotums/groin area a couple of times;" and "c.o. coffey . . . kicked [Plaintiff] really hard in [the] penis/groin/rectum area a couple times." *Id.* at 19-20.

[3] To be sure, Defendants concede the "[Third] Incident" on September 13, 2017, which "involves allegations of sexual assault . . . is not the subject of Defendants' Motion for Summary Judgment for failure to exhaust." Dkt. No. 58-1 at 18.

### III.   LEGAL STANDARD

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure.  To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

> Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.

*Iqbal*, 556 U.S. at 679 (internal quotations and citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face."  *Twombly*, 550 at 570.  While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation."  *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).  A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice.  *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's]

supporting papers liberally, and . . . interpret them to raise the strongest arguments that they

suggest."  *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572

F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even

after *Twombly*).  In considering a Rule 12(b)(6) motion, "the court considers the complaint, any

written documents attached to them, and any matter of which the court can take judicial notice

for the factual background of the case."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422

(2d Cir. 2011) (citation and internal quotation marks omitted).

> The mandate to read the papers of *pro se* litigants generously makes
> it appropriate to consider a plaintiff's papers in opposition to a
> defendant's motion to dismiss as effectively amending the
> allegations of the plaintiff's complaint, to the extent that those
> factual allegations are consistent with the allegations of the
> plaintiff's complaint.

*Robles v. Bleau*, No. 07-CV-0464, 2008 WL 4693153, at *6 and n.41 (N.D.N.Y. Oct. 22, 2008)

(collecting cases); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (where a *pro*

*se* is faced with a motion to dismiss, a court may consider materials outside of the complaint "to

the extent they are consistent with the allegations in the complaint."), *vacated in part on other*

*grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004).

## IV.   DISCUSSION

"In section 1983 actions, the applicable limitations period is found in the 'general or

residual [state] statute [of limitations] for personal injury actions[.]'" *Pearl v. City of Long*

*Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)).

In New York, a three-year statute of limitations applies for personal injury actions, N.Y.

6

C.P.L.R. § 214(5), therefore, "[t]he statute of limitations for § 1983 actions arising in New York is three years." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020) (citing *Owens*, 488 U.S. at 250-51).

"[T]he accrual date of a § 1983 cause of action is a question of federal law . . . ." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). As the Second Circuit has explained, "a section 1983 cause of action accrues . . . when the plaintiff knows or has reason to know of the injury which is the basis of his action[.]" *Pearl*, 296 F.3d at 80 (internal quotations and citations omitted); *see also*, *e.g.*, *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994) (a § 1983 claim accrues "when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm.") (citations omitted). Thus, "a claim for excessive force accrues when the use of force occurred . . . ." *Jefferson v. Kelly*, No. 1:06-CV-6616 (NGG/LB), 2008 WL 1840767, at *3 (E.D.N.Y. Apr. 22, 2008) (citing *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)).

Here, Plaintiff's claims accrued on the dates of the alleged incidents, September 12, 2017, and September 13, 2017, thus the three-year statute of limitations for his § 1983 claims would have expired on September 14, 2020.[4]

> On March 7, 2020, then-New York State Governor Andrew Cuomo issued Executive Order 202, declaring a disaster emergency for the State of New York due to the COVID-19 pandemic. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 8.202. On March 20, 2020, Governor Cuomo signed Executive Order 202.8, limiting court operations to "essential matters" and declaring that "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding as prescribed by the procedural laws of the state . . . is hereby tolled from the date of this executive order until April 19, 2020." *Id*. § 8.202.8. Nine

---

[4] Because September 12, 2020, and September 13, 2020, were a Saturday and Sunday, respectively, the statute of limitations for Plaintiff's claims concerning both incidents expired on Monday September 14, 2020. *See* Fed. R. Civ. P. 6(a)(1)(C).

> subsequent Executive Orders collectively extended the first order until November 3, 2020. *See id.* §§ 8.202.14, 8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.63, 8.202.67. Executive Order 202.72 provided that the tolling of time limits established by Executive Order 202.8 would no longer be in effect as of November 4, 2020, *id.* § 8.202.72, yielding a total tolling period of 228 days.

*Briglin v. Hurley*, No. 9:23-CV-1001 (BKS/TWD), 2024 WL 3828234, at *9 (N.D.N.Y. Aug. 15, 2024). "[C]ourts 'have uniformly concluded that Executive Order 202.8 applies to federal cases applying New York's statute of limitations, including for § 1983 claims.'" *Bell v. Saunders*, No. 9:20-CV-0256 (BKS/TWD), 2022 WL 2064872, at *4 (N.D.N.Y. June 8, 2022) (quoting *Rich v. New York*, No. 1:21-CV-3835, 2022 WL 992885, at *8 (S.D.N.Y. Mar. 31, 2022) (collecting cases)).

As Defendants point out, however, even affording Plaintiff the added tolling period of 228 days *and* the 177 days remaining on the three-year statute of limitations as of March 20, 2020, for a total of 405 days of tolling beginning November 4, 2020, Plaintiff was required to file his complaint by December 14, 2021. *See* Dkt. No. 58-1 at 14-15. Therefore, the claims contained in Plaintiff's complaint, signed November 16, 2023, *see* Dkt. No. 1 at 40, were not timely filed.[5]

Plaintiff asks the Court "to borrow New York State's statute of limitations of sexual abuse," N.Y. C.P.L.R. § 214-j, as the "controlling statute" for his § 1983 claims. Dkt. No. 64 at 9. The ASA "created a one-year revival period, starting November 24, 2022, during which adult survivors of sexual assault could sue their abusers despite the expiration of the previously

---

[5] Under the "prison mailbox rule," the date of filing is deemed to be the date that the prisoner-plaintiff delivered his complaint to a prison guard for mailing to the court, which is presumed to be the date that the complaint was signed. *See Houston v. Lack*, 487 U.S. 266, 276 (1988); *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001).

applicable statutes of limitation." *Carroll v. Trump*, 650 F. Supp. 3d 213, 218 (S.D.N.Y. 2023) (citing N.Y. C.P.L.R. § 214-j).  Defendants argue Plaintiff cannot revive his federal claims by way of the ASA.  *See* Dkt. No. 58-1 at 10-12; Dkt. No. 68 at 4-6.  The undersigned agrees.

"The Second Circuit has not yet considered whether the ASA can revive §§ 1983, 1986, or 1986 claims.  However, it recently held that a nearly identical revival statute pertaining to victims under eighteen years old does *not* revive § 1983 claims." *Doe 1 v. Cnty. of Rockland*, No. 7:21-CV-6751 (KMK), 2025 WL 945873, at *13 (S.D.N.Y. Mar. 28, 2025) (emphasis in original) (citing *Kane v. Mount Pleasant Central Sch. Dist.*, 80 F. 4th 101, 108 (2d Cir. 2023)). In concluding the Child Victims Act ("CVA") does not revive or toll the statute of limitations for § 1983 claims in *Kane*, the Second Circuit cited Supreme Court precedent "that 'the federal interests in uniformity, certainty, and the minimization of unnecessary litigation' required a single statute of limitations for Section 1983 claims." *Kane*, 80 F.4th at 107 (quoting *Wilson v. Garcia*, 471 U.S. 261, 275 (1985)).  The Second Circuit further reasoned "every United States Court of Appeals to address this issue thus far has determined that a specialized statute for sexual abuse claims does not render an otherwise untimely Section 1983 or Title IX claim timely." *Kane*, 80 F.4th at 108 (collecting cases).

As relevant here, the ASA uses "almost precisely the same statutory language" as that utilized by the CVA.  *Carroll*, 650 F. Supp. 3d at 222; *see also*, *e.g.*, *Wilkie v. Vill. of Hempstead*, No. 2:22-CV-00920 (JMA/JMW), 2023 WL 5952056, at *8 (E.D.N.Y. June 20, 2023) (explaining, "the relevant statutory language in the CVA is identical to that of the ASA . . . .").  Therefore, "courts have interpreted the ASA by reference to the CVA." *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 661 (S.D.N.Y. 2024) (citing *Beter v. Baughman*, No. 1:24-CV-0079 (GHW/RFT), 2024 WL 1333570, at *11 (S.D.N.Y. Mar. 13, 2024), *report and*

*recommendation adopted*, 2024 WL 1329066 (S.D.N.Y. Mar. 28, 2024)) (additional citation

omitted).  As a result, courts in this circuit have applied *Kane*'s holding with respect to the CVA

to attempts to revive § 1983 claims under the ASA.  *See*, *e.g.*, *Doe 1*, 2025 WL 945873, at *14;

*Roldan v. Lewis*, No. 1:20-CV-03580 (HG/MMH), 2025 WL 676090, at *7, n.14 (E.D.N.Y. Mar.

3, 2025) ("*Kane*'s rationale applies with equal force to the ASA, another specialized tolling

statute.") (citing *Doe v. Columbia Univ.*, No. 1:23-CV-10393, 2024 WL 4149252, at *11 n.6

(S.D.N.Y. Sept. 11, 2024) ("There is no authority for the proposition that the ASA revives other

federal claims; the most direct guidance from the Second Circuit is that the analogous New York

Child Victims Act . . . N.Y. C.P.L.R. § 214-g, does not.")).

        This Court is similarly persuaded the ASA may not revive Plaintiff's § 1983 claims in the

instant action.  Plaintiff's arguments to the contrary are unavailing.  In his response in opposition

to the Defendants' motion, Plaintiff argues "applying the statute of limitations for 'personal

injury' (3 years) as defendant[]s are suggesting . . . would be inconsist[e]nt with New York

legislative's purpose of enacting CPLR 214-j . . . ."  Dkt. No. 64 at 9.  However, other courts in

this circuit have rejected similar arguments.  *See*, *e.g.*, *Doe 1*, 2025 WL 945873, at *14

("Although Plaintiffs argue that the 'facts and circumstances [here] are unique and consistent

with the underlying policies' behind the ASA . . . the Court finds *Kane*'s reasoning persuasive

and concludes that the same reasoning applies to the ASA . . . .") (citations omitted).  Moreover,

Plaintiff's reliance on *Dixon*, in his sur-reply in support of the proposition that the ASA does

revive his claims is misplaced, *see* Dkt. No. 70 at 2-3, as civil claims alleging intentional torts in

that case are distinguishable from Plaintiff's civil claims brought pursuant to § 1983 here.  *See*

*Dixon v. Reid*, 744 F. Supp. 3d 323, 327-28 (S.D.N.Y. 2024) (concluding "the ASA revives false

imprisonment and IIED claims arising from an alleged sexual assault.  Accordingly, Plaintiff's false imprisonment and IIED claims are not time barred . . . .").

In sum, Plaintiff's § 1983 claims alleging violations of his constitutional rights on September 12, and September 13, 2017, were not timely filed by way of his November 16, 2023, complaint, and the ASA's one-year revival period cannot revive his § 1983 claims.  Accordingly, the undersigned recommends Defendants' motion to dismiss be granted and Plaintiff's amended complaint be dismissed with prejudice.  Because dismissal of the complaint in its entirety is warranted, the Court need not reach Defendants' partial motion for summary judgment.

## V.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 58) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's complaint be **DISMISSED WITH PREJUDICE** as time-barred; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of

---

[6] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a

the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

**WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated:  December 12, 2025
Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2008 WL 4693153
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond ROBLES, Plaintiff,

v.

K. BLEAU, Correctional Officer, Riverview C.F.; Peacock, Correctional Sergeant, Riverview C.F.;
R. Varkiar, Senior Counsel, Riverview C.F.; and New York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
|
Oct. 22, 2008.

**Attorneys and Law Firms**

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, David L. Cochran, Esq., of Counsel, New York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action, brought pursuant to 42 U.S.C. § 1983, was referred to the Hon. George H. Lowe, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation dated September 12, 2008 recommended that Defendants motion to dismiss be granted in part and denied in part. Specifically, Judge Lowe recommended that Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be dismissed if, within thirty (30) days from the filing of this Final Order, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim. It was recommended that Plaintiff's remaining claims be dismissed with prejudice.

Plaintiff filed objections to the Report-Recommendation, essentially raising the same arguments presented to the Magistrate Judge.

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Lowe for the reasons stated in the Report-Recommendation.

It is therefore

**ORDERED** that Defendants motion to dismiss be **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me by the Honorable Thomas J. McAvoy, Senior United States District Judge, for Report and Recommendation with regard to any dispositive motions filed, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Complaint, Raymond Robles ("Plaintiff") alleges that three employees of the New York State Department of Correctional Services ("DOCS"), as well as DOCS itself, violated his rights under the Eighth and Fourteenth Amendments when they (1) required him to submit to a random urinalysis test when they knew he was taking a medication that would prevent him from providing a urine sample, and (2) charged, convicted, and punished him with eighty-seven days in a Special Housing Unit for refusing to provide a urine sample. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**

**\*2**   As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [1] Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint. Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.; [2]

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing; [3]

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes; [4]

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom at approximately 7:10 a.m. that morning, he would need more water in order to urinate; [5]

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff; [6]

2008 WL 4693153

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample; [7]

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937; [8]

8. At approximately 10:30 a.m., Plaintiff was still unable to provide a urine sample; [9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [11]

**\*3**  11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [14]

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report; [15]

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self"; [16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up"); [17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating; [18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate; [19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records; [20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U ., with a corresponding loss of privileges;[21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's own hearing testimony (which Defendant Varkiar stated was not credible);[22]

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007;[23] and

**\*4** 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there.[24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief.[25]

#### B. Summary of Grounds in Support of Defendants' Motion

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

### II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2);[26] or (2) a challenge to the legal cognizability of the claim.[27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests."[28] The main purpose of this rule is to "facilitate a proper decision on the merits."[29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[31] However, it is well established that even this liberal notice pleading standard "has its limits."[32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard.[33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007).[34] Rather than

turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

 **\*5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ). [35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b) (6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [39] In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality . [40]

 **\*6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [41] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [42] Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [43] Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [44] In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [45]

2008 WL 4693153

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [47] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [48] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [49]

## III. ANALYSIS

### A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].) In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket"; [50] (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws .... " [51]; and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice. [52]

**\*7** For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities. [53] However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

### B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted. [55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal) [56] that simply cannot be overlooked.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 19 of 160
Robles v. Bleau, Not Reported in F.Supp.2d (2008)
2008 WL 4693153

**C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition**

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment or perhaps inadequate-prison-conditions under the Eighth Amendment. (To the extent that this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

 **\*8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference*. Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety. [57] Here, Plaintiff himself alleges that the three individual Defendants did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation. [58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence*. Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence." [59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

**D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report**

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ). [61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at \*26, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [62]

 **\*9** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

**E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction**

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation, but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population. [63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

**\*10** Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C .F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate. [64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the medical unit at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

2008 WL 4693153

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws. [65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983. [66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; [67] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. [68]

**\*11** Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing, upon penalty of dismissal), I am in no way "issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint"- instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at \*6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be ***GRANTED* in part** and ***DENIED* in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be ***DISMISSED*** if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be ***DISMISSED* with prejudice,** and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [69]

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

30   *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

1    *See, infra,* note 41 of this Report-Recommendation (citing cases).

2    (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

3    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

4    (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"].)

5    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

6    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

7    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

8    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

9    (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

10   (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

11   (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

12   (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

13   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

14   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

15   (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

16    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

17    (*Id.*)

18    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

19    (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax].)

20    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax].)

21    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

22    (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

23    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

24    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

25    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

26    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b) (6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a) (2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

27    *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a]

); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

28    *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U .S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

29    *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

31    *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

32    2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

33    *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a] [2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

34    The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

35    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

36    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible"* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

37    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

38    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

39    *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

40    *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

41    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160

(N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

42    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

43    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

44    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

45    *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

46    *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

47    *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

48    *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

49    *Stinson v. Sheriff's Dep't of Sullivan Cty.*, 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison*, 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord*, 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.*, 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains*, 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright*, 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord*, 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.*, 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons*, 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

50    *McGinty v. State of New York*, 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

51    42 U.S.C. § 1983 [emphasis added].

52    *See, supra,* note 44 of this Report-Recommendation.

53    *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky*, 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

54    *See, infra,* note 41 of this Report-Recommendation (citing cases).

55    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

56    As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2), but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

57    *Farmer v. Brennan*, 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause

as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

58    In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition. See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

59    *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

60    *See, supra,* note 44 of this Report-Recommendation.

61    *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008) (Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS 52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

62    *See, supra,* note 44 of this Report-Recommendation.

63    *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985

F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at \*4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at \*4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

64    *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at \*40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) (Lowe, M.J.) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at \*10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at \*6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

65    *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States."* ) [emphasis added].

66    *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at \* 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

67    *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

68    *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

69    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World*

*Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4693153

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    18

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 31 of 160

KeyCite Yellow Flag

Distinguished by   Hargroves v. City of New York,   E.D.N.Y.,   March 4, 2010

2008 WL 1840767

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Roger JEFFERSON, Plaintiff,

v.

Raymond W. KELLY, et al., Defendants.

No. 06-CV-6616 (NGG)(LB).

|

April 22, 2008.

**Attorneys and Law Firms**

Roger Jefferson, Malone, NY, pro se.

Douglas William Heim, Seth D. Eichenholtz, New York City Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, District Judge.

**\*1**  Before the court is a motion to dismiss *pro se* plaintiff Roger Jefferson's ("Plaintiff" or "Jefferson") 42 U.S.C. § 1983 Complaint by Defendants Raymond W. Kelly, Detective Mary Javits,[1] Detective Greco, and Detective John Doe, pursuant to Fed.R.Civ.P. 12(c). Defendants initially served their motion papers on Plaintiff on July 16, 2007. (*See* Defendants' November 9, 2007 letter to the court (Docket Entry # 21).) On August 17, 2007, Plaintiff submitted a two-page "Affidavit/Affirmation in Opposition to Defendant's [sic] Motion." (*See* Docket Entry # 16.) After Defendants informed Magistrate Judge Lois Bloom that they had yet to receive a "proper" response from Plaintiff, on October 11, 2007, Judge Bloom ordered that if Plaintiff failed to submit an additional response to Defendants' motion by October 26, 2007, his affidavit/affirmation would be construed as his response to the motion. (*See* Docket Entry # 20.) Judge Bloom also ordered that the fully briefed motion be filed by November 9, 2007 and that no further extensions would be granted. (*Id.*) On November 9, 2007, having received no further response from Plaintiff, Defendants filed their motion papers with the court in accordance with Judge Bloom's Order and requested that the court treat the motion as fully briefed. Plaintiff has not filed any additional response since that time.

[1]     The docket sheet lists this Defendant as "Javits," but Defendants refer to her as "Javis" in their motion papers. The court will use the name on the docket sheet.

Accordingly, the court considers Defendants' motion fully briefed and will decide it based on the papers submitted to date. For the reasons set forth below, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

**I. Background**

Jefferson alleges the following in his December 11, 2006 Complaint, which, for purposes of this Fed.R.Civ.P. 12(c) motion, the court accepts as true. *See Desiano v. Warner-Lambert & Co.,* 467 F.3d 85, 89 (2d Cir.2006). On July 17, 2003, when Jefferson

2008 WL 1840767

was on his way to visit his son, two individuals exited a vehicle with guns and "started shooting." (Complaint (Docket Entry # 1) at 4.) After he ran to his son's apartment, Jefferson realized he had been shot in the leg and called an ambulance, which arrived approximately fifteen to twenty minutes later. (*Id.*) Two Emergency Medical Technicians carried Jefferson to the ambulance on a stretcher, escorted by Javits. (*Id.*) As Jefferson was being transported to the hospital, Javits ordered the ambulance to stop and "forced" Jefferson to stand up to see if he could identify as those who had fired the shots three individuals in police custody who were standing approximately 50 feet from the ambulance. (*Id.* at 5.) Jefferson informed Javits that he could not identify who had fired the shots and asked that he be transported to the hospital.

Javits then began questioning Jefferson about whether he had a weapon, at which point he told Javits that he did not want to talk with her anymore and that she could speak to his attorney. (*Id.*) However, Javits persisted in asking questions about a gun en route to the hospital and during the time Jefferson was being treated in the emergency room. (*Id.*) After being treated, Jefferson was moved to a hospital room and handcuffed to the bed. (*Id.*)

**\*2** The next morning Jefferson was taken to the 120th Precinct, where he was questioned by Detective Greco and his partner. (*Id.*) Jefferson informed the officers that he "d[id] not want to speak with them without an attorney present." (*Id.* at 5-6.) In response, an unidentified detective said "Look we found a gun at Jennifer Miles's home and unless you claim it, [w]hich we will require a written statement of, we[']re going to lock her up and take away the kids." (*Id.* at 6.) As a result, Jefferson "wrote and signed whatever they directed, or put before me" (*id.*), which included a *Miranda* waiver and a written statement about the incident, (Ex. D to Douglas Heim Decl. ("Heim Decl.") (Docket Entry # 24)). In the signed statement, Jefferson stated that he had pulled out a gun and started shooting in self defense at the men who were shooting at him. (*Id.*)

After signing the statement, Jefferson was "officially arrested" and charged with Criminal Possession of a Weapon in the Second Degree, Criminal Use of a Firearm in the Second Degree, and Reckless Endangerment in the First Degree. (Ex. C to Heim Decl., NYPD Arrest Report.) [2] On July 18, 2003, Jefferson was charged in a criminal complaint with Attempted Murder in the Second Degree, Criminal Possession of a Dangerous Weapon in the Second Degree, and Criminal Possession of a Weapon in the Second Degree. (Ex. E. To Heim Decl.) The criminal complaint indicates that information about the incident was also provided by Jermaine Dickerson and Joseph Sith-Davis, who claimed that Jefferson fired numerous rounds at them. (*Id.*)

[2]    In his Complaint, Jefferson alleges that he was arrested on July 18, 2003 after the detectives interrogated him, but the arrest report indicates that the arrest occurred on July 17, 2003. The discrepancy is immaterial to the resolution of this motion.

Jefferson was indicted by a grand jury on July 31, 2003 and again on October 31, 2003. (Exs. F & G to Heim Decl.) Jefferson's first trial resulted in a mistrial and his second trial resulted in an acquittal on December 7, 2004. (Complaint at 6; Ex. H to Heim Decl.) Jefferson spent seventeen months in jail during the prosecution of his case. (Complaint at 6.)

The court agrees with Defendants that Plaintiff's allegations, liberally construed, attempt to assert false arrest, false imprisonment, excessive force, due process (coerced confession), and malicious prosecution claims, notwithstanding his failure to articulate those claims as such.

## II. Discussion

In reviewing the Complaint, the court is mindful that Jefferson is proceeding *pro se* and that his pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980). It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006). If a liberal reading of the pleading "gives any indication that a valid claim might be stated," the court must grant leave to amend it. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

**\*3** As noted above, the court must accept Plaintiff's allegations in the Complaint as true and must draw all reasonable inferences in his favor when deciding a motion to dismiss under Fed.R.Civ.P. 12(c). *Desiano,* 467 F.3d at 89. In addition "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir.2002) (citation omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Id.* at 153 (citation and internal quotation marks omitted). When faced with considering documents outside the Complaint on a motion to dismiss, the need for a district court to convert the motion into one for summary judgment under Fed.R.Civ.P. 56 "largely dissipate[s]" where the non-movant had notice of "all the information in the movant's papers and has relied upon these documents in framing the complaint." *Id.* Because Plaintiff's Complaint relies heavily on the information contained in the documents attached to Defendants' motion and because Plaintiff had notice of all of those documents, I find that there is no need to convert the instant motion to a motion for summary judgment.

### A. Defendant Kelly

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted). Furthermore, "[a] supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002) (citation omitted). Rather, supervisory liability attaches only where a supervisor has shown "deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury." *Id.*

Here, Jefferson does not offer any allegations whatsoever against Commissioner Raymond Kelly, either with respect to personal involvement in the alleged violations or supervisory culpability. Accordingly, all claims against Defendant Kelly are dismissed.

### B. Statute of Limitations

In section 1983 actions, the applicable limitations period is found in the " 'general or residual [state] statute [of limitations] for personal injury actions,' " which in New York state is three years. *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) (*quoting Owens v. Okure,* 488 U.S. 235, 249-50, 109 S.Ct. 573, 102 L.Ed.2d 594(1989)). In general, a section 1983 action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (citation and internal quotation marks omitted). Specifically, a false imprisonment ends and the claim begins accruing "once the victim becomes held pursuant to [legal] process-when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace v. Kato,* ---U.S. ----, ----, 127 S.Ct. 1091, 1096, 166 L.Ed.2d 973 (2007). Similarly, "a cause of action for false arrest accrues at the time of detention," *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir.2006), and a claim for excessive force accrues when the use of force occurred, *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980). Finally, the court agrees with Defendants that a due process claim based on a coerced confession would logically accrue on the day the confession was allegedly coerced. *See id.; see also Weaver v. Brenner,* 40 F.3d 527, 536 (2d Cir.1994) (noting that defendants' actions connected to an allegedly coerced confession were not "beyond the reach" of the Due Process Clause).

**\*4** Based upon the allegations in Plaintiff's Complaint, the latest date of accrual for any of these claims (false imprisonment, false arrest, excessive force, and coerced confession) is July 18, 2003, the day on which Detective Greco and his partner questioned Plaintiff and obtained his written statement. Thus, Plaintiff's December 11, 2006 Complaint was not filed within the three-year limitations period applicable to section 1983 claims. The court is cognizant of the fact that a statute of limitations is not jurisdictional, but rather is subject to waiver, estoppel, and equitable tolling. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). However, there is nothing in Plaintiff's Complaint or in his "Affidavit/ Affirmation In Opposition to Defendant's Motion" that would suggest that any such relief is warranted in this case. Accordingly, the aforementioned claims are time-barred and must be dismissed.

2008 WL 1840767

Because the allegations with respect to Detective Javits relate only to these claims, all claims against Detective Javits are dismissed.

### C. Malicious Prosecution

To the extent that Plaintiff's allegations may be read as an attempt to state a malicious prosecution claim, the claim is not similarly time-barred. *See Heck v. Humphrey,* 512 U.S. 477, 489, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) ("[A] cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor.") "To sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003). To state a malicious prosecution claim under New York law, a plaintiff must show: "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Id.*

The only element of a malicious prosecution claim that Jefferson has clearly alleged is that the proceeding was terminated in his favor. As for the other elements, Jefferson does not clearly allege that Greco or his partner [3] played an "active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act," as required to show that Greco or his partner commenced or continued the criminal proceeding against him. *Rothstein v. Carriere,* 373 F.3d 275, 294 (2d Cir.2004).

[3]    Jefferson also does not make clear whether Greco's partner is Defendant Detective John Doe. The court assumes that this is so for purposes of this motion.

With respect to whether there was probable cause for the proceeding, "[p]robable cause requires an officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006) (citation and internal quotation marks omitted). A grand jury indictment gives rise to a rebuttable presumption that probable cause exists. *McClellan v. Smith,* 439 F.3d 137, 145 (2d Cir.2006) The presumption may be rebutted by showing that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* "The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the premise that the Grand Jury acts judicially." *Rothstein v. Carriere,* 373 F.3d 275, 284 (2d Cir.2004) (citation and internal quotation marks omitted).

**\*5**  In this case, Jefferson signed a *Miranda* waiver and a written statement saying that he fired a gun at certain individuals in self defense. Taken at face value, the waiver and Jefferson's statement establish probable cause for his arrest and for the charges contained in the criminal complaint. Moreover, Jefferson was indicted twice by a grand jury, which creates the rebuttable presumption that probable cause existed for his prosecution. However, Jefferson's allegations suggest that in his view his *Miranda* waiver and resulting statement were coerced. The allegations relevant to this inquiry are that Greco and his partner continued questioning Jefferson after being informed that he did not want to answer their questions without a lawyer and that Jefferson signed his statement only because the detectives threatened to lock up Jennifer Miles and "take away the kids."

The court is not inclined to view Jefferson's allegations as sufficient to support a claim that his statement was coerced, as he does not allege any specific actions on the part of the detectives that appear designed to overcome his will and produce an involuntary incriminating statement. *See Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) (stating that the issue in determining whether a statement was coerced is whether the conduct of law enforcement officials "was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined."); *Weaver v. Brenner,* 40 F.3d 527, 536 (2d Cir.1994) (criminal suspects have a clearly established due process right to be free from official conduct designed to overcome the accused's will and produce an involuntary incriminating statement). More importantly, even assuming that the statement was coerced, Jefferson does not offer any allegations relevant to establishing misconduct with respect to the grand jury, for instance, that this statement was presented to the grand jury as a basis for obtaining the indictments. *See Rothstein,* 373 F.3d at 284 (concluding that Plaintiff could not overcome the presumption of probable cause where the contents of grand jury

testimony was unknown and he had no idea what had happened before the grand jury); *cf. Boyd v. City of New York,* 336 F.3d 72, 77 (2d Cir.2003) (reversing a grant of summary judgment on a malicious prosecution claim where conflicting stories between Plaintiff and police officers suggested the possibility that the police had lied in order to secure an indictment, and therefore a jury could reasonably find that the indictment was secured through bad faith or perjury).

Finally, Jefferson also has failed to specifically allege malice, although malice may normally be inferred from the absence of probable cause. *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996).

In short, Jefferson's pleadings in their current form do not state a claim against Greco or his partner for malicious prosecution. Notwithstanding this conclusion, and because the court is troubled by the allegations that Greco and his partner may not have paid heed to Jefferson's invocation of his right to counsel, the court declines to dismiss the claim at this time. Given Jefferson's *pro se* status, in an abundance of caution the court grants him leave to amend his Complaint to state a malicious prosecution claim. *See Cuoco,* 222 F.3d at 112. Plaintiff shall file the Amended Complaint within thirty days of the date of this Order. Failure to do so will result in dismissal with prejudice. [4]

[4]     The court declines to reach Defendants' qualified immunity argument at this time in the absence of a more developed record. Should Plaintiff submit an Amended Complaint that states a malicious prosecution claim, Defendant Greco may again assert a qualified immunity defense should he so desire.

## III. Conclusion

**\*6** For the foregoing reasons, Defendants' motion to dismiss is GRANTED with respect to all claims against Defendants Kelly and Javits. Defendants' motion is DENIED with respect to the malicious prosecution claim against Defendant Greco and his partner in order to allow Plaintiff thirty days to amend his complaint. The Clerk of Court is directed to send Plaintiff a copy of this Order via U.S. mail.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1840767

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Briglin v. Hurley, Not Reported in Fed. Supp. (2024)

2024 WL 3828234

2024 WL 3828234
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Todd BRIGLIN, Plaintiff,

v.

Clifford HURLEY, Gerald Cahill, and Priti Mandalaywala, Defendants.

9:23-cv-1001 (BKS/TWD)
|
Signed August 15, 2024

**Attorneys and Law Firms**

For Plaintiff: Amy Jane Agnew, Joshua L. Morrison, Law Office of Amy Jane Agnew, P.C., 24 Fifth Avenue, Suite 1701, New York, New York 10011.

For Defendants: Oriana L. Kiley, Anna V. Seitelman, Viktoria Yudchits, Whiteman Osterman & Hanna LLP, One Commerce Plaza, Albany, New York 12260.

## MEMORANDUM-DECISION AND ORDER

Brenda K. Sannes, Chief United States District Judge:

## I. INTRODUCTION

**\*1** On August 17, 2023, Plaintiff Todd Briglin initiated this action pursuant to 42 U.S.C. § 1983 against Defendants David Dinello, Clifford Hurley, Gerald Cahill, and Priti Mandalaywala alleging a claim for deliberate indifference under the Eighth Amendment. (Dkt. No. 1.) Plaintiff subsequently moved before the United States Judicial Panel on Multidistrict Litigation ("MDL Panel") for transfer of the action, along with numerous other actions filed by Plaintiff's counsel, under 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings. (Dkt. No. 5.) On November 18, 2023, Plaintiff filed the operative amended complaint, adding Defendant Carol Moores. (Dkt. No. 17.) [1] On December 7, 2023, the MDL Panel denied Plaintiff's § 1407 motion. *In re N.Y. Dep't of Corr. & Cmty. Supervision Medications With Abuse Potential Prisoner Litig.,* 709 F.Supp.3d 1390, —— (J.P.M.L. 2023).

[1]     Plaintiff later voluntarily dismissed Defendant Moores, (Dkt. No. 37), and on July 29, 2024, the parties stipulated to dismissal of Defendant Dinello, (Dkt. Nos. 45–46), leaving only Defendants Hurley, Cahill, and Mandalaywala.

Presently before the Court is Defendants Hurley, Cahill, and Mandalaywala's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 33.) The motion is fully briefed. (Dkt. Nos. 39–41.) For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.

## II. FACTS [2]

[2]     These facts are drawn from the amended complaint. (Dkt. No. 17.) The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York,* 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

### A. Medications With Abuse Potential Policy

Plaintiff, who was held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") from, among other times, 2019 to 2021, alleges that Defendants' continued refusal to represcribe certain medications due to DOCCS policies and customs constitutes deliberate indifference. (Dkt. No. 17, ¶¶ 379–85.)

DOCCS' "policy on Medications With Abuse Potential" ("MWAP") was promulgated on June 2, 2017. (*Id.* ¶¶ 144–45.) [3] On its MWAP list, "DOCCS included a group of ... ubiquitous medications, including" medications at issue here: Neurontin (also known as Gabapentin), "an anticonvulsant generally taken to control seizures" and "often prescribed to relieve nerve pain," and Flexeril (also known as Cyclobenzaprine), a muscle relaxer used in short-term doses to control muscle spasms by blocking nerve impulses to the brain. (*Id.* ¶¶ 77, 81, 87.) [4] The medications on the MWAP list "are not risk free," and "[l]ike any medication they can be abused, but many of them—including Neurontin ... —are considered to have low addiction potential." (*Id.* ¶ 97–98.) "DOCCS, its physicians and mid-level clinicians have been aware of the risks of these medications for decades." (*Id.* ¶ 99.)

[3]    The MWAP policy is codified as DOCCS Health Services Policy 1.24, "Medications with Abuse Potential."

[4]    Although Plaintiff appears to allege that Neurontin was in a 2019 Formulary Book and was therefore available to doctors to prescribe without approval from an administrator, (*id.* ¶¶ 35–36, 38), Plaintiff's allegations as to the MWAP policy and related customs suggest that the MWAP policy altered these practices.

**\*2** Under the MWAP policy, a provider must "submit an MWAP Request Form" to the Regional Medical Director ("RMD") in charge of their region. (*Id.* ¶ 157–58.) The MWAP Request Form "asked for relevant health information regarding the patient, the justification for use of the medication and a list of any alternatives tried to treat the medical issue." (*Id.* ¶ 159.) The MWAP Request Form "also asked if there is any recent evidence of drug diversion or abuse by the patient." (*Id.* ¶ 160.) "Based on the MWAP Request Form contents—the RMD and not the patient's medical provider—determined whether a patient will receive an MWAP." (*Id.* ¶ 163.) The treating physicians and mid-level clinicians "had to discontinue an MWAP prescription if it was not approved by the RMD"; "pharmacies would not fill a prescription for an MWAP without RMD approval"; and providers "had no ability to provide the medication once an RMD refused to approve the prescription." (*Id.* ¶ 167.)

The MWAP policy "had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates on MWAPs." (*Id.* ¶ 173.) "As implemented, the MWAP Policy was an almost wholesale restriction on the prescription of MWAPs, except in cases of acute need or palliative care." (*Id.* ¶ 106.) This stands in contravention of the positions of several other agencies, such as the National Commission on Correctional Health Care, of which DOCCS is an accredited member, who published a position indicating that "[c]linicians should not approach the treatment of chronic pain as a decision regarding the use or nonuse of opioids (as in acute pain)[;] [r]ather clinicians should consider all aspects of the problem and all available proven modalities," and "[p]olicies banning opioids should be eschewed." (*Id.* ¶¶ 107–09.) Similarly, the Federal Bureau of Prisons' ("BOP") Clinical Guideline does not prohibit use of opioids or neuromodulating medications like Neurontin but instead "lists Neurontin ... as [a] second line treatment[ ] for neuropathic pain." (*Id.* ¶¶ 111–12.) The American Correctional Association, by which DOCCS is accredited, "lists the BOP Clinical Guideline ... as its clinical guideline standard." (*Id.* ¶ 113.) The New York State Department of Health "has only two main concerns regarding Neurontin/Gabapentin: it recommended avoiding prescriptions in doses higher than 3600 mg per day because there is no evidence of increase in therapeutic dose, and it recommended avoidance of use of Neurontin by a patient benefiting from concurrent opioid treatment." (*Id.* ¶ 114.) The American Medical Association "also does not restrict the prescription of many of the medications on the MWAP list." (*Id.* ¶ 115.) In fact, "[t]he standard in the medical community is to use medications like Neurontin ... and other non-opioid MWAPS to treat chronic conditions to reduce the number of opioid prescriptions"; "[t]he standard in the medical community is not to restrict all effective treatment." (*Id.* ¶ 117.)

In February 2021, "as a direct result of class action litigation, DOCCS ... rescinded the MWAP Policy and promulgated a new policy[,] 1.24A," entitled "Prescribing for Chronic Pain." (*Id.* ¶ 285.) [5] "The new policy demanded 'Pain management

Briglin v. Hurley, Not Reported in Fed. Supp. (2024)

2024 WL 3828234

medication should only be discontinued after a provider has met with the patient, discussed the issues regarding the use of the medication, analyzed the patient's situation, and subsequently determined that it is in the best interest of the patient for the medication to be discontinued.[']" (*Id.* ¶ 286.)

5    Plaintiff appears to be referring to class-action litigation in the Southern District of New York challenging the MWAP policy. *See Allen v. Koenigsmann*, No. 19-cv-8173 (S.D.N.Y.).

### B. Plaintiff's Medical Issues

Plaintiff "suffered from a number of chronic injuries and related pain and neuropathy," "was deemed disabled by the NY Workers' Compensation Bureau due to his injuries[,] and was effectively treated until 2019 when he drafted into DOCCS and his effective medications, Neurontin and Flexeril, were summarily discontinued without medical justification." (*Id.* ¶ 5.)

**\*3** Between July 2013 and July 2018, Plaintiff experienced a multitude of medical issues, including, among others, chronic headaches, dizziness, and blurry vision; bilateral hip pain and hip spurs; degenerative disc disease; nerve damage; and multiple hernias. (*See generally id.* ¶¶ 313–31.) On July 28, 2016, a "pain management doctor" diagnosed Plaintiff with "1. Spinal stenosis in the lumbar region. 2. Sacroiliitis. 3. Neuralgia and neuritis. 4. Chronic pain. 5. Chronic pain syndrome." (*Id.* ¶ 325.) Plaintiff's pain management doctor "further noted ... a diagnosis of pudendal nerve entrapment." (*Id.*) In January 2017, an "independent medical examiner" for a worker's compensation claim assessed Plaintiff as having "1. Chronic lumbar strain with left radiculopathy. 2. Aggravation of lumbar disc disease. 3. Two left groin hernias, on[e] being a sports hernia. 4. Inguinal hernia on right side. 5. Umbilical hernia. 6. Chronic cervical strain. 7. Aggravation of cervical disc disease. 8. Left shoulder strain." (*Id.* ¶ 330–31.) As of December 19, 2016, Plaintiff's "doctors still assessed that he was unable to work due to his injuries," and as of January 23, 2017, Plaintiff "could not put on his socks, could not shovel snow nor do housework, could only drive for short distances, and he spent most of his time in bed." (*Id.* ¶¶ 329–30.)

During this period, Plaintiff experienced chronic pain and was variously treated with Elavil (also known as amitriptyline), which was later discontinued due to adverse side effect; verapamil; ibuprofen; Topamax; Motrin; propranolol; Lyrica; Prilosec; Oxycodone; epidural steroid injections; a "TENS unit"; physiotherapy; groin surgery; and chiropractic. (*Id.* ¶¶ 313–18, 321–22, 325–26, 330–34.) Both during a stint in the custody of DOCCS from July 2013 to April 2015 and out of DOCCS' custody, medical providers prescribed Plaintiff Gabapentin. (*Id.* ¶¶ 315–16, 324, 326, 334.) Gabapentin "was helpful with [Plaintiff's] headaches" and the "gabapentin prescription was slowly increased by [Plaintiff's] medical providers," but Plaintiff complained of nausea and diarrhea caused by the Gabapentin and twice discontinued—but resumed—use of Gabapentin due to those side effects. (*Id.* ¶¶ 315–17, 334.)

On March 12, 2019, Plaintiff was incarcerated in the Steuben County Jail. (*Id.* ¶ 335.) His medication and treatment order provided to him at the Steuben County Jail included "the continuation of his gabapentin 600mg T.I.D.," and Plaintiff "was also noted to need a wheelchair and back brace for mobility." (*Id.*) The Steuben County Jail intake listed diagnoses of neuropathic legs, low back pain, mid back pain, and neck pain" and "additionally noted his pain management prescription of oxycodone 10mg and Lyrica 200 mg." (*Id.*) "The records indicate that the county jail changed Lyrica to gabapentin," and on April 18, 2019, "Steuben County Jail medical staff changed the time of his gabapentin administration to 8am, 1pm, and 5pm." (*Id.* ¶ 336.) Plaintiff's dosage of 600 mg remained the same. (*Id.*)

On April 26, 2019, Plaintiff "was admitted to Downstate Correctional Facility infirmary" in DOCCS custody. (*Id.* ¶ 337.) "When a patient is first 'drafted in' to DOCCS he/she generally resides at a reception facility until staff conducts a medical assessment and a department called 'Movement and Classification' determines the best housing for the patient." (*Id.* ¶ 69.) The medical staff at a reception facility maintain a patient on all the medications and prescriptions they were taking before being "drafted in" to ensure continuity of care. (*Id.* ¶ 70.) "The medical staff at the reception facility conduct a thorough individualized assessment of the patient's health issues for use by practitioners in receiving facilities, and their findings related to major disease or mobility issues are entered into the patient's Medical Problem List." (*Id.* ¶ 71.) Upon transfer to a facility for housing, "a nurse is supposed to conduct an 'assessment[ ]' of the patient," and if a "prisoner needs medications prescribed, a medical provider

2024 WL 3828234

is given the medication list to review for ordering." (*Id.* ¶ 72.) The doctor at Downstate "maintained [Plaintiff's] medication orders for gabapentin 600 mg and his muscle relaxant medication (cyclobenzaprine)." (*Id.* ¶ 337.)

**\*4** On May 3, 2019, Plaintiff "was transferred to Franklin Correctional Facility and admitted to the infirmary." (*Id.* ¶ 338.) Plaintiff's "medication orders show all his medications from Downstate except his Neurontin and Cyclobenzaprine[,] which were both noted 'DC M.' " (*Id.*) Defendant Mandalaywala had not seen Plaintiff before she discontinued his medications. (*Id.*) "She noted 'MD f/u 5/6/19.' " (*Id.*)

"A note on May 8, 2019[,] from a nurse to the doctor stated, 'Came in to facility on Neurontin 600mg ... was told would be tapered off MD Review. Do you want tapered Neurontin 600mg [once per day]?[']" (*Id.* ¶ 339.) Defendant Cahill "wrote a tapering schedule, but no medical justification for the discontinuation of the Neurontin." (*Id.*) Defendant Cahill "did not see [Plaintiff] nor examine him." (*Id.*) Plaintiff "was denied permission to use a wheelchair and discharged from infirmary with a cane and back brace," and Plaintiff's "Neurontin prescription and cyclobenzaprine prescription were immediately discontinued." (*Id.* ¶ 340.) "Within two weeks, [Plaintiff] was not receiving any Neurontin, and no pain management assessment or referral was noted to address his pain management needs." (*Id.* ¶ 341.) Plaintiff's pain was "intense and chronic." (*Id.*)

On May 23, 2019, Plaintiff asked medical staff when he would see a doctor, and on May 28, 2019, Plaintiff was seen by Defendant Cahill, "who noted that [Plaintiff] complained of increasing neuropathic pain and scheduled him for an EMG." (*Id.* ¶ 342.) Defendant Cahill did not represcribe Plaintiff's "effective Neurontin prescription." (*Id.*) On May 29, 2019, Defendant Cahill referred Plaintiff for a CT on his pelvis to evaluate an impingement on the formal nerve, and Plaintiff "continued to report neuropathic pain and discomfort." (*Id.* ¶ 343.)

Defendant Cahill

> testified under oath that "Dinello ... felt that, especially Gabapentin, ... that there was no indication for the use of Gabapentin ... so anybody coming in, frequently we would get drafts who would come in and were on Gabapentin ... when the MWAP form came out, I had to submit that to Dr. Dinello and generally he would put people on a tapering program ... and it had to be discontinued. So eventually, when I found that we were not going to be doing it, you know, we were not going to have it approved, I would just start ... my own tapering ... [.]"

(*Id.* ¶ 344.) Defendant Cahill testified that Dinello "was adamant in his directives about these medications." (*Id.* ¶ 345.) "Because [Defendant] Cahill knew the medication would not be approved by Dinello, he did not even bother trying to get it for his patients —even when medically justified." (*Id.*)

On June 3, 2019, Plaintiff was transferred to Groveland Correctional Facility. (*Id.* ¶ 346.) Plaintiff's "transfer records state he was prescribed Elavil for his pain management, but he was experiencing adverse effects." (*Id.*) On June 14, 2019, Plaintiff's "previously filed grievance for the discontinuation of his pain medication was denied by the superintendent of Franklin Correctional Facility specifically citing the MWAP policy and the fact that the RMD, David Dinello, was responsible 'to assure that the patient's need for a medication with abuse potential is well documented, justified ... [.]' " (*Id.* ¶ 347.)

On June 21, 2019, Plaintiff "complained to medical staff of back and groin pain and that he wanted a medical appointment," and Plaintiff's Elavil prescription "was noted as being ordered." (*Id.* ¶ 348.) On June 25, 2019, Plaintiff "submitted another grievance that his injuries were getting worse and he was not receiving proper medical attention." (*Id.* ¶ 349.) On July 10, 2019, Plaintiff "wrote to the medical review board requesting that they review and intervene on his behalf." (*Id.* ¶ 350.)

**\*5** "Meanwhile, [Plaintiff] was transferred back to Franklin but nothing was prescribed to address his chronic pain and neuropathy." (*Id.*) On July 17, 2019, Plaintiff "complained to sick call of 'burning pain' and severe leg and lower back pain and requested his Elavil dose be increased because his Flexeril and Neurontin were discontinued in May." (*Id.* ¶ 351.) On July 29, 2019, in response to Plaintiff's letter to the medical review commission, the DOCCS Chief Medical Officer ("CMO") stated that "the medical department was aware of his concerns and that an EMG was scheduled." (*Id.* ¶ 352.) "Despite the fact that

2024 WL 3828234

[the CMO] knew of the MWAP policy and its profound negative impact on patients—including on [Plaintiff]—he did nothing to help." (*Id.*)

On August 3, 3019 Plaintiff "wrote directly to [the CMO] about his complaints in medical treatment including seeing only one doctor since arriving in DOCCS custody, having all his specialty appointments cancelled, being taken off Neurontin for his nerve pain, and being denied use of a wheelchair," and Plaintiff "requested that [the CMO] intervene." (*Id.* ¶ 353.) The CMO "testified under oath that he reviewed all letters sent to him and would look into patient's complaints," but "[d]espite his investigation, [the CMO] did nothing to help [Plaintiff]." (*Id.* ¶ 354.)

On August 8, 2019, Plaintiff transferred back to Groveland for court appearances. (*Id.* ¶ 355.) On August 23, 2019, Plaintiff "complained to medical staff at Groveland of his left leg pain" and "requested to see mental health because he was not sleeping well and had anxiety about not getting help with his pain." (*Id.* ¶ 356.) On September 3, 2019, the Regional Health Services Administrator responded to Plaintiff's letter; "[s]he cut and pasted the exact same response that Central Office had sent in response to hundreds of letters alerting Central Office that effective medications were being discontinued without medical justification." (*Id.* ¶ 357.) "Specific to [Plaintiff], the response stated he had electrocardiogram on July 31, 2019 and that an EMG had been scheduled," and the letter indicated that Plaintiff "should bring any concerns to his provider." (*Id.* ¶ 358.) The EMG still did not take place. (*Id.*)

On August 23, 2019, Plaintiff "saw medical at Groveland[,] who noted his nerve issues, pain, that he wanted to see a doctor, and that the EMG was ordered." (*Id.* ¶ 359.) "Still nothing was done." (*Id.*)

On September 9, 2019, Plaintiff "wrote to the superintendent of Groveland CF asking him to personally review his medical treatment" and "inform[ing] the superintendent that the judge ordered him to remain at Groveland through his sentencing and that he is being told by Groveland medical staff that they cannot treat him because his home facility is Franklin CF." (*Id.* ¶ 360.) Plaintiff "reported that he had fallen twice and needed medical attention." (*Id.*)

On October 1, 2019, Plaintiff's "long-awaited EMG was canceled through no fault of his own." (*Id.* ¶ 361.) On October 3, 2019, Plaintiff "complained to sick call about his pain and neuropathy and requested an increase in Elavil, which was denied." (*Id.* ¶ 362.) Defendant Hurley "was told that [Plaintiff] needed medication for his neuropathy but responded only 'Elavil doses are ordered as intended.' " (*Id.* ¶ 362.) Defendant Hurley "did not bother to see [Plaintiff]." (*Id.*)

On October 7, 2019, Defendant Hurley "put in the referral for an EMG [and] again noted, 'having neuropathy of left leg and numbness of both feet .. [.] MVA 2015 Lower back pelvic injury has Hx of L4 L5 ... [.]' " (*Id.* ¶ 363.)

On October 21, 2019, in response to Plaintiff's letter to the DOCCS CMO, Plaintiff "received a letter from [the] Regional Health Services Administrator ... that stated [Plaintiff] has an appointment with his provider on September 24, 2019[,] and his EMG procedure has been scheduled to occur soon." (*Id.* ¶ 364.) On November 3, 2019, Plaintiff "sent a return correspondence ... that he still had not seen a doctor and had not been sent for EMG; instead he has been taken off his medication that had been prescribed to treat his nerve pain." (*id.* ¶ 365.)

**\*6** By November 12, 2019, Plaintiff was back in Franklin. (*Id.* ¶ 366.) Plaintiff "was seen by [Defendant] Cahill[,] who noted that he presented with chronic pain syndrome with neuropathy to both upper and lower extremities." (*Id.*) Defendant Cahill "noted that [Plaintiff] needed pain control, an MRI and that an EMG should be ordered," but "[w]hen [Defendant] Cahill ordered the MRI, Dinello denied it." (*Id.* ¶ 367.)

On December 31, 2019, Plaintiff "finally was approved for an EMG & NCV study for his neuropathy," and the test "confirmed 'chronic radiculopathy involving the L>R L4, L5 roots.' " (*Id.* ¶ 368.) Defendant Cahill "still did not prescribe [Plaintiff's] effective treatment, Neurontin." (*Id.*) On January 27, 2020, Plaintiff was seen for a physical therapy appointment. (*Id.* ¶ 369.)

Briglin v. Hurley, Not Reported in Fed. Supp. (2024)

2024 WL 3828234

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 41 of 160

In April 2020, Plaintiff's ibuprofen "was discontinued without him ever seeing his provider because a nurse believed that ibuprofen was aspirin for which he has an allergy." (*Id.* ¶ 370.) On April 26, 2020, Plaintiff wrote a letter to the Franklin nurse administrator "about the discontinuation of his ibuprofen, his worsening pain and that the Tylenol replacement does not help his pain." (*Id.* ¶ 371.) On May 12, 2020, Plaintiff "filed a grievance over his discontinuation of medication without seeing a doctor." (*Id.* ¶ 372.) On September 17, 2020, Plaintiff "attended another physical therapy appointment and complained of continued back pain." (*Id.* ¶ 372.)

On October 5, 2020, Plaintiff "started talking Cymbalta[,] which was ineffective in treating his chronic pain and neuropathy." (*Id.* ¶ 373.) On October 19, 2020, Defendant Mandalaywala "completed an MWAP and Chronic Pain Patient Reassessment form" and "noted that [Plaintiff's] Neurontin was stopped and switched to Elavil and his pain scale was 8 out of 10." (*Id.* ¶ 374.) Defendant Mandalaywala "did not identify the discontinuation of his Flexeril in her assessment," "did not identify which therapies were helpful or not helpful," "did not identify the discontinuation of [Plaintiff's] ibuprofen," and "did not identify [Plaintiff's] EMG findings of chronic radiculopathy in his L4 and L5 roots." (*Id.*) Defendant Mandalaywala "originally seemed to recommend [Plaintiff] be returned to Neurontin but crossed that recommendation out and suggested only that his Cymbalta be increased." (*Id.* ¶ 375.)

In April 2021, Plaintiff was released from DOCCS' custody. (*Id.* ¶ 376.) Plaintiff "immediately sought treatment and MRIs were performed." (*Id.*) "The MRIs showed T6-T7 right paracentral disc protrusion, degenerative changes at L4-L1, moderate to severe bilateral neural foraminal narrowing at the L4-L5[,] and severe bilateral neural foraminal narrowing at L5-S1." (*Id.*) Plaintiff's physician "immediately prescribed Neurontin and cyclobenzaprine for [Plaintiff's] pain management" and "recommended an updated MRI of his lumbar and thoracic spine for the placement of a spinal cord stimulator trial for his CRPS with Boston Scientific." (*Id.* ¶ 377.) Plaintiff "continues to be effectively treated on the outside, but only because he was released from DOCCS' custody." (*Id.* ¶ 378.)

Plaintiff alleges that he "was a victim of [a] grand plan" that involved certain DOCCS medical administrators determining "to remove certain medications from DOCCS[ ] facilities—not based on patients' needs or efficacy—but the perceived 'abuse potential' of the medication" and that "patients like [Plaintiff] [who] had the misfortunate to be housed in facilities within Dinello's [region] [had] their medications ... discontinued by providers—sometimes just at transfer, or for unconfirmed reports by security of diversion attempts, or because facilities did not 'give that here.[']" (*Id.* ¶¶ 380–81, 383.) Plaintiff alleges that "DOCCS' Central Office started marking each facility's ability to get their patients off the medications" and that "[d]iscontinuations were done without medical justification or individualized assessments." (*Id.* ¶ 382.) "Despite having his medical records for review, Defendant[s] ... continuously refused to represcribe [Plaintiff's] effective treatment due to these policies and customs." (*Id.* ¶ 384.) Plaintiff "repeatedly and consistently reported his pain and suffering to no avail," and Plaintiff "suffered severely due to Defendant['s] adherence to the[se] customs, policies and practices." (*Id.* ¶¶ 384–85.)

## III. LEGAL STANDARD

**\*7** To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.' " *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at \*2, 2017 U.S. Dist. LEXIS 155140 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 42 of 160

Briglin v. Hurley, Not Reported in Fed. Supp. (2024)

2024 WL 3828234

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself," *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006), "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court may also consider a document on which "the complaint 'relies heavily ...,' thereby rendering the document 'integral' to the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *DiFolco*, 622 F.3d at 111). But "[m]erely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (second alteration in original) (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)).

## IV. DISCUSSION

### A. Statute of Limitations

Defendants argue that Plaintiff's claim is time-barred and must therefore be dismissed. (Dkt. No. 33-1, at 12–16.) Plaintiff argues that he is entitled to (1) equitable tolling during the period in which Plaintiff was exhausting administrative remedies; (2) tolling pursuant to COVID-related executive orders; and (3) tolling under the continuing violation doctrine. (Dkt. No. 40, at 20–27.) Defendants argue (1) Plaintiff has not sufficiently pleaded facts demonstrating that he is entitled to equitable tolling arising from the administrative-exhaustion process; (2) even applying tolling pursuant to COVID-related executive orders, Plaintiff's claim is still untimely; and (3) Plaintiff has not alleged acts within the relevant statutory period that are traceable to policy of deliberate indifference that would render the continuing violation policy applicable. (Dkt. No. 41, at 4–9.)

"The statute of limitations for § 1983 actions arising in New York is three years." *Lucente v. County of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020); *see also Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) ("The statute of limitations for claims brought under Section 1983 is governed by state law, and [for an Eighth Amendment deliberate indifference claim] is the three-year period for personal injury actions under New York State law."). "A Section 1983 claim ordinarily 'accrues when the plaintiff knows or has reason to know of the harm.' " *Shomo*, 579 F.3d at 181 (quoting *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994)). "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *See Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)).

**\*8** Here, Plaintiff filed his complaint on August 17, 2023. (Dkt. No. 1.) Absent tolling, Plaintiff's claim must have accrued within the three-year period ending on the date on which Plaintiff filed his complaint. In other words, Plaintiff's claim must have accrued on or after August 17, 2020. Because, based on the face of the amended complaint, all of the alleged acts involving Defendants Hurley and Cahill and all but one of the alleged acts involving Defendant Mandalaywala occurred prior to that date, the Court will examine Plaintiff's arguments as to tolling of the statute-of-limitations period.

### 1. Continuing Violation Doctrine

Plaintiff argues that he is entitled to tolling under the continuing violation doctrine. (Dkt. No. 40, at 26–27.) The "continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date,' " *Shomo*, 579 F.3d at 181 (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)), which the Second Circuit has applied to Eighth Amendment deliberate indifference claims, *see Williams v. Annucci*, No. 20-cv-1417, 2021 WL 4775970, at \*3, 2021 U.S. Dist. LEXIS 196917 (N.D.N.Y. Oct. 13, 2021) (collecting cases). The continuing violation doctrine "applies to claims 'composed of a series of separate acts that collectively constitute one unlawful [ ] practice.' " *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (alteration in original) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004)). "To assert a continuing violation for statute of limitations purposes" in the context of an Eighth Amendment claim for deliberate indifference, "the plaintiff must 'allege both the existence of an ongoing policy of [deliberate indifference to his or her serious medical needs] and some non-time-barred acts taken in the furtherance of that policy.' " *Id.* at 182 (alteration in original) (quoting *Harris*, 186 F.3d

Briglin v. Hurley, Not Reported in Fed. Supp. (2024)

2024 WL 3828234

at 250). This is because "[w]hen the plaintiff brings a Section 1983 claim challenging a ... policy [of deliberate indifference], 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *See id.* at 181–82 (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)). The continuing violation doctrine does not, however, apply to "discrete unlawful acts, even if those discrete unlawful acts are part of 'serial violations.'" *See Lucente*, 980 F.3d at 309 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

In the context of an alleged continuing violation, if a plaintiff alleges "some [ ] act that did occur within the statute of limitations, so that his claim would not be time-barred," *Harris*, 186 F.3d at 250, and "[t]he complaint suggests a pattern" of deliberately indifferent treatment, *see Shomo*, 579 F.3d at 182, an Eighth Amendment claim for deliberate indifference can withstand a challenge for failure to state a claim. Where a plaintiff brings a claim against multiple defendants, the plaintiff must allege a non-time-barred act as to each defendant. *See id.* at 183 ("The continuing violation doctrine does not apply to the claim against [the individual defendant] because there is no indication that [the plaintiff] is able to allege acts involving [that defendant] that fall within the three-year statutory period."); *Lucente*, 980 F.3d at 310 (holding that Section 1983 claims could proceed against certain individual defendants "as long as each plaintiff alleged an unconstitutional act committed by each particular defendant that falls within the three-year statutory period"). Here, Plaintiff has not alleged any acts by Defendants Hurley or Cahill after August 17, 2020. While Plaintiff has alleged an act by Defendant Mandalaywala in October 2020, as discussed further below, Plaintiff has not plausibly alleged a claim for Eighth Amendment deliberate indifference against Defendant Mandalaywala. Accordingly, the Court need not consider whether the continuing violation doctrine renders such a claim timely.[6]

[6]   For the same reason, Court does not consider the applicability of tolling pursuant to COVID-related executive orders or during the period in which Plaintiff was exhausting administrative remedies with respect to Plaintiff's claim against Defendant Mandalaywala.

## 2. COVID-Related Tolling

**\*9**  Plaintiff also argues that he is entitled to tolling pursuant to COVID-related executive orders. (Dkt. No. 40, at 26.) On March 7, 2020, then-New York State Governor Andrew Cuomo issued Executive Order 202, declaring a disaster emergency for the State of New York due to the COVID-19 pandemic. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 8.202. On March 20, 2020, Governor Cuomo signed Executive Order 202.8, limiting court operations to "essential matters" and declaring that "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding as prescribed by the procedural laws of the state ... is hereby tolled from the date of this executive order until April 19, 2020." *Id.* § 8.202.8. Nine subsequent Executive Orders collectively extended the first order until November 3, 2020. *See id.* §§ 8.202.14, 8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.63, 8.202.67. Executive Order 202.72 provided that the tolling of time limits established by Executive Order 202.8 would no longer be in effect as of November 4, 2020. *id.* § 8.202.72, yielding a total tolling period of 228 days.

Because federal courts "borrow not only a state's limitations period but also its 'tolling rules,' ... unless applying the state's tolling rules 'would defeat the goals of the federal statute at issue,'" *Pearl*, 296 F.3d at 80, "Executive Order 202.8 applies to federal cases applying New York's statute of limitations, including ...§ 1983 claims," *Bell v. Saunders*, No. 20-cv-256, 2022 WL 2064872, at \*4–5, 2022 U.S. Dist. LEXIS 101994 (N.D.N.Y. June 8, 2022) (quoting *Rich v. State of New York*, No. 21-cv-3835, 2022 WL 992885, at \*8, 2022 U.S. Dist. LEXIS 60779 (S.D.N.Y. Mar. 31, 2022)) (collecting cases).

Here, the amended complaint contains allegations of acts by Defendants Hurley and Cahill that occurred immediately prior to and during the period covered by the COVID-related executive orders, (*see, e.g.,* Dkt. No. 17, ¶¶ 338, 342, 362, 374), and therefore, the statute-of-limitations period for Plaintiff's claim was tolled for 228 days. However, as Defendants point out, this tolling period alone is insufficient to render the alleged acts of Defendants Hurley and Cahill actionable. Plaintiff alleges acts by Defendant Hurley in October 2019, (*id.* ¶¶ 362–63), and Defendant Cahill in May, November, and December 2019, (*id.* ¶¶ 339,

Briglin v. Hurley, Not Reported in Fed. Supp. (2024)

2024 WL 3828234

342–45, 366–68). A claim based on these alleged acts would not be rendered timely by COVID-related tolling alone.[7] Thus, the Court must examine the remaining tolling argument put forth by Plaintiff with respect to Defendants Hurley and Cahill.

[7]    That is, these alleged acts fall outside the period of three years plus 228 days ending on the date on which Plaintiff filed his complaint.

### 3. Tolling During Administrative Exhaustion

Plaintiff argues that he is entitled to tolling during the period in which he was pursuing administrative remedies. (Dkt. No. 40, at 21–25.) Defendants argue that Plaintiff has not sufficiently alleged circumstances warranting tolling and that the Court may not consider documents attached to Plaintiff's opposition to Defendants' motion. (Dkt. No. 41, at 5–7.)

First, the Court addresses the grievance-related documents attached to Plaintiff's opposition to Defendants' motion to dismiss. (Dkt. No. 39-1.) Defendants are correct that consideration of a motion to dismiss under Rule 12(b)(6) is limited to the complaint itself and any document attached to, incorporated by reference into, or integral to the complaint. *See Faulkner*, 463 F.3d at 134; *DiFolco*, 622 F.3d at 111; *Nicosia*, 834 F.3d at 230. The documents at issue are not attached to or incorporated by reference into the amended complaint. And because the contents of the documents do not "appear to have been necessary to the 'short and plain statement of the claim showing that [Plaintiff] entitled to relief' " and Plaintiff does appear to have "rel[ied] on the terms and effect of [the] document[s] in drafting the complaint,' " *see Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 436 (S.D.N.Y. 2022) (third alteration in original) (first quoting *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir. 2008), and then quoting *Glob. Network Commc'ns, Inc.*, 458 F.3d at 156), the documents are not integral to the amended complaint. Thus, the Court will not consider these documents in deciding Defendants' motion.[8]

[8]    Under Rule 12(d), a court must convert a motion to dismiss under Rule 12(b)(6) to one for summary judgment under Rule 56 where "matters outside the pleadings are presented to and not excluded by the court" and where all parties are "given a reasonable opportunity to present all the material that is pertinent to the motion." The Court declines to do so here and instead excludes the extrinsic documents from consideration in deciding Defendants' motion to dismiss.

**\*10**  Next, the Court considers whether, based on the amended complaint, Plaintiff is entitled to tolling during the period in which he was pursuing administrative remedies. In *Gonzalez v. Hasty*, the Second Circuit held "that the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process [under the Prison Litigation Reform Act ('PLRA')]." 651 F.3d 318, 323–24 (2d Cir. 2011) (quoting *Brown v. Valoff*, 422 F.3d 926, 943 (9th Cir. 2005)).[9] The tolling period begins when a plaintiff first raises an administrative claim and ends when the plaintiff's administrative remedies are deemed exhausted. *Gonzalez*, 651 F.3d at 324 ("[T]he applicable three-year statute of limitations is tolled only during that exhaustion period and not during the period in between the accrual of those claims and when [the plaintiff] began the administrative remedy process."). That is, the applicable statute-of-limitations period is tolled during the time that an inmate is "actively exhausting [administrative] claims." *See id.*[10]

[9]    The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Proper exhaustion of administrative remedies is dependent on the rules and regulations of the prison in which the grievance is filed; thus, an inmate of a DOCCS facility must satisfy the requirements set forth by DOCCS regulations. *See Garcia v. Heath*, 74 F.4th 44, 46 (2d Cir. 2023). In brief, DOCCS regulations set out a three-step administrative process: First, the inmate must submit a grievance to the Inmate Grievance Resolution Committee. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a)(1). Second, the inmate must appeal a denial of that grievance to the correctional facility's superintendent. *See id.* § 701.5(c).

Briglin v. Hurley, Not Reported in Fed. Supp. (2024)

2024 WL 3828234

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 45 of 160

Third, the inmate must appeal a superintendent's denial to the Central Office Review Committee ("CORC"). *See id.* § 701.5(d).

10    Defendants' argument that Plaintiff failed to allege "extraordinary circumstances," (Dkt. No. 41, at 6–7), misses the mark. Under *Gonzalez*, Plaintiff need not demonstrate that extraordinary circumstances prevented him from timely filing his suit; rather, Plaintiff's prior status as an inmate under the custody of DOCCS and the attendant pre-filing exhaustion requirements imposed by the PLRA "prevented [him] from filing" and therefore entitle him to tolling of the statute-of-limitations period while he was actively exhausting administrative remedies. *See Gonzalez*, 651 F.3d at 322 (emphasis omitted) (quoting *Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004)).

Plaintiff alleges in the amended complaint that he filed at least three grievances related to alleged acts underlying this action. (Dkt. No. 17, ¶¶ 347, 349, 372.) Plaintiff also refers to one denial of a grievance by the superintendent of Franklin, (*id.* ¶ 347), from which the Court can infer that Plaintiff appealed at least one grievance, *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(c). Taking these allegations as true and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has plausibly alleged that he was "actively exhausting [administrative] claims," *Gonzalez*, 651 F.3d at 324, for at least some portion of his incarceration with DOCCS from 2019 to 2021. However, it is not clear from the face of the amended complaint precisely how long Plaintiff was undertaking the required administrative-exhaustion process—that is, it is not clear on the face of the amended complaint when his claims were exhausted. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d) (describing appeal to the central office review committee as the third step in grievance process).

" 'Dismissal under [Rule] 12(b)(6) is appropriate when a defendant raises' ... timeliness[ ] 'as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.' " *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008)). Because it is not clear on the face of the amended complaint how long Plaintiff was actively exhausting his administrative claims—and, consequently, how long the applicable statute-of-limitations period should be tolled under *Gonzalez*—the Court cannot conclude that Plaintiff's claim is barred as a matter of law. *See Williams v. Annucci*, No. 20-cv-1417, 2021 WL 4775970, at *4, 2021 U.S. Dist. LEXIS 196917 (N.D.N.Y. Oct. 13, 2021) ("The parties have not addressed how long it took Plaintiff to complete the exhaustion process ... and for how long the statute of limitations applicable to his claims should be tolled. Accordingly, the Court cannot determine from the face of the [operative complaint] that any of Plaintiff's claims are 'barred as a matter of law.' " (citation omitted)); *Hirsch v. Rehs Galleries, Inc.*, No. 18-cv-11864, 2020 WL 917213, at *5, 2020 U.S. Dist. LEXIS 32926 (S.D.N.Y. Feb. 26, 2020) ("[I]t is not 'clear from the face of the complaint ... that [P]laintiff's claims are barred as a matter of law,' and there is 'some doubt as to whether dismissal is warranted,' .... Therefore, because Plaintiff's Amended Complaint cannot be dismissed on statute of limitations grounds at this juncture, Defendant's motion to dismiss is DENIED." (second and third alterations in original) (citations omitted)). Accordingly, Defendants' motion to dismiss Plaintiff's claims as to Defendants Hurley and Cahill as time-barred is denied. [11]

11    This denial is without prejudice to renew the argument as to untimeliness under *Gonzalez* after completion of discovery.

### B. Eighth Amendment Deliberate Medical Indifference

**\*11** Defendants argue that Plaintiff has not plausibly alleged (1) the personal involvement of Defendant Hurley in the alleged deprivation; or (2) that Defendants Hurley, Cahill, or Mandalaywala knew of and disregarded an excessive risk to Plaintiff's health. (Dkt. No. 33-1, at 18–25.) Plaintiff argues that he has alleged the personal involvement of Defendant Hurley and that "Defendants reflexively followed DOCCS' policy[,] ignored the individual medical needs of Plaintiff," and "deliberately and blindly followed DOCCS' policy and replaced Plaintiff's effective treatment with easier and knowingly less efficacious medication." (Dkt. No. 40, at 15–20.)

The Eighth Amendment, applicable to the states through the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), prohibits the infliction of cruel and unusual punishment. *See* U.S. Const.

Briglin v. Hurley, Not Reported in Fed. Supp. (2024)

2024 WL 3828234

amend. VIII. This prohibition establishes "the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (alteration in original) (quoting *Estelle*, 429 U.S. at 104, 97 S.Ct. 285). "The standard of deliberate indifference includes both subjective and objective components." *Id.* "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries": (1) "whether the prisoner was actually deprived of adequate medical care," and (2) "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006).

The first inquiry under the objective component requires examining "whether the prisoner was actually deprived of adequate medical care." *Id.* at 279. Prison officials who act "reasonably" in response to an inmate's health risk will not be found liable because the official's duty is only to provide "reasonable care." *Id.* at 279–80. The second inquiry under the objective component requires examining whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. If the "unreasonable care" consists of a failure to provide treatment, then the court must examine whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.' " *Id.* (alteration in original) (quoting *Chance*, 143 F.3d at 702). "In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower," *id.*, and it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant," *Smith*, 316 F.3d at 186 (citing *Chance*, 143 F.3d at 702–03).

As to the subjective component of a deliberate indifference claim, a plaintiff must show that the defendant "act[ed] with a sufficiently culpable state of mind." *Chance*, 143 F.3d at 702 (quoting *Hathaway*, 37 F.3d at 66). The defendant's "state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. That is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *See Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105–06, 97 S.Ct. 285. Nor does the "mere disagreement over the proper treatment ... create a constitutional claim[;] [s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

### 1. Defendant Hurley

**\*12** Defendants argue that Plaintiff has not alleged the personal involvement of Defendant Hurley in the alleged deprivation and that Plaintiff has not alleged that Defendant Hurley "knew of and disregarded an excessive risk by failing to increase [Plaintiff's] Elavil." (Dkt. No. 33-1, at 18–21.) Plaintiff argues that he has plausibly alleged a violation of his rights by Defendant Hurley. (Dkt. No. 40, at 19–20.)

Plaintiff's Eighth Amendment deliberate indifference claim is premised on Defendants' alleged adherence to DOCCS policies and customs related to the MWAP policy and refusal to represcribe certain medications on the MWAP list without medical justification or individualized assessments. (*See* Dkt. No. 17, ¶¶ 380–85.) But Plaintiff's allegations involving Defendant Hurley are limited to two paragraphs. Plaintiff alleges that on October 3, 2018, he "requested an increase in Elavil, which was denied," and "[Defendant] Hurley was told that [Plaintiff] needed medication for his neuropathy but responded only 'Elavil doses are ordered as intended' " and "did not bother to see" Plaintiff. (*Id.* ¶ 362). On October 7, 2019, Defendant Hurley "put in the referral for an EMG again noted, 'having neuropathy of left leg and numbness of both feet .. [.] MVA 2015 Lower back pelvic

Briglin v. Hurley, Not Reported in Fed. Supp. (2024)

2024 WL 3828234

injury has Hx of L4 L5 ... [.]" (*Id.* ¶ 363.) Plaintiff does not allege how Defendant Hurley's refusal to increase Plaintiff's Elavil dose is related to any policy or custom at issue: Plaintiff does not allege that Elavil, unlike Neurontin and Cyclobenzaprine, was on the MWAP list or was otherwise affected by the MWAP policy or related customs. Thus, Plaintiff has not plausibly alleged that Defendant Hurley's denial of Plaintiff's request for an increase in Elavil was based on the MWAP policy or related customs at the exclusion of medical judgment.[12] And, in any event, these limited allegations concerning Defendant Hurley are insufficient to plausibly allege that he knew of and disregarded an excessive risk to Plaintiff's health or safety. Accordingly, Defendants' motion to dismiss is granted with respect to Defendant Hurley.

[12]    Nor does Plaintiff allege that Defendant Hurley was aware, either through medical records or directly from Plaintiff, of prior use of Neurontin and Cyclobenzaprine in treating Plaintiff's conditions; rather, Plaintiff alleges that his "transfer records [at Groveland] state that he was prescribed Elavil for his pain management, but he was experiencing adverse effects." (*Id.* ¶ 346.)

### 2. Defendant Cahill

Defendants next argue that Plaintiff has failed to plausibly allege that Defendant Cahill knew of and disregarded an excessive risk to Plaintiff's health by refusing to represcribe Neurontin. (Dkt. No. 33-1, at 21–23.) Plaintiff argues that he has plausibly alleged that "Defendants knew the best course of treatment was to continue to prescribe Plaintiff's effective treatment, but, instead, they deliberately and blindly followed DOCCS' policy and replaced Plaintiff's effective treatment with easier and knowingly less efficacious medication" and that this treatment, which was not based on medical judgment, establishes "a *prima facie* deliberate indifference claim." (Dkt. No. 40, at 16–19.)

Plaintiff has alleged that he suffers from numerous serious medical issues that, during the relevant time, resulted in Plaintiff experiencing, inter alia, chronic neuropathic pain. (*See, e.g.*, Dkt. No. 17, ¶¶ 5, 335, 341–43, 362–63, 366, 373.) Defendants do not argue that Plaintiff has failed to plead that this was, in objective terms, sufficiently serious. Rather, Defendants' motion with respect to Defendant Cahill is premised on the contention that Plaintiff has not plausibly alleged that Defendant Cahill knew of and disregarded an excessive risk of substantial harm to Plaintiff because Plaintiff has not alleged that Defendant Cahill "was aware of any reliable information to suggest that Neurontin had previously been effective for Plaintiff" and because Defendant Cahill "ordered different tests for Plaintiff." (Dkt. No. 33-1, at 22.)

**\*13**  Plaintiff alleges that his prescriptions for Neurontin and Cyclobenzaprine were maintained when he entered DOCCS custody at Downstate on April 26, 2019, and that when he was transferred to Franklin on May 3, 2019, his "medication orders" included notations of his prior Neurontin and Cyclobenzaprine prescriptions. (Dkt. No. 17, ¶¶ 337, 338.) Plaintiff alleges that five days later, Defendant Cahill "wrote a tapering schedule" to discontinue Plaintiff's Neurontin prescription with "no medical justification for the discontinuance" and without seeing or examining Plaintiff. (*Id.* ¶ 339.) Thus, Plaintiff has plausibly alleged that Defendant Cahill was aware of Plaintiff's prior prescriptions for Neurontin and Cyclobenzaprine. Furthermore, Plaintiff has alleged that Defendant Cahill was aware of Plaintiff's uncontrolled and worsening chronic neuropathic pain as early as May 23, 2019, and as late as December 31, 2019, (*id.* ¶¶ 342–43, 366, 368), but that Defendant Cahill did not adequately address it, (*id.* ¶¶ 342, 366, 368). Plaintiff alleges that discontinuations of MWAP medications in general "were done without medical justification or individualized assessments." (*Id.* ¶ 382.) And Plaintiff alleges that Defendant Cahill wrote the tapering schedule for discontinuing Neurontin with "no medical justification" and without seeing or examining Plaintiff. (*Id.* ¶ 339.) Plaintiff did not receive any "pain management assessment or referral to address his pain management needs." (*Id.* ¶ 341.) Defendant Cahill testified that he did not even try to get MWAP medications like Neurontin for his patients, even when it was medically justified, because he knew the medication would not be approved. (*Id.* ¶ 345.) Defendant Cahill did not represcribe Neurontin even after noting in November 2019 that Plaintiff had "chronic pain syndrome with neuropathy to bother upper and lower extremities," that Plaintiff "needed pain control," and after a December 31, 2019 neuropathy study confirmed "chronic radiculopathy." (*Id.* ¶ 345.)

Plaintiff has also alleged that he was a "victim of [a] grand plan" under which medications were removed from DOCCS facilities based on policies and customs related to the perceived abuse potential of the medicines, not based on patients' needs or efficacy; that discontinuances were done "without medical justifications or individualized assessments"; that doctors, including Defendant Cahill, continued to refuse to represcribe Plaintiff's effective treatment "due to these policies and customs"; that Plaintiff "suffered severely due to Defendants' adherence to the[se] customs, policies and practices," which were at odds with standards accepted in the medical community. (*Id.* ¶¶ 106–17, 380–85); *see Brock v. Wright*, 315 F.3d 158, 167 (2d Cir. 2003) ("[T]he policy [precluding use of certain medications], the jury may conclude, represents a conscious choice by DOCS to prescribe " 'easier and less efficacious' treatment plan[s]' .... Such a choice violates the Eighth Amendment." (third alteration in original) (citations omitted)).

Drawing all reasonable inferences in Plaintiff's favor, Plaintiff has plausibly alleged that Defendant Cahill knew of Plaintiff's sufficiently serious condition—that is, his worsening chronic neuropathic pain, *see Jahad v. Holder*, No. 19-cv-4066, 2023 WL 8355919, at *6, 2023 U.S. Dist. LEXIS 215553 (S.D.N.Y. Dec. 1, 2023) (collecting cases and holding that prolonged chronic pain constitutes a "sufficiently serious deprivation")—and disregarded a risk to Plaintiff's health by failing to exercise medical judgment or conduct an individualized assessment to address it. Thus, at this early stage of the case, the Court declines to rule as a matter of law that Plaintiff has failed to state an Eighth Amendment deliberate indifference claim against Defendant Cahill. *See Chance*, 143 F.3d at 703; *see also Tavares v. N.Y.C. Health & Hosps. Corp.*, No. 13-cv-3148, 2015 WL 158863, at *6, 2015 U.S. Dist. LEXIS 3815 (S.D.N.Y. Jan. 13, 2015) ("The allegation that a physician chose to give less efficacious treatment for reasons not deriving from medical judgment can support a deliberate indifference claim."); *Stevens v. Goord*, 535 F. Supp. 2d 373, 388 (S.D.N.Y. 2008) (stating that "judgments that have no sound medical basis, contravene professional norms, and appear designed simply to justify an easier course of treatment ... may provide the basis of a claim" for deliberate indifference under the Eighth Amendment).[13] The fact that Defendant Cahill ordered diagnostic tests for Plaintiff, including EMGs and an MRI, (Dkt. No. 17, ¶¶ 342, 367), does not belie this conclusion because "even if an inmate receives 'extensive' medical care, a claim is stated if ... the gravamen of his problem is not addressed," *Sulton v. Wright*, 265 F. Supp. 2d 292, 298 (S.D.N.Y. 2003), *abrogated on other grounds by Richardson v. Goord*, 347 F.3d 431 (2d Cir. 2003).

[13]   Defendants' argument that Plaintiff's allegations as to Neurontin causing Plaintiff negative side effects demonstrate Defendant Cahill's "conscious *regard* to Plaintiff's health and safety," (Dkt. No. 33-1, at 22–23; *see also* Dkt. No. 41, at 11), is unavailing. While Plaintiff does allege that he experienced negative side effects from Neurontin in 2014 and 2018, (Dkt. No. 17, ¶¶ 316–17, 334), prior to any interaction with any Defendant, there is no allegation that Defendant Cahill was aware of this history of side effects and Plaintiff has alleged that Defendant Cahill's decisions were based on DOCCS policies and customs.

**\*14**   Defendants are correct that "mere disagreement over the proper treatment does not create a constitutional claim." *See Chance*, 143 F.3d at 703. But this is so where there exists such disagreement *and* the provided medical treatment, based on medical judgment, is adequate. *See id.* ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Cases on which Defendants rely demonstrate this requirement. *See, e.g., McLean v. Ferguson*, No. 20-cv-1115, 2021 WL 6750544, at *5, 2021 U.S. Dist. LEXIS 214589 (N.D.N.Y. Nov. 5, 2021) ("Plaintiff's allegations amount to a 'mere disagreement over the proper treatment' of his pain ... [because] Plaintiff appears to rest his claim on the basis that, because he was previously prescribed meloxicam, he was entitled to receive meloxicam moving forward. However, the record establishes [the defendant] *exercised her medical judgment* to determine Plaintiff did not require prescription medication ...." (emphasis added) (citation omitted)), *report and recommendation adopted*, 2022 WL 252162, 2022 U.S. Dist. LEXIS 15250 (N.D.N.Y. Jan. 27, 2022); *Banks v. Annucci*, 48 F. Supp. 3d 394, 410 (N.D.N.Y. 2014) ("Although plaintiff claims that defendant ... performed a 'half-hearted' examination of plaintiff[ ] ..., he nonetheless [provided plaintiff with adequate medical treatment]."); *Rush v. Fischer*, 923 F. Supp. 2d 545, 555 (S.D.N.Y. 2013) ("[T]he plaintiff has provided no factual allegations that the [medical] decision ... deviated from *reasonable medical practice* ...." (emphasis added)), *aff'd sub nom. Rush v. Canfield*, 649 F. App'x 70 (2d Cir. 2016) (summary order).

2024 WL 3828234

Here, Plaintiff alleges that MWAP medications were removed from DOCCS facilities based on policies and customs related to the perceived abuse potential of the medicines, not based on patients' needs or efficacy; that discontinuances were done "without medical justifications or individualized assessments"; that Defendant Cahill continued to refuse to represcribe Plaintiff's effective treatment "due to these policies and customs"; and that Plaintiff "suffered severely due to Defendants' adherence to the[se] customs, policies and practices," which were at odds with standards accepted in the medical community. (Dkt. No. 17, ¶¶ 106–17, 380–85). Thus, Plaintiff has plausibly alleged inadequate medical treatment rendered by Defendant Cahill that was not based on individualized assessment or on medical judgment, which renders Defendants' reliance on cases involving "mere disagreement" or other dissatisfaction with adequate treatment inapt. [14]

[14]    Plaintiff's citation of *Johnson v. Wright*, 412 F.3d 398 (2d Cir. 2005), is of limited utility. In *Johnson*, the Second Circuit relied predominantly on the fact that "every single one of [the] plaintiff's treating physicians, including prison physicians, indicated to the defendants that prescribing [a certain medication] to the plaintiff was the medically appropriate course of treatment" but the defendants "ignore[d] the unanimous advice of [the plaintiff's] treating physicians." *See* 412 F.3d at 404; *cf. Allen v. Koenigsmann*, No. 19-cv-8173, 2022 WL 1597424, at *6–7, 2022 U.S. Dist. LEXIS 90413 (S.D.N.Y. May 19, 2022) ("Plaintiffs have adequately pleaded facts to permit the [c]ourt to infer that [the defendants'] dismissal of specialty doctors' recommendations of MWAP medications without explanation diverged from reasonable medical practices because of the MWAP policy and not [the defendants'] medical judgment.... Thus, [the defendants'] motion to dismiss for failure to state a claim is denied."). Here, there are no allegations that any Defendant ignored the advice of any other medical professional. Nevertheless, accepting all facts in the amended complaint as true and drawing all reasonable inferences in Plaintiff's favor, the amended complaint plausibly alleges that Defendant Cahill was aware of Plaintiff's prior treatments and was therefore "put on notice [of what] the medically appropriate decision could be," and Plaintiff's allegations of Defendant Cahill's refusal to represcribe Plaintiff's effective treatment for debilitating pain due to DOCCS policies and customs that was not based on patients' needs or efficacy plausibly state an Eighth Amendment deliberate indifference claim, *see Johnson*, 412 F.3d at 406, at the motion to dismiss stage.

**\*15**  In reply, Defendants argue that even if any Defendants acted in "reflexive" compliance with DOCCS policies and customs, that is still not enough to establish Plaintiff's claim because "[f]ollowing a mandatory prison policy, without more, does not amount to a 'conscious disregard of a substantial risk of harm.' " (Dkt. No. 31, at 6 (citation omitted).) But Defendants point to no case to suggest that compliance with policies or customs *at the exclusion* of individualized assessments or exercises of medical judgment is insufficient to state an Eighth Amendment deliberate indifference claim; indeed, such compliance does support an Eighth Amendment deliberate indifference claim. *See Brock*, 315 F.3d at 167; *Stevens*, 535 F. Supp. 2d at 388; *Tavares*, 2015 WL 158863, at *6, 2015 U.S. Dist. LEXIS 3815. And here, Plaintiff expressly alleges that Defendant Cahill refused to represcribe certain treatments for Plaintiff's debilitating pain due to DOCCS policies and customs that were not based on patients' needs or efficacy or on medical judgment. (Dkt. No. 17, ¶¶ 380–82.) [15]

[15]    Defendants misconstrue Plaintiff's argument related to Defendants' medical judgment. Plaintiff does not argue, as Defendants suggest, that the Court should deny Defendants' motion because there exist questions of fact as to whether Defendants exercised *proper* medical judgment. (Dkt. No. 41, at 9–10.) Rather, Plaintiff argues that he has pleaded a prima facie case of deliberate indifference against Defendants because he has alleged that Defendants' inadequate treatment was "policy driven—and not medical judgment." (Dkt. No. 40, at 16–17); *see Brock*, 315 F.3d at 167; *Stevens*, 535 F. Supp. 2d at 388; *Tavares*, 2015 WL 158863, at *6, 2015 U.S. Dist. LEXIS 3815.

Therefore, Defendants' motion to dismiss is denied with respect to Defendant Cahill.

### 3. Defendant Mandalaywala

Defendants finally argue that Plaintiff has failed to plausibly allege that Defendant Mandalaywala knew of and disregarded an excessive risk to Plaintiff's health by discontinuing Plaintiff's prescription for Neurontin and Cyclobenzaprine. (Dkt. No. 33-1,

at 23–25.) Similarly to their argument with respect to Defendant Cahill, Defendants argue that Plaintiff has not plausibly alleged that Defendant Mandalaywala knew of and disregarded an excessive risk of substantial harm to Plaintiff because Plaintiff has not alleged that Defendant Mandalaywala "was in possession of any information in 2019 ... sufficient to demonstrate that she was specifically aware of, but disregarded, any substantial risk to Plaintiffs health by discontinuing these medications." (Dkt. No. 33-1, at 23.) Defendants also argue that Plaintiff's allegations as to Defendant Mandalaywala "amount to nothing more than a 'mere disagreement over the proper treatment' of Plaintiff's pain." (*Id.* at 23–24 (citations omitted).)

The amended complaint only contains two allegations concerning Defendant Mandalaywala. Plaintiff alleges that Defendant Mandalaywala "had not seen [Plaintiff] before she discontinued his medications" for Neurontin and Cyclobenzaprine on May 3, 2019, when Plaintiff entered Franklin. (Dkt. No. 17, ¶ 338.) Plaintiff also alleges that on October 19, 2020, Defendant Mandalaywala "completed an MWAP and Chronic Pain Patient Reassessment form" on which "she noted that [Plaintiff's] Neurontin was stopped and switched to Elavil and his pain scale was 8 out of 10," and that on this form Defendant Mandalaywala "originally seemed to recommend [Plaintiff] be returned to Neurontin but crossed that recommendation out and suggested only that his Cymbalta be increased." (*Id.* ¶¶ 374–75.) These limited allegations are insufficient to plausibly allege that Defendant Mandalaywala knew of and disregarded an excessive risk to Plaintiff's health. Plaintiff has not alleged, for instance, that Defendant Mandalaywala ever examined Plaintiff, that Plaintiff complained to Defendant Mandalaywala about his chronic pain, or that Defendant Mandalaywala had any involvement in Plaintiff's care beyond discontinuing his medications when he arrived at Franklin and completing an MWAP form over a year later. *See Alston v. Bendheim*, 672 F. Supp. 2d 378, 386 (S.D.N.Y. 2009) (dismissing an Eighth Amendment deliberate indifference claim where the plaintiff alleged neither that "[the defendant] was aware [of the plaintiff's medical condition nor ... that [the plaintiff] provided such information to [the defendant]"). While the MWAP form that Defendant Mandalaywala completed describes Plaintiff's pain as an "8 out of 10," the form is a request for an increase in Plaintiff's Cymbalta prescription. Given Defendant Mandalaywala's limited contact with the Plaintiff, Plaintiff has failed to plausibly that allege that by discontinuing his medications on May 3, 2019, and seeking to increase his Cymbalta on October 19, 2020, Defendant Mandalaywala knew of and disregarded an excessive risk to Plaintiff's health. Accordingly, Defendants' motion to dismiss is granted with respect to Defendant Mandalaywala.

## V. CONCLUSION

**\*16** For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss under Rule 12(b)(6), (Dkt. No. 33), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiff's claims against Defendants Hurley and Mandalaywala are **DISMISSED**; and it is further

**ORDERED** that Defendants Hurley and Mandalaywala are **DISMISSED** from this action; and it is further

**ORDERED** that Defendants' motion to dismiss is otherwise **DENIED**.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2024 WL 3828234

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Bell v. Saunders, Not Reported in Fed. Supp. (2022)

2022 WL 2064872

2022 WL 2064872
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Herman BELL, Plaintiff,

v.

New York State Corrections Officer ("C.O.") Jeremy SAUNDERS, C.O. Christopher Winchell, C.O.
Anthony Wetherby, C.O. Patrick Brockway, and C.O. Justin Quain, in their individual capacities, Defendants.

9:20-cv-00256 (BKS/TWD)
|
Signed 06/08/2022

**Attorneys and Law Firms**

For Plaintiff: David B. Rankin, Regina Powers, Beldock, Levine & Hoffman LLP, 99 Park Avenue PH/26th Floor, New York, NY 10016.

For Defendant Christopher Winchell: Lawrence Elmen, Elmen Law Firm P.C., 24 Pine Street, Suite 4, Glens Falls, NY 12801.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

**\*1** Plaintiff Herman Bell brings this action under 42 U.S.C. § 1983, alleging that during his incarceration at Great Meadow [1] Correctional Facility ("Great Meadow"), Defendant Corrections Officers ("C.O.'s") Jeremy Saunders, Christopher Winchell, [2] Anthony Wetherby, Patrick Brockway, and Justin Quain subjected him to excessive force and/or failed to intervene to prevent this use of force in violation of the Eighth and Fourteenth Amendments. (Dkt. No. 56). Plaintiff further alleges that Defendants violated his Fourteenth Amendment right to procedural due process when they initiated a disciplinary proceeding against him based on false reports, leading to his placement in a "Segregated Housing Unit" ("SHU") where he was subjected to restrictive conditions of confinement. (*Id.*). Presently before the Court is Defendant Christopher Winchell's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the applicable statute of limitations bars Plaintiff's claims against him, and that Plaintiff's due process claim must be dismissed for failure to plead a protected liberty interest. (Dkt. No. 69). Plaintiff opposed the motion, (Dkt. No. 76), and Defendant Christopher Winchell replied, (Dkt. No. 77). For the reasons discussed below, the motion to dismiss is granted in part.

[1]   Although Plaintiff refers to "Great Meadows Correctional Facility" in his Amended Complaint, the parties refer to "Great Meadow Correctional Facility" in their briefing, which appears to be the correct name of the facility.

[2]   As discussed below, although Plaintiff originally named *Charles* Winchell as a defendant, (Dkt. No. 1), in his Amended Complaint, he substituted *Christopher* Winchell as a defendant, (Dkt. No. 56).

**II. FACTS** [3]

[3]   The facts are drawn from Plaintiff's Amended Complaint. (Dkt. No. 56). The Court assumes that all well-pleaded facts are true and draws all reasonable inferences in Plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

2022 WL 2064872

On September 5, 2017, Plaintiff was incarcerated at Great Meadow in Westchester County, New York. (Dkt. No. 56, ¶ 6). That day, at around 10:00 a.m., Defendant C.O.'s Saunders, Christopher Winchell, Wetherby, and Brockway "assaulted" Plaintiff "without provocation" around the steps to the mess hall foyer. (*Id.* ¶ 8). Defendant C.O. Quain failed to intervene to stop the assault despite having "the opportunity to" do so. (*Id.* ¶ 9). As a result of this incident, Plaintiff "suffered a concussion, a serious knee injury, eye damage, multiple broken ribs, bruising, and emotional distress" and he was "denied adequate medical care in response to his injuries." (*Id.* ¶¶ 12–13).

Defendants "issued false reports" and "fabricated evidence against [Plaintiff] in that they initiated a disciplinary proceeding through the use of false documents and statement[s]" causing Plaintiff to be placed in solitary confinement or SHU "without cause" for approximately 30 days. (*Id.* ¶¶ 10, 20–21). When Plaintiff was in SHU, he was confined to his cell for 23 hours per day. (*Id.* ¶ 11). The back portion of his cell "opened electronically for one hour of recreation," and it was up to him whether to go outside at that time. (*Id.*). It was "possible to get direct sunlight from the screened in space depending on [the] time of day." (*Id.*). There were no windows, he had a "non-reflective mirror," and the cell provided Plaintiff "limited privacy." (*Id.*). Plaintiff's phone use was restricted, he could only have one visitor each week, he was "not allowed any items of personal clothing" and he "could only have" paper and a pencil. (*Id.*).

## III. PROCEDURAL HISTORY [4]

[4] The Court assumes the parties' familiarity with the procedural history as set out in the Court's decision on Plaintiff's motion to amend. (Dkt. No. 55).

**\*2** Plaintiff filed his original complaint on March 6, 2020, naming Charles Winchell as a defendant. (Dkt. No. 1). In a letter dated April 27, 2020, Plaintiff requested a 45-day extension of time to serve the defendants in light of "the severity of the COVID-19 situation." (Dkt. No. 4). The Court granted Plaintiff's request, extending the time for service until June 19, 2020. (Dkt. No. 5). Plaintiff served all Defendants, including Charles Winchell, by June 20, 2020. (Dkt. Nos. 8, 11–14).

On September 9, 2020, Assistant Attorney General Mark G. Mitchell entered an appearance on behalf of Defendant Charles Winchell, (Dkt. No. 19), and filed a motion to dismiss for failure to state a claim on his behalf, (Dkt. No. 18). In the motion, Defendant Charles Winchell argued, inter alia, that Plaintiff's claims against him should be dismissed for lack of personal involvement, (Dkt. No. 18-2, at 4–5), attaching a declaration in which he attested that he worked "exclusively at Eastern NY Correctional Facility in Ulster County," and that he had "never been to Great Meadow Correctional Facility," (Dkt. No. 18-1).

On September 17, 2020, United States Magistrate Judge Thérèse Wiley Dancks held a telephone conference, during which the parties discussed "whether the correct 'Winchell' is a party to this case." (Text Minute Entry Sept. 17, 2020). In a September 18, 2020 Text Order following the conference, Magistrate Judge Dancks directed the parties confer on this issue. (Dkt. No. 23). According to Plaintiff, "Charles Winchell's counsel did not provide the correct individual, or any individual, with the last name of Winchell." (Dkt. No. 30-1, ¶ 5). Plaintiff, however, "subsequently identified Christopher Winchell as the party that should properly be added." (*Id.* ¶ 7).

On October 28, 2020, Plaintiff filed a cross-motion to amend the Complaint, attaching a Proposed Amended Complaint substituting Christopher Winchell for Charles Winchell. (Dkt. Nos. 30, 30-2). Defendant Charles Winchell responded in opposition, arguing that while all claims against him should be dismissed for lack of personal involvement, Plaintiff's amendments would be futile, as Plaintiff's claims against Christopher Winchell would be time-barred, and that Plaintiff's due process claim must be dismissed as he had not alleged a protected liberty interest. (Dkt. No. 35; Dkt. No. 35-1, at 5, 10). Plaintiff replied, arguing that his claims against Christopher Winchell were timely because New York's statute of limitations was tolled from March 20, 2020 through November 3, 2020 by Executive Order No. 202.8 and subsequent orders issued by New York State Governor Andrew Cuomo, and that his claims against Christopher Winchell relate back to his original complaint under Fed. R. Civ. P. 15(c)(1)(C). (Dkt. No. 40).

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 53 of 160

Bell v. Saunders, Not Reported in Fed. Supp. (2022)

2022 WL 2064872

On April 29, 2021, this Court granted Plaintiff's motion to amend, directing Plaintiff to file his Amended Complaint by May 12, 2021, and denying Defendant's motion to dismiss as moot. (Dkt. No. 55). The Court did not reach the tolling or relation-back issues, noting that the parties agreed that Charles Winchell was not a proper defendant and should be dismissed, that these issues had not yet been fully addressed by the parties in interest, and that these issues would be addressed if raised by the parties in interest in a future motion. (*Id.* at 7–8).

Plaintiff filed his Amended Complaint on May 12, 2021, substituting Christopher Winchell for Charles Winchell. (Dkt. No. 56).

## IV. STANDARD OF REVIEW

**\*3** To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). The court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

## V. DISCUSSION

### A. Statute of Limitations

Defendant Christopher Winchell first argues that Plaintiff's claims against him are barred by the statute of limitations, because Plaintiff did not file his Amended Complaint, naming Christopher Winchell as a defendant, until May 12, 2021. (Dkt. No. 69-3, at 7–20).

The parties agree that Plaintiff's cause of action for excessive force and failure to intervene accrued on September 5, 2017, when he was allegedly assaulted. (Dkt. No. 69-3, at 7–8); *see also Fairley v. Collins*, No. 09-cv-6894, 2011 WL 1002422, at *3, 2011 U.S. Dist. LEXIS 26536 (S.D.N.Y. Mar. 15, 2011) (noting that "an excessive force claim accrues when the use of force occurred") (quotations omitted). The parties also agree that Plaintiff's § 1983 claims are subject to a three-year statute of limitations period. (Dkt. No. 69-3, at 7 (first citing N.Y. C.P.L.R. § 214(5), and then citing *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) ("In section 1983 actions, the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions.' ")); Dkt. No. 76, at 8 (citing *Pearl*, 296 F.3d at 79)). [5]

[5]    As to Plaintiff's second cause of action for violation of his procedural due process rights, Plaintiff does not allege when the disciplinary proceedings resulting in his SHU confinement occurred. "[T]he statute of limitations begins to run from the date that the plaintiff was denied the full and fair hearing he was entitled to." *Povoski v. Lacy*, No. 14-cv-97, 2017 WL 9511094, at *8, 2017 U.S. Dist. LEXIS 205851 (N.D.N.Y. Dec. 13, 2017) (quotations omitted), *report and recommendation adopted*, 2018 WL 547392, 2018 U.S. Dist. LEXIS 7016 (N.D.N.Y. Jan. 17, 2018). Therefore, because the accrual date of Plaintiff's due process claim is not clear from his Amended Complaint, dismissal of the claim on statute of limitations grounds would be improper at this stage. *Ceara v. Deacon*, 68 F. Supp. 3d 402, 406 (S.D.N.Y. 2014) ("Although '[t]he lapse of a limitations period is an affirmative defense that a defendant must plead and prove[,]' a statute of limitations defense may be 'raise[d] ... in a Rule 12(b)(6) motion *if the defense appears on the face of the complaint.*' ") (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)) (emphasis added); *see also Gonzalez v. City of New York*, No. 18-cv-02197, 2018 WL 10323053, at *6, 2018 U.S. Dist. LEXIS 213958 (S.D.N.Y. Dec. 17, 2018) (denying motion to dismiss due process claims on timeliness grounds when it was not sufficiently clear from the face of the complaint when the termination forming the basis of these claims occurred).

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 54 of 160

Bell v. Saunders, Not Reported in Fed. Supp. (2022)

2022 WL 2064872

**\*4** Plaintiff did not file his Amended Complaint, (Dkt. No. 56), naming Christopher Winchell as a defendant, until May 12, 2021, more than three years after his claim accrued on September 5, 2017. However, Plaintiff argues that his claims against Christopher Winchell are not barred by the statute of limitations because: (1) Executive Orders tolled the statute of limitations for 228 days, and he timely filed his motion to amend (attaching a proposed amended complaint naming Christopher Winchell as a defendant) on October 28, 2020, and (2) Defendant had constructive notice of Plaintiff's claims against Christopher Winchell through counsel, such that those claims relate back to the filing of the original complaint. (Dkt. No. 76, at 8–17).

On March 7, 2020, New York State Governor Andrew Cuomo issued Executive Order 202, declaring a disaster emergency for the State of New York due to the COVID-19 pandemic. 9 N.Y.C.R.R. § 8.202. On March 20, 2020, Governor Cuomo signed Executive Order 202.8, limiting court operations to "essential matters" and declaring that "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding as prescribed by the procedural laws of the state ... is hereby tolled from the date of this executive order until April 19, 2020." *Id.* § 8.202.8. The Governor issued nine subsequent Executive Orders, collectively extending the first order until November 3, 2020. *See id.* §§ 8.202.14, 8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.63, 8.202.67. Executive Order 202.72 provided that the tolling of time limits established by Executive Order 202.8 would no longer be in effect as of November 4, 2020. *Id.* § 8.202.72.

Although Defendant "concedes that New York State Executive Order 202.8 ... tolled the statute of limitations ... from March 20, 2020 through April 19, 2020," he "does challenge the scope and breath of such action upon Federal statutes, rules and regulations." (Dkt. No. 69-3, at 11). However, "[t]he Supreme Court has instructed that in section 1983 actions, we borrow not only a state's limitations period but also its 'tolling rules,' ... unless applying the state's tolling rules 'would defeat the goals of the federal statute at issue.' " *Pearl*, 296 F.3d at 80 (citing, inter alia, *Board of Regents v. Tomanio*, 446 U.S. 478, 484–86, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980)); *see also Barnes v. Uzu*, No. 20-cv-5885, 2022 WL 784036, at \*10, 2022 U.S. Dist. LEXIS 46014 (S.D.N.Y. Mar. 15, 2022) ("Because the statute of limitations for § 1983 actions is driven by state law, any statute or executive order that tolls the underlying statute of limitations on state personal injury claims has the effect of tolling the statute of limitations for commensurate § 1983 action.") (citations omitted). Indeed, courts "have uniformly concluded that Executive Order 202.8 applies to federal cases applying New York's statute of limitations, including for § 1983 claims." *Rich v. State of New York*, No. 21-cv-3835, 2022 WL 992885, at \*8, 2022 U.S. Dist. LEXIS 60779 (S.D.N.Y. Mar. 31, 2022); *see, e.g.*, *McDonald v. City of New York*, No. 20-cv-4614, 2022 WL 1469395, at \*4, 2022 U.S. Dist. LEXIS 84310 (E.D.N.Y. May 10, 2022) (applying the tolling rules of Executive Order 202.8 and subsequent orders to § 1983 claims); *Paul v. Capra*, No. 20-cv-5154, 2022 WL 992845, at \*6, 2022 U.S. Dist. LEXIS 60689 (S.D.N.Y. Mar. 31, 2022) (same); *Cain v. County of Niagara, N.Y.*, No. 20-cv-1710S, 2022 WL 616795, at \*5, 2022 U.S. Dist. LEXIS 38140 (W.D.N.Y. Mar. 2, 2022) (same).

Defendant also disputes the "validity or effect of all subsequent executive orders," asserting that "no Federal district court has addressed whether the New York State Executive Orders which followed Order 202.8 served to 'suspend' or to 'toll' the procedural laws of the State of New York, as each term is applied in different Executive Orders." (Dkt. No. 69-3, at 11–12). "A toll suspends the running of the applicable period of limitation for a finite time period, and '[t]he period of the toll is excluded from the calculation of the [relevant time period].' " *Brash v. Richards*, 149 N.Y.S.3d 560, 561, 195 A.D.3d 582 (N.Y. App. Div. 2021) (citing *Chavez v. Occidental Chem. Corp.*, 35 N.Y.3d 492, 505 n.8, 158 N.E.3d 93 (N.Y. 2020)) (alterations in original). A suspension, on the other hand "does not exclude its effective duration from the calculation of the relevant time period. Rather, it simply delays expiration of the time period until the end date of the suspension." *Id.* (citing *Foy v. State of New York*, 144 N.Y.S.3d 285, 71 Misc.3d 605 (Ct. Cl. 2021)).

**\*5** Executive Order 202.8 states that the "time limit for the commencement, filing, or service of any legal action ... is hereby *tolled* from the date of this executive order until April 19, 2020." 9 N.Y.C.R.R. § 8.202.8 (emphasis added). Most of the subsequent Executive Orders do not use the word "toll," but rather state (in the same or substantially similar terms) that they "continue the *suspensions* and modifications of law" established by, inter alia, Order 202.8, *see id.* §§ 8.202.14, 8.202.28, 202.38, 202.48, 202.55, 202.55.1, 202.60, 202.67 (emphasis added). However, two subsequent orders specifically reference the "toll" created by Order 202.8, *see id.* §§ 202.67, 202.72. Thus, the New York State Supreme Court, Appellate Division, Second

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 55 of 160

Bell v. Saunders, Not Reported in Fed. Supp. (2022)
2022 WL 2064872

Department held in *Brash* that because Order 202.8 "expressly and plainly provided that the subject time limits were 'hereby tolled,' " and subsequent orders refer to this modification of time limits as a "toll," the subsequent executive orders "continued the toll that was put in place by Executive Order [202.8]." 149 N.Y.S.3d at 563.

This Court is "bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." *V.S. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010) (citation omitted). Executive Order 202.8 used the word "toll" in its operative language, and the Court does not find any persuasive evidence that the Court of Appeals would reach a different conclusion. District courts in this Circuit have agreed and found that Executive Order 202.8 and subsequent orders tolled the statute of limitations period from March 20, 2020 through November 3, 2020, a total of 228 days. *See, e.g.*, *Powell v. United States*, 19-cv-11351, 2022 WL 1645545, at *2, 2022 U.S. Dist. LEXIS 93314 (S.D.N.Y. May 24, 2022); *McDonald*, 2022 WL 1469395, at *4, 2022 U.S. Dist. LEXIS 84310; *Freud v. N.Y.C. Dep't of Educ.*, No. 21-cv-2281, 2022 WL 889213, at *5, 2022 U.S. Dist. LEXIS 54353 (S.D.N.Y. Mar. 25, 2022); *Paul*, 2022 WL 992845, at *6, 2022 U.S. Dist. LEXIS 60689. The Court thus finds that the statute of limitations period for Plaintiff's § 1983 claims was tolled for 228 days, and the period expired on April 21, 2021. [6]

[6]     Defendant asserts that the statute of limitations expired on September 4, 2020 at 11:59 p.m. (Dkt. No. 69-3, at 10 n.3). However, when calculating the statute of limitations for § 1983 actions, courts use the three-year anniversary of the accrual date. *See, e.g.*, *Mickens v. United States*, 148 F.3d 145, 148 (2d Cir. 1998) (citing Fed. R. Civ. P. 6(a)) ("[W]hen a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the start of the limitations period."); *Ceara*, 68 F. Supp. 3d at 406 (finding that when a § 1983 claims accrued on September 5, 2010, the statute of limitations expired on September 5, 2013). Therefore, the statute of limitations, as tolled by Executive Orders, expired three years plus 228 days after the accrual date of September 5, 2017, which is April 21, 2021.

Although Plaintiff did not file the Amended Complaint until May 12, 2021, he filed his motion to amend, attaching a proposed amended complaint naming Christopher Winchell, on October 28, 2020. (Dkt. No. 30). Defendant asserts that filing a motion to amend does not satisfy the statute of limitations. (Dkt. No. 77, at 6–7 (citing N.D.N.Y. L.R. 15.1(c), which notes that the granting of a motion to amend "does not constitute the filing of the amended pleading")). However, "[w]hen a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000) (quoting *Nw. Nat'l Ins. Co. v. Alberts*, 769 F. Supp. 498, 510 (S.D.N.Y. 1991)); *see also Brown v. City of New York*, No. 13-cv-06912, 2017 WL 1390678, at *6, 2017 U.S. Dist. LEXIS 58283 (S.D.N.Y. Apr. 17, 2017) (finding that when the plaintiff filed a motion to amend adding new defendants within the limitations period, his claims against those new defendants were timely, and the fact that the amended complaint was not actually filed until after the limitations period ran was "irrelevant"). Therefore, because Plaintiff filed his motion to amend (attaching a proposed amended complaint naming Christopher Winchell as a defendant) before the statute of limitations period, as tolled by the Executive Orders, expired, Defendant's motion to dismiss Plaintiff's claims on statute of limitations grounds is denied. [7]

[7]     In light of this holding, the Court need not address Plaintiff's relation-back argument.

**B. Due Process**

**\*6** Defendant next argues that Plaintiff's due process claim against him should be dismissed for "failure to plead a liberty interest protected by the Fourteenth Amendment," arguing that Plaintiff's allegations, regarding having been in SHU "for approximately 30 days" are "typically associated with placement in [SHU]." (Dkt. No. 69-3, at 20–22). Plaintiff responds that Defendant's motion is premature, and the Court can only "properly assess" whether the conditions of his confinement in SHU were atypical after "development of the record." (Dkt. No. 76, at 17–23). He also responds that he has plausibly alleged that his "conditions of confinement were an atypical and significant hardship," specifically pointing to the alleged denial of medical care. (*Id.* at 21–23).

Bell v. Saunders, Not Reported in Fed. Supp. (2022)

2022 WL 2064872

To state a claim under § 1983 for the denial of procedural due process, a plaintiff must allege both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions and duration of the prisoner's confinement 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Sealey v. Giltner*, 197 F.3d 578, 583 (2d Cir. 1999) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)) (alteration in original). Confinement to segregated housing may trigger procedural due process protections, depending on the length, frequency, and conditions of the confinement. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000) (noting that the "duration and the frequency of such deprivations are highly relevant to whether the conditions of a plaintiff's confinement should be considered atypical" (citations omitted)).

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004). Where the plaintiff is confined for "an intermediate duration–between 101 and 305 days–'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.' " *Id.* (quoting *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000)). While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Id.*; *see Davis v. Barrett*, 576 F.3d 129,133 (2d Cir. 2009).

District courts in this Circuit routinely hold that confinement in SHU for 30 days, under ordinary SHU conditions, does not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development. *See, e.g.*, *Martin v. Oey*, No. 16-cv-00717, 2017 WL 9511174, at *6, 2017 U.S. Dist. LEXIS 113247 (N.D.N.Y. July 19, 2017) ("Courts have consistently held that SHU or keeplock confinement under ordinary conditions for 30 days does not rise to a level sufficient to establish a due process claim.") (collecting cases), *report and recommendation adopted* 2017 WL 4174798, 2017 U.S. Dist. LEXIS 153106 (N.D.N.Y. Sept. 20, 2017); *Brown v. Secore*, No. 08-cv-085, 2010 WL 980233, at *5, 2010 U.S. Dist. LEXIS 23827 (N.D.N.Y. Feb. 12, 2010) ("The federal district courts in New York, applying *Sandin*, have been consistent in holding that terms of SHU or 'keeplock' of approximately 30 days, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.") (collecting cases), *report and recommendation adopted* 2010 WL 980233, 2010 U.S. Dist. LEXIS 23823 (N.D.N.Y. Mar. 15, 2010); *Washington v. Fitzpatrick*, No. 20-cv-911, 2021 WL 966085, at *9, 2021 U.S. Dist. LEXIS 48313 (S.D.N.Y. Mar. 15, 2021) (finding allegations of thirty days in keeplock confinement under ordinary conditions did "not plausibly plead a liberty interest").

**\*7** The conditions Plaintiff describes—confinement for 23 hours per day, one hour of recreation, no windows, limited privacy, access to paper and a pencil, restricted phone use, one visitor per week, and no items of personal clothing—are not atypical for SHU confinement. *See Colon*, 215 F.3d at 230 (finding that SHU conditions including visits which were less frequent and shorter than that of the general population and limited access to books were "normal conditions of SHU confinement in New York"); *Smith v. Costello*, No. 15-cv-0401, 2017 WL 1155811, at *6, 2017 U.S. Dist. LEXIS 31341 (N.D.N.Y. Mar. 3, 2017) (finding that conditions including confinement for 23 hours per day and deprivation of personal property did not implicate a liberty interest), *report and recommendation adopted* 2017 WL 1155813, 2017 U.S. Dist. LEXIS 43866 (N.D.N.Y. Mar. 27, 2017); *Thomas v. DeCastro*, No. 14-cv-6409, 2018 WL 1322207, at *6, 2018 U.S. Dist. LEXIS 41121 (S.D.N.Y. Mar. 13, 2018) ("While the Second Circuit has declined to 'delineate the precise contours of "normal" SHU confinement ... it is sufficient to note that, ordinarily, SHU prisoners are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week.' " (citation omitted)); *see also* 7 N.Y.C.R.R. § 302.2 (a), (g) (providing that new SHU admissions are given a "State-issue" set of clothing, and "[a]ll other inmate property ... [is] confiscated upon admission" and "securely stored ... until the inmate is released or transferred from the SHU.").

While medical deprivation "may properly be considered as part of the liberty interest analysis under *Sandin*," *LaBounty v. Kinkhabwala*, 2 F. App'x 197, 201 (2d Cir. 2001) (summary order), there are no allegations that Plaintiff was denied medical care that he sought when he was in SHU. The Amended Complaint does not allege when Plaintiff was denied medical care, i.e. whether it occurred while he was in SHU or before, and there is no allegation that Plaintiff made any requests for medical treatment while in SHU. *Cf. Martinaj v. Uhler*, No. 18-cv-00257, 2019 WL 652251, at *10, 2019 U.S. Dist. LEXIS 24896 (N.D.N.Y. Feb. 15, 2019) (denying motion to dismiss due process claim where plaintiff alleged that he was assaulted by the defendant, causing leg, back, and head injuries, and during his month-long confinement, his "requests for medical treatment for the injuries that had been caused by [the defendant's] assault upon him were consistently denied"); *Zenon v. Downey*, No. 18-cv-0458, 2018 WL 6702851, at *4–5, 2018 U.S. Dist. LEXIS 215589 (N.D.N.Y. Dec. 20, 2018) (denying motion to dismiss where plaintiff alleged that he was "locked up for twenty-four hours per day without contact with his family or medical attention," after having suffered physical abuse during transfer, and that "no one told him whether or when he would be released from solitary" during 31-day confinement).

Accordingly, Defendant's motion to dismiss Plaintiff's procedural due process claim is granted.[8]

[8]    In his reply brief Defendant notes that the Amended Complaint does not allege that there was any denial of due process relating to the hearing, and that falsified misbehavior reports alone are insufficient to establish a due process claim if the disciplinary hearing provided the inmate with due process. (Dkt. No. 77, at 13) (citing *Mitchell v. Senkowski*, 158 F. App'x 346, 349 (2d Cir. 2005)). The Court cannot consider this argument which was first made in a reply brief. *See Browe v. CTC Corp.*, 15 F.4th 175, 191 (2d Cir. 2021) ("[A]rguments may not be made for the first time in a reply brief.").

## VI. LEAVE TO AMEND

Plaintiff has sought leave to amend. (Dkt. No. 76, at 24). While Plaintiff has not set forth any facts that would indicate a viable basis to amend, in light of Plaintiff's request, he may seek leave to amend. If Plaintiff seeks to file a Second Amended Complaint, Plaintiff must first file a letter brief, along with a proposed second amended complaint, within twenty-one (21) days of this Order; the letter brief must detail how the proposed pleading cures the deficiencies the Court has identified.

## VII. CONCLUSION

**\*8**  For these reasons, it is hereby

**ORDERED** that Defendant Christopher Winchell's motion to dismiss (Dkt. No. 69) is **GRANTED** as to Plaintiff's second cause of action for violation of his procedural due process rights, and that cause of action is **DISMISSED without prejudice**, and the motion to dismiss is otherwise **DENIED**, and it is further

**ORDERED** that if Plaintiff seeks to file an amended complaint, Plaintiff must first file a letter brief along with a proposed amended complaint within twenty-one (21) days of this Order, detailing how the proposed pleading cures the deficiencies the Court has identified. The Defendant may file a response within fourteen (14) days of Plaintiff's submission. The Court will hold a conference to discuss the proposed pleading, if necessary; and it is further

**ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2022 WL 2064872

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 58 of 160

**Bell v. Saunders, Not Reported in Fed. Supp. (2022)**

2022 WL 2064872

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 992885
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Benjamin Samuel RICH, formerly known as Samuel Guillaume, Plaintiff,

v.

State of NEW YORK, New York City; New York City Police Department; New York County;
New York County District Attorney's Office; Detective Michael Miller, Vincent Corrando, John
Passementi, Cyrus Vance, Jr., Shipla Kalra, David Nasar, and Does 1–100, Inclusive., Defendants.

21 Civ. 3835 (AT)
|
Signed 03/31/2022

**Attorneys and Law Firms**

Benjamin Samuel Rich, Staten Island, NY, Pro Se.

Gee Won Cha, Julinda A. Dawkins, New York State Office of the Attorney General, New York, NY, for Defendant State of New York.

Andrew B. Spears, New York City Law Department, New York, NY, for Defendants City New York, Michael Miller, Vincent Corrando, John Passementi.

Patricia Jean Bailey, New York County District Attorney's Office, New York, NY, for Defendants Cyrus Vance, Jr., David Nasar.

**ORDER**

ANALISA TORRES, District Judge:

 **\*1**  This action arises from a 2016 arrest and prosecution of Plaintiff *pro se*, Benjamin Samuel Rich, in New York County. He brings claims against the State of New York (the "State"); former New York County District Attorney ("DA") Cyrus R. Vance, Jr. and two Assistant District Attorneys ("ADAs"), Shilpa Kalra and David Nasar, (collectively, the "DA Defendants"); and the City of New York (the "City"), the New York City Police Department (the "NYPD"), and NYPD officers Michael Miller, Vincent Corrando, and John Passementi (collectively, the "City Defendants"), pursuant to, *inter alia*, 42 U.S.C. §§ 1983, 1985, and 1986, the New York State Constitution, and New York common law. *See generally* Compl., ECF No. 1. Before the Court are three motions to dismiss Plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, brought by the State, ECF No. 20, the DA Defendants, ECF No. 22, and the City Defendants, ECF No. 32.

For the reasons stated below, the State's motion to dismiss is GRANTED, and Plaintiff's claims against the State are DISMISSED. The DA Defendants' motion to dismiss is GRANTED—Plaintiff's claims against Vance are DISMISSED; and his claims against Kalra and Nasar are DISMISSED except for Counts 3 and 4, which are DISMISSED without prejudice to renewal in an amended complaint. The City Defendants' motion to dismiss is DENIED as to Count 4, and GRANTED in all other respects. Plaintiff's claims against Passamenti, the NYPD, and the City are DISMISSED; and his claims against Miller and Corrando are DISMISSED, except for Count 3, which is DISMISSED without prejudice to renewal in an amended complaint.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 60 of 160

Rich v. New York, Not Reported in Fed. Supp. (2022)
2022 WL 992885

# BACKGROUND [1]

[1]     Unless otherwise stated, the following facts are taken from the complaint and assumed, for purposes of this motion, to be true. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

On January 6, 2016, Plaintiff was at the Highline Ballroom ("the Highline"), a nightclub in Manhattan, as an invited guest of Wasief Quahtan, a Highline employee. Compl. ¶ 24. Quahtan and the club owner began arguing over "Quahtan['s] [having brought] Plaintiff to the party." *Id.* ¶ 25. Security staff, and an individual named Avery Jackson, asked Plaintiff to leave. *Id.* ¶ 26. Plaintiff alleges that he was "forcibly escorted" from the club, and that Jackson became "belligerent and aggressive" towards him. *Id.* ¶ 27. Shortly thereafter, a shooting occurred outside the Highline. *Id.* ¶ 28.

Plaintiff believes that Jackson "ran down the street and jumped into a black sedan ... at the time the shots were fired." *Id.* ¶ 37. He also states that there were "numerous witnesses" to the shooting, including a "female 911 caller," who lived "next door" to the Highline. *Id.* ¶ 36. In that 911 call, the witness said that she had seen a "man jump into a black sedan speeding down the street" after shots were fired. *Id.* Based on this call, Plaintiff believes "it was more likely that it was [ ] Jackson who fired the shots before jumping into the black sedan to chase Plaintiff down." *Id.* ¶ 37.

**\*2** The shooting was investigated by Detective Michael Miller, who interviewed Jackson. *Id.* ¶¶ 29–30. Jackson told Miller that he saw Plaintiff go to a car, "pull out a gun, and shoot in the direction of the Highline," and that Jackson "ran back into the club" when shots were fired. *Id.* ¶¶ 30, 37. But, Plaintiff alleges that many of Jackson's representations to Miller contradicted his initial statements to the NYPD officers who first responded to the shooting, as well as other eyewitness accounts. *See, e.g.*, ¶¶ 30–32. For instance, Plaintiff alleges that Jackson told the responding officers that Plaintiff was "escorted from the club because he was intoxicated," and that Plaintiff then "went to his car, [a Rolls Royce] removed a firearm ... and fired several shots." *Id.* ¶¶ 31, 46. But, Jackson told Miller that Plaintiff was "forcibly ejected from the club" after an altercation with its manager, that Plaintiff was "belligerent," and threatened that he had a gun. *Id.* ¶ 32. Plaintiff also contends that Jackson's statements were demonstrably false, because surveillance videos showed that Jackson "was the aggressor towards Plaintiff," and that Plaintiff was "calm, peaceful, and cooperative" when escorted from the club. *Id.* ¶¶ 32, 41.

Plaintiff alleges that Miller failed to conduct a thorough and complete investigation of the shooting, because he did not interview several witnesses, including the 911 caller. *Id.* ¶¶ 36–37, 39. Plaintiff also suggests that Miller obtained—but disregarded— surveillance video from the inside and the outside of the club that would have corroborated Plaintiff's version of events. *See id.* ¶¶ 40–43. Plaintiff also complains that Officer Vincent Corrando, Miller's supervisor, "approved all [of the] reports written" in the investigation and "should have notice[d] or known of all the inconsistencies and contradictory statements" in Miller's reports. *Id.* ¶ 95. And, Plaintiff alleges that Officer John Passementi "authorized DNA tests," which revealed that the DNA evidence recovered at the scene "did not match Plaintiff." *Id.* ¶ 96.

On January 9, 2016, Miller obtained a search warrant for Plaintiff's car, based on what Plaintiff contends were "false, misleading and/or embellished information" in the underlying affidavits. *Id.* ¶ 46. The next day, Jackson picked Plaintiff's mugshot out of a photo lineup. *Id.* ¶ 92. Plaintiff appears to argue that this lineup was unduly suggestive, because his "mugshot had a lighter background than the other photographs." *Id.* ¶ 92. The same day, Miller obtained a warrant for Plaintiff's arrest for attempted murder, assault, and weapons possession, and in February obtained additional search warrants for Plaintiff's cell phone and laptop, allegedly based, again, on false and misleading statements provided by Miller and Jackson. *Id.* ¶¶ 45, 47. According to Plaintiff, no "physical evidence [ ] tie[d] him to any part of the shooting," *id.* ¶ 81, and the police did not recover a gun or find gunshot residue in Plaintiff's car, *id.* ¶ 91.

On January 22, 2016, a grand jury indicted Plaintiff for second-degree attempted murder, first-degree assault, and two counts of criminal possession of a weapon. *See id.* ¶¶ 45, 51. On January 27, 2016, Plaintiff was arrested. *Id.* ¶ 51. He was incarcerated until February 18, 2016, when he was released on bail. *Id.* ¶ 52.

2022 WL 992885

In November 2016, Plaintiff was taken back into custody on suspicion of witness tampering, after Jackson allegedly made a "false[ ]" report to the DA's Office that Plaintiff had tried to contact him. *Id.* ¶¶ 53, 103. Plaintiff remained in jail until his trial, which began in June 2017. *Id.* ¶¶ 54, 64; *see also* Trial Tr. at 1, ECF No. 22-3. [2]

2    The relevant state court trial transcripts were submitted by the DA Defendants in their motion to dismiss. *See* Trial Tr.; Dismissal Tr., ECF No. 22-4. The Court may take judicial notice of these transcripts as a matter of public record. *See Shmueli v. City of N.Y.*, 424 F.3d 231, 233 (2d Cir. 2005).

On March 26, 2016, ADAs Shilpa Kalra and David Nasar provided surveillance videos from the Highline to Plaintiff's counsel. Compl. ¶ 64. Plaintiff alleges, however, that the relevant video showed only "one (1) camera angle [out] of 14 camera angles." *Id.* He alleges that prosecutors did not provide videos from the thirteen additional camera angles until a week after trial commenced, even though these videos were collected from the Highline eighteen months earlier. Compl. ¶ 64. The trial court accordingly granted counsel's request to review the additional videos before conducting Jackson's cross-examination. Trial Tr. at 3. On direct examination, Jackson testified that he did not participate in escorting Plaintiff out of the club. *Id.* at 47–48.

**\*3** On June 12, 2017, prior to Jackson's cross-examination, Plaintiff's counsel reported to the trial court that Jackson could be identified in the additional videos based on his clothing. *Id.* at 135. Nasar acknowledged that if Jackson was indeed visible in the videos, he was "doing a bunch of things contrary to what he testified about." *Id.*; *see also id.* at 136. The trial court then determined that Jackson should be questioned, under oath, outside the jury's presence, about his clothing on the night in question, and whether he could identify himself on the videos, among other matters. *See id.* at 146–50, 152–54. Jackson was brought in, and warned about perjury. *See id.* at 154–56. Jackson identified himself on the videos wearing a jacket and a light-colored shirt. *See id.* at 156–59. The court then adjourned the proceedings. *See id.* at 159. When the court resumed, Jackson, through counsel, invoked his Fifth Amendment right against self-incrimination, *id.* at 176, and the court declared a mistrial, *id.* at 186–88.

Plaintiff's counsel then moved to dismiss the indictment against Plaintiff on two grounds: first, that it was based on false testimony, and second, because of prosecutorial misconduct. Compl. ¶ 100. On October 17, 2017, Kalra consented to dismissal of the indictment on the first ground, but opposed the assertion of prosecutorial misconduct. Dismissal Tr. at 12–13, 15–16. The court dismissed the indictment, but the presiding judge stated he did not "see any prosecutorial misconduct." *Id.* at 16.

On March 12, 2021, over three years after the indictment was dismissed, Plaintiff commenced this action. Compl. Defendants move separately to dismiss the claims against them. ECF Nos. 20, 22, 32. The Court considers each motion in turn.

## DISCUSSION

I. <u>Legal Standard</u>

    A. Rule 12(b)(1)
An action should be dismissed pursuant to Rule 12(b)(1) where it is apparent that the court lacks subject matter jurisdiction— that is, the statutory or constitutional power—to adjudicate it. *See* Fed. R. Civ. P. 12(b)(1); *Thomas v. Metro. Corr. Ctr.*, No. 09 Civ. 1769, 2010 WL 2507041, at \*1 (S.D.N.Y. June 21, 2010). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A district court must consider a challenge to subject matter jurisdiction before addressing other grounds for dismissal. *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

On a Rule 12(b)(1) motion, the Court must accept all material factual allegations as true. *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). It may not, however, "draw inferences ... favorable to [the] plaintiff[ ]" on such a motion. *Id.* And, the Court may consider evidence outside the pleadings to resolve disputed factual issues relating to jurisdiction. *See id.*

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 62 of 160

Rich v. New York, Not Reported in Fed. Supp. (2022)

2022 WL 992885

### B. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns, Inc.*, 493 F.3d at 98. On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Additionally, because Plaintiff proceeds *pro se*, the Court is obligated to construe his submissions "liberally and interpret[ ] [them] to raise the strongest arguments they suggest." *Triestman v. Fed. Bur. of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citation omitted). And, on a motion to dismiss, the Court may appropriately consider a *pro se* plaintiff's opposition papers to "supplement or clarify" the allegations in their complaint. *Sommersett v. City of N.Y.*, No. 09 Civ. 5916, 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) (citation omitted).

### II. Duplicative and Improper Claims

**\*4** Count 7 of the complaint asserts a claim under 18 U.S.C. § 245 for the deprivation of rights under the color of law. Compl. ¶¶ 148–51. But, no private right of action exists under this federal criminal statute, and accordingly, Plaintiff cannot raise a cognizable claim under it. *See Corrado v. State of N.Y. Univ. Stony Brook Police*, No. 15 Civ. 7443, 2016 WL 4179946, at *3 (E.D.N.Y. Aug. 5, 2016). Count 7 is, accordingly, DISMISSED with prejudice.

Further, the Court finds that Count 9 of the complaint—fraudulent misrepresentation under § 1983, Compl. ¶¶ 157–63—is duplicative of Count 4—deprivation of a fair trial under § 1983, *id.* ¶¶ 133–37—because both seek redress for violations of Plaintiff's liberty interests arising from the alleged "fabrication of evidence by a government officer." *See Zahrey v. Coffey*, 221 F.3d 342, 349–50 (2d Cir. 2000). Count 9 is, accordingly, DISMISSED with prejudice.

Finally, three of Plaintiff's claims—Counts 4, 5, and 6—include both federal constitutional claims and analogous state constitutional claims. Compl. ¶¶ 133–47. The New York State Constitution "provides a private right of action where remedies are otherwise unavailable at common law or under § 1983." *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016). But, where alternative remedies are available under the federal civil rights statutes, including § 1983, courts must dismiss the plaintiff's state constitutional claims. *Id.* Because § 1983 provides a remedy for all of Plaintiff's alleged federal constitutional violations, any analogous state constitutional claims are duplicative. Accordingly, the state constitutional claims pleaded in Counts 4, 5, and 6 are DISMISSED with prejudice.

### III. The State's Motion

The State moves to dismiss the complaint under Rule 12(b)(1), on the ground that the Eleventh Amendment bars Plaintiff's claims against it by virtue of sovereign immunity. State Mem. at 3, ECF No. 21. The Court agrees.

The Eleventh Amendment bars federal courts from exercising jurisdiction over claims against states. U.S. CONST. AMEND. XI. This extends to a state sued by its own citizens, *see Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72–73 (2000), and state agencies, *see Welch v. Texas Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 480 (1987). There are only limited exceptions to this rule, none of which are applicable here.

First, a state may waive its Eleventh Amendment defense. *See Coll. Sav. Bank v. Fla. Prepaid Postsec. Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). Here, the State has not explicitly waived its immunity, or consented to be sued. *See* State Mem. at 3. And, by filing a motion to dismiss, rather than an answer to the complaint, the State cannot be said to have taken actions inconsistent

with an assertion of immunity. *Cf. Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002) (finding waiver of immunity where state removed action to federal court, then asserted immunity).

Second, Congress may abrogate the states' immunity from suit through statute. *Kimel*, 528 U.S. at 80. But, Congress has not done so for claims brought under § 1983, *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990), § 1985, *see Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013), or § 1986, *Medina v. Cuomo*, No. 15 Civ. 1283, 2015 WL 13744627, at *6–7 (N.D.N.Y. Nov. 9, 2015). In the "absence of [the State's] consent," accordingly, such claims are "proscribed by the Eleventh Amendment." *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see also Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977).

**\*5** Finally, the Eleventh Amendment does not bar a "suit against a state official when that suit seeks prospective injunctive relief." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996); *see also Ex parte Young*, 209 U.S. 123 (1908). But here, Plaintiff seeks only money damages, and retrospective declaratory and equitable relief. Compl. § IX. And, Eleventh Amendment immunity shields states from claims for money damages, *Liner v. Hochul*, No. 21 Civ. 11116, 2022 WL 826342, at *1 (S.D.N.Y. Mar. 17, 2022), and "declaratory relief dealing solely with past violations," *Medina*, 2015 WL 13744627, at *7. Although Plaintiff demands "affirmative relief necessary to eradicate the effects of Defendants' unlawful practices," *see* Compl. § IX(B), he does not allege any present violations of his rights, *see id. See Medina*, 2015 WL 13744627, at *7 (noting that "declaratory relief where there is no present violation, is also barred under the Eleventh Amendment"). Accordingly, this exception does not preclude the State's immunity defense in this matter.

Where a defendant is found to have sovereign immunity from suit, the Court is deprived of subject-matter jurisdiction under Rule 12(b)(1). *McGinty v. New York*, 251 F.3d 84, 89, 101 (2d Cir. 2001). Accordingly, because the State is immune from liability on all of Plaintiff's claims under the Eleventh Amendment, its motion to dismiss is GRANTED. And, because amendment would be futile, Plaintiff's claims against the State are DISMISSED with prejudice to renewal.[3]

3       Because the Court concludes that it lacks jurisdiction over Plaintiff's claims against the State under Rule 12(b)(1), it need not reach the State's alternative ground for dismissal, that Plaintiff's § 1983 and § 1985 claims must be dismissed because the State is not a suable "person" within the meaning of those statutes. State Mem. at 3–4.

## IV. The DA Defendants' Motion

Plaintiff raises claims against the DA Defendants "in their individual capacities"[4] arising *inter alia* under § 1983, § 1985, and § 1986,[5] based on three main factual assertions. *See generally Compl.* First, Plaintiff alleges that Kalra and Nasar wrongfully chose to prosecute him, despite the lack of physical evidence tying him to the shooting. Compl. ¶ 81. Second, Plaintiff asserts that Kalra and Nasar intentionally withheld exculpatory surveillance videos until the middle of his trial, *see id.* ¶¶ 75–76, 78. Third, Plaintiff alleges that the "[p]rosecuting [a]ttorneys" "coached" Jackson to give false testimony to the grand jury that indicted him. *Id.* ¶¶ 50–51.

4       Plaintiff makes this clarification for the first time in his opposition papers. ECF No. 28 at 14. The Court notes that because, as discussed, the Eleventh Amendment bars suits against states, *see supra* at 8–10, when a defendant is sued in his official capacity, the court treats the suit as one against the "entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Serves*, 436 U.S. 658, 690 n.55 (1978)). And, where a "district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the State, and therefore immune from suit in her official capacity." *D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 8 (2d Cir. 2017). Accordingly, any claims Plaintiff may raise against the DA Defendants in their "official capacity" would be precluded by immunity under the Eleventh Amendment. *See id.*

5       Although Plaintiff asserts that he pleads each of his claims against "all Defendants," even a liberal read of the complaint makes clear that certain of Plaintiff's claims cannot implicate the DA Defendants' conduct, including counts

Rich v. New York, Not Reported in Fed. Supp. (2022)

2022 WL 992885

1 (unreasonable search and seizure); 2 (false arrest/imprisonment); 11 (personal injury); 12 (property damage) and 13 (negligent hiring, training, supervision, and discipline of officers). Compl. ¶¶ 117–27, 168–81. As the Court has already dismissed Counts 7 and 9, *see supra* at 7–8, it only considers Counts 3 (malicious prosecution); 4 (deprivation of fair trial); 5 (conspiracy); 6 (failure to intervene); 8 (abuse of process); 10 (negligent misrepresentation); and 14 (negligent infliction of emotional distress) against the DA Defendants.

A. Absolute Immunity

**\*6** The DA Defendants argue that Plaintiff's claims are barred by absolute and qualified prosecutorial immunity. DA Defs. Mem. at 10–12, ECF No. 22-1. To the extent Plaintiff's claims are predicated on his allegations that Kalra and Nasar wrongfully chose to prosecute him and withheld allegedly exculpatory evidence, the Court agrees.

1. Federal Claims

Although § 1983 has no immunities on its face, the Supreme Court has held that, when Congress initially enacted the statute, it did not intend to abrogate existing immunities established at common law. *See Imbler v. Pachtman*, 424 U.S. 409, 418 (1976). Thus, both absolute and qualified immunity are applicable defenses to § 1983 claims. *See Bernard v. Cty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004). Prosecutors are entitled to "absolute immunity" from liability when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. But, prosecutors are entitled only to "qualified immunity" when they perform "investigative functions" normally undertaken by a police officer. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Under the doctrine of qualified immunity, an official is immune from liability "only when in light of clearly established law and the information the official possesses, it was objectively reasonable for him to think that his actions were lawful." *Hill v. City of N.Y.*, 45 F.3d 653, 663 (2d Cir. 1995).

Courts employ a "functional approach" to determine the availability of absolute immunity, looking to "the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (citations omitted). And, although the party claiming absolute immunity bears the burden of establishing its applicability, *see Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996), if the court finds that that the conduct at issue is covered by absolute immunity, then the actor is shielded from liability for damages no matter "how[ ] erroneous the act ... and how[ ] injurious ... its consequences." *Cleavinger v. Saxner*, 474 U.S. 193, 199–200 (1985) (citation omitted); *see also Anilao v. Spota*, No. 19 Civ. 3949, 2022 WL 697663, at \*4 (2d Cir. Mar. 9, 2022).

Plaintiff first alleges that Kalra and Nasar improperly chose to prosecute him, despite a lack of physical evidence tying him to the crime. Compl. ¶ 81. But, prosecutors are immune from suit for decisions regarding "whether and when to prosecute," *Imbler*, 424 U.S. at 430–31 n.32–33, even where they may prosecute an innocent individual, *Schmueli*, 424 F.3d at 237–39. Kalra and Nasar are, therefore, entitled to absolute immunity to the extent Plaintiff's claims are based on their decision to prosecute him.[6]

6    Because the Court finds that the DA Defendants are entitled to absolute immunity on any claims arising from the withholding of exculpatory evidence, the Court does not reach their alternative argument that Plaintiff fails to state a claim for an alleged *Brady* violation, *see* DA Defs. Mem. at 12–15.

Second, Plaintiff alleges that Kalra and Nasar intentionally withheld exculpatory surveillance videos until the middle of trial, Compl. ¶¶ 75–76, 78. But again, prosecutors are entitled to absolute immunity for all decisions taken "in their prosecutorial capacity, including decisions regarding which evidence should be disclosed to a criminal defendant." *Newson v. City of N.Y.*, No. 16 Civ. 6773, 2019 WL 3997466, at \*3 (E.D.N.Y. Aug. 23, 2019). This is true even where information was deliberately withheld, *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 640 (E.D.N.Y. 2017), or where such withholding violated the defendant's constitutional rights, *see Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d Cir. 2009). Accordingly, Kalra and Nasar have absolute immunity to the extent any of Plaintiff's claims are predicated on a violation under this factual allegation.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 65 of 160

Rich v. New York, Not Reported in Fed. Supp. (2022)
2022 WL 992885

**\*7** Finally, Plaintiff alleges that the "Prosecuting Attorneys" coached Jackson to give false testimony to the grand jury, which then formed the basis for his indictment. Compl. ¶¶ 50–51. Prosecutors generally only have qualified immunity for actions taken before there is probable cause to arrest a defendant, because they are performing an investigative function, rather than acting as advocates. *See Hill*, 45 F.3d at 661; *Buckley*, 509 U.S. at 273. And, although "knowingly presenting evidence" to a grand jury is considered the "core of a prosecutor's role as an advocate," *Bernard*, 356 F.3d at 503, the Second Circuit has distinguished between a prosecutor's knowing presentation of false evidence to the grand jury—which is still entitled to absolute immunity —from a prosecutor's deliberate fabrication of evidence, *Hill*, 45 F.3d at 662–63 (finding that where prosecutor deliberately manufactured evidence to establish probable cause for plaintiff's arrest, his conduct was investigatory, regardless of whether, when the evidence was manufactured, the prosecutor intended to present it to the grand jury). In *Hill*, the Second Circuit also established that "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of qualified immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." *Id.* at 663.

As in *Hill*, Plaintiff alleges that the prosecutors deliberately participated in the fabrication of false evidence by coaching a material witness to give perjured testimony to the grand jury, so that the jury would return an indictment. Compl. ¶¶ 50–51. Allegations that the prosecution falsified evidence are distinct from allegations that the prosecution merely presented evidence they knew to be false. *Compare Hill*, 45 F.3d at 662–63, *with Urrego v. United States*, No. 00 Civ. 1203, 2005 WL 1263291, at \*2 (E.D.N.Y. May 27, 2005) (prosecutors receive absolute immunity for claims predicated on "false presentation of evidence to a grand jury"). And, considering the Court's obligation to liberally construe Plaintiff's pleadings and afford every reasonable inference in his favor at this stage, the Court concludes the DA Defendants have not established that they were acting as "advocates," rather than "investigators," when they engaged in the challenged conduct. *Hill*, 45 F.3d at 660 (officials asserting absolute immunity bear the burden of establishing it for the action in question). And, accepting the facts in the complaint as true, the DA Defendants would not be entitled to even qualified immunity, because it is objectively unreasonable for them to have knowingly coached a witness to give false testimony before a grand jury. *See Cipolla v. Cty. of Rensselaer*, 129 F. Supp. 2d 436, 456 (N.D.N.Y. 2001) (not "objectively reasonable" to believe presenting or soliciting perjured testimony did not violate plaintiff's clearly established rights). Accordingly, to the extent that Counts 3, 4, 5, 6, and 8 are predicated on the claim that the DA Defendants coached Jackson to give false testimony, they are not entitled to either absolute or qualified immunity.

### 2. State Claims

Plaintiff raises state-law claims against the DA Defendants in Counts 10 and 14 of the complaint. Compl. ¶¶ 164–67, 182–85. As with federal law, under New York law, a district attorney prosecuting crime is performing a quasi-judicial function, and, as such, is entitled to absolute immunity. *Arteaga v. State*, 72 N.Y.2d 212, 217 n.1 (N.Y. 1988). But, unlike federal law, prosecutors are absolutely immune for official acts in both the prosecution and investigation of criminal charges. *See Moore v. Dormin*, 173 Misc. 2d 836, 843, (N.Y. Sup. Ct. 1997), *aff'd as modified*, 252 A.D.2d 421 (N.Y. App. Div. 1998). A prosecutor does not receive absolute immunity, however, "when knowingly acting in violation of law." *Id.* As with Plaintiff's federal claims, to the extent his state law claims against the DA Defendants are predicated on his allegations that they improperly targeted him for prosecution or deliberately withheld exculpatory evidence, the DA Defendants are entitled to absolute immunity. But, construing Plaintiff's third allegation liberally, he essentially claims that the prosecutors knowingly acted in violation of the law by suborning perjury. The Court cannot conclude, therefore, that the DA Defendants are entitled to absolute immunity as a matter of state law to the extent Counts 10 and 14 rest on this allegation. [7]

---

[7] As noted, the parallel state-law constitutional claims in Counts 4, 5, and 6 are dismissed with prejudice. *See supra* at 8.

### B. Time Bar

**\*8** The DA Defendants argue that Plaintiff's claims are untimely. DA Defs. Mem. at 6–8. With the exception of Counts 3 (§ 1983 malicious prosecution) and 4 (§ 1983 deprivation of a fair trial), the Court agrees.

Case 9:23-cv-01465-DNH-TWD     Document 72     Filed 12/12/25     Page 66 of 160

Rich v. New York, Not Reported in Fed. Supp. (2022)
2022 WL 992885

### 1. Federal Claims

Claims arising under §§ 1983 and 1985, when brought in this district, are governed by New York's three-year statute of limitations for personal injury actions, N.Y. C.P.L.R. § 214; *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citation omitted); *Hernandez-Avila v. Averill*, 725 F.2d 25, 27 n.3 (2d Cir. 1984). But, claims under § 1986 have a one-year statute of limitations, *see* 42 U.S.C. § 1986. Federal courts are also obligated to apply New York's tolling rules. *Bd. of Regents of Univ. of the State of N.Y. v. Tomanio*, 446 U.S. 478, 483 (1980).

On March 20, 2020, then-Governor Andrew Cuomo issued Executive Order 202.8, which tolled the statute of limitations in New York in light of the COVID-19 pandemic. 9 N.Y.C.R.R. § 8.202.8. Subsequent orders extended the tolling period until November 3, 2020. Exec. Order 202.67 (Oct. 4, 2020). Contrary to the DA Defendants' assertion, *see* DA Defs. Mem. at 7–8, other courts in this district have uniformly concluded that Executive Order 202.8 applies to federal cases applying New York's statute of limitations, including for § 1983 claims. *See, e.g., Lewis v. Westchester Cnty.*, No. 20 Civ. 9017, 2021 WL 3932626, at *2 n.3 (S.D.N.Y. Sept. 2, 2021). [8] The Court concludes, therefore, that Executive Order 202.8 tolls the statute of limitations for Plaintiff's §§ 1983 and 1985 claims, which apply New York's three-year limitations period—but not Plaintiff's § 1986 claims, because the applicable statute of limitations for that claim is found in the federal statute itself.

[8]    The DA Defendants' reliance on *Johnson v. Fargione* is unavailing. In that case, the court found that the plaintiff's claims, which had expired weeks before the issuance of Executive Order 202.8, could not "be said to have been tolled" by that Executive Order, as the time for filing had already passed and the plaintiff had offered no excuse for the delay. 20 Civ. 764, 2021 WL 1406683, at *3 (N.D.N.Y. Feb. 17, 2021), *report and recommendation adopted* 2021 WL 1404554 (Apr. 14, 2021). Although *Johnson* is instructive with respect to how claims that may have expired *before* the issuance of Executive Order 202.8 (*i.e.*, before March 20, 2020) should be treated, it does not address the applicability of the Executive Order to federal claims that, like Plaintiff's, had not yet expired by that date.

Section 1983 claims based on malicious prosecution or deprivation of a fair trial accrue when the underlying criminal action against the plaintiff is "favorably" terminated, rather than at the time of arrest. *Sharp v. Cnty. of Putnam*, No. 18 Civ. 780, 2019 WL 2250412, at *4 (S.D.N.Y May 24, 2019); *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 394 (S.D.N.Y. 2016). The dismissal of an indictment constitutes the termination of a proceeding. *Sharp*, 2019 WL 2250412, at *4–5. Applying these principles, Plaintiff's § 1983 claims for malicious prosecution (Count 3) and denial of a fair trial (Count 4) accrued on October 17, 2017, the date the trial court dismissed the indictment against him. Dismissal Tr. at 5. And, although the statute of limitations would have expired on October 17, 2020, New York's COVID-19 tolling rule extended the limitations period until June 2, 2021. [9] Because Plaintiff commenced this suit on March 12, 2021, Counts 3 and 4 are timely.

[9]    Executive Order 202.8 tolled applicable limitations periods from March 20, 2020 to November 3, 2020. The order amounted to a "pause" in the limitations period—that is, during the duration of the toll, the clock to file [did] not run," but "[o]nce the toll end[ed,] the clock resume[d] from where it was when the toll began, and the plaintiff ha[d] the rest of his limitations period to file his complaint," *Johnston v. City of Syracuse*, No. 20 Civ. 1497, 2021 WL 3930703, at *6 (N.D.N.Y. Sept. 2, 2021). Because, as of March 20, 2020, when the clock was "paused," Plaintiff had 211 days remaining before the expiration of the limitations period on October 17, 2020, the Court calculates 211 days after November 3, 2020, as the end of the relevant limitations period when tolled—which is June 2, 2021.

 **\*9**  By contrast, a § 1983 abuse-of-process claim accrues when the criminal process is "set in motion—typically at arrest—against the plaintiff." *Hadid v. City of N.Y.*, No. 15 Civ. 19, 2015 WL 7734098, at *5 (E.D.N.Y. Nov. 30, 2015), *aff'd* 730 F. App'x 68 (2d Cir. 2018). Because Plaintiff was arrested on January 27, 2016, the relevant statute of limitations for Count 8, § 1983 abuse of process, expired on January 27, 2019, and COVID-19 tolling provisions are, therefore, inapplicable. Accordingly, this claim is DISMISSED with prejudice as untimely.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 67 of 160

Rich v. New York, Not Reported in Fed. Supp. (2022)

2022 WL 992885

Section 1985(3) conspiracy claims accrue "at the time of the events that caused the injury." *Panetta v. Cassel*, 20 Civ. 2255, 2020 WL 2521533, at *5 (S.D.N.Y. May 18, 2020). The existence of a conspiracy "does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs. It is the wrongful act, not the conspiracy, which is actionable, whether the act is labelled a tort or a violation of [federal civil rights statutes]." *Singleton v. City of N.Y.*, 632 F.2d 185, 192 (2d Cir. 1980) (citation omitted). As discussed, the single allegation that escapes absolute immunity—and therefore is the only remaining basis for Plaintiff's claims against the DA Defendants—is that those defendants suborned perjury in the grand jury proceedings by coaching Jackson to give false testimony, resulting in Plaintiff's indictment and arrest. Plaintiff's § 1985(3) claim—Count 5 of the complaint—accrued no later than January 27, 2016, the date of his arrest—which again, applying a three-year statute of limitations untouched by COVID-19 tolling provisions, renders it untimely. Count 5 is, accordingly, DISMISSED with prejudice.

Similarly, Count 6, Plaintiff's § 1986 conspiracy claim, accrued when Plaintiff knew, or had reason to know of the harm or injury. *Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 346, 354 (E.D.N.Y. 2013). Plaintiff knew of the injury by his arrest date. Applying § 1986's one-year statute of limitations, any § 1986 claim Plaintiff brought after January 27, 2017, is untimely. [10] Accordingly, Count 6 is DISMISSED with prejudice.

[10]    Even assuming, *arguendo*, that Plaintiff would not have had reason to know of the harm or injury that was the basis of his Section 1986 claim until the date the indictment was dismissed (October 17, 2017), the claim would still be time-barred, because this would only extend the limitations period to October 17, 2018—nearly three years before the commencement of this action.

### 2. State Claims

Counts 10 and 14 of the complaint—both state common-law claims—are also time-barred. "Under New York law, a plaintiff asserting tort claims against the City or its employees," as well as against municipal officials like district attorneys, "must file a notice of claim within [90] days after the incident giving rise to the claim and commence the action within a year and [90] days from the date of the incident." *Brown v. City of N.Y.*, No. 18 Civ. 3287, 2020 WL 1819880, at *7 (S.D.N.Y. Apr. 9, 2020) (citing N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(1)); *see also Gonzalez v. City of N.Y.*, No. 94 Civ. 7377, 1996 WL 227824, *2 (S.D.N.Y. May 3, 1996). Plaintiff asserts that he filed the requisite notice of claim with the City on January 16, 2018—720 days after his arrest, and 91 days after the dismissal of the indictment. Compl. ¶ 16. Plaintiff did not commence this action until March 12, 2021. *See* Compl. Therefore, Plaintiff neither timely filed a notice of claim within 90 days, nor did he commence this lawsuit within a year and 90 days after the date the indictment was dismissed—the last date that could possibly serve as the trigger for the statute of limitations. Failure to comply with the mandatory notice of claim requirements is a basis for dismissal of a plaintiff's claims. *Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003). The Court, accordingly, concludes that Counts 10 and 14 are also time-barred, and therefore, these claims are DISMISSED with prejudice.

### C. Personal Involvement

**\*10**  Liability under § 1983 must be premised on a defendant's direct, personal involvement in the alleged violations. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). A defendant cannot be held vicariously liable under § 1983 for employing or supervising an employee that violated the plaintiff's rights—rather, a plaintiff must plead "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

As to Vance, Plaintiff only alleges that he served as the DA of New York County. Compl. ¶ 11. Vance may not be held liable for merely employing or supervising Kalra and Nasar. *See Iqbal*, 556 U.S. at 676. And, Plaintiff neither pleads that Vance was personally involved in investigating the shooting or prosecuting him, nor is there any evidence in the record to support such a finding. Accordingly, Plaintiff's claims against Vance are DISMISSED with prejudice, because given the lack of evidence

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 68 of 160

Rich v. New York, Not Reported in Fed. Supp. (2022)
2022 WL 992885

of Vance's personal involvement, the Court finds that granting leave to amend would be futile. *Hill v. Curcione*, 657 F.3d 116, 123–24 (2d Cir. 2011).

Plaintiff similarly fails to specify Kalra and Nasar's personal involvement in his claimed constitutional violations, stating only that the "Prosecuting Attorneys" coached Jackson to provide testimony. Compl. ¶ 50. But, given Plaintiff's position as a *pro se* litigant, the Court recognizes that there may be additional information made available to Plaintiff through discovery that would enable Plaintiff to assert claims directly against Kalra and Nasar, such as if, for example, either of them prepared Jackson to testify. By **April 15, 2022**, accordingly, the DA Defendants shall, through counsel, inform Plaintiff and the Court whether Kalra or Nasar prepared Jackson to testify before the grand jury with respect to any potential criminal charges against Plaintiff, and/or conducted an examination of Jackson before the grand jury. No later than **May 16, 2022**, Plaintiff shall file an amended complaint, alleging with specificity Kalra and Nasar's direct, personal involvement in either "coaching" Jackson to testify falsely before the grand jury, or deliberately eliciting false testimony from Jackson during the grand jury proceedings. In addition, because, as detailed *infra* at 25–26, the Court finds that Plaintiff's malicious prosecution claim is deficient because he failed to allege that the underlying criminal proceedings terminated in his favor, an argument raised by the City Defendants but not the DA Defendants, any amended malicious prosecution claim that Plaintiff wishes to assert against Kalra and Nasar should also address this issue. Failure to do so shall result in dismissal with prejudice of Plaintiff's remaining claims against Kalra and Nasar.

V. City's Motion to Dismiss

Plaintiff brings claims against the City Defendants, on the grounds that (1) Miller failed to conduct a thorough and complete investigation of the shooting, by not interviewing several witnesses, including the 911 caller, Compl. ¶¶ 36–37, 39; (2) in his investigation, Miller obtained—but disregarded—surveillance video from both the inside and outside of Highline Ballroom, *id.* ¶¶ 40–43; (3) that Miller "used his own added facts and embellished statements" in his investigative reports to target Plaintiff as the sole suspect in the shooting, *id.* ¶ 44, *see also* ¶ 39; (4) that Corrando, as Miller's supervisor, approved his investigative reports but failed to notice the inconsistencies and contradictions therein, *id.* ¶ 95; and (5) that Passamenti "authorized DNA tests," which revealed that the DNA evidence recovered at the scene "did not match Plaintiff," *id.* ¶ 96. The Court addresses each remaining [11] cause of action.

[11] As noted, the Court dismissed Count 7 for relying on a statute that does not provide a private right of action, *see supra* at 7; Count 9 for being duplicative of Count 4, *see id.* at 8, and all the state constitutional claims Plaintiff asserts analogously to his federal constitutional claims, *see id.*

A. Time Bar

1. Section 1983 Claims

**\*11** Plaintiff brings claims under § 1983 for unlawful search and seizure (Count 1); false arrest (Count 2); malicious prosecution (Count 3); deprivation of a fair trial (Count 4); and abuse of process (Count 8). As noted, § 1983 claims are subject to a three-year statute of limitations in this district. *See supra* at 15. And, for the reasons discussed with respect to the DA Defendants, the Court concludes that Counts 3 and 4 were timely pleaded. *See supra* at 16–17.

A § 1983 unlawful search and seizure claim, however, accrues on the date the allegedly unlawful search occurred. *McClanahan v. Kelly*, No. 12 Civ. 5326, 2014 WL 1317612, at \*4 (S.D.N.Y. Mar. 31, 2014). Plaintiff alleges that his property was searched on January 9, February 12, and February 15, 2016. Compl. ¶¶ 46–47. The applicable statute of limitations, therefore, expired no later than February 15, 2019, nearly two years before Plaintiff brought suit. Plaintiff's claims are, therefore, untimely, and Count 1 is DISMISSED with prejudice as time-barred.

Section 1983 false arrest claims and abuse-of-process claims accrue from the date of Plaintiff's arrest. *See Rivera v. City of N.Y.*, No. 16 Civ. 9709, 2019 WL 252019, at \*4 (S.D.N.Y. Jan. 17, 2019) (false arrest); *Anderson v. Cnty. of Putnam*, No. 14

Rich v. New York, Not Reported in Fed. Supp. (2022)

2022 WL 992885

Civ. 7162, 2016 WL 297737, at *3 (S.D.N.Y. Jan. 22, 2016) (abuse-of-process). Plaintiff was arrested on January 27, 2016, and therefore, any such claims should have been brought no later than January 27, 2019. Counts 2 and 8 are, accordingly, DISMISSED with prejudice as untimely.

### 2. Sections 1985(3) and 1986 Claims

Liberally construing the complaint, in Count 5, Plaintiff sets forth a conspiracy cause of action under § 1985(3), alleging that the City Defendants engaged in a conspiracy to have Plaintiff wrongfully convicted, *see* Compl. ¶ 97. This claim appears predicated on the NYPD investigation into the January 6, 2016 shooting, and Miller's alleged embellishment of information, and focus on Plaintiff as the sole suspect. *Id.* ¶¶ 36–37, 39, 46, 90. Plaintiff also raises a failure-to-intervene claim under § 1986 (Count 6), seemingly arising from Corrando's alleged failure to notice the inconsistencies and contradictory statements allegedly included in Miller's police reports. *Id.* ¶ 95.

Section 1985(3) claims accrue "at the time of the events that caused the injury," and are subject to a three-year statute of limitations, *Panetta*, 2020 WL 2521533, at *5. Section 1986 claims based on a failure to intervene accrue when the defendant fails to intervene, *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 303 (N.D.N.Y. 2018), and must be brought within one year, *see* 42 U.S.C. § 1986. Plaintiff's claims each began accruing no later than January 27, 2016, the date of Plaintiff's arrest, because Plaintiff does not suggest that any investigation took place after that date. The applicable limitations period extends no later than January 27, 2019, for Plaintiff's § 1985(3) claim, and January 27, 2017 for Plaintiff's § 1986 claim, two and four years, respectively, before the complaint was filed. Counts 5 and 6 are, therefore, DISMISSED with prejudice as time-barred.

### 3. State Claims

To the extent Plaintiff's state common-law claims, asserting various types of negligence, arise from the NYPD investigation into the shooting on January 6, 2016; the searches of Plaintiff's property on January 9, February 12, and February 15, 2016; and Plaintiff's arrest on January 27, 2016, Plaintiff was required to file a notice of claim within 90 days of those events, *see* N.Y. Gen. Mun. L. § 50-e. As noted, Plaintiff did not file a notice of claim with the City until January 16, 2018—one year and eleven months after the latest of those dates. Compl. ¶ 16. Accordingly, each of Plaintiff's negligence claims (Counts 10–14) are DISMISSED with prejudice. [12]

[12] As discussed *supra* at 18–19, even if the Court construes Plaintiff's notice of claim as timely based on the dismissal of Plaintiff's criminal case on October 17, 2017, Plaintiff still failed to commence this action within one year and 90 days, as required by statute. This provides an alternative ground for dismissal.

### B. Claim Against the City [13]

[13] Plaintiff also names the NYPD as a defendant. *See* Compl. But, the NYPD is a non-suable agency of the City, and thus, to the extent any of Plaintiff's claims are brought against it, they fail as a matter of law. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 93 n.19 (2d Cir. 2007). Any such claims are, accordingly, DISMISSED with prejudice.

**\*12** The Court reads Plaintiff's complaint as claiming, under *Monell v. Department of Social Services*, 436 U.S. 658, that the City is liable for the allegedly unlawful conduct of the named NYPD officers. *See* Compl. ¶ 179. The City Defendants argue that Plaintiff does not include sufficient factual allegations to support a municipal liability claim. City Defs. Mem. at 20–22, ECF No. 34. The Court agrees.

To bring a municipal liability claim under § 1983, the plaintiff must "prove the existence of a municipal policy or custom," then demonstrate a causal connection between the policy and the alleged constitutional deprivation. *Vippolis v. Vill. of Haverstraw*,

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 70 of 160
Rich v. New York, Not Reported in Fed. Supp. (2022)
2022 WL 992885

768 F.2d 40, 44 (2d Cir. 1985). Plaintiff pleads neither, offering only conclusory allegations that the City Defendants "engaged in a pattern and practice to commit the aforementioned unlawful acts," Compl. ¶ 179, and that a policy is "inferred" because the City Defendants "took no steps to reprimand or discharge the officers involved," ECF No. 39 at 27. These allegations cannot, without more, state a claim for municipal liability. *E.g.*, *Fleming v. City of New York*, No. 18 Civ. 4866, 2020 WL 5522871, at *6 (S.D.N.Y. July 23, 2020). Because Plaintiff offers no facts which suggest that the deficiencies in his *Monell* claim may be cured by amendment, any such claim is DISMISSED with prejudice. *Strong v. City of Syracuse*, No. 16 Civ. 1054, 2020 WL 137250, at *3–4 (N.D.N.Y. Jan. 13, 2020) (dismissing *Monell* claim, with prejudice, given "[p]laintiff's conclusory allegations are insufficient to plausibly infer a custom or policy to support municipal liability").

C. Passamenti's Personal Involvement

Plaintiff's remaining claims are Counts 3 (malicious prosecution) and 4 (denial of a fair trial). As to Defendant Passamenti, Plaintiff alleges that Passamenti authorized DNA tests, which revealed that the DNA evidence recovered at the scene "did not match Plaintiff." Compl. ¶ 96. Plaintiff does not allege that Passamenti was involved in falsification of evidence, that he attempted to hide the results of the relevant DNA tests, or that he was otherwise responsible for, or even aware of, the alleged "embellishment" of statements in the NYPD's investigative reports. Plaintiff has not, therefore, sufficiently alleged Passamenti's direct, personal involvement in any constitutional violations under § 1983. *Tangreti*, 983 F.3d at 618. And, because the record does not establish that Plaintiff could cure this pleading defect by amendment, Plaintiff's claims against Passamenti are DISMISSED with prejudice.

D. Malicious Prosecution

A claim for malicious prosecution under § 1983—Count 3 of the complaint—requires the plaintiff to show that the criminal proceedings against him were terminated "in his favor," typically by an acquittal or another form of dismissal of the charges on the merits. *Janetka v. Dabe*, 892 F.2d 187, 189–90 (1989). The City Defendants argue that Plaintiff has not made such a showing. City Defs. Mem. at 10, 14–17. The Court agrees. Plaintiff asserts—citing no authority in support—that the dismissal of the indictment was a "termination in his favor" because dismissals that "include constitutional privilege assertions are considered favorable terminations." ECF No. 39 at 7, 10 (quotation marks omitted). It is not clear what Plaintiff means by this. And, from the Court's review of the state court transcript, it appears that, in dismissing the indictment, neither the prosecution, nor the court, made any statements indicating a belief in Plaintiff's innocence. *See Lanning v. City of Glens Falls*, 908 F.3d 19, 28 (2d Cir. 2018) (looking to the "reasons ... stated on the record for dismissing the charges" in determining whether the termination of the criminal case was in plaintiff's favor). Indeed, Kalra expressly declined to concede that Plaintiff was innocent, instead reaffirming her belief that Plaintiff "was the shooter." Dismissal Tr. at 15. The presiding judge similarly stated on the record that dismissal of the indictment was warranted even though he did not "see any prosecutorial misconduct." *Id.* at 16. The dismissal of the indictment, therefore, left open the question of Plaintiff's guilt or innocence, and Plaintiff cannot, accordingly, assert on that basis alone, that the proceedings were terminated in his favor.

**\*13**  The Court notes, however, that because four years have passed since the dismissal of the indictment, Plaintiff may be able to plead additional facts from that time that support this relevant element of his claim. There is no information before the Court as to whether, for example, Plaintiff was ever informed by the prosecutors that he had been cleared of wrongdoing, whether Jackson or anyone else was later prosecuted for the shooting, or whether the state court made any further statements regarding the merits of the charges against Plaintiff. Count 3 is, accordingly, DISMISSED without prejudice, to provide Plaintiff with an opportunity to plead additional facts to support this claim.

E. Denial of Fair Trial

To state a claim under § 1983 for denial of a fair trial based on the fabrication of evidence by a police officer—Count 4 of the complaint—a plaintiff must allege that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016) (citation omitted). The plaintiff need not show

2022 WL 992885

a favorable termination indicative of innocence to state such a claim. *Smalls v. Collins*, 10 F. 4th 117, 142–43 (2d Cir. 2021). The City Defendants argue that Plaintiff has failed to show a deprivation of his liberty interests because there was probable cause for his prosecution, in the form of corroborative ballistics evidence. City Defs. Mem. at 16 (citing Dismissal Tr. at 15); City Defs. Reply at 6–7, ECF No. 46.

Probable cause is not a complete defense to a fair trial claim. *Torres v. City of N.Y.*, No. 16 Civ. 6719, 2017 WL 4325822, at *5 (E.D.N.Y. Sept. 27, 2017) (noting that where "independent probable cause exists for the prosecution," a plaintiff must "show that the misconduct caused some deprivation above and beyond the fact of the prosecution itself." (citation omitted)). Plaintiff plausibly alleges that Miller fabricated and "embellished" Jackson's statements in his investigative report; that Miller provided these reports to prosecutors to secure Plaintiff's indictment and arrest; and that Corrando, as Miller's supervisor, reviewed and approved these reports without identifying any "embellishments" or obvious factual contradictions. *See* Compl. ¶¶ 44–49, 95. On a motion to dismiss, the Court cannot take as true the City Defendants' factual assertion that, regardless of any alleged fabrications in Miller's reports, the prosecution had independent ballistics evidence to satisfy the probable cause standard. *Compare* City Defs. Reply at 6–7, *with* ECF No. 39 at 9–12. It cannot, therefore, find as a matter of law, that the City Defendants had probable cause for Plaintiff's indictment and prosecution. *See Bullard v. City of N.Y.*, 240 F. Supp. 2d 292, 299 (S.D.N.Y. 2003). The Court concludes, therefore, that Plaintiff has sufficiently alleged a § 1983 denial of fair trial claim against Miller and Corrando. The City Defendants' motion to dismiss Count 4 of the complaint is, accordingly, DENIED.

## CONCLUSION

For the reasons stated above, the State's motion to dismiss, ECF No. 20, is GRANTED, and Plaintiff's claims against the State are DISMISSED. The DA Defendants' motion to dismiss, ECF No. 22, is GRANTED—Plaintiff's claims against Vance are DISMISSED; and his claims against Kalra and Nasar are DISMISSED except for Counts 3 and 4, which are DISMISSED without prejudice to renewal in an amended complaint. By **April 15, 2022,** the DA Defendants shall make the disclosures directed in this order. The City Defendants' motion to dismiss is DENIED as to Count 4, and GRANTED in all other respects. Plaintiff's claims against Passamenti, the NYPD, and the City are DISMISSED; and his claims against Miller and Corrando are DISMISSED, except for Count 3, which is DISMISSED without prejudice to renewal in an amended complaint.

 **\*14**  By **May 16, 2022**, Plaintiff shall file an amended complaint as to Counts 3 and 4, with the additional factual allegations detailed in this order. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 20, 22, and 32, and mail a copy of this order to Plaintiff *pro se.* The Court shall separately provide Plaintiff with a copy of all unpublished cases cited herein.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 992885

---

**End of Document**                                                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 945873

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Jane DOE 1, et al., Plaintiffs,

v.

COUNTY OF ROCKLAND, et al., Defendants.

No. 21-CV-6751 (KMK)

|

Signed March 28, 2025

**Attorneys and Law Firms**

Steven A. Metcalf II, Esq., Metcalf & Metcalf, P.C., New York, NY, Counsel for Plaintiffs.

Matthew R. Hughes, Esq., Robert B. Weissman, Esq., Saretsky Katz Dranoff Weissman & Maynard, LLP, Elmsford, NY, Counsel for Defendants County of Rockland, Rockland County Correctional Center, and Rockland County Sheriff's Office – Corrections Division.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

**\*1** Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6 (together, "Plaintiffs"), formerly incarcerated at the Rockland County Jail (the "Jail"), bring the instant Action pursuant to 42 U.S.C. §§ 1983, 1985, and 1988 and state law against the County of Rockland, Rockland County Correctional Center, and Rockland County Sheriff's Office – Corrections Division (together, the "County") and its employees Corrections Officer Christopher Taggart ("Taggart"), Corrections Officer John Kezek ("Kezek"), Sergent Cooper, Corrections Officer Gomez, Corrections Officer Mantello, Corrections Officer Ranolfo Ventillo, Corrections Officer Charlie Mae, Corrections Officer Danny, Corrections Officer Kyle Farrison, Corrections Officer Joseph Helchowski, Corrections Officer Starky, and John Does/Jane Does 1–6 (collectively, the "Individual Defendants"). [1] (*See* Second Am. Compl. ¶¶ 38–44 ("SAC") (Dkt. No. 74).) [2]

[1]    None of the Individual Defendants have yet appeared in this Action. (*See generally* Dkt.) The Court notes that although Plaintiffs occasionally spell Ventillo as "Vintello" in the SAC, (*e.g.*, SAC ¶¶ 214–15), the Court will refer to him solely as "Ventillo" to avoid confusion.

[2]    Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

Before the Court is the County's Motion to Dismiss the Second Amended Complaint ("SAC"), insofar as it pertains to the County, pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (*See* Not. of Mot. to Dismiss (Dkt. No. 91).) For the reasons stated below, the Motion is granted in part and denied in part.

I. Background

A. Materials Considered

Plaintiffs have attached multiple exhibits to the SAC, (*see* SAC, Ex. Nos. 1–5 (Dkt. Nos. 74-1 through 74-5)), while the County has submitted two declarations and accompanying exhibits in support of their arguments, (*see generally* Decl. of Robert B. Weissman, Esq. in Supp. of Mot. ("Weissman Decl.") (Dkt. No. 92); Reply Affirm. of Robert B. Weissman, Esq. ("Weissman Reply Affirm.") (Dkt. No. 103)).

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the Complaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). "Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety ..., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.' " (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

**\*2** Plaintiffs submitted the following documents as attachments to the SAC: (1) a September 3, 2021, letter from Amy L. Soloman, Acting Assistant Attorney General, to state governors, discussing state requirements to certify and assure compliance with the Prison Rape Elimination Act of 2003 ("PREA"), (SAC Ex. A (Dkt. No. 74-5)); (2) a list of PREA Certification and Assurance submissions from August 20, 2020, through August 19, 2021, (SAC Ex. B (Dkt. No. 74-1)); (3) a January 2023 special report from the U.S. Department of Justice, Bureau of Justice Statistics, titled "Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities, 2016–2018," (SAC Ex. C. (Dkt. No. 74-2)); (4) a September 11, 2020, news article from lohud.com titled "Rockland corrections officer John Kezek faces 78 additional charges for jail misconduct," (SAC Ex. D (Dkt. No. 74-3)); and (5) notices of claims filed in July 2023 on behalf of Jane Does One through Six against the Defendants in this Action, (SAC Ex. E (Dkt. No. 74-4)).

The Court may take judicial notice of these sources, as the County does not dispute their authenticity "and [they are] capable of accurate and ready determination." *O'Neill v. Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 519 n.2 (S.D.N.Y. 2018); *In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 735 F. Supp. 3d 352, 369 (S.D.N.Y. 2024) (taking notice of facts "contained in the FDA's announcements ..., as set forth in the Agency's guidance documents and related statements on its official website"); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (observing that judicial notice may be taken of an official government website, as "the website's authenticity is not in dispute and 'it is capable of accurate and ready determination' " (quoting *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006))). The Court notes that even though it takes judicial notice of these documents, "their purposes at the motion-to-dismiss stage are limited," as they can only be used to "determin[e] what the documents state," not to "prove the truth of their contents." *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

The County, for its part, submitted the following documents in support of its Motion: (1) the Jail's Code of Conduct, regarding the rules and regulations for uninformed staff, first issued January 1, 2001, and amended October 7, 2014, (Weissman Decl. Ex. B (Dkt. No. 92-2)); (2) the Jail's Code of Conduct as amended August 30, 2017, (Weissman Decl. Ex. C (Dkt. No. 92-3)); (3) the Jail's PREA policy, rules, and regulations enacted from 2002 to January 2012, (Weissman Decl. Ex. D (Dkt. No. 92-4)); (4) the Jail's January 15, 2015, PREA policy, rules, and regulations, (Weissman Decl. Ex. E (Dkt. No. 92-5)); (5) the Jail's Inmate Rules and Regulations (Weissman Decl. Ex. F (Dkt. No. 92-6)); (6) Plaintiffs' acknowledgement of receipt of rules and regulations, (Weissman Decl. Ex. G (Dkt. No. 92-7)); (7) an April 26, 2016, Felony Complaint regarding Ranolfo Ventillo, (Weissman Decl. Ex. H (Dkt. No. 92-8)); (8) an information filed on October 13, 2016, in connection with the County's prosecution of Ventillo, (Weissman Decl. Ex. I (Dkt. No. 92-9)); (9) an arrest report from June 12, 2020, in connection with the state prosecution of Christopher Taggart, (Weissman Decl. Ex. J (Dkt. No. 92-10)); (10) a July 31, 2020, grand jury indictment of Taggart in

with the same prosecution, (Weissman Decl. Ex. K (Dkt. No. 92-11)); (11) an April 8, 2021, transcript of Taggart's guilty plea and allocution, (Weissman Decl. Ex. O (Dkt. No. 92-15)); [3] (12) a July 31, 2020, grand jury indictment of John Kezek, (Weissman Decl. Ex. M (Dkt. No. 92-13)); (13) an arrest report from August 5, 2020, in connection with the state's prosecution of Kezek, (Weissman Decl. Ex. N (Dkt. No. 92-14)); (14) a December 22, 2021, transcript of Kezek's guilty plea and allocution, (Weissman Decl. Ex. L (Dkt. No. 92-12)); and (15) an August 26, 2020, complaint filed in *Santiago, et al. v. United States of America*, No. 20-CV-6887 (S.D.N.Y. 2020), (Weissman Reply Decl. Ex. A (Dkt. No. 103-1)).

[3]     In its Declaration and on the docket, the County appears to have mislabeled Taggart's guilty plea and allocution transcript as Exhibit L, when the transcript is, in fact, Exhibit O. Conversely, Kezek's guilty plea and allocution transcript was mislabeled as Exhibit O when it is actually Exhibit L.

**\*3**  As for the first six documents, the County argues that these documents are regulations "promulgated by an administrative agency" and thus, are "a proper subject for judicial notice." (County's Mem. of Law in Supp. of Mot. 16 n.3 ("County's Mem.") (Dkt. No. 93) (quoting Op. & Order Granting Mot. to Dismiss Amend. Compl. 4 ("Op. & Order") (Dkt. No. 71)).) Plaintiffs, however, dispute the relevance and authenticity of these exhibits, because, inter alia, "Plaintiffs have been unable to explore whether such policies were even provided to each Defendant," "whether such policies were trained and enforced at Defendants['] facility," the policies "do[ ] not contain any indication or signature line that such policy was provided to any [D]efendant, by any [D]efendant or staff member," and the policies they "do[ ] not contain the date Defendants were provided such policy, or trained on such policy." (Pls' Opp'n to Mot. to Dismiss 29–30 ("Pls' Opp'n") (Dkt. No. 99).)

Although a Court may take judicial notice of prison regulations when undisputed, *see Spurgeon v. Wettenstein*, No. 13-CV-8117, 2015 WL 1408874, at \*2 n.1 (S.D.N.Y. Mar. 26, 2015) (taking notice of prison regulations); *Gray v. Erfe*, No. 13-CV-39, 2015 WL 3581230, at \*2 n.1 (D. Conn. June 5, 2015) (same); *Lurry v. Ford*, No. 13-CV-1157, 2014 WL 859270, at \*2 (D. Conn. Mar. 5, 2014) ("The court also may consider matters of which judicial notice may be taken, such as ... prison directives." (citing *Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972))), a court "cannot consider extrinsic evidence if there is a dispute 'regarding the authenticity or accuracy of the document' or 'the relevance of the document' to the dispute," *Hunter v. Kaufman Enters., Inc.*, No. 09-CV-5540, 2011 WL 3555809, at \*4 n.4 (E.D.N.Y. Aug. 8, 2011) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)); *see, e.g., Giraud v. Bd. of Educ., Newburgh Enlarged City Sch. Dist.*, No. 12-CV-1842, 2013 WL 3776242, at \*5 (S.D.N.Y. July 17, 2013) ("[E]ven if a document is 'integral' to the complaint, a court may only consider it if there is no dispute regarding its authenticity, accuracy[,] or relevance.") (citing *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). Moreover, the Court notes that although the SAC discusses the Jail's purported lack of training, lack of adequate polices or practices to comply with its PREA obligations, and lack of supervision, (*see, e.g.*, SAC ¶¶ 228, 291, 322–34), it "does not point to any express written policy, let alone any specific document in which the policies were contained," *Hunter*, 2011 WL 3555809, at \*4 n.4. Accordingly, the Court will not take notice of Defendants' Exhibits A through G.

However, although Plaintiffs lodge a blanket objection to "all of Defendant[s'] Exhibits," they do not discuss the remaining documents submitted by Defendants (i.e., Exhibits H through L) or explicitly dispute their relevance or authenticity. (*See* Pls' Opp'n 31.) The County has argued that the Court may take judicial notice of these documents because the Taggart and Kezek Allocutions are transcripts of public court proceedings and the arrest reports, grand jury indictments, and Ventillo Complaint and Information are documents filed in a criminal case before another court. (County's Mem. 13 n.2.) The Court agrees, as there is no genuine dispute as to their authenticity and the Court "may take judicial notice of court filings." *Brooks v. Westchester Cnty. Jail*, No. 19-CV-10901, 2021 WL 3292229, at \*5 n.8 (S.D.N.Y. Aug. 2, 2021) (citing *Linares v. Annucci*, No. 19-CV-11120, 2021 WL 2689736, at \*1 n.2 (S.D.N.Y. June 30, 2021)); *see also O'Hara v. Cohen-Sanchez*, No. 22-CV-6209, 2023 WL 5979176, at \*8 n.4 (E.D.N.Y. Aug. 28, 2023) ("The court may take judicial notice of state court filings." (citing *Williams v. N.Y.C. Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020))); *Monroe v. Myskowsky*, No. 12-CV-5513, 2014 WL 496872, at \*1 n.3 (S.D.N.Y. Feb. 6, 2014) ("The Court may consider matters of which judicial notice may be taken under [Federal Rule of Evidence] 201, including public records such as arrest reports, indictments, and criminal disposition data."). However, the Court will consider the documents only for the fact that they exist, not the truth of the matters asserted therein. *See Ferranti v. Arshack, Hajek & Lehrman PLLC,* No. 20-CV-2476, 2021 WL 1143290, at \*3 (S.D.N.Y. Mar. 24, 2021) ("The [c]ourt may take judicial notice

of a document filed before another court and may consider such documents for the fact that they exist, but not for the truth of the matters asserted therein." (citing *Roth*, 489 F.3d at 509)), *appeal withdrawn*, No. 21-1245, 2021 WL 3575023 (2d Cir. June 23, 2021); *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *7 (S.D.N.Y. Sept. 29, 2018) (taking judicial notice of filings in a court case submitted by a party "only to establish the fact of such filings and what they contained, not for the truth of the matter asserted therein" (citation omitted)). [4]

[4]    Although the County fails to offer any reason why the Court should consider the *Santiago* Complaint, (*see* Reply Mem. of Law in Supp. of Mot. to Dismiss 9 ("Reply") (Dkt. No. 102)), the Court nevertheless will consider it for the limited purpose of its existence based upon the same reasons discussed above.

B. Factual Background

**\*4** The following facts are drawn from Plaintiffs' SAC and are taken as true for the purpose of resolving the instant Motion. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

1. PREA

In 2003, Congress enacted PREA, which was designed to "provide for the analysis of the incidence and effects of prison rape ... and provide information, resources, recommendations and funding to protect individuals from prison rape." (SAC ¶ 45 (quotations omitted).) As the County was allegedly aware, PREA provides that state governors must regularly certify to the U.S. Department of Justice ("DOJ") that "their jurisdiction is in full compliance" with PREA standards, or else be subject to the loss of five percent of certain DOJ funds. (*Id.* ¶¶ 46–47.) The County is also allegedly "fully aware of PREA federal law and its regulations," and of "the forms and procedures needed to be submitted to obtain and stay in PREA compliance with the DOJ." (*Id.* ¶¶ 49, 51.)

The County, which operates the Jail, (*id.* ¶ 60), was "responsible for the safety of the inmates at [the Jail] and responsible for creating and enforcing policies and practices that ensure the safety of the inmates at [the Jail]," (*id.* ¶ 73), including "preventing sexual abuse," (*id.* ¶ 70). Based on the enactment of PREA and various state laws, the County was "aware of the substantial risks of sexual abuse face[d] by female prisoners in [the Jail]," and "of the statistics that dictate sexual abuse is a pervasive problem," and further knew "that assigning male staff to guard female prisoners creates obvious risks of sexual abuse." (*Id.* ¶¶ 77–82.)

2. The Jail Policies

The Jail allegedly promulgates rules requiring random and unannounced supervisory rounds. (*Id.* ¶ 109.) However, supervisors typically conduct rounds only once a shift, and would not actually "do rounds,"—i.e., check on the inmates—but would instead "predominately only [stand]" for "less than ten minutes," "speak with the officers on the shift," take notes, and leave. (*Id.* ¶¶ 107, 109–10.) Plaintiffs allege that, upon information and belief, the Jail had no requirement that supervisors had to check in with each officer on duty, ask them particular questions, speak with the prisoners, or observe the entire area. (*Id.* ¶ 111.) After the reports of the Individual Defendants' misconduct, as detailed below, the Jail did not make any changes to its supervisory round practices. (*Id.* ¶ 117.)

Plaintiffs also allege that, upon information and belief, surveillance cameras were not installed through the Jail or, to the extent that they were installed, were inadequately monitored. (*Id.* ¶¶ 118–20.) Many areas of the Jail, including enclosed and isolated areas, were in "dead zone[s]" that were "completely outside of any video or audio surveillance." (*Id.* ¶ 119.) No staff member was assigned to view the cameras either "in real time" or shortly thereafter. (*Id.* ¶ 120.) Instead, video footage was only reviewed after an incident was reported. (*Id.* ¶ 121.)

The Jail employed approximately 120 male correctional officers and only approximately 8–10 female correctional officers. (*Id.* ¶ 105.) The Jail did not employ any female sergeants or supervisors. (*Id.*) Because of this staffing, the Jail permitted the assignment of male staff, including the Individual Defendants, to posts wherein they had "ample opportunity for unmonitored contact with female inmates, including Plaintiffs." (*Id.* ¶ 102.)

**\*5** Each shift at the Jail was comprised of two male officers per shift. (*Id.* ¶ 105.) One officer would be in the control room "separate and apart from the pod," and one officer "was able to walk around to the pod and to various cell." (*Id.* ¶ 147.) This allowed the male staff to often be alone in areas with no surveillance cameras or other staff in range of visual contact. (*Id.*)

The Individual Defendants, all male employees of the County, were corrections officers at the Jail whose responsibilities included guarding inmates and supervising the guarding of inmates. (*Id.* ¶¶ 41–42.)

### 3. Jane Doe 1

On or about May 8, 2019, Jane Doe 1 was arrested for assault and incarcerated at the Jail. (*Id.* ¶ 153.) While at the Jail, Jane Doe 1 was only housed in the "F-wing" of the Jail, in the top level of a pod in individual "cell 14." (*Id.* ¶ 154.) Although Jane Doe 1's cell was located in a "dead zone," where there was no direct surveillance from security cameras or other staff or prisoners, there were many cameras throughout the pod and the control room. (*Id.* ¶¶ 155–56.) [5]

[5]  Jane Doe 1 alleges it was "common knowledge to everyone" that her cell was in a "dead zone." (*Id.* ¶ 165; *see also id.* ¶ 162.)

#### a. Taggart

In or around July 2019, Jane Doe 1 met Taggart, the assigned "pod officer" in the "F-wing" from 3:00 PM to 11:00 PM, who began to befriend her. (*Id.* ¶ 160.) As time went on, Taggart began conversing with Jane Doe 1 on a regular basis and would spend several hours during each shift in front of her cell speaking with her. (*Id.* ¶ 161.) Jane Doe 1 alleges that other inmates became upset because of the favoritism Taggart showed Plaintiff by spending too much time by her cell, which went on for "months on end." (*Id.* ¶ 162.) In or around August 2019, Jane Doe 1 alleges that the "normal conversations," with Taggart became "more personal and sexual" and, eventually, "directly sexual" with Taggart requesting to engage in oral sex with Jane Doe 1 and asking her "will you be my girlfriend?" (*Id.* ¶ 163.) Jane Doe 1 alleges that each of these "sexual conversations" took place when Taggart stood in front of her cell and conversed with her for "significant amounts of time." (*Id.* ¶ 164.) Jane Doe 1 alleges that, at some point, Taggart "went so far as letting her out of her cell to speak with him when his shift changed from working within the pod to working in the control room." (*Id.*)

On multiple occasions, Taggart brought in contraband for Jane Doe 1, including alcohol, food, and a burner phone which he used to speak with Jane Doe 1. (*Id.* ¶ 165.) Taggart also promised to keep Jane Doe 1's family "informed on how she was doing." (*Id.*) Jane Doe 1 alleges that after the fifth time Taggart brought contraband in for her, he began to ask "what she would do in exchange for him" continuing to bring in contraband. (*Id.*) Taggart allegedly began asking Jane Doe 1 to undress for him and, during cell inspections, to let him smell her underwear. (*Id.*) Jane Doe 1 also alleges that Taggart "would ask ... to smell her urine, touch her underwear, [and] asked for her tampons to smell." (*Id.* ¶ 187.) Jane Doe 1 "obeyed [Taggart's] demands for her to disrobe," as she was in a "very vulnerable position" and unable to clearly see "just how much she was being taken advantage of." (*Id.* ¶ 166.)

Jane Doe 1 alleges that during and after her encounter with Kezek in November 2019, described below, Taggart continued to engage in an inappropriate relationship with her, including speaking to her about "sexually inappropriate" matters, asking her

to disrobe, and entering her cell. (*Id.* ¶ 186.) Jane Doe 1 alleges that she was in "an extremely vulnerable position as a female prisoner who complained about a male officer being sexually inappropriate with [her]," and Taggart "fooled [Jane Doe 1] into thinking that [he] cared about [her] .... [and] attempted to begin an intimate relationship ... [by] telling her how the two would be together when [she] got out of jail." (*Id.* ¶ 185.) Jane Doe 1 alleges that Taggart made Jane Doe 1 "feel as if [he] was looking out for [her] safety and was protecting her against the harassment and abuse from the other guards and staff." (*Id.*)

**\*6** In January 2020, Taggart was reprimanded and suspended following a review by the Jail of the phone calls between him and Jane Doe 1. (*Id.* ¶ 189.) The facility began placing additional security cameras that same month. (*Id.*) Jane Doe 1 alleges that in connection with the allegations in this matter, Taggart was indicted in July 2020 on two felony counts of promoting prison contraband and several misdemeanor counts of official misconduct. (*Id.* ¶ 193; Weissman Decl. Ex. K.) Taggart pled guilty and was sentenced to two years of probation. (SAC ¶ 193; Weissman Decl. Ex. O.) As part of his plea deal, Taggart also had to resign as a corrections officer. (SAC ¶ 193; Weissman Decl. Ex. O.)

Jane Doe 1 alleges that the County "knew or should have known how [Taggart] did the same thing with other woman prisoners in the past while these other women were housed" in the Jail and "that [Taggart] was a person who utilized his position as a correction[s] officer to manipulate exceptionally vulnerable female prisoners." (SAC ¶¶ 190, 192.) Jane Doe 1 also alleges that other women with whom Taggart had relationships "learned about [Taggart's] interest in [Jane Doe 1] and ... have threatened [Jane Doe 1's] safety for even speaking with [Taggart]." (*Id.* ¶ 190.)

### b. Kezek and John Doe 1

On November 27, 2019, Kezek and John Doe 1 were working the "day tour." (*Id.* ¶ 168.) John Doe 1 placed Jane Doe 1 on a shift lock—i.e., temporary confinement to one's cell—for having a hair tie. (*Id.*) John Doe 1 also ordered Jane Doe 1 to clean the drains located in the yard. (*Id.*) While Jane Doe 1 was cleaning the drains, Kezek made sexual remarks about her. (*Id.* ¶ 169.) After cleaning the drains, Jane Doe 1 was locked into her cell. (*Id.*) Kezek then approached Jane Doe 1's cell and remarked that the pictures Jane Doe 1 had on her cell desk were the same photos that she had posted on her Instagram account. (*Id.*) Kezek then stated that he "did things to [Jane Doe's 1] photos on his time off[.]" (*Id.*) As he was making these statements to Jane Doe 1, Kezek became visibly erect. (*Id.*) Kezek and John Doe 1 then unlocked Jane Doe 1's cell door. (*Id.* ¶ 170.) Kezek stood in Jane Doe 1's cell doorway, took out his penis, and masturbated for 40 to 60 seconds. (*Id.*) After he finished, Kezek zipped his pants back up and closed the door behind him. (*Id.*) Following this incident, Jane Doe 1 began experiencing anxiety upon seeing Kezek. (*Id.*)

Jane Doe 1 alleges that this was the first time Kezek entered her cell but not the first time that Kezek had acted inappropriately in the pod. (*Id.* ¶ 171.) On numerous occasions, Jane Doe 1 alleges Kezek intervened in conversations that other inmates and Jane Doe 1 were having in the pod and made "inappropriate sexual comments[.]" (*Id.*) Jane Doe 1 alleges that on various occasions in the pod, Kezek: described, in graphic detail, sexual acts that he enjoyed; informed another inmate that he could help her masturbate; and stated he wanted to find a different inmate in town because he wanted to "tear her up." (*Id.*)

Jane Doe 1 alleges that she did not immediately report these incidents with Kezek and John Doe 1 because she "became ... scared." (*Id.* ¶ 173.) On or about December 12, 2019, Jane Doe 1 reported the incident to the jail chaplain on December 12, 2019, who told a superior officer. (*Id.* ¶¶ 174–75.) Jane Doe 1 "quickly" noticed that lieutenants and sergeants "began treating [her] differently." (*Id.* ¶ 174.) On or about that same date, after Jane Doe 1 began experiencing anxiety attacks and having nightmares about being raped and stabbed, Jane Doe 1 reported the incident to her psychiatrists. (*Id.* ¶ 176.) On December 14, 2019, Jane Doe 1 submitted a formal complaint against Kezek. (*Id.* ¶ 179.)

**\*7** Jane Doe 1 alleges that once "people" found out she had submitted a formal complaint, officers refused to provide Jane Doe 1 necessary daily supplies. (*Id.* ¶¶ 175, 180.) Additionally, Jane Doe 1 was "labeled a 'rat,' 'dub,' 'undercover[,]' an[d] many more inappropriate" names by several officers in English and Spanish in front of "the rest of the inmates." (*Id.* ¶¶ 175,

180–81.) Jane Doe 1 also alleges "word spread throughout the jail, fast" about the incidents, (*id.* ¶ 177), and Taggart approached Jane Doe 1 and told her that "other officers were making fun of Kezek in the locker room," (*id.* ¶ 178).

During this period, Jane Doe 1 was "subject to having to interact" with Kezek during each of his shifts. (*Id.* ¶ 182.) At some point, Kezek was moved from the F-wing but remained assigned to the women's wing of the Jail. (*Id.* ¶ 184.) Jane Doe 1 would "still see him if he came up and spoke to other officers[,]" which would "cause [Jane Doe 1] great anxiety ... for [her] safety." (*Id.*) Jane Doe 1 alleges that the County's "failure to keep [Kezek] in a separate area from [her]" caused her anxiety and concern. (*Id.* ¶ 194.)

Following her formal complaints against Kezek, Jane Doe 1 grew "so anxious and fearful" that she contacted the District Attorney's Office to have her transfer facilities, but the Jail refused. (*Id.* ¶ 188.) On or about February 20, 2020, Jane Doe 1 was transferred to Orange County Jail. (*Id.* ¶¶ 188, 195.) Jane Doe 1 alleges that, after her transfer, "word" about her relationship with Taggart "spread[ ] fast," and she was again labeled "a rat" and received threats from "other women who thought they were in a relationship with [Taggart]." (*Id.* ¶ 195.) This caused Jane Doe 1's fear for her safety "to be present and very real, every day." (*Id.*) Jane Doe 1 was released on her own recognizance from Orange County Jail on July 8, 2020. (*Id.* ¶ 157.)

Kezek was indicted in July 2020 on five counts of official misconduct in connection with these incidents, to which he pled guilty. (Weissman Decl. Exs. L–M.)

### 4. Jane Doe 2

Jane Doe 2 was incarcerated at the Jail from around September 2014 until her release in 2017. (*Id.* ¶ 196.) Jane Doe 2, who was only eighteen at the time of her incarceration, soon learned that "the correction[s] officers who had been hired to protect her ... posed the greatest threat," and would "use[ ] their position of power to force female[ inmates] ... into performing sexual benefits." (*Id.* ¶¶ 197–98.) Jane Doe 2 alleges that if she refused the officers' demands, she would get harassed by the Individual Defendants and other officers, who make her time in jail "miserable" and told her that "officers would go out of their way to penalize her for rules that other women were also breaking." (*Id.* ¶ 201–02.) At first, the threats were minor, such as not being allowed an extra blanket if she did not comply, but they escalated to threatening to lock her in her cell for "23 hours a day," essentially solitary confinement. (*Id.* ¶¶ 203–04.)

In or around January 2015, John Doe 2 approached Jane Doe 2 and said, "show me the brownies"—meaning her breasts—for which he would put money in her commissary so that she could call her mother. (*Id.* ¶ 210.) Jane Doe 2, who had not had any contact with her mother since being incarcerated, was "lonely and desperate" and "apprehensively" complied. (*Id.* ¶ 211.) The next day, Jane Doe 2 received money in her commissary account. (*Id.*)

At some point in or around 2014–2015, Jane Doe 2 was placed in cell block 19, which is a "dead zone" without any surveillance. (*Id.* ¶ 214.) John Doe 2 pretended that Jane Doe 2 had requested something so he could open the slot on her cell. (*Id.* ¶ 214.) He then demanded that Jane Doe 2 place her vagina by the slot so that Ventillo could "play with" it; after Jane Doe 2 did so, Ventillo penetrated her. (*Id.* ¶ 215.) This occurred on three occasions. (*Id.* ¶¶ 215, 227.)[6] On another occasion, Ventillo stood in the door of Jane Doe 2's cell, where he forced Jane Doe 2 to stroke his penis while he penetrated her vagina for a fourth time. (*Id.* ¶¶ 216, 227.)[7] Jane Doe 2 further alleges, on more than one occasion between February 2015 and June 2015, other officers demanded Jane Doe 2 "play with herself for the officer's personal sexual pleasure." (*Id.* ¶ 218.) Jane Doe 2 was released from the Jail in or about 2017. (*Id.* ¶ 219.) In or about September 2019, she was rearrested and reincarcerated at the Jail. (*Id.* ¶ 220.) When she arrived back at the jail, Kezek approached Jane Doe 2 and made sexually harassing comments to her before demanding that she flash him. (*Id.* ¶ 221.)[8]

6    The SAC is unclear on whether John Doe 2 participated in all three occasions or only one, or whether John Doe 2 is, in fact, Ventillo. (*See id.* ¶¶ 214–16.)

7    Jane Doe 2 alleges that, upon information and belief, Ventillo was arrested in 2016 in connection with the death of another female inmate who overdosed on the heroin that Ventillo provided her in exchange for sexual favors. (*Id.* ¶ 217; Weissman Decl. Ex. H.)

8    Jane Doe 2 was later a complaining victim in Jane Doe 1's criminal cases against Kezek. (*Id.* ¶ 224.)

**\*8** Jane Doe 2's second period of incarceration lasted approximately 30 days. (*Id.* ¶ 222.) During that time, she again witnessed female inmates being directed to flash officers and play with themselves, at approximately the same rate of frequency as during her first period of incarceration. (*Id.* ¶¶ 222–23.)

#### 5. Jane Doe 3

Jane Doe 3 was "sporadically" incarcerated at the Jail from in or about 2012 until in or about 2016. (*Id.* ¶ 229.) Jane Doe 3 alleges that, during her time at the Jail, Farrison "engaged in unlawful sexual acts" and "sexually inappropriate behavior" with her. (*Id.* ¶¶ 232–33.) Specifically, about three to four times a week, Farrison forced Jane Doe 3 to remove her underwear, "show him her naked body," and touch herself while he locked her in her cell. (*Id.* ¶ 234.) If Jane Doe 3 "failed to comply[,] she would be locked in her cell," so she "complied out of pure survival." (*Id.* ¶ 235.) Jane Doe 3 also alleges she was "offered contraband such as Xanax and privileges in exchange for her sexual acts." (*Id.* ¶ 235.)

In 2016, Jane Doe 3 was released from custody and released into "sheriff's work," where she was required to participate in supervised community service as part of her sentence. (*Id.* ¶¶ 230–31.) During this work, Farrison touched her, "grabb[ing] her butt and legs on several occasions." (*Id.* ¶ 240.) Farrison also obtained Jane Doe 3's home address information from the facility database and came to Jane Doe 3's house once she was released. (*Id.* ¶ 241.) Jane Doe 3 alleges that, after her release, Farrison "forced her to have sex[ ] against her will." (*Id.* ¶ 242.)

#### 6. Jane Doe 4

Jane Doe 4 was incarcerated sporadically in the Jail from in or about 2012 until in or about 2018. (*Id.* ¶ 243.) During her incarceration, Helchowski "sexually harassed" and "engaged in unlawful sexual acts" and "sexually inappropriate behavior" with Jane Doe 4. (*Id.* ¶¶ 244–47.) Specifically, Helchowski forced Jane Doe 4 to "flash him each and every time he walked by her cell," which occurred at least three or four times a week. (*Id.* ¶ 248.) Helchowski was allegedly aware Jane Doe 4 had a drug abuse problem, and "capitalized on [her] vulnerability." (*Id.*)

Jane Doe 4 also alleges that John Doe 5, the son of one of the Jail supervisors, "sexually harassed" her and "engaged in unlawful sexual acts" and "sexually inappropriate behavior" with her. (*Id.* ¶¶ 249–52.) Jane Doe 4 avers that, beginning in 2012 and continuing through the duration of her first period of incarceration at the Jail, John Doe 5 would force Jane Doe 4 to touch his penis. (*Id.* ¶ 252.) This contact occurred outside Jane Doe 4's jail cell. (*Id.*) Jane Doe 4 complied out of "pure survival," as she feared "repercussions for non-compliance," especially given that John Doe 5's father was a supervisor. (*Id.* ¶ 253.)

#### 7. Jane Doe 5

Jane Doe 5 was incarcerated at the Jail in 2019. (*Id.* ¶ 260.) During this time, John Doe 1 sexually harassed Jane Doe 5 and "engaged in sexually inappropriate behavior with her," forcing Jane Doe 5 to "touch herself and flash him," which occurred

consistently during her time at the Jail. (*Id.* ¶¶ 260–62.) [9] If Jane Doe 5 did not do so, she would be locked in her cell. (*Id.* ¶ 263.) Jane Doe 5 "complied out of pure survival" and was also offered "contraband" and "privileges" in exchange for performing sexual acts. (*Id.*) Jane Doe 5 also avers that, upon information and belief, the Individual Defendants would obtain female inmates' addresses and names from the Jail computer system and use that information against them once the inmates were released. (*Id.* ¶ 264.) Jane Doe 5's fear that this would occur to her compelled her to comply with John Doe 1's demands. (*Id.* ¶ 265.)

[9]    Jane Doe 5 alleges that John Doe 1 was also known as "Ken Doll." (*Id.*) However, elsewhere in the SAC, Plaintiffs allege that "Ken Doll" was John Doe 3, not John Doe 1. (*See id.* ¶¶ 43, 207.) Given the apparent confusion, the Court will only refer to the respective John Does by their numbers, not their nicknames.

Jane Doe 5 also alleges that Farrison "engaged in sexually inappropriate behavior with her," but provides no further details about his specific behavior. (*Id.* ¶ 261.)

### 8. Jane Doe 6

**\*9**   Jane Doe 6 was incarcerated in the Jail for the first time in September 2017 and for a second time in or about October 2019. (*Id.* ¶ 268.) Consistently throughout Jane Doe 6's first period of incarceration, John Does 2, 3, and 4 engaged in "sexually inappropriate behavior" with Jane Doe 6, forcing her to flash them, engage in intimate conversations with them, and "act as if she were in relationships with [them.]" (*Id.* ¶¶ 270–71.) John Does 2 through 4 would then "use[ ] such a false relationship to progress into sexually inappropriate behavior." (*Id.* ¶ 271.) Jane Doe 6 complied out of "pure survival," as if she failed to comply, she would be locked in her cell. (*Id.* ¶¶ 272–73.) Jane Doe 6 was also offered "contraband as privileges in exchange for her sexual acts"; John Does 2 through 4 would then deliver her the contraband. (*Id.* ¶ 274.)

Jane Doe 6 also alleges that, during her second period of incarceration, in 2019, Kezek subjected her to "sexually inappropriate behavior" and made numerous jokes to her about the size of his genitalia. (*Id.* ¶ 275.)

### 9. The Culture of the Jail

Jane Doe 1 alleges that the type of "sexual harassment and abuse" she experienced were "widespread," and that it was "the culture of the facility[ ] for many officers to ... make inappropriate sexual comments both directly and indirectly to inmates." (*Id.* ¶ 172.) Specifically, Jane Doe 1 alleges that an unidentified officer from another section of the jail would "casually come by" to "check out the inmates" and make sexually inappropriate comments about "intimate parts" of their bodies, and that another unidentified officer would call female inmates derogatory names linked to their gender and threaten sexual violence against them if they "didn't lock in." (*Id.*) Jane Doe 1 avers that "superior officers failed to protect [her] from continued harassment ... [and] [o]fficers [were] not held accountable for flagrant and constant sexual[ly] harassing comments[,] ... [as] disciplinary actions [were] never taken." (*Id.* ¶ 183.)

Jane Doe 2 alleges that, during her time in the Jail, she "frequently" saw officers pass by the female inmates' cells and "ask the women to flash their breast[s] to the officers if they wanted certain treatment," such as the officer putting money in the inmate's commissary account. (*Id.* ¶ 199.) Individual Defendants would give contraband or benefits to the inmates in exchange for sexual favors, ranging from "Dunkin Donuts, extra supplies, monies on your commissary, and turning a blind eye to any medicinal abuse." (*Id.* ¶ 200.) Jane Doe 2 alleges that she witnessed the Individual Defendants going after drug addicts specifically, as they were "especially vulnerable and would do anything for an officer if they agreed to get them drugs." (*Id.* ¶ 206.) Jane Doe 2 also witnessed "frequent sexual abuse," up to five times a shift, three shifts a day. (*Id.* ¶ 209.) She witnessed officers come up to other female inmates' cells and "demand that [they] play with themselves in a way the officers could watch." (*Id.* ¶ 212.) During her time at the Jail, Jane Doe 2 realized that the officers all had a code—"Mess with one, then you mess with them all." (*Id.* ¶ 208.)

2025 WL 945873

Jane Does 3, 4, 5, and 6 also allege that during their incarceration, they witnessed other inmates endure similar abuse, as the "culture of the facility" was for officers—a "majority" of whom participated in this behavior—to walk by inmates' cells and "have the inmates flash [the officers] or speak with them intimately." (*Id.* ¶¶ 237–38, 258, 266, 276.) Jane Does 3, 4, 5, and 6 also aver that, upon information and belief, many of the inmates were "asked to disrobe and told to gratify ... themselves for the officers['] ... sexual pleasure." (*Id.* ¶¶ 239, 259, 267, 277.)

C. Procedural History

The Court discussed the procedural background of this Action in a previous Opinion. (*See* Op. & Order.) The Court therefore assumes familiarity with the dispute and describes subsequent proceedings only as relevant to deciding the instant Motion.

**\*10** On October 23, 2023, Plaintiffs filed a SAC, adding for the first time Jane Does 2 through 6 as Plaintiffs. (*See* SAC.) On December 12, 2023, after requesting and receiving additional time to respond to the SAC, the County submitted a letter requesting to file a Motion to Dismiss. (*See* Dkt. Nos. 75–76; Letter from Robert B. Weissman, Esq. (Dkt. No. 77).) After multiple requests for additional time, which were granted, Plaintiffs filed their response on January 18, 2024. (*See* Dkt. Nos. 78–81; Letter from Steven A Metcalf, Esq. (Dkt. No. 82).) After holding a pre-motion conference on February 7, 2024, the Court set a briefing schedule. (*See* Dkt. (minute entry for Feb. 7, 2024); Scheduling Order (Dkt. No. 84).) The briefing schedule was later modified after requests from the County. (*See* Dkt. Nos. 85–90.)

On May 3, 2024, the County submitted its Motion to Dismiss the SAC and accompanying papers. (Not. of Mot. to Dismiss; County's Mem; Weissman Decl.) After requesting and receiving multiple extensions, (Dkt. Nos. 94–98), Plaintiffs filed their Opposition on August 1, 2024. (Pls' Opp'n.) The County filed its Reply on September 16, 2024, after requesting and receiving yet another extension. (Dkt. Nos. 100–01; Reply; Weissman Reply Affirm.)

## II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Doe 1 v. County of Rockland, Slip Copy (2025)
Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 82 of 160
2025 WL 945873

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Analysis

### 1. Counts One, Two, and Four

**\*11** Plaintiffs allege claims against Defendants based on violations of the Eighth, Fourteenth, and Fourth Amendments. (SAC ¶¶ 278–303, 357–67.) However, as the Court held in its prior Order, these claims are defectively pled because they allege liability directly under the Constitution, and there is no such direct cause of action for damages under the Constitution. (*See* Op. & Order at 17–18, n.11 (citing *Runge v. Collins*, No. 99-CV-9639, 2000 WL 726502, at *2 (S.D.N.Y. May 22, 2000) (explaining that "[v]iolations of an individual's constitutional rights by a [g]overnment official are actionable under 42 U.S.C. § 1983, rather than directly under the United States Constitution")).) Thus, Plaintiffs' first, second, and fourth causes of action fail as a matter of law and must be dismissed. [10] However, because the SAC incorporates Plaintiffs' allegations as to the Eighth and Fourteenth Amendment claims into their third cause of action under 42 U.S.C. § 1983, the Court reads the SAC as alleging those claims and considers the merits of those claims below, in connection with Plaintiffs' *Monell* claims. [11]

[10]   Plaintiffs argue, without more, that these claims are "properly plead" because they alleged violations of their due process rights. (Pls' Opp'n 32.) Plaintiffs again miss the point. It is not enough to allege a constitutional violation in an action seeking only damages; one must also bring the allegations in a suitable vehicle—i.e., under § 1983. *See Runge*, 2000 WL 726502, at *2 (citing *Monroe v. Pape*, 365 U.S. 167, 172 (1961)). Plaintiffs were given ample notice and opportunity to cure this deficiency and have failed to do so here.

[11]   Because the SAC does not incorporate Plaintiffs' Fourth Amendment challenge into their § 1983 claim, that count is dismissed for the reasons stated above.

### 2. Jane Doe 2 Through 6: Remaining Federal Claims

The County argues that, apart from those asserted by Jane Doe 1, all of the remaining federal claims are time barred. Specifically, the County argues that the federal claims asserted by Jane Does 2 through 6 are time barred by the three-year statute of limitations for §§ 1983 and 1985 claims, and the one-year statute of limitations for § 1986 claims. (County's Mem. 22.) Further, the County argues that these federal claims cannot be revived by the Adult Survivors Act, New York Civil Practice Law and Rules Law § 214-j (the "ASA"). (*Id.* at 23.) The Court agrees.

While Section 1986 has a strict one-year statute of limitations, *see* 42 U.S.C. § 1986, for §§ 1983 and 1985 actions, "the applicable limitations period is found in the general or residual state statute of limitations for personal injury actions," *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citation and quotation marks omitted) (alterations adopted). Here, New York's three-year statute of limitations for personal injury actions applies. *Id.* (citing, inter alia, N.Y. C.P.L.R. § 214(5)); *see also Fairley v. Collins*, No. 09-CV-6894, 2011 WL 1002422, at *3 (S.D.N.Y. Mar. 15, 2011) (same). The question of when §§ 1983, 1985, and 1986 claims accrue is a "question of federal law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "[A]ccrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl*, 296 F.3d at 80 (citation and quotation marks omitted); *Paige v. Police Dep't of City of Schenectady*, 264 F.3d 197, 200 (2d Cir. 2001) ("[A] § 1983 claim

accrues when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm." (internal quotation marks and citation omitted)); *see Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (noting § 1985 claims accrue once the plaintiff knows or has reason to know of the injury forming the basis of the action); *see Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 346, 354 (E.D.N.Y. 2013) (same, in the context of a § 1986 action). Put differently, accrual occurs when the plaintiff has "a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace*, 549 U.S. at 388 (citations and quotation marks omitted).

**\*12**  As alleged, Jane Doe 2 was incarcerated "on and off" from September 2014 through 2017, and again briefly in 2019, (SAC ¶¶ 196, 225); Jane Doe 3 was incarcerated from 2012 through 2016, (*id.* ¶¶ 229–30); Jane Doe 4 was incarcerated from "2012 until in or about 2018," (*id.* ¶ 243); Jane Doe 5 was incarcerated "[d]uring the year of 2019," (*id.* ¶ 260); and Jane Doe 6 was incarcerated in September 2017 and again "in or about October 2019," (*id.* ¶ 268). Jane Does 2 through 6's claims accrued, at the very latest, by their release from incarceration. Thus, their §§ 1983 and 1985 claims expired, at the latest, three years after their respective releases (i.e., expiring between 2019 and 2022) and their § 1986 claims expired one year after release (i.e., expiring between 2017 and 2020). Because Jane Does 2 through 6 were not joined in this lawsuit until the filing of the SAC in October 2023, their claims are thus time barred and must be dismissed. *See Wheeler v. Slanovec*, No. 16-CV-9065, 2019 WL 2994193, at \*7–8 (S.D.N.Y. July 9, 2019) (granting motion to dismiss on the grounds that plaintiffs' claims are time-barred).

Plaintiffs do not dispute that these claims are time barred but instead assert that they should gain the benefit of equitable tolling, as they feared retaliation if they filed suit against Defendants. (Pls' Opp'n 42–43.) While the Court is sympathetic to this claim, the law does not support it.

Under federal law, equitable tolling of the statute of limitations is applied "only in 'rare and exceptional circumstances,' where ... 'extraordinary circumstances' prevented a party from timely performing a required act." *Davis v. Jackson*, No. 15-CV-5359, 2016 WL 5720811, at \*9 (S.D.N.Y. Sept. 30, 2016) (quoting *Deraffele v. City of New Rochelle*, No. 15-CV-282, 2016 WL 1274590, at \*11 (S.D.N.Y. Mar. 30, 2016)); *see also Moses v. Westchester Cnty. Dep't of Corr.*, 951 F. Supp. 2d 448, 454 (S.D.N.Y. 2013) ("[C]ourts in th[e] [Second] Circuit deciding [§] 1983 claims have applied the federal equitable tolling standard, which allows tolling where extraordinary circumstances prevented a party from timely performing a required act." (internal quotation marks omitted)). "Equitable tolling is generally not available where the circumstances that a plaintiff claims prevented h[er] from timely filing were within the plaintiff's control." *Davis*, 2016 WL 5720811, at \*9 (quoting *Myers v. New York*, No. 14-CV-1492, 2016 WL 2636295, at \*5 (N.D.N.Y. May 9, 2016)); *see also Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (finding that equitable tolling was not available where pro se litigant's delay in filing his § 1983 action appeared to be entirely within his control). Moreover, "[t]he party asserting that equitable tolling applies must have 'acted with reasonable diligence throughout the period [s]he [sought] to toll.' " *Myers*, 2016 WL 2636295, at \*5 (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)). "[A] plaintiff bears the burden of establishing that equitable tolling of her claims is appropriate." *Id.* However, "[t]o secure equitable tolling, it is not enough for a party to show that [s]he experienced extraordinary circumstances. [Sh]e must further demonstrate that those circumstances caused h[er] to miss the original filing deadline." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011); *see also Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 527 (S.D.N.Y. Mar. 26, 2015) ("[T]o benefit from equitable tolling, a litigant must allege that extraordinary circumstances prevented h[er] from acting in a timely manner." (internal quotation marks omitted)).

Plaintiffs have failed to show such extraordinary circumstances here. Although Plaintiffs acknowledge that retaliation is typically an insufficient basis for equitable tolling, they argue that tolling should nevertheless apply because the "prison context establishes 'a real and ever-present force in an inmate's life' which 'can reasonably be said to be outside of an inmate-plaintiff's control.' " (Pls' Opp'n 43 (quoting *Davis*, 2016 WL 5720811, at \*11).) But Plaintiffs overlook that not "every inmate is entitled to equitable tolling merely because [s]he resides in an environment that intrinsically works to [her] disadvantage," as "[g]eneralized allegations of fear of retaliation ... are not sufficient to establish 'extraordinary circumstances.' " *Davis*, 2016 WL 5720811, at \*11.

Doe 1 v. County of Rockland, Slip Copy (2025)
Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 84 of 160
2025 WL 945873

**\*13** As the County points out, even if the Court assumes that Plaintiffs allege sufficient facts suggesting they had a legitimate fear of retaliation if they reported their claims of sexual abuse while incarcerated, once Jane Does 2 through 6 were released from incarceration—when all of their claims would still have been timely—they were "no longer under the 'substantial control' of the defendant correction officers and supervisory officials, and accordingly no longer subject to the 'unique psychological environment' of incarceration." *Stone #1 v. Annucci*, No. 20-CV-1326, 2021 WL 4463033, at \*12 (S.D.N.Y. 2021) (quoting *Davis*, 2016 5720811, at \*10–11). There are no specific facts alleged in the SAC suggesting Jane Does 2 through 6 had a credible basis to fear retaliation after their release, let alone any facts suggesting that they did, in fact, fear retaliation at that point.[12] *See id.* (finding plaintiff did not allege facts establishing a "specific and credible basis to fear retaliation once she was released from prison"); *Pratt v. Stop & Shop Supermarket Co., LLC*, No. 09-5417, 2011 WL 579152, at \*5 (E.D.N.Y. Feb. 9, 2011) ("[P]laintiffs['] generalized allegations of fear are insufficient to warrant equitable tolling." (citation omitted)).

[12]    Indeed, the opposite inference can be drawn at least as to Jane Doe 5, who, in August 26, 2020, sued a correctional officer at another facility for sexual abuse. (*See* Reply Weissman Reply Decl. Ex. A, ¶¶ 89–102.) Although this says nothing about Jane Doe 5's fear of retaliation from the officers in *this* Action, it does suggest that she was able to file suit as of that point.

Moreover, even if Plaintiffs alleged sufficient facts to suggest a specific and credible basis to fear retaliation post incarceration, they have not established another element of equitable tolling—that they pursued their claims with due diligence. *Myers*, 2016 WL 2636295, at \*5–6. Because Plaintiffs allege no facts suggesting they sought any protection from the purportedly feared retaliation, "the Court would be hard pressed to conclude that Plaintiff[s] exercised reasonable diligence in pursuing [their] rights if, for the entire time Plaintiff[s] allege[ ] [they] faced a threat of retaliation, [they] did nothing to seek protection from that threat of retaliation." *Davis*, 2016 WL 5720811, at \*11; *see also Doe v. USA*, No. 19-CV-1649, 2024 WL 4224467, at \*6 (D. Conn. Sept. 12, 2024) (finding a plaintiff did not act with reasonable diligence in pursuing her rights where "[p]laintiff had ample time, opportunity, and access to many other people who could have safely assisted her prior to ... the latest arguable accrual date for her claims"), *appeal pending*, No. 24-2374 (2d Cir. Sept. 11, 2024); *Clark v. Hanley*, No. 18-CV-1765, 2022 WL 124298, at \*5–6 (D. Conn. Jan. 13, 2022) (finding equitable tolling based on a fear of retaliation was not warranted where plaintiff never reported any behavior by defendants that led to her fear despite opportunities to do so), *aff'd*, 89 F.4th 78 (2d Cir. 2023). Accordingly, the Court concludes that Jane Does 2 through 6 cannot equitably toll their federal claims.

Further, to the extent Plaintiffs are attempting to revive their federal claims by way of the ASA, (*see* Pls' Opp'n 42), they are unsuccessful. The ASA "created a one-year revival period, starting November 24, 2022, during which adult survivors of sexual assault could sue their abusers despite the expiration of the previously applicable statutes of limitation." *Johnson v. NYU Langone Health*, No. 22-CV-9456, 2023 WL 6393466, at \*2 (S.D.N.Y. Sept. 30, 2023) (citation omitted). The Second Circuit has not yet considered whether the ASA can revive §§ 1983, 1986, or 1986 claims. However, it recently held that a nearly identical revival statute pertaining to victims under eighteen years old does *not* revive § 1983 claims. *See Kane v. Mount Pleasant Central Sch. Dist.*, 80 F. 4th 101, 108 (2d Cir. 2023). The Second Circuit reasoned that per Supreme Court precedent, "federal interests in uniformity, certainty, and the minimization of unnecessary litigation" require a single statute of limitations for § 1983 claims—i.e., state personal injury statutes. *Id.* at 107 (quoting *Wilson v. Garcia*, 471 U.S. 261, 275 (1985)). Accordingly, the "application of [state] tort-specific revival or tolling provisions" would frustrate those interests and cause confusion. *Id.* at 109. In so holding, the Second Circuit noted that "every United States Court of Appeals to address this issue thus far has determined that a specialized statute for sexual abuse claims does not render an otherwise untimely Section 1983 ... timely." *Id.* (collecting cases).

**\*14** Although Plaintiffs argue that the "facts and circumstances [here] are unique and consistent with the underlying policies" behind the ASA, (Pls' Opp'n 42), the Court finds *Kane*'s reasoning persuasive and concludes that the same reasoning applies to the ASA, *see Doe v. Columbia Univ.*, No. 23-CV-10393, 2024 WL 4149252, at \*11 n.6 (S.D.N.Y. Sept. 11, 2024) (stating, after plaintiff's concession that the ASA did not revive his federal claims, "[t]here is no authority for the proposition that the ASA revives other federal claims," but noting that "the most direct guidance from the Second Circuit is that the analogous New York Child Victims Act, ('CVA') does not" (citing *Kane*, 80 F. 4th at 104)); *Austin v. Fordham Univ.*, No. 21-CV-6421, 2022

WL 4626485, at *11 n.6 (S.D.N.Y. Sept. 30, 2022) ("[T]he Court is not persuaded that [the ASA] will have any impact on the statute of limitations and tolling analysis" in the Title IX context, as "[c]ourts that considered revival claims under an analogous statute, the [CVA], found that the Act did not extend the statute of limitations for federal § 1983 claims."). [13]

13    Moreover, even if the ASA did revive §§ 1983, 1985, and 1986 claims, it would not be able to revive the claims of Jane Does 5 and 6, whose claims cannot be revived even solely under state law. "For a claim to be revived pursuant to the ASA, a defendant's underlying conduct must 'constitute a sexual offense as defined in article one hundred thirty of the penal law.' " *Johnson*, 2023 WL 6393466, at *2 (quoting N.Y. C.P.L.R. 214-j). The SAC relies upon New York Penal Law §§ 130.65, 130.60, and 130.55—sexual abuse in the first, second, and third degrees, respectively. (*See* SAC ¶¶ 403, 409, 414.) As the County points out, each of these offenses requires that the perpetrator subject another person to "sexual contact," which is defined as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party" and "includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed." N.Y. Penal L. § 130.00(3). Thus, claims that do not include some type of physical touching—such as those alleged by Jane Does 5 and 6—are not revived by the ASA. *See Johnson*, 2023 WL 6393466, at *2–3 (concluding that claims that included no allegations of "forcible touching" as required by the relevant Penal Law could not be revived); *Leib-Podry v. Tobias*, No. 22-CV-8614, 2024 WL 1421152, at *8–9 (S.D.N.Y. Feb. 13, 2024) (finding that the ASA did not apply because the claim "d[id] not allege anything that would constitute a sexual offense under NY CPL [§] 130"), *report and recommendation adopted*, 2024 WL 1134597 (S.D.N.Y. Mar. 15, 2024), *appeal dismissed*, No. 24-1248 (2d Cir. July 21, 2024). Although Plaintiffs argue that the County "fails to sufficiently demonstrate that touching under the direction and coercion ... of one['s] self and the conduct alleged is insufficient" to be revived under the ASA, Plaintiffs offer no support detailing why such conduct *would* be sufficient to overcome the Penal Law's clear statutory language. (*See* Pls' Opp'n 44.)

### 3. *Monell* Claims (Counts Three, Five, and Six)

The Court next turns to Jane Doe 1's *Monell* claims against the County (Counts Three, Five, and Six) based on violations of her rights under the Fifth, Eighth, and Fourteenth Amendments. (SAC ¶¶ 305–21, 368–80.) The County argues that Jane Doe 1's claims must be dismissed because she has not adequately alleged either a widespread custom or practice that subjected her to a deprivation of her Constitutional rights or a failure to train or supervise to the extent that it amounted to deliberate indifference to Jane Doe 1's rights. (County's Mem. 27–33.) Jane Doe 1 argues that, drawing all inferences in her favor, she has alleged sufficient indicia of a widespread pattern such that "policy-makers must have been aware yet inadequately responded." (Pl.'s Opp'n 32–39.)

**15**  "To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived [her] of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013). "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Thus,

> to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.

*Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (recommending dismissal of a claim against agencies where plaintiff did not allege that any policy

or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr. 16, 2010) (recommending dismissal of a claim against a county because the complaint "does not allege the existence of an unconstitutional custom or policy"), *adopted as modified sub nom. Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010). The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong" (emphasis in original)). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

**\*16** *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). Generally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at 404); *see also Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis in original)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

a. Widespread Practice or Custom

**Doe 1 v. County of Rockland, Slip Copy (2025)**
Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 87 of 160
2025 WL 945873

Jane Doe 1 argues that she has adequately pled the existence of a widespread practice or custom of tolerating sexual harassment and abuse, as she alleges the Jail had a "custom of allowing one male officer to supervise females without cameras and the ability to deter other officers," (*see* SAC ¶¶ 343–56), which led to "almost a decade of abuse that can be accounted for, on a daily basis, by multiple officers who were trading contraband and privileges for sexual acts," (Pl.'s Opp'n 39). Jane Doe 1 does not allege that there is any formal policy underlying this abuse, but instead, that it is so common as "to support an inference that [supervisors] had a policy, custom or usage of acquiescence in such abuse." (*Id.* at 38 (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012)).)

To establish *Monell* liability based upon a "persistent and widespread" practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be " ' 'so manifest as to imply the constructive acquiescence of senior policy-making officials.' " *Lucente v. County of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) ("[A] plaintiff must prove that the custom at issue is permanent and well-settled." (citing *Praprotnik*, 485 U.S. at 127)). "[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]." *Bowen v. County of Westchester*, 706 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (quoting *Newton v. City of New York*, 566 F. Supp. 2d 256, 270–71 (S.D.N.Y. 2008)); *see also Tuttle*, 471 U.S. at 823–24; *Sorlucco*, 971 F.2d at 870 ("A municipal agency may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees."). Instead, "in assessing whether it can be inferred that municipal policymakers acquiesced in unconstitutional conduct of a subordinate employee, it is important to analyze the severity and scope of the unconstitutional conduct by the employee or multiple employees." *Lucente*, 980 F.3d at 298.

Here, Jane Doe 1 pleads sufficient facts to infer that the County had an informal policy, or custom, of tolerating sexual abuse and harassment by corrections officers, which directly led to her own constitutional violations. [14] Jane Doe 1 alleges that, during her incarceration in the Jail, she was sexually harassed by Kezek, Taggart, and John Doe 1, (*see* supra Section I.B.3.), and that it was "the culture of the facility[ ] for many officers to ... make inappropriate sexual comments both directly and indirectly to inmates," (SAC ¶ 172; *see* supra Section I.B.9). Further, the SAC contains allegations that, over a seven-year period, at least five other inmates were continually abused and harassed in substantially similar ways by at least nine separate officers (including the son of one of the Jail's supervisors). (*See* supra Section I.B.4–8.) The SAC also contains allegations that apart from the specific instances alleged, there was a widespread culture of officers coercing female inmates into trading sexual favors for contraband or benefits to the inmates, as well as a culture of officers making sexually inappropriate or disparaging remarks to or about female inmates. (*See* supra Section I.B.9.) Thus, Jane Doe 1 "has not alleged one isolated incident of ... misconduct," but instead, "has alleged multiple incidents over a long, continuous time period." *Michael v. County of Nassau*, No. 09-CV-5200, 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010); *see also DiPippo v. County of Putnam*, 2019 WL 1004152, at *9 (S.D.N.Y. Feb. 28, 2019) (finding a plaintiff adequately plead a *Monell* claim where he "pleaded ample specific facts indicating that [d]efendants used extremely similar coercive investigative techniques on at least six witnesses"); *cf. Lucente*, 980 F.3d at 298 (reversing a grant of summary judgment in favor of a municipality where one officer was alleged to have sexually assaulted and harassed six inmates over eighteen months, and where "the record [was] replete with evidence of ... sexual harassment of female inmates on a regular basis" by the same officer); *Rutherford v. City of Mount Vernon*, 698 F. Supp. 3d 574, 612 (S.D.N.Y. 2023) (finding plaintiffs could sustain, at summary judgment, a widespread practice theory of *Monell* liability when they proffered evidence of fourteen complaints of police misconduct, eight of which occurred over a 36-month period, that "detail[ed] substantially similar conduct on the part of the [police]").

[14]    Although all claims other than those asserted by Jane Doe 1 are time barred, (*see* supra Section II.B.2), given that Jane Doe 1 "has alleged both the existence of an ongoing policy of [harassment and abuse] and some non-time-barred acts taken in furtherance of that policy," the Court will consider the time-barred acts alleged by the other Plaintiffs as context when analyzing the merits of Jane Doe 1's *Monell* claim. *See Ciotti v. City of New York*, No. 23-CV-10279, 2025 WL 308022, at *20 (S.D.N.Y. Jan. 27, 2025) (citing *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)); *Murray v. New York City*, No. 19-CV-1959, 2019 WL 4053951, at *3 n.2 (S.D.N.Y. Aug. 28, 2019) (noting, in a § 1983 action, that "untimely claims of sexual harassment may be introduced as evidence in a case involving timely claims"); *cf. Siclari v.*

*N.Y.C. Dep't of Educ.*, No. 19-CV-7611, 2020 WL 7028870, at *7 (S.D.N.Y. Nov. 30, 2020) (noting, while evaluating an ADEA claim, that "untimely allegations may provide background evidence in support of a timely claim" (internal quotation marks omitted)); *Allen v. New York City Dep't of Env't Prot.*, 51 F. Supp. 3d 504, 510 n.2 (S.D.N.Y. 2014) (noting, in the context of a Title VII action, that the untimely "adverse employment decisions [p]laintiff asserts may provide context and support for the timely claims that [p]laintiff asserts").

**\*17** Moreover, the fact that much of this alleged conduct occurred in areas that were subject to supervisory visits, (SAC ¶¶ 107–11), "suggests that the officers involved did not fear supervisory personnel observing their conduct, intervening to stop them, or subjecting them to disciplinary action for their misdeeds," *Michael*, 2010 WL 3237143, at *4 (allegations that corrections officers failed to "regularly patrol the tiers/areas to which they were assigned" suggested "inattention to or knowing acquiescence in misconduct by law enforcement personnel," thereby successfully pleading a widespread practice or custom (citing *Bangura v. County of Nassau*, No. 07-CV-2966, 2009 WL 57135, at *1 (E.D.N.Y Jan. 6, 2009))). In other words, these allegations suggest that the Individual Defendants' abusive behavior was "not isolated, but rather was severe, persistent, and pervasive conduct that was executed in a manner that would have been difficult to conceal from supervisory personnel at the [Jail], including policymakers." *Cf. Lucente*, 980 F.3d at 297–99 (reversing a grant of summary judgment in favor of a municipality because a corrections officer's misconduct was so blatant as to be "open and notorious," thus "constructively support[ing] the inference that policymakers ... had a custom or practice of acquiescing to [the] sexual misconduct"); *see Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 63 (2d Cir. 2014) ("[B]ased on the pervasiveness of the harassment and the lack of response, the jury could reasonably have found that [the policymaker's] inaction and acquiescence to the harassment that [the plaintiff] suffered allowed the harassment to become the custom and practice, if not the policy, of the [municipality].").

The County argues that because "[p]leadings articulating only isolated instances of unconstitutional behavior do not plausibly allege a well-settled custom, ... the SAC's allegations that certain rogue officers engaged in sexual misconduct" fail to plead a widespread custom or practice. (County's Mem. 27–28.) Although the Court agreed when granting the County's Motion to Dismiss the First Amended Complaint ("FAC") that "[s]everal instances of alleged sexual harassment [as to Jane Doe 1] and additional instances of disparaging comments involving different low-level defendants, as troubling as they may be, are insufficient to support a claim of a widespread pattern or practice," (Op. & Order 19–20 (citations omitted)), the SAC contains far more robust allegations, including multiple, specific instances of abuse allegedly perpetrated by multiple defendants against multiple female inmates over an extended period of time. Thus, Jane Doe 1 has not merely "alleg[ed] [her] own experiences and then extrapolat[ed them] to the entire jail population." *See Williams v. Fryermuth*, No. 23-CV-2156, 2024 WL 4557444, at *5 (S.D.N.Y. Oct. 23, 2024) (dismissing *Monell* claim where plaintiff only alleged specific misconduct done to her); *Douglas v. City of Peeksill*, No. 21-CV-10644, 2023 WL 2632217, at *9 (S.D.N.Y. Mar. 24, 2023) (dismissing *Monell* claim where plaintiff identified only isolated instances of constitutional violations). Instead—in addition to the general allegations about the Jail's culture of harassment—Jane Doe 1 has alleged over fifteen specific instances of sexual abuse and/or harassment (many of which were allegedly to be recurring), perpetrated by nine identified officers against six female inmates. Accordingly, at this stage of the litigation, she has adequately plead a widespread practice or custom sufficient to establish *Monell* liability. [15] *See DiPippo*, 2019 WL 1004152, at *9 (denying a motion to dismiss and noting "a *Monell* claim, based on a widespread custom or policy, must be context-specific and cannot be reduced to an overly simplistic analysis of the number of instances alleged"); *see also Michael*, 2010 3237143, at *4–5 (allowing municipal liability claim to proceed where the allegations consisted of "multiple incidents over a long, continuous period of time" that involved "multiple officers"); *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012) (denying the City's motion to dismiss where the plaintiff "points to over fifteen cases where City prosecutors allegedly committed misconduct, and alleges the existence of many more such cases in the form of unpublished opinions"); *cf. Jones*, 691 F.3d at 85 (finding that evidence of "two instances, or at most three, over a period of several years ... fell far short of showing a policy, custom, or usage"); *Ayyaz v. City of New York*, No. 19-CV-1412, 2021 WL 1225684, at *3 (S.D.N.Y. Mar. 31, 2021) (denying a *Monell* claim where plaintiff only alleged "sexual harassment or discrimination incidents ... involving herself" and two defendants); *White v. City of New York*, 206 F. Supp. 3d 920, 938 (S.D.N.Y. 2016) (finding six incidents over five years insufficient to plausibly allege the existence of a municipal policy). [16]

15    The Court notes that, at this stage, Jane Doe 1 is not required to "identify a specific policymaker who promulgated a policy or custom or an express rule or regulation," as "it is enough" at this "context-specific" stage "to plead that a city had a general unconstitutional policy," as a "plaintiff has 'no realistic way to learn about a municipality's training programs without discovery.' *DiPippo*, 2019 WL 1004152, at *9 (internal quotation marks omitted); *see also Michael*, 2010 3237143, at *4 (noting that "[p]laintiff's Complaint [does not] identify a policymaker who promulgated such a policy or custom through his acts[,] [b]ut, at least at [the motion to dismiss] stage, the law does not require him to do so" (citing *Patterson v. County of Oneida, New York*, 375 F.3d 206, 226 (2d Cir. 2004))).

16    The County argues that, because Taggart and Kezek were disciplined and prosecuted once caught, "[s]uch conduct is incompatible with a theory that the County was aware of a widespread pattern of sexual misconduct by corrections officers and failed to act." (County's Mem. 29 (citing Op. and Order at 21).) The County is correct that it acted to correct Taggart and Kezek's abuse once it became aware of those officers' actions in 2019, (SAC ¶¶ 184, 189, 193), and that the Court found that those allegations in the FAC were sufficient to defeat Jane Doe 1's *Monell* claim, (Op. and Order at 21). However, the County overlooks that the SAC is not restricted *only* to Taggart and Kezek's behavior vis-à-vis Jane Doe 1. Instead, the SAC is replete with allegations of blatant and pervasive abuse and harassment committed by Kezek against other female inmates, as well as such abuse committed by multiple other Individual Defendants for years prior to the County's intervention as to Taggart and Kezek. (*See* supra Section I.B.4–9.) In other words, that the County eventually disciplined two of the nine officers involved in the alleged conduct, after the abuse was committed—and only did so for their behavior as to one victim—does not, at this stage, undermine the inference that the County constructively acquiesced to the pattern of sexual abuse. *See Castilla v. City of New York*, No. 09-CV-5446, 2012 WL 3871517, at *5 (S.D.N.Y. Sept. 6, 2012) (noting, in denying a motion to dismiss a *Monell* claim, that "the issue of whether the City eventually investigates and disciplines employees accused of misconduct is distinct from whether the City was deliberately indifferent to the violation of citizens' constitutional rights in the first place").

b. Failure to Train

 **\*18**  Jane Doe 1 also argues that *Monell* liability attaches because the County "fail[ed] to provide adequate training ... [to its] subordinates so much so that it amounted to the County's deliberate indifference." (Pls' Opp'n 33.) The Court disagrees.

*Monell* liability can exist " 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.' " *Fraser v. City of New York*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)). This requires a showing that policymaking officials were deliberately indifferent. *Doe v. City of New York*, No. 18-CV-670, 2018 WL 3824133, at *8 (E.D.N.Y. Aug. 9, 2018). To make out a failure to train claim, a plaintiff must

establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also ... identify a specific deficiency in the city's training program and establish that deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation.

*Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quoting *City of Canton*, 489 U.S. at 391). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Brown*, 520 U.S. at 410). In other words, "the official made a conscious choice, and was not merely negligent." *Jones*, 691 F.3d at 81 (citations omitted). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

Jane Doe 1's primary argument is that the County was aware that female prisoners faced a high risk of sexual abuse—based upon "the prevalent amount of studies that demonstrate sexual inappropriateness among prisons, the enactment of PREA," and Ventillo's 2016 arrest in connection with the death of a former inmate—but that the County failed to adequately train its employees to prevent such abuse. (Pls' Opp'n 36.) However, the Second Circuit has made clear "that a plaintiff may not establish

municipal liability under a failure-to-train theory without identify[ing] a specific deficiency in the city's training program and establish[ing] that [the] deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Noonan v. City of New York*, No. 14-CV-4084, 2015 WL 3948836, at *4 (S.D.N.Y. June 26, 2015) (internal quotation marks omitted) (citing *Amnesty Am.*, 361 F.3d at 129–30). Jane Doe 1 fails to do so here, as her assertions that "Individual Defendants' conduct and choices could of and would have been different had it been for appropriate training on ... [PREA]," (SAC ¶ 324), are insufficient to plausibly allege that any specific training deficiencies caused her injury, *see Williams*, 2024 4557444, at *6 (dismissing a failure to train claim where plaintiff "does not, for instance, allege deficiencies with procedural manuals or training guides" or "highlight relevant particular aspects of [the jail's] training" but instead, "merely accuses [the county] of failing to properly train and monitor its staff" (alterations, quotation marks, and citations omitted)); *Taranto v. Putnam County*, No. 21-CV-2455, 2023 WL 6318280, at *19 (S.D.N.Y. Sept. 28, 2023) (dismissing a failure to train claim "based on a threadbare description of the County's training," which "is the type of conclusory claim that courts routinely dismiss"); *Dumel v. Westchester County*, No. 19-CV-2161, 2021 WL 738365, at *6 (S.D.N.Y. Feb. 25, 2021) (dismissing failure to train claim where "[p]laintiff's general claim that the County failed to train ... its staff is a boilerplate assertion that is insufficient, without more, to state a *Monell* claim" (internal quotation marks omitted) (alterations adopted)); *Marte v. N.Y.C. Police Dep't*, No. 10-CV-3706, 2010 WL 4176696, at *3 (S.D.N.Y. Oct. 12, 2010) (granting a motion to dismiss where plaintiffs did "not ple[a]d any facts that plausibly allege a specific deficiency in the training ... program that accounts for deprivation of their constitutional rights"). Accordingly, Jane Doe 1 has not alleged a specific training deficiency sufficient to survive a motion to dismiss.

**\*19** Further, even had she alleged a specific deficiency, Jane Doe 1 has not "establish[ed] that that [training] deficiency caused the constitutional deprivation," (i.e., the sexual abuse), *Taranto*, 2023 WL 6318280, at *19 (quoting *Benn v. City of New York*, No. 18-CV-722, 2021 WL 3193022, at *6 (S.D.N.Y. July 28, 2021)), as Jane Doe 1 offers no allegations sufficient to suggest that interacting with female inmates "will frequently confront [corrections officers] with difficult choices of law that would be alleviated by training, and no evidence that making the wrong choice will frequently deprive [the inmates] of their constitutional rights," *Castilla*, 2012 WL 5510910, at *6 (denying a failure to train claim at summary judgment). Put differently, "deciding not to rape someone is not the kind of difficult choice of the sort that training ... will make less difficult." *Doe*, 2018 WL 3824133, at *9 (quotation marks omitted) (quoting *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992)); *see Noonan*, 2015 WL 3948836, at *4 ("The decision to commit a sexual assault—a blatantly criminal act—cannot reasonably be seen as posing the type of 'difficult choice' contemplated by the Second Circuit in *Walker*."); *Castilla*, 2012 WL 5510910, at *6 ("It beggars common sense to posit that [an individual defendant] faced a difficult choice as to whether or not to coerce sex from [plaintiff] and that training would have alleviated that conundrum."). [17]

[17]    Jane Doe 1 also attempts to make out a failure to train theory based on the Jail's alleged failure to train the *inmates* on how to report sexual abuse. (*See* SAC ¶¶ 335–42.) However, Jane Doe 1 proffers no legal argument and cites no authority for why the Court should accept this theory of *Monell* liability based on failure to train a third party, and as such, the Court will not consider it here.

Accordingly, Jane Doe 1 has not adequately pled a failure to train claim.

c. <u>Failure to Supervise</u>

Jane Doe 1 further argues that the County is liable for failing to properly supervise its employees. (*See* Pls' Opp'n 34–37.) Specifically, Jane Doe 1 alleges multiple deficiencies in the Jail's supervision of its corrections officers, specifically, that there was: (1) no actual monitoring of contraband; (2) an insufficient number of cameras and an insufficient monitoring of existing cameras; (3) inadequate unannounced supervisory rounds; (4) no enforcement of any disciplinary policy for officers who failed to report abuse; (5) widespread fear of reporting among inmates due to "poor policies"; and (6) no gender specific practices, dual officer requirements, or prohibitions on time spent with inmates. (*Id.* at 36–37.) Jane Doe 1 also alleges that the risk of officers sexually exploiting female inmates was obvious, given the "coercive power that corrections officers wield over incarcerated

women" and that all sexual activity "between incarcerated individuals and correctional staff" has been criminalized by state law. (SAC ¶ 63.) This claim, too, fails.

"To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Lopes v. Westchester County*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020) (citation omitted). To establish deliberate indifference for a failure to supervise claim, a plaintiff

> must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations ... if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."

*Taranto*, 2023 WL 6318280, at *20 (quoting *Buari v. City of New York*, 530 F. Supp. 3d 356, 400 (S.D.N.Y. 2021)). "[A]n allegation of numerous claims of [the underlying constitutional wrong] by itself is insufficient to raise an inference of deliberate indifference due to failure to supervise." *Tieman*, 2015 WL 1379652, at *21.

**\*20** As the Second Circuit recognized in *Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011), given the unique context of the correctional environment and the power imbalances therein, the relevant question here is not whether the County "should have realized the need for ... a prohibition" on sexual activity between corrections officers and female inmates, but

> whether defendants could rely simply on guards' awareness of these criminal laws (and ... policies implementing them) to deter sexual exploitation of prisoners, or whether defendants had reason to know that *more was required* to discharge their affirmative protective duty, specifically, precluding or at least monitoring one-on-one contact between guards and prisoners.... Thus, the deliberate indifference concern here is with the adequacy of defendants' own actions to *prevent* sexual contact between guards and prisoners consistent with their affirmative duty to protect prisoners in their custody.

*Id.* at 335–36 (emphases added). Because the plaintiff in *Cash* had proffered evidence that, prior to the assault at issue, another detainee had complained of similar misconduct by prison guards, to which the county only responded by issuing a one-page memorandum reminding personnel of the facility's "no-contact" policy, *id.* at 330–31, the Second Circuit concluded that a jury could have found that the county should have taken more proactive steps to counter the abuse, *id.* at 336, 339.

Even drawing all inferences in Jane Doe 1's favor, the allegations in the SAC do not demonstrate the County had reason to know that more was required of its policies to prevent the alleged constitutional violations. Although *Cash* confirmed "that a *single*, prior report of sexual abuse at the relevant facility would have put the policymaker on notice that 'mere proscriptions on sexual contact between guards and prisoners had proved an insufficient deterrent to sexual exploitation,' " *Pusepa v. Annucci*, No. 17-CV-1765, 2019 WL 690678, at *6 (S.D.N.Y. Feb. 19, 2019) (emphasis in original) (quoting *Cash*, 654 F.3d at 336), here, Jane Doe 1 does not allege that there were *any* reports prior to the abuse she suffered that would have put the County on notice that their supervisory policies were insufficient, let alone reports that the County ignored, *see Kovalchik v. City of New York*, No. 09-CV-4546, 2014 WL 4652478, at *4 (S.D.N.Y. Sept. 18, 2014) (dismissing *Monell* claim and noting that "[c]entral to [the] conclusion [in *Cash*] was evidence that prior to the sexual assault at issue, another detainee complained of sexual misconduct by prison guards"). Indeed, the only allegation that the County was on actual notice of a specific instance of sexual misconduct related to a Jail employee—prior to its eventual investigations into Taggart and Kezek—was Ventillo's arrest. (*See* SAC ¶ 217.) However, Ventillo's misconduct, unlike the misconduct reported in *Cash*, occurred *outside* the Jail with a *former* inmate no longer in custody. (*See id.*) Given that Ventillo's behavior thus occurred in an environment removed from the Jail's supervisory systems, and with someone who was no longer directly subject "to the inherent power differential between

guards and prisoners," *Cash*, 654 F.3d at 337, this single incident is insufficient to put the County on notice "such that the need for corrective action or supervision was obvious," *id.* (quoting *Amnesty Am.*, 361 F.3d at 128).

**\*21**  Accordingly, because Jane Doe 1 does not allege facts sufficient to infer the County was on notice that current policies "had proved an insufficient deterrent to sexual exploitation," and was deliberately indifferent to the risk of perpetuating those policy, her failure to supervise claim fails. [18]  *Cash*, 654 F.3d at 336*; see Williams*, 2024 WL 4557444, at *7 (rejecting plaintiff's reliance on *Cash* where plaintiff had not pled the county was on notice of prior instances of sexual abuse); *Khapesi v. City of New York*, No. 13-CV-4391, 2014 WL 2605342, at *7 (S.D.N.Y. June 10, 2014) (rejecting plaintiff's reliance on *Cash* to support the argument that "allowing clergy to be alone and unmonitored in visits ... constitutes a moral certainty of sexual temptation" and that "inmates in unmonitored sessions with clergy will be sexually abused"); *see also Taranto*, 2023 WL 6318280, at *20 (noting that plaintiffs' failure to allege "any prior lack of investigation into or disciplining of [the individual defendant], or any other officer for that matter, ... dooms their claim"); *Esperanza v. City of New York*, 325 F. Supp. 3d 288, 309 (E.D.N.Y. 2018) ("Plaintiffs do not allege any specific facts regarding whether the [c]ity investigated or disciplined [defendant police officer] in response to the complaints of excessive force."); *Walker v. City of New York*, No. 14-CV-808, 2015 WL 4254026, at *11 (S.D.N.Y. July 14, 2015) (noting that "[e]ven if [the] [p]laintiff had shown an obvious need for more or better supervision by listing the numerous lawsuits and complaints, he has not stated any facts to show that the [c]ity has acted with deliberate indifference" where "he does not specifically claim that the [c]ity failed to investigate the list of lawsuits"). [19]

[18]  Moreover, to the extent Jane Doe 1 argues that the County demonstrated deliberate indifference by not implementing a policy "requir[ing] segregation of correctional officers from opposite-sex inmates," (SAC ¶ 343), accepting this argument would functionally "create a per se rule ... that corrections officers and prisoners of the opposite sex could never be left in unmonitored one-on-one interactions—a rule the Second Circuit explicitly rejected in *Cash*," *Williams*, 2024 WL 4557444, at *7 (citing *Cash*, 654 F.3d at 336 (taking "no exception to the district court's [ ] observation" that "a policy permitting unmonitored one-on-one interactions between a guard and a prisoner of different sexes was not itself unconstitutional")). Although the Court notes the obvious wisdom behind enacting such a policy, the Court declines to create a rule requiring it.

[19]  The Court notes that, superficially, there may seem to be tension between this conclusion and the Court's conclusion regarding Jane Doe 1's widespread practice theory. However, "[w]hile particular facts supporting each claim are certainly related, the theories are distinct." *Rutherford*, 698 F. Supp. 3d at 617 (denying summary judgment on a failure to train, investigate, and supervise theory of liability but granting summary judgment on a widespread practice theory); *Buari*, 530 F. Supp. 3d at 408 (same, on a motion to dismiss). Moreover, unlike a widespread practice claim, a failure to train or supervise claim has "a heavy burden of proof to show that the municipality's response was so patently inadequate to the task as to amount to deliberate indifference." *Rutherford*, 698 F. Supp. 3d at 616 (quotation marks omitted) (quoting *Floyd v. City of New York*, 813 F. Supp. 2d 417, 441 (S.D.N.Y. 2011)); *see also DiPippo*, 2019 WL 1004152, at *9 ("[T]he pre-discovery pleading standard for a custom or practice is not a high bar.").

d. Failure to Intervene

The County also seeks to dismiss Jane Doe 1's claims for failure to intervene and reckless disregard, insofar as they are asserted against the County, on the grounds that she fails to state a claim. (*See* County's Mem. 33–35.) The Court agrees.

Jane Doe 1 does not respond to the County's arguments, (*see generally* Pls' Opp'n), which, by itself, constitutes a waiver of the failure to intervene claim, *see Johnson v. AFNI, Inc.*, No. 22-CV-2930, 2023 WL 2970919, at *1 (S.D.N.Y. Apr. 15, 2023) ("[T]he plaintiff's failure to respond to the defendants' motions to dismiss is enough on its own to justify dismissal of the complaint, because [t]he failure to oppose a motion to dismiss a claim is deemed abandonment of the claim." (internal quotation marks omitted)); *see also Johnson v. City of New York*, No. 15-CV-8195, 2017 WL 2312924, at *17 (S.D.N.Y. May 26, 2017)

(collecting cases); *Youmans v. Schriro*, No. 12-CV-3690, 2013 WL 6284422, at *5 (S.D.N.Y. Dec. 3, 2013) ("Plaintiff's failure to respond to contentions raised in a motion to dismiss ... constitutes an abandonment of those claims.").

**\*22**  Moreover, Jane Doe 1 has failed to adequately plead a failure to intervene claim. "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Harris v. City of Newburgh*, No. 16-CV-2731, 2017 WL 4334141, at *9 (S.D.N.Y. Sept. 27, 2017) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)); *McClean v. County of Westchester*, No. 17-CV-4492, 2018 WL 6329420, at *19 (S.D.N.Y. Dec. 3, 2018) (same), *aff'd sub nom. McClean v. City of Mount Vernon*, 776 F. App'x 725 (2d Cir. 2019). To establish liability under this theory, a plaintiff must show that: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *McClean*, 2018 WL 632942, at *19 (citations omitted).

Here, Jane Doe 1 only alleges that the County and the Individual Defendants "had a reasonable opportunity to prevent the violations of [her] Constitutional rights but failed to intervene." (SAC ¶ 378.) She does not point to any specific officer that had such an opportunity to prevent her abuse at the hands of Taggart and Kezek, nor identify any specific individual that failed to do so. Such conclusory allegations do not suffice to state a failure to intervene claim and accordingly, the claim must be dismissed. *See Case v. City of New York*, 233 F. Supp. 3d 372, 402 (S.D.N.Y. 2017) (dismissing a failure to intervene claim where the "broad allegations" in the complaint "fail to raise a reasonable inference that [any defendant] had a realistic opportunity to prevent" the constitutional violations (internal quotation marks omitted)); *Bouche v. City of Mount Vernon*, No. 11-CV-5246, 2012 WL 987592, at *7 (S.D.N.Y. Mar. 23, 2012) (dismissing failure to intervene claim where "[plaintiff] only refers to the defendants in the collective, never identifying which defendants were responsible for specific actions" and "failed to state who or how defendants failed to intervene"). [20]

[20]  Jane Doe 1 also asserts a *Monell* theory for reckless disregard (Count Five). (*See* SAC ¶¶ 368–76.) However, in her Opposition, she fails to respond to the County's arguments on the deficiencies of this claim, thus abandoning the claim. *See, e.g., Johnson*, 2023 WL 2970919, at *1. Moreover, in the passing mentions of this claim in her Opposition, she expressly links it to her failure to train and supervise claims, which, as discussed above, both fail. (*See* Pls' Opp'n 4 n2. ("It should be noted that the link to reckless disregard under *Monell* liability is through [the County's] negligent behavior, including but not limited to [their] failure to train and supervise."); *id.* at 6 ("The lack of supervision and intervention of this facility raised to the level of gross negligence [and] reckless disregard .... (emphasis removed)).) Accordingly, the Court also dismisses this claim.

~\*~\*~\*~

In sum, while Jane Doe 1 has not plausibly alleged *Monell* liability based upon a failure to train, supervise, or intervene, she has plausibly alleged a widespread practice or custom. Thus, the County's Motion is denied as to her *Monell* claims. [21]

[21]  Because the County offers no argument why Jane Doe 1's §§ 1985 and 1986 claims fail independent of her § 1983 claims, the Court will not dismiss those claims. *See Myun-Uk Choi v. Tower Rsch. Cap., LLC*, 890 F.3d 60, 69 n.5 (2d Cir. 2018) ("Defendants did not raise this argument in their motion to dismiss the amended complaint and it is therefore waived."); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 n.93(S.D.N.Y. 2014) (noting arguments not made in memorandum of law in support of motion to dismiss are waived).
However, as the Court noted in its prior Opinion, to the extent Jane Doe 1 asserts a *Monell* claim based on alleged violations of her Eighth Amendment rights, that claim fails because she was a pre-trial detainee when the conduct at issue occurred. (*See* Op. & Order 17–18 n. 11 (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment."), and *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d. Cir. 2007) ("Pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." (internal quotation marks omitted)), *rev'd*

*on other grounds* 556 U.S. 662 (2009)); *see also* County Mem. 25 (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).) Jane Doe 1 offers no contrary support nor attempts to explain why she did not correct this deficiency when amending the Complaint. Indeed, Jane Doe 1 explicitly alleges that she "was a pre-trial detainee when the sexual assaults occurred." (SAC ¶ 281.)

### 4. State Law Claims [22]

[22] In light of the Court's dismissal of Jane Does 2 through 6's federal claims, the Court declines to exercise supplemental jurisdiction over their remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ...."); *One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) (summary order) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims ...."); *Young v. Suffolk County*, 922 F. Supp. 2d 368, 398 (E.D.N.Y. 2013) (declining to exercise supplemental jurisdiction over state-law counterclaim after dismissing all federal claims).

#### a. Sexual Misconduct Claims (Counts Seven Through Ten)

**\*23** Jane Doe 1 also alleges four causes of action arising under state law in relation to the sexual misconduct (i.e., common law assault and battery and violations of New York Penal Law §§ 130.65, 130.60, and 130.55). (*See* SAC ¶¶ 381–415.) The County argues these claims should be dismissed because sexual assault is outside the scope of employment. (County's Mem. 35–36.) The Court agrees.

"Under the doctrine of respondeat superior, an employer may be vicariously liable for the tortious acts of its employees only if those acts were committed in furtherance of the employer's business and within the scope of employment." *Doe*, 2018 WL 3824133, at *6 (quoting *N.X. v. Cabrini Med. Ctr.*, 765 N.E.2d 844, 847 (N.Y. 2002)); *Noonan*, 2015 WL 3948836, at *7 ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context.") (quoting *Adorno v. Corr. Servs. Corp.*, 312 F.Supp.2d 505, 517 (S.D.N.Y. 2004)). Sexual assault and harassment "is not in furtherance of [an employer's] business and is a clear departure from the scope of employment, having been committed for wholly personal motives." *Doe*, 2018 WL 3824133, at *6. Accordingly, the County cannot be held vicariously liable for the abuse Taggart and Kezek allegedly committed against Doe, even though such abuse was committed in their place of employment. *See id.* (dismissing state law claims for sexual assault and battery as far as they were asserted against a municipality); *Noonan*, 2015 WL 3948836, at *7 (S.D.N.Y. June 27, 2015) ("Because [p]laintiff's alleged injuries stem from the sexual assault by [the defendant officer], and because New York courts have consistently held that sexually motivated conduct falls outside the scope of employment, [p]laintiff fails to state a claim based on a respondeat superior theory of liability." (italics omitted)).

Accordingly, Jane Doe 1's state law claims for assault and battery, and violations of New York Penal Law §§ 130.65, 130.60, and 130.55 are dismissed insofar as they are asserted against the County.

#### b. Emotional Distress Claims (Counts Eleven and Twelve)

Jane Doe 1 also asserts claims for Intentional Infliction of Emotional Distress ("IIED") and Negligent Infliction of Emotional Distress ("NIED"). (*See* SAC ¶¶ 416–29.) These claims, too, fail against the County.

First, as to her claim of IIED, "[i]t is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity." *Noonan*, 2015 WL 3948836, at *7 (quoting *Lauer v. City of New York*, 240 A.D.2d

543, 544 (N.Y. App. Div. 1997)); *see also Doe*, 2018 WL 3824133, at *10 (same); *J.H. v. Bratton*, 248 F. Supp. 3d 401, 416 n.10 (E.D.N.Y. 2017) (same). Accordingly, this claim may only proceed against the Individual Defendants and is barred against the County.

Second, as the County argues, Jane Doe 1's NIED claim is precluded by the Prison Litigation Reform Act ("PLRA"), which states that "[n]o Federal civil action may be brought by a prisoner ... for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)." 42 U.S.C. § 1997e(e); *see Cano v. City of New York*, 44 F. Supp. 3d 324, 331 (E.D.N.Y. 2014) (same). "Sexual act," as defined, requires various forms of physical contact with genitalia. 18 U.S.C. § 2246(2)(A)–(D). The conduct Jane Doe 1 alleges was committed by Taggart and Kezek—although reprehensible—did not involve any such physical contact. (*See* SAC ¶¶ 160–87.) Accordingly, Jane Doe 1 cannot sustain a claim for NIED based upon the conduct alleged in the SAC. *Cf. Watson v. Carver-Jordan*, No. 11-CV-2415, 2011 WL 6202899, at *4 (S.D.N.Y. Dec. 13, 2011) (noting "[u]nder the [PLRA], a prisoner may not recover for mental or emotional injuries unless he has shown physical injury," and dismissing a claim because "[plaintiff] will not be able to make such a showing" (citing *Jenkins v. Haubert*, 179 F.3d 19, 28–29 (2d Cir. 1999))).

**\*24**  Accordingly, Count Eleven must be dismissed as against the County and Count Twelve must be dismissed as against all Defendants.

### c. Negligent Security (Count Thirteen)

Next, Jane Doe 1 alleges that the County is liable for her injuries by negligently failing to provide her with proper security. (*See* SAC ¶¶ 430–36.) This claim also fails.

"Under New York law, a tort plaintiff seeking to prove a defendant's negligence must show: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.' " *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 675 (S.D.N.Y. 2024) (quoting *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023)). As an initial matter, Jane Doe 1 has abandoned this claim by failing to respond to the County's arguments. *Doe*, 2018 WL 3824133, at *6 n.4 (deeming a claim abandoned where plaintiffs' "only response ... comes in a section heading" while the "body text of th[at] section" addresses a different issue"); *see also Johnson*, 2023 WL 2970919, at *1 ("[T]he failure to oppose a motion to dismiss a claim is deemed abandonment of the claim."). Moreover, Jane Doe 1's allegations that the County "breached" its duty of care to her "by failing to provide [her] with proper, adequate, or sufficient security," (SAC ¶ 432), are, without more, insufficient to make out a negligence claim, *see Doe*, 2018 WL 3824133, at *7 (rejecting a negligence claim where plaintiff offered only "conclusory statements"); *cf. Hall v. City of White Plains,* 185 F.Supp.2d 293, 304 (S.D.N.Y. 2002) (dismissing state law negligence claim based on "nothing more than conclusory allegations").

### d. Negligent Hiring, Supervision, Training, and Retention (Count Fourteen)

Finally, Jane Doe 1 alleges that the County is liable for her injuries under a failure to supervise, retain, or train theory grounded in New York state law. (*See* SAC ¶¶ 437–50.) This claim also fails.

Under New York law, the tort of negligent hiring, retention, or supervision "applies equally to municipalities and private employers." *Doe*, 2018 WL 3824133, at *7 (quoting *Gonzalez v. City of New York*, 17 N.Y.S.3d 12, 15 (N.Y. App. Div. 2015)). To state a claim under this theory, a plaintiff must show:

> (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the

injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels.

*Noonan*, 2015 WL 3948836, at *8 (quoting *Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir. 2004)); *see Doe*, 2018 WL 3824133, at *7 (same). With respect to the failure to train claim, "a cause of action sounding in negligence is legally sustainable against a city when the injured party demonstrates that he was injured due to the negligent training and supervision of a law enforcement officer." *Noonan*, 2015 WL 3948836, at *8 (quoting *Barr v. Albany County*, 406 N.E.2d 481, 485 (N.Y. 1980)). "To prevail on a state law failure to train claim, a plaintiff must set forth more than bare, conclusory allegations of a deficiency in training." *Id.*; *see also Hall*, 185 F. Supp. 2d at 304 (dismissing state law failure to train claim based on "nothing more than conclusory allegations").

 **\*25**  Here, Jane Doe 1 has failed to plausibly allege that the County was negligent under any of these theories because she has not alleged that the County knew (or should have known) of Taggart and Kezek's specific propensity to sexually harass female inmates. Although Jane Doe 1 alleges a pattern of widespread behavior at the Jail, she does not allege that the County was on notice that Taggart and Kezek, specifically, posed a danger to herself or other inmates. Instead, she only alleges that the County "knew or had reason to know that Individual Defendants engaged in inappropriate conduct with female inmates." (*See* SAC ¶ 440; *see id.* ¶ 444 (alleging the County "knew of the individual defendant[s'] propensity to commit tortious acts").) "These are the type of conclusory statements that [the Court is] not bound to accept as true on a motion to dismiss and that do not suffice to state a plausible claim for relief." *Doe*, 2018 WL 3824133, at *7 (internal quotation marks and citations omitted); *see id.* (dismissing a negligence claim as plaintiff "provides no specific allegations of prior sexual misconduct by [the individual Defendants] that would have put ... the [c]ity on notice that either detective posed a danger"); *Noonan*, 2015 WL 3948836, at *8 (dismissing a negligence claim where "[p]laintiff pleads no facts tending to show that the City knew or should have known of [the defendant officer's] alleged propensity to commit sexual assault or related wrongdoing"). And with respect to the negligent training claim, because, "as discussed with respect to [Jane Doe 1's] federal failure to train claim, [Jane Doe 1] has not identified any deficiency in police training nor pleaded facts sufficient to connect such a deficiency to her injuries," that claim must also fail. *See Noonan*, 2015 WL 3948836, at *8 (dismissing a state law claim for negligent training); *see also Rodriguez v. City of New York*, 649 F. Supp. 2d 301, 307–08 (S.D.N.Y. 2009) (finding that conclusory allegations insufficient to sustain a § 1983 failure to train claim also "doom the plaintiff's [parallel] state law claim for failure to train").

III. Conclusion

For the foregoing reasons, the County's Motion to Dismiss is denied as to Jane Doe 1's *Monell* claims (Counts Three, Five, and Six) and is granted as to all other claims, insofar as such claims are asserted against the County.

Because this is the second adjudication on the merits of Plaintiffs' direct claims under the Constitution against the County and the Individual Defendants (Counts One, Two, and Four), the dismissal is with prejudice. *See Chavez v. Gutwein*, No. 20-CV-342, 2022 WL 1487781, at *7 (S.D.N.Y. May 11, 2022) (dismissing with prejudice previously adjudicated claims as the plaintiff was not entitled to "a third go-around" (quoting *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978))); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff has already had two bites at the apple, and they have proven fruitless" (alteration and quotation marks omitted)).

Because Jane Doe 2 through 6's federal claims against the County and the Individual Defendants are time barred (Counts Three, Five, and Six), those claims are also dismissed with prejudice. *See Perkins v. Perez*, No. 17-CV-1341, 2020 WL 248686, at *8 (S.D.N.Y. Jan. 16, 2020) (noting time-barred claims "were properly dismissed with prejudice"). The Court declines to exercise supplemental jurisdiction over Jane Doe 2 through 6's state law claims.

Because this is the first adjudication on the merits of Jane Doe 1's state claims (Counts Seven through Fourteen), the dismissal is without prejudice. If Jane Doe 1 wishes to file an amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Jane Doe 1 must do so within thirty days of the date of this Opinion & Order. *See Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913, at *19 (S.D.N.Y. Mar. 25, 2019) ("The Court will afford [p]laintiff an opportunity to amend if, after reviewing this Order and Opinion and the law therein, [s]he still believes that [s]he can plausibly state claims against Defendants." (alteration adopted) (citation omitted)). There will be no extensions. Jane Doe 1 is further advised that an amended complaint will completely replace, not supplement, the SAC. Any amended complaint must therefore contain *all* of the claims, defendants, and factual allegations that Jane Doe 1 wishes the Court to consider. If Jane Doe 1 fails to timely file an amended complaint, the dismissed claims may be dismissed with prejudice.

The Court will hold a telephonic status conference on May 7, 2025, at 10:30 AM.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 945873

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 98 of 160

Wilkie v. Village of Hempstead, Not Reported in Fed. Supp. (2023)

2023 WL 5952056

2023 WL 5952056
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Kristen WILKIE, Plaintiff,

v.

VILLAGE OF HEMPSTEAD, et al., Defendants.

Regina Pruitte, Plaintiff,

v.

Village of Hempstead, et al., Defendants.

Jayne Fisher, Plaintiff,

v.

Village of Hempstead, et al., Defendants.

22-CV-00920 (JMA) (JMW), 22-CV-03671 (JMA) (JMW), 22-CV-03805 (JMA) (JMW)

|

Signed June 20, 2023

**Attorneys and Law Firms**

Pablo A. Fernandez, Esq., Charles H. Horn, Esq., The Russell Friedman Law Group, LLP, 400 Garden City Plaza, Ste 500, Garden City, NY 11530, Attorneys for Plaintiffs.

Daniel Robert Lecours, Esq., Harris Beach PLLC, 677 Broadway, Ste 1101, Albany, NY 12207, Attorney for Defendants Village of Hempstead, Village of Hempstead Police Department, Village of Hempstead Police Chief Paul Johnson, Village of Hempstead Police Officer John Does #1-5.

William J Garry, Esq., Harris Beach PLLC, 333 Earle Ovington Blvd., Ste. 901, Uniondale, NY 11553, Attorney for Defendants Village of Hempstead, Village of Hempstead Police Department, Village of Hempstead Police Chief Paul Johnson, Village of Hempstead Police Officer John Does #1-5.

Anthony M. LaPinta, Esq., Kyle O Wood, Esq., Reynolds, Caronia, Gianelli & La Pinta P.C., 200 Vanderbilt Motor Parkway, Ste C-17, Hauppauge, NY 11788, Attorneys for Defendant Village of Hempstead Police Officer Jack Guevrekian.

## REPORT AND RECOMMENDATION

WICKS, Magistrate Judge:

**\*1**  Plaintiffs Kristen Wilke, Regina Pruitte, Jayne Fisher (collectively, "Plaintiffs") each bring actions against Defendants Village of Hempstead ("Hempstead"), Village of Hempstead Police Department ("HPD"), and Village of Hempstead Police Chief Paul Johnson ("Chief Johnson") (collectively the "Village Defendants"), and Defendant Jack Guevrekian. Plaintiffs assert five counts including: (a) claims for unlawful imprisonment, unlawful force, and deliberate indifference to their rights in violation of the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution against Guevrekian pursuant to 42 U.S.C. § 1983; (b) claims for failure to protect and/or intervene in violation of the Fourth, Fifth, and Fourteenth Amendments against Chief Johnson, Hempstead, HPD, and John Does #1-5 pursuant to 42 U.S.C. § 1983; and (c) claims against Village Defendants pursuant to *Monell v. Dept. of Social Services*, 436 US. 658 (1978) ("*Monell* claims"). These claims all stem from the alleged sexual assaults committed by Guevrekian against Plaintiffs for the period of time from 2013 to 2019.

2023 WL 5952056

Before the Court are three identical motions for leave to amend complaints in each of the cases bearing the following docket numbers: 22-cv-0920 (DE 24), 22-cv-3671 (DE 19), and 22-cv-3805 (DE 20). The Village Defendants oppose these motions in a combined opposition. 22-cv-0920 (DE 21), 22-cv-3671 (DE 19), and 22-cv-3805 (DE 22). [1] Guevrekian did not file any opposition. The parties appeared before the undersigned for an oral argument on the motions on June 8, 2023. (DE 30.)

[1]    For ease of reference, citations to the docket ("DE") throughout this Report and Recommendation, unless otherwise noted, are to the filings in Docket No. 22-cv-0920.

For the reasons below, undersigned respectfully recommends that the subject motions be granted in part and denied in part. [2]

[2]    There is disagreement within this Circuit as to whether the denial of a motion to amend is considered dispositive matter. "Some courts 'have suggested that a magistrate judge's denial of a motion to amend a complaint should be treated as dispositive, while a grant of the same motion should be treated as non-dispositive.' " *Thompson v. Spota*, No. 14-CV-2473 (JMA) (AKT), 2015 WL 4389931, at *1 (E.D.N.Y. July 15, 2015) (Azrack, J.) (citing *Tyree v. Zenk*, No. 05–CV–2998, 2009 WL 1456554, at *3 (E.D.N.Y. May 22, 2009)). Out of an abundance of caution, the undersigned proceeds by Report and Recommendation rather than by order. *See Domni v. Cnty. of Nassau*, No. 19-CV-00083 (JMA) (LGD), 2022 WL 16950055, at *1 (E.D.N.Y. Nov. 14, 2022) (Azrack, J.) (reviewing *de novo* the denial of a motion to amend "[f]or the avoidance of doubt"); *see also Lashley v. Sposato*, No. 13-CV-6343 (JMA) (SIL), 2016 WL 406351, at *1 n.1 (E.D.N.Y. Feb. 2, 2016) (Locke, M.J.) ("[D]enial of leave to amend is a dispositive decision at least in situations where the denial is premised on futility"), *report and recommendation adopted*, Order (Feb. 19, 2016).

## I. RELEVANT BACKGROUND

**\*2**  There are five cases currently on a joint discovery track before the undersigned: 20-cv 2117; 21-cv-4268, 22-cv-0920, 22-cv-3671, and 22-cv-3805. The Plaintiffs in the latter four have sought to amend their respective complaints. In the 21-cv-4268 action, plaintiff's counsel notified the Court on May 2, 2023, that plaintiff Tooher had passed away. (DE 43.) Accordingly, the motion to amend in that action was denied without prejudice to renewal following a motion, if any, pursuant to Rule 25(a)(1) of the Federal Rules of Civil Procedure to substitute the deceased plaintiff. (Electronic Order dated May 2, 2023.)

Plaintiffs seek to add the following claims under the New York State Adult Survivors Act ("ASA") "(1) Negligence against the Village Defendants; (2) Negligence/Gross Negligent Hiring, Retention, Training and Supervision against Village Defendants; (3) Respondeat Superior against Village Defendants; (4) Assault against Defendant Guevrekian; (5) Battery against Defendant Guevrekian; and (6) False Arrest/False Imprisonment against Defendant Guevrekian." (DE 24-3 at 1.) Guevrekian was a Village of Hempstead Police Officer at all relevant times. Plaintiffs allege that Guevrekian sexually assaulted Plaintiffs at various times between 2013 to 2019. The following allegations are taken from the Plaintiffs' initial complaints.

### A. *Plaintiff Kristin Wilke*

Sometime in 2019, Guevrekian called Plaintiff Wilke [3] and told her to meet him near Sacred Heart Academy on Cathedral Avenue in Hempstead, NY. (DE 1 at ¶ 34.) Guevrekian told her to get in the car and drove to a nearby location. (*Id.* at ¶ 36.) Guevrekian tried to "work out a deal" for sex with Wilke. (*Id.* at ¶ 36.) Guevrekian told Wilke that he would not arrest her if she provided sex. (*Id.*) Guevrekian then became aggressive and demanded oral sex from Wilke. (*Id.* at ¶¶ 37-38.) Guevrekian then proceeded to physically grab Wilke and make her perform oral sex on him. (*Id.*)

[3]    Plaintiff Wilke's name appears on the docket and in the initial complaint as "Wilkie," however, the proposed amended complaint appears to correct that misspelling. (*See* DE 24-2 at 2.)

### B. *Plaintiff Regina Pruitte*

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 100 of 160

Wilkie v. Village of Hempstead, Not Reported in Fed. Supp. (2023)

2023 WL 5952056

Between 2006 and 2013, Guevrekian allegedly solicited oral sex and/or sex from Plaintiff Pruitte while on duty and in uniform except the first time when he was in plain clothes and in his personal vehicle. (22-cv-3671, DE 1 at ¶ 20.) The two would regularly meet and engage in oral sex and/or sex. (*Id.* at ¶ 22.) However, Pruitte alleges that sometime starting in 2013 and up to sometime in 2019, on several occasions, Guevrekian demanded Pruitte provide oral sex and/or sex under the threat of arrest or physical violence if she did not comply. (*Id.* at ¶¶ 23-28.) Pruitte was under the influence of drugs on some of the occasions. (*Id.*) On one occasion, when Pruitte did not comply with Guevrekian's attempts, she was arrested. (*Id.* at ¶ 29.)

### C. *Plaintiff Jayne Fisher*

Plaintiff Fisher alleges that starting sometime in 2010, Guevrekian would seek her out and attempt to engage her for sex and became increasingly aggressive. (22-cv-3805, DE 1 at ¶¶ 20, 23.) Sometime in 2019, Guevrekian arrested Plaintiff for possession, and took her to the precinct for processing. (*Id.* at 25.) When Plaintiff requested to use the bathroom, Guevrekian followed her and forced her to undress and use the bathroom in front of him while he watched. (*Id.*)

Later that same year, Guevrekian was driving a black sedan and allegedly approached Fisher while she was walking in the street. (*Id.* at ¶¶ 26-27.) He ordered her to get inside the car otherwise he would lock her up. (*Id.* at ¶¶ 26-27.) Guevrekian drove Fisher to a parking lot and ordered her to give him oral sex under the threat of arrest. (*Id.* at ¶ 28.)

### D. *Village Defendants*

**\*3** Plaintiffs further allege that Defendants Chief Johnson, Hempstead, and HPD knew of prior instances of misconduct on behalf of Guevrekian, and other HPD Officers, yet failed to take any action to prevent future instances of misconduct, essentially countenancing their behavior. (DE 1 at ¶ 58.) Plaintiffs assert that Guevrekian's conduct well-known within the department, and other police officers engaged in similar conduct. (*Id.* at ¶¶ 65-68.) In late 2004, a complaint was filed with HPD and the Nassau County District Attorney's office about an incident that allegedly occurred when Guevrekian responded to a 911 call by a female who was seeking assistance regarding a domestic violence incident. (*Id.* at ¶ 69.)

The complaint allegedly stated that Guevrekian made inappropriate comments to the female in question, asked her to lift her shirt, and then rubbed his body against hers. (*Id.* at ¶ 70.) The next day, Guevrekian returned to the female complainant's home, hugged and kissed her, and told her that he "would like to take her out sometime." (*Id.* at ¶¶ 70-71.) Plaintiffs assert that the Village Defendants failed or refused to adequately investigate Guevrekian's actions or take any remedial action. (DE 1 at ¶ 73.)

## II. <u>LEGAL STANDARD</u>

Motions to amend pleadings are governed by Federal Rule of Civil Procedure 15(a). Pursuant to Fed. R. Civ. P. 15(a)(2), which provides that "[t]he court shall freely give leave when justice so requires." Generally, "[u]nless there is a showing of bad faith, undue delay, futility or undue prejudice to the non-moving parties, the district court should grant leave to amend." *Adlife Mktg. & Commcns Co. v. Best Yet Mkt., Inc.*, No. 17-CV-02987 (ADS) (ARL) 2018 WL 4568801, at \*1 (E.D.N.Y. Sept. 24, 2018) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)).

The party opposing the proposed amended pleading has the burden of establishing that amendment would be prejudicial or futile. *Jipeng Du v. Wan Sang Chow*, No. 18-CV-01692 (ADS) (AKT) 2019 WL 3767536, at \*4 (E.D.N.Y. Aug. 9, 2019) (internal quotations and citations omitted). The moving party must attach the proposed amended complaint to the motion, like was done here, specifying the new claims and/or parties intended to be added. *See Nabatkhorian v. County of Nassau*, No. 12-CV-1118 (JS) (GRB) 2012 WL 13113646, at \*1 (E.D.N.Y. Aug. 9, 2012).

The Second Circuit has clarified the standard to be applied by the District Courts in considering motions for leave to amend dependent upon the timing of the proposed amendment:

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 101 of 160

Wilkie v. Village of Hempstead, Not Reported in Fed. Supp. (2023)

2023 WL 5952056

The ability of a plaintiff to amend the complaint is governed by Rules 15 and 16 of the Federal Rules of Civil Procedure which, when read together, set forth three standards for amending pleadings that depend on when the amendment is sought. At the outset of the litigation, a plaintiff may freely amend her pleadings pursuant to Rule 15(a)(1) as of right without court permission. After that period ends—either upon expiration of a specified period in a scheduling order or upon expiration of the default period set forth in Rule 15(a)(1)(A)—the plaintiff must move the court for leave to amend, but the court should grant such leave "freely ... when justice so requires" pursuant to Rule 15(a)(2). This is a "liberal" and "permissive" standard, and the only "grounds on which denial of leave to amend has long been held proper" are upon a showing of "undue delay, bad faith, dilatory motive, [or] futility." The period of "liberal" amendment ends if the district court issues a scheduling order setting a date after which no amendment will be permitted. It is still possible for the plaintiff to amend the complaint after such a deadline, but the plaintiff may do so only up [to] a showing of the "good cause" that is required to modify a scheduling order under Rule 16(b)(4).

**\*4**  *Sacerdote v. NYU*, 9 F.4th 95, 115 (2d Cir. 2021).

Here, the subject motions were filed within the time set by the Court. Accordingly, the subject motions are analyzed under more permissive Rule 15(a)(2) standard.

## III. <u>DISCUSSION</u>

Rule 15(a)(2) dictates that the Court "should freely give leave to amend when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). "Unless there is a showing of bad faith, undue delay, futility or undue prejudice to the non-moving parties, the district court should grant leave to amend." *Adlife Mktg. & Commcns Co. v. Best Yet Mkt., Inc.*, No. 17-CV-02987 (ADS) (ARL), 2018 WL 4568801, at \*1 (E.D.N.Y. Sept. 24, 2018) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)). Generally, "[w]ith respect to the Rule 15(a) factors, '[t]he party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial or futile.' " *Joinnides v. Floral Park-Bellerose Union Sch. Dist.*, No. 12-CV-5682, 2015 WL 1476422, at \*9 (E.D.N.Y. Mar. 31, 2015). As evident from their papers, and as articulated at oral argument, Defendants do not argue prejudice or undue delay. That is unsurprising given that the proposed amendments are based on a recently enacted law that revives certain categories of causes of action that were previously time-barred.

Defendants instead rest their opposition solely on the alleged futility of two of the proposed amendments. (DE 26-3 at 1.) In determining whether an amendment is futile, courts consider whether a plaintiff's proposed claims would survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Bodenmiller v. Cnty. of Suffolk*, No. 20-CV-0414 (JMA) (ARL), 2021 WL 4555884, at \*4 (E.D.N.Y. Aug. 30, 2021), *report and recommendation adopted*, 2021 WL 4553177 (E.D.N.Y. Oct. 5, 2021) ("An amendment is considered futile if the proposed claim would not survive a motion to dismiss made pursuant to Fed. R. Civ. P. 12(b)(6).") (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339–40 (2d Cir. 2000)). Plaintiffs' claims must therefore be construed in a light most favorable to Plaintiffs, and Plaintiffs "must merely show that [they] ha[ve] at least colorable grounds for relief" to overcome objections of futility. *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Copantitla v. Fiskardo Estiatorio, Inc.*, No. 09-CV-1608 (RJH) (JCF), 2010 WL 1327921, at \*3 (S.D.N.Y. Apr. 5, 2010)).

Specifically, Defendants oppose the addition of (1) Plaintiff's respondeat superior claims against the Village Defendants that are premised on the alleged sexual assaults perpetrated by Guevrekian, and (2) Plaintiffs' false arrest and/or false imprisonment claims against Guevrekian. (DE 26-3 at 1.) The Court addresses each in turn below.

### A. *Respondeat Superior*

Plaintiffs seek to utilize the doctrine of respondeat superior (Count VIII) to hold the Village Defendants liable for Guevrekian's alleged actions. (DE 24-2 at ¶¶ 199-201.) This cause of action is also linked to the recently enacted ASA, see *infra* III.B, and stems from Guevrekian's alleged sexual assaults against Plaintiffs. (*Id.*) "Under New York law, the doctrine of respondeat

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 102 of 160

Wilkie v. Village of Hempstead, Not Reported in Fed. Supp. (2023)

2023 WL 5952056

superior renders an employer vicariously liable for a tort committed by an employee while acting within the scope of his employment." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995).

**\*5** Plaintiffs state that whether certain actions taken by an employee fall within the scope of that employee's employment is a fact-intensive inquiry typically reserved for a jury. (DE 24-3 at 3-4 (citing *Riviello v. Waldron*, 47 N.Y.2d 297, 302–303, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979); *Matter of Williams v. City of New York*, 64 N.Y.2d 800, 802, 486 N.Y.S.2d 918, 476 N.E.2d 317 (1985)).) That is true. "Whether an employee was acting within that scope at a particular time requires a fact-intensive inquiry." *Girden v. Sandals Int'l*, 262 F.3d 195, 205 (2d Cir. 2001) (citing *Riviello*, 47 N.Y.2d 297 at 303.). However, every rule has its exceptions. And although, "[t]he ultimate determination of this issue is ordinarily for the jury ... it can be made as a matter of law in some instances." *Id.*

Defendants correctly argue that under New York law, an employee's sexual assault is considered outside the scope of an employee's duties and does not form the basis for vicarious liability. (DE 26 at 3.) Here, Plaintiffs allege that Guevrekian ordered them to get in his car and ordered them to engage in sex and/or perform oral sex on him under the threat of arrest and/or physical violence. Guevrekian's actions were based on his personal motive, and a lucid departure from his duties as a police officer rather than in furtherance of those duties. *Cf. Doe v. Poly Prep Country Day Sch.*, No. 20-CV-04718 (DG) (PK), 2022 WL 4586237, at \*7 (E.D.N.Y. Sept. 29, 2022) ("Plaintiff's contention that sexual abuse was a feature, not a bug, of the system at Poly, ... does not save his assault and battery claims. Although Plaintiff alleges that adults in positions of power at Poly were aware of, tolerated and covered up rampant and foreseeable sexual abuse at the school, [these references] to Defendant's culture do not amount to plausible allegations that Miller's alleged assaults furthered [Defendant's] business interests or constituted an actual responsibility Miller had to Defendant; nor do they create a reasonable inference that [Defendant's] business included sex crimes." (internal quotation marks omitted))

The complaints are also devoid of any specific factual allegations that would indicate Village Defendants were aware that Guevrekian had previously ordered civilians to perform sex and/or oral sex under the threat of arrest or physical violence. *See Richardson v. City of New York*, 326 F. App'x 580, 582 (2d Cir. 2009) (summary order) (finding that notwithstanding the probation officer instigating thirty five sexual relations with a minor, the state-law claims for vicarious liability failed). Even if the 2004 complaint could suffice to show that the Village Defendants knew or should have known about Guevrekian's tendencies, that is more relevant to Plaintiffs' state-law negligence claims.[4] *See Richardson v. City of New York*, 326 F. App'x 580, 582 (2d Cir. 2009) (summary order) ("Richardson's state-law negligence claims also fail because he has failed to show the City knew or should have known about Waite's alleged propensity to impose herself sexually on minors she was supervising.").

[4]    The Court notes that the assertion of Plaintiffs' respondeat superior claim appears to be inconsistent with their assertion of negligent/gross negligent hiring, retention, training and supervision claim (Count 7). *See Marotta v. Palm Mgmt. Corp.*, No. 05-CIV-10688 (LTS)(HBP), 2009 WL 497568, at \*4 (S.D.N.Y. Feb. 25, 2009) ("[L]iability for negligent hiring, retention, training or supervision typically arises only *when an employee acts outside of the scope of his employment and vicarious liability cannot obtain.*" (emphasis added)).

**\*6** Indeed, "[i]n many New York cases, courts have held as a matter of law that an employer was not responsible for a sexual assault committed by an employee because the attack was outside the scope of the employee's duties." *Girden*, 262 F.3d 195 at 205–06 (collecting cases). And "it is well-settled in the Second Circuit that employers are not liable to plaintiffs for sexual assaults under a theory of respondeat superior since sexual misconduct is necessarily outside the scope of employment." *Doe v. New York City Dep't of Educ.*, No. 21-CV-4332, 2023 WL 2574741, at \*5 (E.D.N.Y. Mar. 20, 2023) (dismissing sexual assault claims against the New York City Department of Education that were based on a respondeat superior liability); *Doe v. City of New York*, No. 18-CV-670 (ARR) (JO), 2018 WL 3824133, at \*6 (E.D.N.Y. Aug. 9, 2018) (dismissing "respondeat superior claims" because "[t]he City cannot be held vicariously liable for the sexual assaults Hall and Martins allegedly committed against Doe, even though the detectives were then on duty").

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 103 of 160
Wilkie v. Village of Hempstead, Not Reported in Fed. Supp. (2023)
2023 WL 5952056

Further, Plaintiffs do not cite any authority to the contrary.[5] That is, there is an absence of any authority in New York where the doctrine of respondeat superior liability was successfully applied to hold an employer liable for a sexual assault committed by their employee. *See Doe v. New York City Dep't of Educ.*, No. 21-CV-4332, 2023 WL 2574741, at *5 (E.D.N.Y. Mar. 20, 2023) ("No decision in New York has been cited to date in which the doctrine of respondeat superior was held to apply to sexual assault") (quoting *Doe v. Alsaud*, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014)); *C.Q. v. Est. of Rockefeller*, No. 20-CV-2205 (VSB), 2021 WL 4942802, at *3 (S.D.N.Y. Oct. 21, 2021) (same). Instead, Plaintiffs simply argue that they have sufficiently alleged that the relevant actions committed by Guevrekian were committed in the furtherance of the Village's business and within the scope of his employment. (DE 25 at 1.) Such conclusory statements are insufficient.

[5]    At Oral Argument, Plaintiffs represented that they were aware of caselaw applying New York law where the doctrine of respondeat superior has been applied to hold an employer liable for sexual assaults committed by an employee. (DE 30.) Thus, the Court gave Plaintiffs an opportunity to file a supplemental letter identifying those cases. (DE 30.) The supplemental filing failed to identify any relevant cases concerning New York law. (*See* DE 33.)

Plaintiffs also rely on inapposite cases. In *Rohan*, the Appellate Division expressly stated given that the "bus driver's acts of sexual abuse and molestation were a clear departure from the scope of his employment, committed solely for personal reasons, and unrelated to the furtherance of his employer's business, neither the bus company nor the School District can be held vicariously liable for his acts." *Doe v. Rohan*, 17 A.D.3d 509, 512, 793 N.Y.S.2d 170 (2d Dep't 2005) (affirming trial court's finding that defendant was not liable for intentional tort claims under the doctrine of respondeat superior). And *Schilt*, another case relied upon by Plaintiffs, did not involve a sexual assault. *See Schilt v. N.Y.C.T.A.*, 304 A.D.2d 189, 759 N.Y.S.2d 10 190 (1st Dep't 2003) ("alleging negligence on the part of defendants.").

The Court finds that, as a matter of law, Plaintiff's respondeat superior claim against Village Defendants (Count VIII) fails to put forth a colorable argument, and thus, is futile. Accordingly, the undersigned respectfully recommends that this branch of Plaintiffs' motion to amend be denied.

**B. *False Arrest and/or False Imprisonment***

Plaintiffs seek to assert claims for false arrest and/or false imprisonment against Guevrekian. (DE 24-2 at ¶¶ 211-212.) A plaintiff must show the following elements to establish a false arrest[6] or false imprisonment claim pursuant to New York Law: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Doe v. City of New York*, No. 18-CV-670 (ARR) (JO), 2018 WL 3824133, at *4 (E.D.N.Y. Aug. 9, 2018). An arrest based on probable cause is considered "privileged," however it is the defendant's "burden of proving that probably cause existed for the plaintiff's arrest." *Id.* An arrest without a warrant is "presumed to be unlawful, and the defendant has the burden of proving legal justification as an affirmative defense," thus mere allegations that the plaintiff was arrested "without just cause of provocation" are sufficient at the pleading stage. *Id.* (internal quotation marks omitted).

[6]    False arrest is a form of false imprisonment. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("The common law tort of false arrest is a species of false imprisonment[.]").

**\*7** Plaintiffs seek to revive these claims pursuant to the ASA -- a New York statute that was enacted in 2022. The ASA creates a 12-month revival window beginning on November 24, 2022 and running until November 24, 2023 for certain types of claims. *See* N.Y. C.P.L.R. § 214-J (2022). The ASA provides in relevant part:

> [E]very civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal

Wilkie v. Village of Hempstead, Not Reported in Fed. Supp. (2023)

2023 WL 5952056

law committed against such person who was eighteen years of age or older ... which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section.

N.Y. C.P.L.R. § 214-j; *see also Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 185507, at *10 (S.D.N.Y. Jan. 13, 2023) (holding that the ASA is constitutional).

The Village Defendants contend that Plaintiffs seek to assert claims directly against them for direct and vicarious liability for Guevrekian's alleged false arrest/imprisonment. (DE 26-3 at 5.) The parties do not dispute the elements of these claims. Rather, Village Defendants query whether the ASA even permits revival of false arrest/imprisonment claims. Village Defendants argue that since the ASA only covers conduct that constitutes a sexual offense as defined in N.Y. Penal L. § 130, false imprisonment and false arrest, which are not such offenses, cannot be asserted under the ASA. (DE 26-3 at 5.) Village Defendants further aver that since these claims are not covered by the ASA, they are time-barred because Plaintiffs failed to comply with the statutory prerequisites of N.Y. Gen. Mun. Law §§ 50-e, 50-h, and 50-i. (DE 26-3 at 5.) Village Defendants do not otherwise appear to dispute that if the claims are covered by the ASA, they would be timely.

On the other hand, Plaintiffs argue that the Village Defendants' proffered reading of the ASA is incorrect since the statute, by its plain language, revives "*every civil claim or cause of action* brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered *as a result of* conduct which would constitute a sexual offense." N.Y. C.P.L.R. § 214-j (emphasis added). Thus, the ASA covers civil claims related to intentional torts -- false arrest/imprisonment -- that were suffered "as a result of conduct" that otherwise would be a sexual offense under N.Y. Penal L. § 130.

"Absent law from a state's highest court, a federal court sitting in diversity has to predict how the state court would resolve an ambiguity in state law." *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000). "As a federal court applying state law, we are generally obliged to follow the state law decisions of state intermediate appellate courts ... in the absence of any contrary New York authority or other persuasive data establishing that the highest court of the state would decide otherwise." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199-200 (2d Cir. 2005) (quoting *Pentech Int'l, Inc. v. Wall St. Clearing Co.*, 983 F.2d 441, 446 (2d Cir. 1993)).

**\*8** The parties do not offer any authority, caselaw or otherwise, specifically interpreting the ASA in relation to parties' dispute. However, each side offers a case involving the Child Victims Act ("CVA"), a statute that accomplished for children under the age of eighteen, what the ASA does for those over the age of eighteen. *See* N.Y. C.P.L.R. § 214-g. Given that the relevant statutory language in the CVA is identical to that of the ASA, how the CVA has been interpreted by New York courts is helpful guidance. *See id.* (the CVA revives "*every civil claim or cause of action* brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered *as a result of conduct* which would constitute a sexual offense" (emphasis added)).

Plaintiffs cite to a decision by the Supreme Court, Appellate Division, Fourth Department, New York by way of example for the proposition that N.Y. C.P.L.R. § 214-j extends to claims that arise out of conduct that constitutes a sexual offense under the penal law and not just conduct that constitutes such offenses. *See Shapiro v. Syracuse University*, 208 A.D.3d 958, 173 N.Y.S.3d 958 (4th Dep't 2022). The plaintiff in *Shapiro* had brought a personal injury action pursuant to the CVA. *See id.* at 960-61. In relevant part, the trial court had granted defendants Camp Greylock, Inc. ("Greylock") motion for summary judgment to dismiss the first and second counts of the plaintiffs' amended complaint on statute of limitations grounds. *Id.* at 958, 961.

Wilkie v. Village of Hempstead, Not Reported in Fed. Supp. (2023)

2023 WL 5952056

On appeal, the Appellate Division reversed and found that the "CVA revival statute applies" to the first and second causes of action against Greylock. *Id.* at 961. Notably, these causes of action were Negligence, Gross Negligence, Recklessness, and Failure to Exercise a Reasonable Standard of Care (first cause of action) as well as Negligent Hiring, Negligent Retention, and Negligent Training, Negligent Supervision (second cause of action). *See generally* Complaint, *Shapiro v. Syracuse Univ.*, 176 N.Y.S.3d 499 (2021) (No. 24). The *Shapiro* Court noted that "it is undisputed that the claims against Greylock *arise from sexual abuse that occurred.*" 208 A.D.3d at 961.

This decision is at odds with Defendants' proffered interpretation of the statute. If the CVA revived claims of negligence, it follows that the ASA would revive an intentional tort, such as false imprisonment and/or arrest. The elements of, *inter alia*, Negligent Hiring, are not synonymous with conduct that constitutes an offense under N.Y. Penal L. § 130. Yet, the claim was revived by the CVA. There is then no reason that an intentional tort like false imprisonment, which more obviously arises from the conduct that constitutes an offense under N.Y. Penal L. § 130, would not be revived by the ASA.

Defendants point to *Rapp* to support their interpretation of N.Y. C.P.L.R. 214-j, that a claim must involve conduct that itself is a sexual offense itself in order to be revived. *See Rapp v. Fowler*, No. 20-CV-9586 (LAK), 2022 WL 1997176 at *3 (S.D.N.Y. June 6, 2022). In *Rapp*, the court held that the CVA did not revive the plaintiff's common law assault claim. *Id.* The court noted that since common law assault "is not a sexual offense ... as defined in the Penal Law, the Child Victims did not revive such claims." *Id.* The conclusion certainly supports Defendants' reading of the ASA. However, it is supported by little reasoning and appears at odds with the New York authority on point. Nonetheless, the Court finds the state intermediate appellate court's revival of a claim that is not a sexual offense under the CVA to be a more persuasive indicator of how the highest court in the state would interpret the ASA.

**\*9** Moreover, the legislative history of the ASA offers further support for Plaintiff's proffered interpretation of the statute. *See Trump*, 2023 WL 185507, at \*7 (noting that courts may consider "such historical or other facts as are reasonably within the scope of judicial cognizance," *inter alia*, "statements by bill sponsors" when considering the intention of the state legislature). Senate Bill 66 eventually became the ASA, and the legislative committee report accompanying the bill stated in relevant part that the ASA "would create a one-year window for the revival of otherwise time-barred civil claims *arising out of sexual offenses* committed against people who were 18 or older at the time of the conduct." *Id.* (citing N.Y. Comm. Rept., 2021 NY S.B. 66 (NS) (emphasis added)).

Plaintiffs note that at the time of the alleged incidents, Plaintiffs were each over the age of 18 and were victims of sexual assaults perpetrated by the Defendants. (DE 24-3 at 2.) The parties also do not appear to dispute that the underlying conduct of non-consensual sex and/or oral sex that Plaintiffs allege, if true, would constitute a sexual offense under N.Y. Penal L. § 130, "which includes, [*inter alia*] rape, statutory rape, forcible touching," and criminal sexual acts. *See Doe v. New York City Dep't of Educ.*, No. 21-CV-4332, 2023 WL 2574741, at \*4 (E.D.N.Y. Mar. 20, 2023); *see also* N.Y. Penal L. § 130. To the extent Plaintiffs allege that Defendant Guevrekian falsely arrested/imprisoned them *during* his assaults, those particular claims arise from conduct that constitutes a sexual offense under N.Y. Penal L. § 130.

Thus, at this threshold pleading stage, Plaintiffs raise a colorable argument, and their claim is not futile. Accordingly, the undersigned respectfully recommends this branch of Plaintiffs' motion to amend be granted.

## CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that Plaintiffs' motion for leave to amend be granted except to the extent Plaintiffs seek to add a respondeat superior claim against Village Defendants (Count VIII).

Plaintiffs are directed to file the amended complaint on ECF within 14 days of the District Judge's decision on this Report and Recommendation if Plaintiffs are granted leave to amend the complaint.

Once the amended complaint is filed, it shall serve as the operative pleading in this matter upon its filing. Defendants' time to respond to or otherwise move against the complaint shall be on or before 14 days after the amended complaint is filed.


## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.

Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).


**All Citations**

Not Reported in Fed. Supp., 2023 WL 5952056

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1333570

2024 WL 1333570
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Petra Christina BETER, Plaintiff,

v.

Duane BAUGHMAN, et al., Defendants.

24-CV-0079 (GHW) (RFT)
|
Signed March 13, 2024

**Attorneys and Law Firms**

Ian Michael Bryson, Derek Smith Law Group, PLLC, New York, NY, for Plaintiff.

Jessica Meyers, Brown Rudnick LLP, New York, NY, for Defendant Duane Baughman.

Andrew Spital, Kenneth David Sommer, Willkie Farr & Gallagher LLP, New York, NY, for Defendant Edward Skyler.

Violet Elizabeth Grayson, Violet Elizabeth Grayson, Atty., at Law 2, New York, NY, for Defendant Douglas Schoen.

**REPORT AND RECOMMENDATION**

ROBYN F. TANOFSKY, United States Magistrate Judge

**\*1  TO THE HONORABLE GREGORY H. WOODS, UNITED STATES DISTRICT JUDGE:**

Plaintiff began this action on November 20, 2023, by filing a summons and complaint in in New York Supreme Court, New York County, against Defendants Duane Baughman ("Baughman"), Edward Skyler ("Skyler"), and Douglas Schoen ("Schoen"), alleging, among other claims, intentional infliction of emotional distress, assault and battery, discrimination, and violation of the Gender Motivated Violence Protection Act and the Adult Survivors Act ("ASA"), as revived by the ASA. (*See* ECF 1-1, Compl.) The claims arise out of an alleged sexual assault of Plaintiff by Baughman in September of 2001; Baughman, who allegedly was Michael Bloomberg's top mayoral campaign strategist, had arranged for Plaintiff to photograph Bloomberg for the campaign.

On January 5, 2024, Baughman filed a notice of removal to this Court based on diversity jurisdiction. (*See* ECF 1.) On January 17, 2024, Your Honor referred this matter to me for General Pretrial Supervision and Dispositive Motions. (*See* ECF 3.) On February 2, 2024, Plaintiff filed a timely motion to remand to state court. (*See* ECF 12, Mot. To Remand.) Baughman filed an opposition to that motion. (*See* ECF 14, Opp. to Mot. To Remand.) Plaintiff filed a reply memorandum in further support of the motion to remand. (*See* ECF 18, Reply.) I held oral argument on February 23, 2024, and requested supplemental briefing, which Baughman provided on March 1, 2024, and which Plaintiff provided on March 5, 2024. (*See* ECF 20, Baughman's Supp. Memo.; ECF 21, Pl.'s Supp. Memo.)

Having carefully considered the parties' arguments and filings, for the reasons set forth below, I respectfully recommend that Plaintiff's motion to remand to state court be DENIED, provided that, by March 20, 2024, Defendant Baughman files an amended petition for removal that corrects the technical flaws in the original petition, which flaws are identified herein. [1]

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 108 of 160

Beter v. Baughman, Not Reported in Fed. Supp. (2024)

2024 WL 1333570

1    In this Circuit, a motion to remand pursuant to 28 U.S.C. § 1447 is considered a dispositive motion. *See Williams v. Beemiller, Inc.*, 527 F.3d 259, 266 (2d Cir. 2008) ("A motion to remand is not a 'pretrial matter' under § 636(b)(1)(A) and a magistrate judge presented with such a motion should provide a report and recommendation to the district court.").

## Background

Plaintiff is a citizen of Massachusetts, while Baughman is a citizen of California, Skyler resides in New York, and Schoen resides in Florida. (*See* ECF 1, Not. of Removal ¶¶ 5-6; ECF 13, Response to Statement of Omitted Information in Not. of Removal.) As to the amount in controversy, Plaintiff alleges that she suffered "numerous damages as a result" of Defendants' conduct (ECF 1-1, Compl. ¶¶ 68, 73, 80, 84), and the Complaint demands "an amount which exceeds the jurisdiction of all lower courts for all damages including but not limited to compensatory damages, punitive damages, statutory damages, attorney's fees, costs, interest and all other damages," (*id.* at 16 ("wherefore" clause after paragraph 80)).

**\*2** On December 9, 2023, Plaintiff's process server served Duane Baughman at his residence, located at 2373 Washington Street, San Francisco, California 94115. (*See* ECF 12-5, Mot. To Remand Ex. E, Aff. of Service for Duane Baughman.) On January 5, 2024, at 10:15 am, Plaintiff's process server served Douglas Schoen at his residence, located at 350 S. Collier Blvd., Unit 308, Marco Island, Florida 34145. (*See* ECF 12-6, Mot. To Remand Ex. F, Aff. of Service for Douglas Schoen.) Baughman contends that Schoen has not been properly served, or alternatively that he had not been properly served at the time of removal. (*See* ECF 14, Opp. to Mot. To Remand at 12.) Baughman argues that Plaintiff merely described the process server's actions vis-à-vis Schoen without arguing that the method of service used was proper "under any cognizable legal theory." He goes on to say that, while "Plaintiff's theory of proper service on Mr. Schoen is not clear, it is clear that Mr. Schoen was not 'personally served' " because the process server checked the "other" box on the affidavit of service, rather than the box indicating personal service. (*Id.* at 12-13.)

In the affidavit of service, the process server states that a man opened the door at Schoen's residence and, on being asked his identity, said he was "Doug." The process server told the individual he was being served with a summons and complaint, and the individual said he was "not interested" and quickly slammed the door at the same time the process server told the individual he was being "drop served." (*See* ECF 12-6, Mot. To Remand Ex. F, Aff. of Service for Douglas Schoen.) "Drop service" is a colloquial term for serving someone who refuses to take the documents. The process server did not indicate that he mailed a copy of the papers to Schoen or filed proof of service on the docket. (*See* ECF 14, Opp. to Mot. To Remand at 12-13.)

On November 29, 2023, Plaintiff's process server attempted to serve Defendant Edward Skyler at his primary residence, located at 88 Lexington Avenue, Apt. 706, New York, NY 10016. (*See* ECF 12-2, Mot. To Remand Ex. B, Aff. of Service for Edward Skyler ("Skyler Service Aff.").) The affidavit of service notes that the process server spoke to the doorman who "refused name" and "refused to allow" the process server up to Skyler's apartment. (*Id.*) The affidavit of service also states that the unnamed doorman "called tenant/recipient [Mr. Skyler] and was advised to accept the documents." (*Id.*)

Upon receiving the affidavit of service from the process server, Plaintiff's counsel on January 3, 2024 mailed copies of the summons, complaint, and notice of electronic filing to Skyler via certified mail, return receipt requested; the documents were delivered and signed for on January 10, 2024. (*See* ECF 12-3, Mot. to Remand Ex. C, Aff. of Mailing to Edward Skyler.) Proof of service was filed on January 2, 2024. (*See* ECF 12-4, Mot. to Remand Ex. D, Timestamped Aff. of Service for Edward Skyler.) Plaintiff obtained an amended affidavit from the process server, who clarified that "doorman confirmed Edward Skyler resides here." (ECF 12-7, Mot. To Remand Ex. G, Amended Aff. of Service for Edward Skyler.)

Baughman filed a notice of removal around 11:40 am on January 5, 2024, arguing that he did not need consent from Defendants Skyler and Schoen, because they had not been properly served at the time of removal. (ECF 1, Not. of Removal ¶¶ 8(a)-(c); *see also* CM/ECF Receipt for ECF 1.) [2] The notice of removal also states that although Skyler is a citizen of New York State, and although 28 U.S.C. § 1441 bars removal of a case based on diversity of citizenship if a defendant "is a citizen of the State

Case 9:23-cv-01465-DNH-TWD   Document 72   Filed 12/12/25   Page 109 of 160
Beter v. Baughman, Not Reported in Fed. Supp. (2024)
2024 WL 1333570

in which such action is brought," that bar applies only when such a defendant has been "properly joined and served," which Baughman contends is not the case here. (*See* ECF 1, Not. of Removal ¶¶ 8(a)-(c).)

2      The CM/ECF Docket provides a receipt for docket entries that contains the time of filing.

In Plaintiff's motion to remand, she argues that the forum-defendant rule precluded removal, since Skyler, a citizen of New York State, had been properly served at the time of removal; and that removal was improper for the additional reason that not all defendants had joined or consented to the removal. (*See* ECF 12, Mot. To Remand at 6-9.)

## Legal Standard for Removal from State Court

**\*3**  "A civil action brought in state court may be removed to a federal district court only if it could have originally been commenced in federal court on either the basis of federal question jurisdiction or diversity jurisdiction." *Nix v. Office of Comm'r of Baseball*, No. 17-CV-1241 (RJS), 2017 WL 2889503, at \*3 (S.D.N.Y. July 6, 2017) (internal quotation marks and citation omitted); *see also* 28 U.S.C. § 1441(a) ("[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."). However, "[a] civil action otherwise removable solely on the basis of [diversity jurisdiction] may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2). "The statute plainly provides that an action may not be removed to federal court on the basis of diversity of citizenship once a home-state defendant has been 'properly joined and served.' " *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019) (quoting 28 U.S.C. § 1441(b)(2)).

The statute setting the procedure for removal states that "all defendants who have been properly joined and served must join in or consent to the removal of the action." 28 U.S.C. § 1446(b)(2)(A). Courts in the Second Circuit "have consistently interpreted the statute 'as requiring that all defendants consent to removal within the statutory thirty-day period, a requirement known as the 'rule of unanimity.' " *Pietrangelo v. Alvas Corp.*, 686 F.3d 62, 66 (2d Cir. 2012) (quoting *Beatie & Osborn LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 383 (S.D.N.Y. 2006)). As a result, non-removing defendants "must independently express their consent to removal," *Pietrangelo*, 686 F.3d at 66, and so "[t]he failure of any defendant to provide its written consent within the thirty-day period constitutes a fatal procedural defect in the removal procedure and warrants a remand of the case." *In re Vill. of Kiryas Joel, N.Y.*, No. 11-CV-8494 (ER), 2012 WL 1059395, at \*3 (S.D.N.Y. Mar. 29, 2012).

The party who removes bears the burden of showing that removal was proper. *See California Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004); *Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 296 (2d Cir. 2000). Under Second Circuit law, affidavits of service establish a prima facie case that service was carried out as described. *See Old Republic Ins. Co. v. Pac. Fin. Servs. of Am., Inc.*, 301 F.3d 54, 57 (2d Cir. 2002). However, the Second Circuit has held that "[a] defendant's sworn denial of receipt of service ... rebuts the presumption of proper service established by the process server's affidavit and necessitates an evidentiary hearing." *Id.* It then becomes the plaintiff's burden to prove it validly served each defendant. *See Hudson Priv. LP v. Creative Wealth Media Fin. Corp.*, 629 F. Supp. 3d 237, 245 (S.D.N.Y. 2022).

"In light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability." *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) ("[O]ut of respect for the limited jurisdiction of the federal courts and the rights of states, we must resolve any doubts against removability.").

"If a case is removed and the district court determines that it lacks subject jurisdiction over the matter, it must be remanded." *See* 28 U.S.C. § 1447(c).

2024 WL 1333570

### Analysis

**I. The Notice of Removal Has Curable Defects Relating to Diversity Jurisdiction**

The notice of removal has curable defects relating to diversity jurisdiction. Plaintiff does not raise this issue in connection with the motion to remand. However, it is my obligation to address this question sua sponte. "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). "This provision authorizes a district court to remand a case sua sponte at any time upon finding that it lacks subject matter jurisdiction." *Herlihy v. Hyatt Corp.*, No. 20-CV-10885 (MKV), 2022 WL 826151, at *3 (S.D.N.Y. Mar. 18, 2022) (citing *Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.*, 435 F.3d 127, 133 (2d Cir. 2006)).

A. The Parties' Citizenship

**\*4**  Baughman avers on information and belief that Plaintiff is a citizen of Massachusetts. (*See* ECF 1, Not. of Removal ¶ 5.) He is a citizen of California. (*See* ECF 13, Response to Statement of Omitted Information in Not. of Removal.) As to Defendants Schoen and Skyler, he merely quotes the Complaint, which says that Schoen resides in Florida and Skyler resides in New York. (*See* ECF 1, Not. of Removal ¶ 5.) In his Notice of Removal, he argues that Skyler should not be considered a citizen of New York for purposes of the forum-defendant rule, because the Complaint alleges only that Skyler resides in New York and does not say that he is a citizen of this State. (*See id.* ¶ 8(b).) But if he is contesting that the allegation in the Complaint that Skyler resides in New York is sufficient to establish Skyler's citizenship, then there is nothing before me to allow me to assess Skyler's citizenship (and by the same logic, Schoen's citizenship). Under those circumstances, I cannot conclude that Baughman has established that Schoen and Skyer are citizens of States other than the Commonwealth of Massachusetts, as required for this Court to have diversity jurisdiction over this matter. *See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 47 (2d Cir. 1996) (holding that "a statement of the parties' residence is insufficient to establish their citizenship"); *Mackason v. Diamond Fin. LLC*, 347 F. Supp. 2d 53, 55 (S.D.N.Y. 2004) (explaining that allegations of the plaintiffs' residences were insufficient to establish diversity jurisdiction).

This issue could, however, be remedied by an amendment of the petition for removal, even though the 30-day period for addressing a substantive problem with a petition for removal has lapsed. A petition for removal may be amended freely within the statutory 30-day period calculated from the date of service. While a defendant generally "may not amend its notice of removal after this thirty-day period to remedy a substantive defect in the petition," *Briarpatch Ltd. v. Pate*, 81 F. Supp. 2d 509, 517 (S.D.N.Y. 2000), a defendant may amend its notice of removal more than 30 days after receiving the complaint if the amendment is technical in nature. *See, e.g.*, *Lombardi v. Paige*, No. 00-CV-2605 (RCC), 2001 WL 303831, at *2 (S.D.N.Y. Mar. 28, 2001) (concluding that defects in removal petition's allegations of citizenship were "technicalities" and approving late amendment); *CBS Inc. v. Snyder*, 762 F. Supp. 71, 73 (S.D.N.Y. 1991) (distinguishing between "fundamental" defects, which cannot be cured with a late amendment, and "technical" defects, which can, and holding that an amendment to clarify citizenship of the parties that was not inconsistent with the original petition of removal was technical and permissible).

"[M]ost cases indicate that [after 30 days have elapsed] defendants may amend the notice only to set out more specifically the grounds for removal that already have been stated, albeit imperfectly, in the original notice": a defendant "may correct an imperfect statement of citizenship, state the previously articulated grounds more fully, or clarify the jurisdictional amount." 14C Charles Alan Wright, et al., Federal Practice and Procedure § 3733 (Rev. 4th ed. 2023). And including allegations in the petition for removal of the parties' "residency" as opposed to their "citizenship" is merely a technical defect that could be cured, even with an untimely amendment. *See Dominguez v. Rogers*, No. 16-CV-6888 (VSB), 2017 WL 3381894, at *4 (S.D.N.Y. Aug. 4, 2017) (holding that an allegation about residence rather than citizenship was merely technical and therefore permitting amendment); *Fulfree v. Manchester*, No. 95-CV-7723 (DC), 1996 WL 1997, at *2 (S.D.N.Y. Jan. 3, 1996) (same).

B. Amount in Controversy

---

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 111 of 160

Beter v. Baughman, Not Reported in Fed. Supp. (2024)

2024 WL 1333570

"The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by plaintiff controls if the claim is apparently made in good faith." *Ocean Ships, Inc. v. Stiles,* 315 F.3d 111, 115 (2d Cir.2002); *see also* 28 U.S.C. § 1446(c)(2) ("If removal of a civil action is sought on the basis of [diversity jurisdiction], the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy ...."). However, the Complaint does not specify the amount in controversy; New York law prohibits a plaintiff in a personal injury case from pleading a specific monetary demand. *See* N.Y.C.P.L.R. § 3017(c). [3]

[3]     The defendant in such cases may demand that the plaintiff set forth the total damages she is claiming within fifteen days of the request. *See id.*

**\*5**  Where a complaint is inconclusive as to the damages amount because state law "does not permit demand for a specific sum," removal is appropriate based on the amount in controversy stated in the removal petition, 28 U.S.C. § 1446(c)(2)(A)(ii), "if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds the [jurisdictional threshold]." 28 U.S.C. § 1446(c)(2)(B). While a defendant need not "prove the amount in controversy to an absolute certainty," he has "the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." *Villafana v. So,* No. 13-CV-0180 (KNF), 2013 WL 2367792, at \*1 (S.D.N.Y. May 29, 2013) (quoting *Mehlenbacher v. Akzo Nobel Salt, Inc.,* 216 F.3d 291, 296 (2d Cir. 2000) (internal quotation marks omitted). "[I]f the jurisdictional amount is not clearly alleged in the plaintiff's complaint, and the defendants' notice of removal fails to allege facts adequate to establish that the amount in controversy exceeds the jurisdictional amount, federal courts lack diversity jurisdiction as a basis for removing the plaintiff's action from state court." *Villafana,* 2013 WL 2367792, at \*1.

I conclude that the notice of removal does not demonstrate by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount. Baughman argues that "it appears to a reasonable probability that the amount in controversy exceeds $75,000" based on, among other considerations, "the jurisdictional limits of the lower courts of the State of New York," since the Complaint demands "an amount which exceeds the jurisdiction of all lower courts for all damages" and on the serious nature of the claims against Defendants and the significant harm allegedly suffered by Plaintiff. (ECF 1, Not. of Removal ¶ 7 (quoting ECF 1-1, Compl. at 16 (wherefore clause after paragraph 80)).) But the reference to the jurisdictional amounts of the lower New York State Courts is unavailing, since the jurisdictional threshold for New York civil courts is $50,000. *See, e.g.,* N.Y. City Civ. Ct. Act § 202 (limiting New York City Civil Court's jurisdiction to matters seeking less than $50,000). The reference to the jurisdictional amounts of the lower New York State Courts suggests that the amount in controversy is more than $50,000, but it does not demonstrate that more than $75,000 is at stake. *See Ma v. United Rentals (N. Am.), Inc.,* No. 23-CV-1503 (KHP), 2023 WL 4102684, at \*3 (S.D.N.Y. June 21, 2023) (finding that an allegation that the plaintiff alleged damages "in an amount which exceeds the monetary jurisdictional limits of all Courts having jurisdiction save the Supreme Court of New York" was insufficient to demonstrate that the amount in controversy exceeded the jurisdictional amount for federal diversity jurisdiction because at the time the lower civil courts of New York State could hear cases seeking to recover only up to $25,000).

And while it is true that Plaintiff alleges that she suffered "numerous damages" and asserts eleven causes of action against the three Defendants (ECF 1-1, Compl. ¶¶ 68, 73, 80, 84), those allegations do not place a value on her damages. "Allegations of injury themselves, without any statement of damages, also do[ ] not give rise to a finding that the amount in controversy exceeds $75,000." *Ma,* 2023 WL 4102684, at \*3; *see also Doe v. Warner,* 659 F. Supp. 3d 293, (S.D.N.Y. 2023) (collecting cases remanding "for failure to establish amount in controversy, even where permanent, serious, and fatal injuries were alleged because allegations did not particularize extent of injuries or damages"); *Baisley v. Slade Indus., Inc.,* No. 22-CV-0116 (PMH), 2022 WL 92778, at \*2 (S.D.N.Y. Jan. 10, 2022) (holding that allegations in the complaint that the plaintiff had sustained serious injuries "to and about his/her head, limbs, spine and body," which required "medical care and treatment," and left her "unable to attend to ... [her] usual duties" were insufficient to demonstrate that the amount in controversy exceeded the jurisdictional amount). The defendants wanting to remove in these cases were not without recourse: Section 3017(c) of the Civil Practice Law and Rules ("CPLR") provides a mechanism for making a supplemental demand that the plaintiff specify the damages amount. *See Cadmen v. CVS Albany, L.L.C.,* No. 22-CV-0046 (PKC) (SJB), 2022 WL 138056, at \*2 n.2 (E.D.N.Y. Jan. 14,

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 112 of 160

Beter v. Baughman, Not Reported in Fed. Supp. (2024)

2024 WL 1333570

2022) (finding that removal was "premature" when the defendant had failed before removing to make a supplemental demand under CPLR § 3017(c) for the damages amount).

 **\*6** However, a late amendment of the removal petition could cure the failure to demonstrate that the amount in controversy exceeds the jurisdictional amount, *see* 14C Charles Alan Wright, et al., Federal Practice and Procedure § 3733. At oral argument, counsel for Plaintiff conceded that the Complaint seeks more than $75,000 in damages. That concession provides Baughman with a basis for amending the petition to cure its failure to adequately allege that the case satisfies the jurisdictional amount for diversity jurisdiction. *See Luo v. Mikel*, 625 F.3d 772, 775 (2d Cir. 2010) (holding that, when the plaintiff represented to the defendant that "the amount in controversy was satisfied at the time of removal," the plaintiff "effectively conceded that amount in controversy" exceeded the jurisdictional amount and that, "[w]ith nothing in the record suggesting [her] assertions were made in bad faith or that the true value of the claim was to a 'legal certainty' less than the jurisdiction threshold," she could not subsequently change her position on the amount in controversy to "deprive the district court of jurisdiction that it properly possessed").

## II. The Forum-Defendant Rule Is Not a Barrier to Removal

If Your Honor agrees with the analysis above and concludes that Baughman can remedy the defects in the removal petition relating to diversity jurisdiction through a late amendment, the forum-defendant rule would not present a barrier to removal. The Second Circuit has held that the forum-defendant rule does not prevent removal of a state court action on diversity grounds before a forum-state defendant has been properly served. *See Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 704-07 (2d Cir. 2019). Baughman has demonstrated that removal was proper notwithstanding the forum-defendant rule because service on the forum-state defendant (Skyler) was not completed at the time of removal.

   A. Service on Skyler's Doorman Could Lead to Effective Service

CPLR § 308 provides, as relevant here, that service on a natural person may be made by "delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business ...." CPLR § 308(2) further provides that: (a) the "mailing" of a summons shall occur within 20 days of the hand delivery of the complaint; (b) "proof of service shall be filed with the clerk of court designated in the summons" within 20 days "of either such delivery or mailing, whichever is effected later"; and (c) "service shall be complete ten days after such filing" of proof of service. CPLR § 308(2). This type of service is known as substituted service.

Service that is left with a doorman, followed by a mailing, is valid where access to the building is prohibited. *See F.I. duPont, Glore, Forgan & Co. v. Chen*, 41 N.Y.2d 794, 797-98 (1977); *see also Rosenberg v. Haddad*, 617 N.Y.S.2d 330 (1st Dep't 1994). The affidavit of service for Skyler states that on November 29, 2023, the doorman "refused to allow" the process server up to Skyler's apartment, and that the doorman "called tenant/recipient [Mr. Skyler] and was advised to accept the documents." (*See* ECF 1-2, Not. of Removal Ex. B, Skyler Service Affidavit.) Under these circumstances, Plaintiff successfully took the first step toward serving Skyler.

   B. Plaintiff Failed To Timely Send Skyler a Copy of the Summons and Complaint

Plaintiff did not, however, mail a copy of the summons and complaint to Skyler within 20 days of the hand delivery of the summons and complaint, as required by CPLR § 308(2). Plaintiff concedes that she did not mail the summons and complaint to Skyler until January 3, 2024, which is 35 days after the summons and complaint were left with the doorman. (*See* ECF 1-3, Not. of Removal Ex. C, Affidavit of Mailing for Edward Skyler.)

 **\*7** Plaintiff's motion to remand does not address whether the delay in sending Skyler a copy of the complaint and summons means that service on Skyer was not properly effected at the time of removal. Instead, Plaintiff argues that the delay in filing

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 113 of 160

Beter v. Baughman, Not Reported in Fed. Supp. (2024)
2024 WL 1333570

*proof* of service was a procedural irregularity, not a jurisdictional defect, and therefore that the delay in filing proof of service did not cause service to have been ineffective as of the date of removal. However, filing proof of service can be accomplished only after service is complete. And service under CPLR § 308(2) includes mailing the summons and complaint to the defendant within 20 days of leaving the summons and complaint with a suitable person at the defendant's home. *See* Vincent C. Alexander, Supplementary Practice Commentaries, N.Y.C.P.L.R. 308 (McKinney 2023) (explaining that "the two service acts of CPLR 308(2) – the delivery and the mailing of process – must be performed within 20 days of each other, and this 20-day requirement has been held to be jurisdictional, citing *In re Estate of Perlman v. Kelley,* 108 N.Y.S.3d 28, 31 (2d Dep't 2019), for the proposition that failure to timely mail the summons and complaint meant that the court lacked personal jurisdiction over the defendant because "the mailing of process ... more than 20 days after the delivery to a person of suitable age and discretion" was "not a 'mere technically' that the court could overlook," but rather was "a critical component of the notice-giving function of process" and therefore was "jurisdictional")); *see also Williams v. MTA Bus Co.*, 203 N.Y.S.3d 90, 91 (1st Dep't 2024) (concluding that a late mailing under CPLR § 308(2) was a jurisdictional defect).

As the court went on to explain in *Estate of Perlman*, the statutory requirements of service are treated as jurisdictional when they seek to diminish the possibility of failed notice of a legal proceeding, and "[i]f the delivery and mailing required by [CPLR § 308(2)] are not made within a short time of one another, there is a greater likelihood that one or both sets of pleadings will be mislaid, or, at the very least, that confusion will arise as to how much time the defendant has to respond ...." 108 N.Y.S.3d at 31. Thus, Plaintiff's tardy mailing of the complaint and summons to Skyler means that she has not yet properly served him under the New York's substituted service provision, CPLR § 308(2).

   C. <u>Plaintiff Failed To Timely File Proof of Service for Sklyer</u>

Even if Plaintiff had timely sent the summons and complaint to Skyler, she did not file proof of service until January 2, 2024, meaning that service was not complete until January 12, 2024, after the case was removed to this Court. Her citations to *Reporter Co., Inc. v. Tomicki*, 401 N.Y.S.2d 322, 323 (3d Dep't 1978), and *Lancaster v Kindor*, 471 N.Y.S.2d 573, 578 (1st Dep't 1984), for the proposition that "[t]he purpose of requiring the filing of proof of service pertains to the time within which the defendant must answer and does not relate to the jurisdiction acquired by the court upon service of the summons" (ECF 12, Mot. To Remand at 7) are unavailing. *Lancaster* stands for the proposition that, where the defendant was served with the summons and complaint before the statute of limitations had run, but proof of service was filed outside the limitations period, the court nevertheless had personal jurisdiction over the defendant, because an action is commenced with delivery of the summons, and the plaintiff could request a nunc pro tunc extension of time to file proof of service. *See Lancaster*, 471 N.Y.S.2d at 578. And *Reporter Company* affirmed the lower court's refusal to dismiss a complaint for late filing of proof of service, because an extension could be granted nunc pro tunc. *See Reporter Co.*, 401 N.Y.S.2d at 323. Neither of these cases arose in the context of removal from state court, which requires analysis of when service is complete (as opposed to when an action is started). There are many cases in this District holding that, for purposes of determining whether removal based on diversity is timely or otherwise appropriate, "substituted service in New York is only 'complete' upon the expiration of ten days after proof of service is filed." *E.g.*, *Creative Kids Far E. Inc. v. Griffin*, No. 15-CV-06027 (NSR), 2016 WL 8710479, at *2 (S.D.N.Y. Jan. 22, 2016). Those cases teach that, "prior to the filing of proof of service, service under § 308(2) is not 'complete,' and is therefore not 'proper' within the meaning of § 1441(b)," which governs removal based on diversity of citizenship. *Stop & Shop Supermarket Co. LLC v. Goldsmith*, No. 10-CV-3052 (KMK), 2011 WL 1236121, at *3-6 (S.D.N.Y. Mar. 31, 2011); *see also Lewis v. Permanent Mission of Cote D'Ivoire to United Nations*, No. 19-CV-1375 (GBD), 2019 WL 4198943, at *2 (S.D.N.Y. Aug. 7, 2019); *cf. C.Q. v. Est. of Rockefeller*, No. 20-CV-2205 (VSB), 2020 WL 5658702, at *3 (S.D.N.Y. Sept. 23, 2020) (holding that "*Gibbons* – which interpreted 28 U.S.C. § 1441(b)(2)'s 'properly joined and served' language to incorporate state service of process law – applies to the identical 'properly joined and served' language in 28 U.S.C. § 1446(b)(2)(A)," which codifies the procedures for removing civil actions).

  **\*8**  This caselaw make clear that even if Skyler has been properly served, such service was not complete until ten days after proof of service was filed, which was January 12, 2024 – after Baughman removed the case to this Court. Accordingly, Baughman's removal was proper notwithstanding the forum-defendant rule.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 114 of 160
Beter v. Baughman, Not Reported in Fed. Supp. (2024)
2024 WL 1333570

### III. Remand Is Not Required Due to Lack of Unanimity on the Notice of Removal

The law in this Circuit is that, absent an exception to the rule of unanimity, non-removing defendants "must independently express their consent to removal," *Pietrangelo*, 686 F.3d at 66, and "[t]he failure of any defendant to provide its written consent within the thirty-day period constitutes a fatal procedural defect in the removal procedure and warrants a remand of the case." *Kiryas Joel*, 2012 WL 1059395, at *3. Baughman did not secure consent of Skyler or Schoen. I analyze below whether an exception to the rule of unanimity is applicable under the circumstances of this case.

A. The Exception to the Rule of Unanimity for Defendants Who Have Not Been Served Applies to Skyler but Does Not Apply to Schoen

One exception to the rule of unanimity that permits a defendant to forgo securing consent from a co-defendant is for a co-defendant who " 'has not been served with service of process at the time the removal petition is filed." *L.Y.E. Diamonds Ltd. v. Gemological Inst. of America, Inc.*, No. 16-CV-3766 (VSB), 2017 WL 1207839, at *4 (S.D.N.Y. Mar. 31, 2017). As discussed above, Skyler had not been properly served at the time of removal, and so there was no need to request his consent to removal. However, the same cannot be said for Schoen.

The affidavit from the process server said that Schoen was served at 10:15 am on January 5, 2024, a little more than an hour before Baughman filed his notice of removal. (*See* ECF 12-6, Mot. To Remand Ex. F, Affidavit of Service for Douglas Schoen; *see also* CM/ECF Receipt for ECF 1). While the process server checked to box for "other" service, his written description of what he did to serve Schoen states that the man who opened the door at Schoen's residence identified himself as "Doug"; that the individual, on being told the process server was there to serve him with a summons and complaint, said he was "not interested"; and that the individual then quickly slammed the door at the same time the process server told the him he was being "drop served." (*See* ECF 12-6, Mot. To Remand Ex. F, Aff. of Service for Douglas Schoen.)

When, as apparently happened here, a defendant tries to avoid being served, "it suffices to leave the summons in his general vicinity." *Jane Doe I v. Karadzic*, No. 93-CV-0878 (PKL), 1996 WL 194298, at *1-2 (S.D.N.Y. Apr. 22, 1996) (quoting *McDonald v. Ames Supply Co., Inc.*, 238 N.E.2d 726, 728 (N.Y. 1969) (internal quotation marks omitted). [4] In *Karadzic*, the Court quoted Siegel's *New York Practice 2d*, to explain that:

> All the process server has to do is tender the summons to the defendant .... The normal reaction of anyone to whom a paper is tendered, except in certain parts of Manhattan, is to extend a hand to receive it. But if the defendant does not do that, the process server need only leave the summons on a table or other item nearby, or on the floor in front of the defendant (or behind him as he walks away).

*Karadzic*, 1996 WL 194298, at *2 (quoting Siegel, *New York Practice 2d*, § 66, at 82 (1991) and holding that the process server had been diligent in trying to deliver the process to the defendant by approaching him, offering the papers to him, and, after the papers were knocked to the floor, leaving them near the defendant and calling out "you've been served").

[4]    At oral argument, Baughman took the position that Florida law governed the service on Schoen, but he has abandoned that position in his supplemental briefing (*see* ECF 20, Baughman's Supp. Memo. at 1 n.1).

**\*9**   Schoen's process server was similarly diligent in bringing the summons and complaint to Schoen. As a result, the service on Schoen was proper, and qualifies as personal service, notwithstanding that the process server checked the box for "other" service (presumably because Schoen refused to take the papers the process server tried to hand him). Thus, the cases cited by Baughman for the proposition that "methods of service *other than personal service* generally require the filing of proof of

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 115 of 160

Beter v. Baughman, Not Reported in Fed. Supp. (2024)
2024 WL 1333570

service to render such service proper for purposes of the rule of unanimity" (ECF 14, Opp. to Mot. To Remand at 13 (emphasis supplied)) are inapposite.

Because Plaintiff has demonstrated that Schoen was served personally before Baughman filed the notice of removal, the exception to the rule of unanimity for a co-defendant who has not been served would not apply.

Absent the applicability of another exception to the rule of unanimity, Schoen's consent was required even though Baughman was unaware at the time of removal that Schoen had been served. *Williams v. Beemiller, Inc.*, No. 05-CV-836S (WJS) (LGF), 2009 WL 1812819 (W.D.N.Y. June 25, 2009), is instructive on this point. In *Williams*, the removing defendants argued that they did not need to obtain the consent of their codefendants, because they lacked actual or constructive notice that the non-removing codefendants had been served: no proof of service had been filed when the removing defendants checked at the Erie County Clerk's office the day before removing the case to federal court. *See Williams*, 2009 WL 1812819, at *6. As the Court in *Williams* explained:

> In an action involving multiple defendants and sought to be removed upon diversity of citizenship, the relevant inquiry in determining whether removal was proper is not whether the defendants seeking to remove the action had actual or constructive notice of service of process on the other served defendants but, rather, whether the other defendants had in fact been served.

*Id.* A removing defendant's ignorance about service on a co-defendant is "irrelevant," since the codefendant was obligated either to timely file a removal petition or join the one filed by the removing defendant. *Tate v. Mercedes-Benz USA, Inc.*, 151 F. Supp. 2d 222, 225 (N.D.N.Y. 2001). That "the operation of this rule requires the Court to hold [the non-removing defendant's] late consent against [the removing defendant] is simply a function of the fact that the carefully crafted mandates of the removal statute are interpreted strictly in order to balance a plaintiff's right to select its forum against the need to promote unanimity among defendants." *Id.*

Baughman argues that requiring a defendant to seek consent of a codefendant before the plaintiff has filed proof of service on the codefendant would lead to improper gamesmanship:

> It cannot be the case that Mr. Baughman was required to seek the consent of a non-removing defendant that he had no way of knowing Plaintiff had even attempted to serve. A contrary ruling would incentivize plaintiffs facing removal to conceal the fact that non-removing defendants had been served.

(ECF 14, Opp. to Mot. To Remand at 13.) This argument might be more persuasive were it not for the requirement that federal courts construe the removal statute narrowly and resolve "any doubts against removability." *Lupo*, 28 F.3d at 274 (2d Cir. 1994). Additionally, Baughman is conjuring a parade of horribles based on the implausible premise that a plaintiff could successfully hide from one defendant whether a codefendant has been served. A plaintiff has no way of preventing a defendant from learning a codefendant's service status if the defendant simply asks the codefendant before filing a notice of removal. The caption identifies all the defendants. Baughman could have reached out to Schoen to determine whether Schoen had been served before Baughman filed the notice of removal. Baughman did not do so. He gambled on the fact that Schoen had not yet been served, and he lost. It turns out that Schoen was served around an hour before Baughman filed the notice of removal. As a result, the exception to the rule of unanimity for a codefendant who was not yet served is inapplicable here.

B. The Exception to the Rule of Unanimity for Nominal Defendants Applies to Schoen

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 116 of 160

Beter v. Baughman, Not Reported in Fed. Supp. (2024)

2024 WL 1333570

**\*10**  Baughman argues that the rule of unanimity does not require remand in this matter because of a second exception to that rule for "nominal defendants," whose consent is not needed for removal. (ECF 14, Opp. to Mot. To Remand at 14 (citing *Zerafa v. Montefiore Hosp. Housing Co., Inc.*, 403 F. Supp. 2d 320, 328 (S.D.N.Y. 2005)).) In this context, a nominal defendant is one for whom there is no legally cognizable theory of liability based on the allegations in the complaint. *See Zerafa*, 403 F. Supp. 2d at 327-28. The removing party bears the burden of demonstrating by clear and convincing evidence that a defendant qualifies as nominal. *See Lucas v. Verizon Commc'ns, Inc.*, No. 20-CV-5542 (AJN), 2021 WL 1226889, at \*5 (S.D.N.Y. Mar. 31, 2021). Plaintiff brings claims against Schoen for negligent infliction of emotional distress ("NIED"), for aiding and abetting sex discrimination and sexual harassment, for retaliation, and for aiding and abetting the alleged sexual assault. (*See* ECF 21, Pl.'s Supp. Memo at 1.) I address below Baughman's argument that Schoen is a nominal defendant because all claims against Schoen would be time barred and because Plaintiff fails to state any claims against Schoen. [5] For the reasons set out herein, I conclude that Baughman has met his significant burden of demonstrating that Schoen is a nominal defendant.

[5]  Because I conclude that Skyler had not been properly served at the time of removal, his consent to removal is not required under the rule of unanimity, *L.Y.E. Diamonds*, 2017 WL 1207839, at \*4, and so I do not address the alternative theory that Skyler's consent is not required under the exception for nominal defendants.

### 1. The Timeliness of Plaintiff's Claims Against Schoen

All of Plaintiff's claims against Schoen would be time barred, unless they were revived by the ASA, which revives, for a window of time, certain otherwise time-barred claims, as described below. [6]

[6]  The limitations periods for Plaintiff's claims against Schoen have long since passed. *See AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp. 2d 312, 317 (S.D.N.Y. 2005) (three-year limitations period for NIED claim); *Kornmann v. City of New York Bus. Integrity Comm.*, 467 F. Supp. 3d 54, 60 (E.D.N.Y. 2020) (three-year limitations period for discrimination and retaliation claims under the New York State and New York City Human Rights Laws); *Canosa v. Ziff*, No. 18-CV-4115 (PAE), 2019 WL 498865, at \*12 (S.D.N.Y. Jan. 28, 2019) (one-year statute of limitations for intentional tort applies to claim of aiding and abetting sexual assault).

The ASA applies to "every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older." CPLR § 214-j. Baughman argues that Plaintiff fails to allege any conduct by Schoen that constitutes a sexual offense under the penal law. (*See* ECF 20, Baughman's Supp. Memo. at 5.) Plaintiff counters that the ASA revives her claim against Schoen for aiding and abetting Baughman's alleged sexual assault. (*See* ECF 21, Pl.'s Supp. Memo. at 1-2.) By the same logic, she can rely on Baughman's alleged sexual assault to support a conclusion that the ASA would revive her other claims against Schoen if 1) Baughman's alleged treatment of Plaintiff would constitute a sexual offense under the relevant penal law and 2) the ASA revives claims against one party (here Schoen) that are related to a sexual offense under the relevant penal law by another party (here Baughman).

Baughman's behavior as alleged in the Complaint would constitute an offense under the relevant penal law. *See Morrison v. Scotia Cap. (USA) Inc.*, No. 21-CV-1859 (SHS), 2023 WL 8307930, at \*3 (S.D.N.Y. Dec. 1, 2023) (describing the low threshold for acts sufficient to constitute forcible touching under N.Y. Penal Law § 130.52); *People v. Guaman*, 22 N.Y.3d 678, 684 (N.Y. 2014) (discussing the requirements of the misdemeanor of forcible touching).

**\*11**  With regard to whether the ASA revives claims against Schoen predicated on a sexual offense under the relevant penal law by Baughman, Plaintiff argues that the reference to "any party" for injuries caused by conduct that qualifies as a sexual offense means that the ASA revives claims against one person predicated on a sexual offense by another person. (*See* ECF 21, Pl.'s Memo. at 2.) Plaintiff cites one case, *PB-36 Doe v. Niagara Falls City Sch. Dist.*, 152 N.Y.S.3d 242, 245 (Sup. Ct. Niagra

Beter v. Baughman, Not Reported in Fed. Supp. (2024)

2024 WL 1333570

Cty. 2021), in which the court accepted that the otherwise time-barred claims against the school district for negligent hiring and related claims were revived by the New York's Child Victims Act, which has substantially similar language to the ASA, based on alleged sexual abuse of the plaintiff by a teacher in the district. Other New York State courts have reached the same conclusion. *See, e.g., Forbes v. Poly Prep Country Day Sch.*, 198 N.Y.S.3d 147, 149 (2d Dep't 2023). I conclude that the ASA revives Plaintiff's claims against Schoen.

### 2. Plaintiff Fails To State a Claim Against Schoen

Plaintiff claims that the Complaint alleges that Schoen "assisted Mr. Baughman in committing the sexual assault by pressuring Ms. Beter to stay quiet about it, threatening her employment if she reported it, and attempting to cover it up." (ECF 18, Reply at 4.) This is not an entirely accurate summary of the relevant allegations in the Complaint. However, the Complaint does allege that Schoen, who had introduced Plaintiff to Baughman, did so knowing that Baughman had a history of improperly touching women, and that Schoen told Plaintiff not to tell anyone about the alleged sexual assault because she wanted to work for Bloomberg. (*See* ECF 1-1, Compl. ¶ 38.)

Baughman originally argued that Plaintiff fails to allege that Schoen "participated in this alleged assault or otherwise took any adverse actions against Plaintiff as a result thereof" and that Schoen's status as a defendant "is at best[ ] legally and factually tenuous." (ECF 14, Opp. to Mot. To Remand at 14.) This fell short of an argument that there is no legally cognizable claim against Schoen based on the allegations in the Complaint. However, in his supplemental briefing, Baughman addressed in more detail the substance of Plaintiff's claims against Schoen. (*See generally* ECF 20, Baughman's Supp. Memo.) As set forth below, Baughman has shown that the allegations in the Complaint cannot support any of Plaintiff's claims against Schoen under any legally cognizable legal theory.

#### a. Negligent Infliction of Emotional Distress

Baughman demonstrates that Plaintiff has no possible claim against Schoen for NIED. To state a claim for NIED under New York law, a plaintiff must allege "(1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress." *Truman v. Brown*, 434 F. Supp. 3d 100, 122 (S.D.N.Y. 2020) (internal quotation marks and citation omitted). In addition, a plaintiff must plead "facts making out one of three theories: (1) a bystander theory, (2) a direct duty theory, or (3) a special circumstances theory." *Id.* at 122-23 (internal quotation marks and citation omitted). The bystander theory requires injury from witnessing death or serious injury of a family member, and the special circumstances theory is limited to being negligently informed of one's own terminal illness or the death of a family member. *See id.*

The only theory of NIED that could conceivably apply to Schoen's alleged conduct is the "direct duty" theory, which requires a plaintiff to allege "an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety." *Id.* at 123 (internal quotation marks and citation omitted). The direct duty "must be specific to the plaintiff, not some amorphous, free-floating duty to society." *Id.* Courts in this Circuit have not hesitated to dismiss NIED claims in the absence of an allegation of that the defendant owed the plaintiff a direct duty. *See, e.g., Mortise v. U.S.*, 102 F.3d. 693, 696 (2d Cir. 1996) (dismissing NIED claim because, "while [the defendant] may have had a generalized duty to prevent unreasonable risks of harm to passers-by, this duty was not specific to [the plaintiff]"); *Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F. Supp. 2d 506, 531 (S.D.N.Y. 2000) (dismissing NIED claim because the plaintiff failed to allege any special duty owed to her by [the defendant] other than the duty to obey the law); *Kojak v. Jenkins*, No. 98-CV-4412 (RPP), 1999 WL 244098, at *9 (S.D.N.Y. Apr. 26, 1999) (dismissing claim of NIED where the plaintiff failed to allege a special duty owed to her by the defendant); *Drankwater v. Miller*, 830 F. Supp. 188, 190 n.5 (S.D.N.Y. 1993) (same).

**\*12**  Plaintiff has not alleged any facts suggesting that Schoen owed her a such a duty. She alleges that Schoen was a friend – not a fiduciary or someone else in a relationship of confidence with her. (*See* ECF 1-1, Compl. ¶¶ 9-12.) And she does not allege that Schoen was present during the assault, so he could not have intervened and therefore had no duty to do so.

Plaintiff has no possible NIED claim against Schoen for the additional reason that the claim requires allegations of conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Goldstein v. Mass. Mut. Life Ins. Co.*, 875 N.Y.S.2d 53, 55 (1st Dep't 2009); *see also McCollum v. Baldwin*, No. 22-CV-7328 (ER), 2023 WL 5392684, at \*10 (S.D.N.Y. Aug. 22, 2023) (explaining that there is an extremely high standard for pleading extreme and outrageous conduct). Plaintiff's description of Schoen's behavior fails to clear this high bar.

Plaintiff alleges that Schoen introduced her to Baughman in the hope of getting her a photography engagement for the Bloomberg campaign, even though he knew that Baughman was a sexual predator; warned Baughman not to touch her; expressed anger about Baughman's behavior when Plaintiff told Schoen that Baughman had assaulted her; and advised her on the potential consequences of disclosing the alleged assault. (*See* ECF 1-1, Compl. ¶¶ 9-16, 36-38.) This conduct does not rise to the level of "extreme and outrageous." *Truman*, 434 F. Supp. 3d at 121-22 (finding that plaintiff's allegation that defendant manipulated her vulnerabilities was not extreme and outrageous).

### b. Discrimination and Retaliation

Baughman also demonstrates that Plaintiff has no possible claims against Schoen for discrimination and retaliation (or aiding and abetting discrimination and retaliation) under any cognizable legal theory pursuant to the New York State Human Rights Law ("NYSHRL") or the New York City Human Rights Laws ("NYCHRL"), because she has not adequately alleged that Schoen or Baughman was her employer. (*See* ECF 20, Baughman Supp. Memo. at 9-10.) Plaintiff does not even try to allege that she was employed by Schoen; instead, she claims that "Defendants" hired her with Schoen's "assistance." (ECF 21, Pl.'s Supp. Memo. at 2.) And her allegation that Baughman was her employer is wholly conclusory.

Plaintiff does not address Baughman's argument that the version of the employment discrimination laws in effect at the time of the alleged incident required an employment relationship; besides her conclusory assertion that she was an employee, she notes (presumably in the alternative) that the current versions of the NYSHRL and the NYCHRL cover independent contractors as well as employees. (*See id.*)

At the time of the alleged incident, "[a]n essential element of a claim under the NYSHRL or the NYCHRL [was] the existence of an 'employer-employee relationship.' " *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 80-81 (S.D.N.Y. 2020). Although these statutes were amended in 2019 and 2020, respectively, to cover other persons, including independent contractors, neither amendment applies retroactively. *See Franklin v. Whole Foods Mkt. Grp.*, 2022 WL 256460, at \*3, n.4 (S.D.N.Y. Jan. 26, 2022). Plaintiff therefore cannot maintain a claim against Schoen under the NYSHRL or the NYCHRL. *See Weerahandi v. Am. Statistical Case Ass'n*, No. 14-CV-7688 (AT), 2015 WL 5821634, at \*8 (S.D.N.Y. Sept. 30, 2015) (dismissing plaintiff's NYSHRL and NYCHRL claims because plaintiff "failed to allege the requisite employment relationship between himself and [the defendant]"); *Wang v. Phoenix Satellite Television US, Inc.*, 976 F. Supp. 2d 527, 537 (S.D.N.Y. 2013) (same under the NYCHRL).

### c. Aiding and Abetting Sexual Assault

**\*13**  Plaintiff also has no conceivable claim against Schoen for aiding and abetting Baughman's alleged sexual assault. The elements of a claim for aiding and abetting sexual assault and battery under New York law are (1) the existence of the underlying assault; (2) the defendant's actual knowledge of the underlying assault; and (3) the defendant's substantial assistance in carrying

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 119 of 160

Beter v. Baughman, Not Reported in Fed. Supp. (2024)

2024 WL 1333570

out the underlying assault. *See Doe 7015 v. Elektra Ent. Grp. Inc.*, No. 21-CV-6868 (JPC), 2023 WL 2744102, at \*4 (S.D.N.Y. Mar. 31, 2023). In addition, aiding and abetting:

> requires the defendant to know or intend that his conduct will substantially assist in its commission in order to be liable for aiding and abetting it. *Oakley* [*v. MSG Networks*, No. 17-CV-6903 (RJS)], 2021 WL 5180229, at \*8 n.3 [(S.D.N.Y. Nov. 8, 2021)] ("An aiding-and-abetting claim requires demonstrating that a defendant knowingly and substantially assisted in a wrongful act ...."); *Naughright* [*v. Weiss*,] 826 F. Supp. 2d [676,] 691 [(S.D.N.Y. 2011)] (requiring "the defendant's knowing and substantial assistance in the principal violation"); *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009) ("[T]he Trustee must show that the defendants knowingly aided the insiders in converting the customers' funds ...."); *IDX Cap., LLC v. Phoenix Partners Grp.*, 922 N.Y.S.2d 304, 307 (App. Div. 2011), *aff'd*, 970 N.E.2d 864 (N.Y. 2012) (dismissing a claim for aiding and abetting when the plaintiff's allegations were "clearly insufficient to draw an inference that [the defendants] took 'common action for a common purpose by common agreement or understanding ... from which common responsibility derives' " (ellipsis in original) (quoting *Goldstein v. Siegel*, 244 N.Y.S.2d 378, 382 (App. Div. 1963))); *Scollo* [*v. Nunez*], 874 N.Y.S.2d 380, at \*2 [(App. Div. 2009)] (framing the dispositive question as "whether the appellants knowingly provided substantial assistance in furtherance of the alleged battery"); *Nat. Westminster Bank USA v. Weksel*, 511 N.Y.S.2d 626, 630 (App. Div. 1987) (explaining that allegations in support of a claim for aiding and abetting must show what the defendant "can be said to have done with the intention of advancing the [tort's] commission").

*Elektra Ent.Grp.*, 2023 WL 2744102, at \*4-5 (dismissing claim for aiding and abetting sexual assault because, among other reasons, the defendants did not intend their actions to aid the perpetrator in committing the sexual assault) (some alterations supplied).

Nothing in the Complaint supports a conclusion that Schoen knew that his conduct would help Baughman sexually assault Plaintiff or that Schoen intended to help Baughman sexually assault Plaintiff. To the contrary, Plaintiff's allegation that Schoen said he told Baughman not to touch her demonstrates that Schoen sought to prevent Baughman from sexually assaulting Plaintiff, not to help Baughman commit the alleged sexual assault. That in itself is sufficient to support a conclusion that Plaintiff cannot plead a claim against Schoen for aiding and abetting sexual assault.

This claim against Schoen fails for the additional reason that Plaintiff has not alleged that Schoen substantially assisted Baughman in sexually assaulting her. Substantial assistance requires that:

> "a defendant must have committed some overt act, either by words or conduct, in furtherance of the" tort. *McKiernan v. Vaccaro*, 91 N.Y.S.3d 478, 481 (App. Div. 2019). Crucially, this rule requires the overt act in question to further the underlying tort itself – a in this case, Euringer's alleged sexual battery of Plaintiff. *See also Bigio* [*v. Coca Cola Co.*], 675 F.3d [163,] 173 [(2d Cir. 2012)] (interpreting New York law to "require that the defendant's conduct bear some contributory relation to the primary tort"); *Oakley v. MSG Networks*, No. 17 Civ. 6903 (RJS), 2021 WL 5180229, at \*8 n.3 (S.D.N.Y. Nov. 8, 2021) ("An aiding-and-abetting claim requires demonstrating that a defendant knowingly and substantially assisted in a wrongful act ...."); *Naughright v. Weiss*, 826 F. Supp. 2d 676, 691 (S.D.N.Y. 2011) (interpreting the "cause of action for aiding and abetting an assault and battery" to require "the defendant's knowing and substantial assistance in the principal violation"); *Scollo v. Nunez*, 874 N.Y.S.2d 380, at \*2 (App. Div. 2009) (affirming a denial of summary judgment on the grounds that "there exist triable issues of fact as to whether the appellants knowingly provided substantial assistance in furtherance of the alleged battery").

**\*14** *Elektra Ent. Grp. Inc.*, 2023 WL 2744102, at \*4. To qualify as "substantial," the assistance provided "must be directed at the tort itself." *Id.* ("[A]bsent overt encouragement of the offensive behavior, merely ... giving tacit approval cannot be deemed aiding or abetting the assault." (emphasis added in *Elektra Ent. Grp.*) (citing *Shea v. Cornell Univ.*, 596 N.Y.S.2d 502, 503-04 (App. Div. 1993)). Neither introducing Plaintiff to Baughman – particularly since Schoen told Baughman not to touch Plaintiff – nor counseling her not to report the assault after the fact would qualify as substantially assisting Baughman with the sexual assault.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 120 of 160

Beter v. Baughman, Not Reported in Fed. Supp. (2024)
2024 WL 1333570

## Conclusion

For the foregoing reasons, I respectfully recommend that Plaintiff's motion to remand (ECF 12) be DENIED, provided that, by March 20, 2024, Baughman files an amended petition for removal that corrects the defects in the original petition identified herein.

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO REPORT AND RECOMMENDATION

The parties shall have fourteen days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure to this Report and Recommendation. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Woods.

THE FAILURE TO OBJECT WITHIN FOURTEEN DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1333570

---

**End of Document**                                             © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Beter v. Baughman, Not Reported in Fed. Supp. (2024)

2024 WL 1329066

2024 WL 1329066
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Petra Christina BETER, Plaintiff,

v.

Duane BAUGHMAN, et al., Defendants.

1:24-cv-79-GHW-RFT
|
Signed March 28, 2024

**Attorneys and Law Firms**

Ian Michael Bryson, Derek Smith Law Group, PLLC, New York, NY, for Plaintiff.

Jessica Meyers, Brown Rudnick LLP, New York, NY, for Defendant Duane Baughman.

ORDER

GREGORY H. WOODS, United States District Judge:

**\*1** On March 13, 2024, Magistrate Judge Robyn Tarnofsky issued a Report and Recommendation ("R&R") recommending that the Court deny Plaintiff's motion to remand, provided that Defendant Baughman filed an amended notice of removal by March 20, 2024 that established diversity jurisdiction and the amount in controversy. Dkt. No. 22. In the R&R, Judge Tarnofsky rejected Plaintiff's arguments that the forum-defendant and unanimity rules precluded removal and concluded that removal was proper, aside from the technical defects identified in the notice of removal. *See id.* On March 18, 2024, Mr. Baughman filed an amended notice of removal detailing the basis for diversity jurisdiction and the amount in controversy. Dkt. No. 23.

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Parties may raise specific, written objections to the report and recommendation within fourteen days of receiving a copy of the report. *Id.*; *see also* Fed. R. Civ. P. 72(b)(2). The Court reviews for clear error those parts of the report and recommendation to which no party has timely objected. 28 U.S.C. § 636(b)(1)(A); *Lewis v. Zon*, 573 F. Supp. 2d 804, 811 (S.D.N.Y. 2008).

No objection to the R&R was submitted within the fourteen-day window. The Court has reviewed the R&R for clear error and finds none. *See Braunstein v. Barber*, No. 06 Civ. 5978 (CS) (GAY), 2009 WL 1542707, at *1 (S.D.N.Y. June 2, 2009) (explaining that a "district court may adopt those portions of a report and recommendation to which no objections have been made, as long as no clear error is apparent from the face of the record."). The Court, therefore, accepts and adopts the R&R in its entirety. For the reasons articulated in the R&R, Plaintiff's motion to remand is denied.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1329066

---

**End of Document**                 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 676090
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Sabrina ROLDAN, Plaintiff,

v.

Adolfo LEWIS et al., Defendants.

20-CV-03580 (HG) (MMH)

|

Signed March 3, 2025

**Attorneys and Law Firms**

Clyde Rastetter, Matthew W. Christiana, Kopke Christiana & Rastetter LLP, Brooklyn, NY, Carolyn A. Kubitschek, Lansner & Kubitschek, New York, NY, for Plaintiff.

David Scott Rutherford, Rutherford & Christie, LLP, New York, NY, Roger Drake Herring, New York, NY, for Defendants Adolfo Lewis, Cecilia Ellis, Natalie Barnwell, HeartShare Human Services of New York, HeartShare St. Vincent's Services.

David Sumner Thayer, New York City Law Department, New York, NY, Suzanne M. Halbardier, Barry McTiernan & Moore, New York, NY, for Defendants Mark Casner, Gloria Antonsanti, Maribel Cruz, Valerie Russo.

David Sumner Thayer, New York City Law Department, New York, NY, Suzanne M. Halbardier, Barry McTiernan & Moore, New York, NY, Eric Proshansky, Corporation Counsel of the City of NY, New York, NY, for Defendant City of New York.

Karen L. Campbell, Corey Shulman, Zachary Candelaria, Lewis Brisbois Bisgaard & Smith LLP, New York, NY, for Defendants Lelar Floyd, Jacqueline Harris, Theodora Diggs, Claire Haynes, Charmaine Frank.

**MEMORANDUM & ORDER**

HECTOR GONZALEZ, United States District Judge:

 **\*1**  Plaintiff Sabrina Roldan sued Defendants the City of New York, Mark Casner, Gloria Antonsanti, Valerie Russo ("individually and as deputy Commissioner"), Maribel Cruz, (together, the "City Defendants"); Concord Family Services ("Concord"),[1] Lelar Floyd, Jacqueline Moseley,[2] Theodora Diggs ("individually and as program director"), Claire Haynes, and Charmaine Frank (together and without Concord, the "Concord Defendants"); and HeartShare Human Services of New York, HeartShare St. Vincent's Services,[3] Adolfo Lewis, Natalie Barnwell ("individually and as director"), and Cecilia Ellis (together, the "HeartShare Defendants").[4] City Defendants, Concord Defendants, and HeartShare Defendants have all moved to dismiss the entire Third Amended Complaint. *See* ECF No. 209 ("TAC"). As explained in detail below, their motions are GRANTED IN PART AND DENIED IN PART.

[1]    Concord has not appeared in this action and is in default with respect to the Second Amended Complaint. *See* ECF No. 206.

[2]    Defendant Moseley appears as "Jacqueline Harris" on the docket. Because her counsel refers to her as Jacqueline Moseley, the Clerk of Court is respectfully directed to update the docket with this name.

3     The two HeartShare entities are collectively referred to as "HeartShare," as in the operative Third Amended Complaint. *See* ECF No. 209 ¶ 21.

4     Plaintiff previously filed a notice of voluntary dismissal with respect to Defendant Luz Liburd, *see* ECF No. 205, whom the Court subsequently dismissed, *see* June 10, 2024, Text Order.

## **BACKGROUND**

### *A. Factual Background*

Plaintiff was born in 1992 and the City took her and her two siblings into its custody in 1997 because Plaintiff's mother abandoned them and her father could not care for them. TAC ¶¶ 12, 70. During Plaintiff's time in foster care, Defendant Antonsanti was employed by the City's Administration for Children's Services ("ACS") as a caseworker. *Id.* ¶ 52. She was responsible for "supervis[ing] and monitor[ing] [P]laintiff's case during part of [P]laintiff's time in foster care." *Id.* ¶ 53. The same is alleged with respect to Defendant Cruz, another caseworker, and Defendant Casner, a supervisor, was also a caseworker with the same responsibilities. *Id.* ¶¶ 50–51, 54–55. Defendant Russo was the Deputy Commissioner of ACS during Plaintiff's time in foster care. *Id.* ¶ 56.

The City placed Plaintiff into the custody of Defendant Concord, which the City contracted with to provide foster care services. *Id.* ¶¶ 33h, 71. Defendant Floyd was Concord's Executive Director "responsible for making, implementing, and supervising the foster care policies and practices of ... Concord." *Id.* ¶¶ 58–59. Defendant Moseley was Concord's Program Director "responsible for managing the foster care program" there, which "includ[ed] making, implementing, and supervising the foster care policies and practices of ... Concord" together with Defendants Floyd and Diggs. *Id.* ¶¶ 60–61. Defendant Diggs was also a Program Director with the same responsibilities, and she worked together with Defendants Floyd and Moseley. *Id.* ¶¶ 62–63.

**\*2** In October 1997, Concord, with the consent of the City, moved Plaintiff and her siblings into the foster home of Juan and Maria Rodriguez.⁵ *Id.* ¶ 72. Concord had "investigated and certified" the Rodriguezes. *Id.* ¶ 73. Plaintiff alleges that she experienced severe sexual and physical abuse and neglect at the hands of the Rodriguezes. *Id.* ¶¶ 74–87. These acts included Juan Rodriguez performing oral sex on, fondling, and simulating sex with Plaintiff, as well as forcing Plaintiff to manually stimulate him. *See id.* ¶¶ 76–79. In addition, in an attempt to coerce Plaintiff into concealing Juan Rodriguez's sexual abuse, Maria Rodriguez, on a nearly daily basis, physically abused Plaintiff, beating her with objects like metal rods and baseball bats. *Id.* ¶¶ 81, 83. These left scar marks on Plaintiff's body which were visible to Defendant Frank. *Id.* ¶ 81. Maria Rodriguez also forced Plaintiff to kneel in a bed of raw rice until her knees bled, tied Plaintiff and her siblings to chairs and left them alone for hours, locked Plaintiff in a windowless basement for hours, failed to bathe Plaintiff, and sent Plaintiff to school wearing "filthy" clothes. *Id.* ¶¶ 82–86. Plaintiff contracted ringworm due to these poor hygienic conditions. *Id.* ¶ 87.

5     The Court "recite[s] the substance of the allegations as if they represent[ ] true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021). In this regard, the Court includes the names of specific foster parents only for convenience and consistency with the TAC. To be clear, none of these individuals is a defendant, and the Court expresses no view as to any potential liability on their part. In addition, the TAC does not follow a clear chronology at all times, but this recitation of the facts generally tracks the order of Plaintiff's allegations.

In early 1998, Plaintiff's brother "disclosed the Rodriguezes' abuse to a mental health professional," and that mental health professional or his or her coworker told Defendants City and Concord about the disclosure. *Id.* ¶ 88. "Upon receiving that notice," neither Concord, the City, Casner, Antonsanti, Cruz, nor Floyd reported the suspected abuse to the New York State Central Register of Child Abuse and Maltreatment ("SCR"). *Id.* ¶¶ 90–92, 259. Shortly after Plaintiff's brother disclosed the

abuse, an eyewitness to Maria Rodriguez's physical abuse of Plaintiff provided those same Defendants with "actual notice" of that abuse, but no Defendant made a report to the SCR. *Id.* ¶¶ 93–94.

During visits with Plaintiff and her siblings at Concord, Plaintiff's father "repeatedly observed" signs that the children were abused and maltreated. *Id.* ¶ 96. He "repeatedly complained" about it to Concord employees, but Concord neither filed a report with the SCR nor took any other action. *Id.* ¶¶ 97–98. After that, Plaintiff's father spoke to employees at Plaintiff's school "to seek their help in protecting [P]laintiff," but the City and Concord then obtained a court order to prevent him from going to the school and continued to prevent him from visiting the school during the rest of Plaintiff's time with Concord. *Id.* ¶¶ 99–101.

Additionally, after Juan Rodriguez began sexually abusing Plaintiff, employees at Plaintiff's school reported to the City and Concord that Plaintiff was abused and neglected, but neither the City, Concord, nor any of their employees filed a report with the SCR. *Id.* ¶¶ 103–05. Employees of Defendant Concord also learned that the Rodriguezes were leaving Plaintiff and her siblings "unattended for extended periods of time," but again, neither the City, Concord, nor their employees filed an SCR report. *Id.* ¶¶ 106–08. Maria Rodriguez eventually learned that Juan Rodriguez had abused Plaintiff, but instead of taking action to protect Plaintiff, Maria Rodriguez threatened to kill her if she reported the abuse and told Plaintiff to lie if asked about it. *Id.* ¶¶ 109–10.

Again, when Plaintiff's father visited Plaintiff at Concord's offices, Plaintiff's father "repeatedly showed" Defendants Frank, Barnwell, [6] and "other employees" of Concord the bruises on the bodies of Plaintiff and her siblings and demanded that Concord investigate. *Id.* ¶ 111. In response, Concord and its employees took no action. *Id.* ¶ 112. The abuse in the Rodriguez home continued for years. *Id.* ¶ 113. Eventually, the Rodriguezes requested that Plaintiff and her siblings leave their home, and Concord and its employees, including Defendant Frank, moved them out in 2002. *Id.* ¶ 113.

[6]     This appears to be an error. As discussed further below, Defendant Barnwell was not associated with Concord.

**\*3** When Plaintiff was ten years old, the City, Concord, and their employees moved her and her siblings into the home of Debra Shields. *Id.* ¶ 115. Concord had "investigated and licensed" Shields. *Id.* ¶ 116. The City "knew and had confirmed" that Shields had previously abused or maltreated other children in her home. *Id.* ¶ 117. [7] At the time Plaintiff and her siblings were placed into the Shields home, Concord, with the City's consent, had already placed two other adolescent boys there. *Id.* ¶ 118. Shields required Plaintiff to change bedsheets, and while she was once doing this, one of the boys entered Plaintiff's room and pinned her down on the bed. *Id.* ¶ 121. Plaintiff got out from under the boy but could not exit the room; in response, the boy grabbed her and threw her against a dresser. *Id.* ¶ 122. Shields "pushed and physically assaulted" Plaintiff as punishment for this incident. *Id.* ¶ 124. "[S]ome time later," after Shields hit Plaintiff's younger sister in the head with a frying pan, Plaintiff was removed from the home. *Id.* ¶ 125.

[7]     Plaintiff claims that this made Shields "legally ineligible to continue to be licensed as a foster mother." TAC ¶ 117.

In November 2003, Plaintiff was separated from her brother and placed in a fourth foster home. *Id.* ¶ 126. [8] Between May 1997 and December 2008, Concord and its employees placed Plaintiff in more than ten different foster homes with the consent of the City. *Id.* ¶ 127. In late 2008, the City terminated its relationship with Concord due to Concord's "gross mismanagement, fiscal impropriety[,] including the misuse of government funds, and criminal activity." *Id.* ¶¶ 128–29. After that, the City placed Plaintiff in HeartShare's care, even though HeartShare "was one of the most dangerous foster care agencies in the City" because "a high percentage of HeartShare foster children were abused and neglected." *Id.* ¶¶ 130–31.

[8]     It is unclear what the third foster home was or when Plaintiff was there.

Defendant Lewis was a HeartShare supervisor responsible for "supervis[ing] the foster care placement of [P]laintiff and ... supervis[ing] the caseworkers who were assigned to [P]laintiff's foster care case. *Id.* ¶¶ 43–44. Defendant Ellis was a HeartShare caseworker responsible for supervising Plaintiff's foster care. *Id.* ¶¶ 45–46. Defendant Barnwell was HeartShare's "director of

foster care" during the time when Plaintiff was supervised by HeartShare, a role in which she was "assigned ... to supervise the children in its foster care placement program, including [P]laintiff." *Id.* ¶¶ 48–49. [9]

[9]    The TAC also alleges that Defendant Barnwell was a *Concord* "supervisor or manager." TAC ¶ 47. That appears to be a mistake.

In December 2008, HeartShare, with the City's consent, placed Plaintiff in the home of Kiesha Bell, whom HeartShare had "investigated and certified." *Id.* ¶ 133. The Bell home was "filthy and malodorous" and "overcrowded and dangerous." *Id.* ¶¶ 134, 136. Bell left the door open at night, when adult men would enter and leave. *Id.* ¶ 135. And Bell failed to provide Plaintiff with food. *Id.* ¶ 134. Plaintiff told HeartShare employees about Bell's "dangerous and neglectful behavior," but HeartShare failed to respond. *Id.* ¶ 137.

Plaintiff "fled" the Bell home and went to stay with her brother in the foster home of Gary Hoyte. *Id.* ¶ 138. First, Concord had "investigated and licensed" Hoyte as a foster parent; later, HeartShare did the same. *Id.* ¶ 140. The home was "filthy" and "overrun by vermin and insects." *Id.* ¶ 150. The plumbing did not work properly, causing leaks, dampness, and mold. *Id.* According to Plaintiff, Hoyte was a "sexual predator" and Defendants HeartShare, Barnwell, Lewis, and Ellis knew that, with Hoyte even sexually harassing Ellis when she came to visit the foster children for whom she was responsible. *Id.* ¶¶ 141–42. Hoyte "subjected [P]laintiff to sexual abuse and sexual harassment for a period of at least six months," including by repeatedly sexually touching and groping her. *Id.* ¶¶ 143–44. On one occasion, Hoyte came up behind Plaintiff and rubbed his body against hers. *Id.* ¶ 145. He repeatedly attempted to pull Plaintiff into his bedroom. *Id.* ¶ 147. He made sexual comments toward Plaintiff and at least one other female foster child in the home. *Id.* ¶ 148. And he also "regularly propositioned" Plaintiff by suggesting that the two go away together for the weekend. *Id.* ¶ 146. Plaintiff and Plaintiff's brother informed Lewis of Hoyte's "behavior," but neither Lewis nor any other HeartShare employee acted. *Id.* ¶¶ 151–52.

 **\*4**  In 2009, the City and HeartShare placed Plaintiff in the home of Dolores Shore, where she lived between the ages of seventeen and nineteen. *Id.* ¶ 153. The City and HeartShare knew that Dolores Shore's adopted adult son Max Shore resided in her home when they placed Plaintiff there because the City had placed Max Shore there as a foster child years earlier. *Id.* ¶ 154. In the Shore home, Max repeatedly rubbed his body against Plaintiff's and tried to pull off her shirt. *Id.* ¶ 155. Max Shore's girlfriend also subjected Plaintiff to sexual harassment and sexual threats. *Id.* ¶ 157. Some of those incidents of sexual assault took place before Plaintiff turned eighteen. *Id.* On one occasion, Max Shore entered a room where Plaintiff was, closed the door, threw her down, and climbed onto her. *Id.* ¶ 156. He began kissing Plaintiff, pinned down her arms, and attempted to rape her. *Id.* His attempt was thwarted because another adult entered the room after hearing Plaintiff's screams. *Id.* Plaintiff does not recall if she was eighteen years old at this time. *Id.* Plaintiff ran away from the Shore home in January 2012 at age nineteen. *Id.* ¶ 159. When Plaintiff ran away, she informed HeartShare employees that the home was "not safe," and HeartShare "belatedly" moved her out of that home. *Id.* ¶ 160. When HeartShare and the City moved her out, they left behind all her possessions and documents, including her birth certificate. *Id.* ¶ 161.

After that, the City and HeartShare moved Plaintiff back into the Bell home, where Plaintiff claims to again have been subjected to "mistreatment and endangerment." *Id.* ¶ 162. The City and HeartShare then moved Plaintiff to numerous other foster homes before placing her in Helen Lacy's home. *Id.* ¶¶ 163–64. The Lacy home was "extremely overcrowded" as up to ten children lived there. *Id.* ¶ 165. Lacy "had many male guests," kept guns in her home, and her former boyfriend, "who had lived with her," was criminally charged with "murder, drugs, and gun possession." *Id.* ¶ 166. Plaintiff was terrified of the Lacy home and begged Ellis and Lewis to remove her, but HeartShare and the City took no action. *Id.* ¶¶ 167–68. Eventually, HeartShare moved Plaintiff out of the Lacy home and "into many other foster homes"; in total, HeartShare placed Plaintiff in more than ten different foster homes. *Id.* ¶¶ 169–70. Plaintiff says that she could not continue with her education because of the frequency of moves and abuse she experienced, causing her to drop out of school. *Id.* ¶ 171. Before turning twenty-one, Plaintiff "signed herself out of foster care." *Id.* ¶ 172.

Based on the above conduct, Plaintiff alleges that she "suffered severe sexual, physical[,] and emotional abuse, in gross disregard of her constitutional, statutory, and common law rights." *Id.* ¶ 1. Plaintiff alleges numerous injuries, including "irreversible and permanent" "extraordinary physical and mental injuries, pain and suffering, anguish, terror, confusion, and helplessness," but also "loss of funds" and the lost opportunity to continue her education. *Id.* ¶¶ 171, 247, 251, 294.

### B. Procedural History

Plaintiff filed the initial complaint on August 9, 2020. *See* ECF No. 1. On May 23, 2022, the case was reassigned to me. *See* May 23, 2022, Text Order. Plaintiff filed her First Amended Complaint on November 22, 2023. *See* ECF No. 145 ("FAC"). The City filed a motion to strike the FAC, *see* ECF No. 146, and the Court ordered Plaintiff to file a letter explaining, *inter alia*, why the FAC was procedurally proper under Rule 15 and "why she ha[d] not unduly delayed in bringing her new claims pursuant to New York's Adult Survivors Act," *see* Dec. 7, 2023, Text Order. Plaintiff filed that response on December 14, 2023. *See* ECF No. 150. On December 14, 2023, the Court ordered Plaintiff to, *inter alia*, explain why her Section 1983 claims should not be dismissed on statute of limitations grounds and to explain this Court's basis for exercising diversity jurisdiction over Plaintiff's state law claims. *See* ECF No. 151. Plaintiff filed her response to that Order on January 4, 2024. *See* ECF No. 174. On March 18, 2024, the Court denied the City's motion to strike, finding the FAC proper under Rule 15, and directing Plaintiff to file a Second Amended Complaint ("SAC") "for the sole purpose of amending allegations related to diversity of citizenship." *See* Mar. 18, 2024, Text Order.

**\*5** On March 20, 2024, Plaintiff filed the SAC. *See* ECF No. 186. [10] On April 3, 2024, City, Concord, and HeartShare Defendants (together, the "Moving Defendants") filed a pre-motion letter in anticipation of filing a motion to dismiss the SAC. *See* ECF No. 188. Plaintiff filed her response on April 11, 2024. *See* ECF No. 193. In that response, Plaintiff sought leave to amend the SAC, which the Court granted pursuant to Rule 15(a)(2). *See* May 31, 2024, Text Order. On June 17, 2024, Plaintiff filed the TAC. *See* ECF No. 209. On June 28, 2024, Moving Defendants filed another pre-motion letter in anticipation of filing a motion to dismiss the TAC. *See* ECF No. 213. Plaintiff filed her response on July 8, 2024. *See* ECF No. 216. The Court then denied the motion for a pre-motion conference as unnecessary and directed the parties to brief the motion to dismiss. *See* July 9, 2024, Text Order.

[10] On May 31, 2024, the Court resolved a third-party dispute between the City and third-party defendants Lexington Insurance Co. and Philadelphia Indemnity Insurance Co. *See Roldan v. Lewis*, 735 F. Supp. 3d 163 (E.D.N.Y. 2024), *as amended*, 2024 WL 4389281 (E.D.N.Y. Oct. 3, 2024).

On August 7, 2024, HeartShare Defendants filed their motion to dismiss. *See* ECF No. 226 (Motion); ECF No. 227 (Declaration); ECF No. 228 (Memorandum). On August 8, 2024, Concord Defendants did the same, *see* ECF No. 231, as did City Defendants, *see* ECF No. 232. The Court directed Plaintiff to file one consolidated oversized opposition on September 24, 2024, which Plaintiff filed the next day. *See* ECF No. 240. On October 14, 2024, the Moving Defendants filed their Replies. *See* ECF No. 245 (HeartShare Defendants); ECF No. 246 (City Defendants); ECF No. 247 (Concord Defendants).

### LEGAL STANDARD

"In order to survive a motion to dismiss, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.' " *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). [11] "A claim is plausibly alleged 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "In making this assessment, the court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those

allegations in the light most favorable to plaintiff, and construe the complaint liberally." *VR Glob. Partners, L.P. v. Petróleos de Venezuela, S.A.*, No. 24-1176-cv, 2024 WL 4891271, at *2 (2d Cir. Nov. 26, 2024).

11    Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted. The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

## DISCUSSION

Plaintiff advances eight causes of action against the sixteen remaining Defendants: (i) "[n]egligence, in violation of the Child Victims Act"; (ii) "[n]egligence, in violation of the Adult Survivors Act"; (iii) "[f]ailure to report child abuse"; (iv) breach of contract; (v) "[v]iolation of the Victims of Gender-Motivated Violence Protection Law," N.Y.C. Admin. Code §§ 10-1101 *et seq.*; (vi) "violations of the Fourteenth Amendment and Sections 1, 6, and 11 of Article I of the New York Constitution"; (vii) "[u]nconstitutional training in [v]iolation of the Fourteenth Amendment and Sections 1, 6, and 11 of Article I of the New York Constitution"; and (viii) "[e]xcessive [f]orce under the Fourth and Fourteenth Amendments and Section 12 of Article I of the New York Constitution." TAC at 32–53.

Although not clearly articulated in the TAC, and as discussed in greater detail below, the Child Victims Act ("CVA") and Adult Survivors Act ("ASA") "create[ ] no cause of action" but are just a "means to an end" by reviving certain claims. *See Giuffre v. Dershowitz*, No. 19-cv-3377, 2020 WL 2123214, at *2 (S.D.N.Y. Apr. 8, 2020) (discussing the CVA). Accordingly, the Court groups Counts I and II alleging negligence. Similarly, Counts VI, VII, and VIII allege violations of the federal and New York State constitutions. Also as discussed in greater detail below, the vehicle for the federal constitutional claims is 42 U.S.C. § 1983. The Court groups those claims under "Section 1983" and the related state claims under "State Constitutional Claims." Because Section 1983 provides a logical starting point for a discussion of the various statute of limitations issues at play in this action, the Court begins there.

### I. Child Victims Act, Adult Survivors Act, and Relevant Allegations

#### *A. Statutory Framework*

**\*6**  Because the current motions to dismiss revolve largely around timeliness, the Court begins with an overview of the relevant statutory framework. New York's CVA provides:

> Notwithstanding any provision of law which imposes a period of limitation to the contrary ... every civil claim or cause of action brought against any party alleging intentional or negligent acts ... which would constitute a sexual offense as defined in [Article 130] of the penal law committed against a child less than eighteen years of age ... is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than two years and six months after the effective date of this section.

N.Y. C.P.L.R. § 214-g. Accordingly, the two-year filing window for claims revived by Section 214-g was August 14, 2019, to August 14, 2021. *Jones v. Cattaraugus-Little Valley Cent. Sch. Dist.*, 96 F.4th 539, 541 (2d Cir. 2024). 12

12    On February 20, 2025, the New York Court of Appeals, in responding to a certified question from the Second Circuit, clarified that claims filed between the enactment of the statute on February 14, 2019, and the effective date on August 14, 2019, were nevertheless timely because the "six-month waiting period preceding August 14, 2019, the date on which

previously brought claims could be brought, is neither a statute of limitations nor a condition precedent." *See Jones v. Cattaraugus-Little Valley Cent. Sch. Dist.*, No. 107, 2025 WL 554454, at *1 (N.Y. Feb. 20, 2025).

Also relevant to this case is New York's ASA. Like its CVA counterpart, "[t]he ASA provided adult victims of sexual abuse with a new one-year window in which to sue their abusers, even if an otherwise applicable statute of limitations had previously expired." *Carroll v. Trump*, 124 F.4th 140, 152 (2d Cir. 2024) (interpreting N.Y. C.P.L.R. § 214-j). Its relevant language is "identical" to the CVA's. *Levin v. Sarah Lawrence Coll.*, No. 23-cv-10236, 747 F.Supp.3d 645, 2024 WL 4026966, at *7 (S.D.N.Y. Sept. 3, 2024). The ASA's period for reviving claims ran from November 24, 2022, to November 24, 2023. *Marciniak v. Mass. Inst. of Tech.*, No. 23-cv-10305, 2024 WL 4350872, at *12 n.8 (S.D.N.Y. Sept. 29, 2024).

### *B. Timely Allegations*

With that background, the Court begins with a threshold issue. As discussed above, the TAC includes several allegations related to physical abuse that Plaintiff experienced as a child. *See, e.g.*, TAC ¶ 82. However, City Defendants argue that Plaintiff may not "seek redress under the CVA for alleged physical or emotional abuse." ECF No. 232-1 at 19. Concord Defendants, *see* ECF No. 231-1 at 15, and HeartShare Defendants, *see* ECF No. 228 at 12–13, make similar arguments. Their position is rooted in the CVA itself, which limits claim revival to conduct, as relevant here, "which would constitute a sexual offense" as defined in New York's Penal Law. N.Y. C.P.L.R. § 214-g; *accord id.* § 214-j (ASA). Unsurprisingly, this position also finds support in the case law. *See, e.g.*, *Perez v. Archdiocese of New York*, No. 950236/2019, 2021 WL 4895306, at *4 (N.Y. Sup. Ct. Oct. 19, 2021) ("[G]eneral claims of physical and emotional abuse that are not sexual in nature ... are not revived."); *Rivera v. Archdiocese of New York*, No. 950001/2019, 2021 WL 4846551, at *4, 2022 N.Y. Misc. LEXIS 37598, at *10-11 (N.Y. Misc. Ct. Mar. 7, 2022) (same); *Brienza v. New York*, No. 950185/2019, 2021 N.Y. Misc. LEXIS 55171, at *16-17 (N.Y. Sup. Ct. Oct. 28, 2021) (same). In Opposition, Plaintiff concedes that claims based on non-sexual abuse are unrevived by the CVA and ASA, stating that she is not "seeking damages for physical abuse and neglect" pursuant to those revival statutes, and that she included these allegations "to provide context and support for her overall claims regarding the sexual abuse she suffered while in ... homes in a foster care system that systemically failed her." *See* ECF No. 240 at 25. Accordingly, although the Court mentions these other allegations as appropriate, the Court makes clear that the non-sexual abuse claims are untimely and must be dismissed.[13]

---

[13]    Concord Defendants argue that these allegations are "scandalous and prejudicial" and should be stricken. ECF No. 247 at 4. That request, made for the first time in Reply, is denied as procedurally improper. *See United States v. Fayton*, 704 F. Supp. 3d 449, 453 (S.D.N.Y. 2023).

### **II. Section 1983**

**\*7**  Plaintiff's Counts VI, VII, and VIII implicate federal constitutional rights. In Count VI, Plaintiff alleges a violation of the Fourteenth Amendment by all Defendants for "fail[ure] to supervise" during her time in foster care. *See* TAC ¶¶ 309–29. Count VII also alleges a violation of the Fourteenth Amendment, but is packaged as an "unconstitutional training" claim against Defendants City, Concord, and HeartShare. *See id.* ¶¶ 330–37. Count VIII similarly alleges a Fourteenth Amendment violation in the form of "excessive force" and is brought against Defendants City, Concord, and HeartShare. *See id.* ¶¶ 338–42. Although not explicitly referenced within each count, Plaintiff brings these claims pursuant to Section 1983. *See Fenner v. City of New York*, 392 F. App'x 892, 893 (2d Cir. 2010) ("We have long held that when 42 U.S.C. § 1983 provides a remedy, an implied cause of action grounded on the Constitution is not available."); *see also* ECF No. 240 at 33–34 (Plaintiff framing these claims under Section 1983).

### *A. Timeliness*

Moving Defendants argue that Plaintiff's claims brought under Section 1983 are time-barred. *See* ECF No. 228 at 23–24; ECF No. 231-1 at 11–12; ECF No. 232-1 at 11–18. "[I]n New York, the statute of limitations for Section 1983 claims is New York's

2025 WL 676090

general statute of limitations for personal injury actions, which is three years." *Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 108 (2d Cir. 2023) (citing N.Y. C.P.L.R. § 214(5)). In addition, New York law automatically tolls statutes of limitations for the period in which the plaintiff is a minor, meaning that the limitations period starts to run when the plaintiff turns eighteen. *See McCoy v. ACS*, No. 23-cv-03019, 2024 WL 4379584, at *9 (E.D.N.Y. Aug. 9, 2024) (citing N.Y. C.P.L.R. § 208(a)), *report and recommendation adopted as modified*, 2024 WL 4344791 (E.D.N.Y. Sept. 30, 2024). This infant tolling provision applies to Section 1983 claims. *See id.* Accordingly, as explained by City Defendants, because Plaintiff was born in 1992, the limitations period for her Section 1983 claims began to run when she turned eighteen in 2010, and expired three years later in 2013. *See* ECF No. 232-1 at 13.

Plaintiff does not dispute that basic timeliness analysis, but instead argues that the limitations period was tolled pursuant to New York's CVA. *See* ECF No. 240 at 34. In *Kane*, the Second Circuit confronted whether Section 214-g of the CVA revived federal Section 1983 claims. 80 F.4th at 108. It concluded that the CVA, as a "specialized statute for sexual abuse claims," was not "closely related" to the borrowed general three-year statute of limitations under state law because it was not a "generally applicable tolling provision," in contrast to, for example, the infant tolling mechanism. *Id.* at 108–09. Accordingly, plaintiffs were not able to rely on the CVA to revive otherwise time-barred Section 1983 claims. *Id.* at 111. Confronted with *Kane*, Plaintiff has two responses. First, she argues that "*Kane* should not apply to her or other foster children" who are "in government custody" and "completely dependent upon [their] governmental custodians." ECF No. 240 at 34. However, *Kane*, which expressly spoke to the vehicle of Section 1983, provided for no such plaintiff-based carveout. 80 F.4th at 111. Second, Plaintiff argues that *Kane* was wrongly decided and that the Second Circuit or Supreme Court will come to a different conclusion in the future. *See* ECF No. 240 at 34. On this point, she presses numerous arguments for revisiting *Kane*'s holding. *See id.* at 34–38. But that reasoning invites the Court to depart from binding Second Circuit precedent and thus to exceed its limited authority. As the Second Circuit has recently emphasized, the Court may not do so. *See Packer ex rel. 1-800-Flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 (2d Cir. 2024) ("District Courts ... are obliged to follow [Second Circuit] precedent, even if that precedent might be overturned in the near future."). [14]

[14]    Plaintiff does not articulate how the ASA would revive any Section 1983 claims based on injuries she alleges to have experienced after becoming an adult in 2010. *See* TAC ¶ 179 (alleging that Plaintiff was in foster care through February 2012). Nor could she because *Kane*'s rationale applies with equal force to the ASA, another specialized tolling statute. *See Doe v. Columbia Univ.*, No. 23-cv-10393, 2024 WL 4149252, at *11 n.6 (S.D.N.Y. Sept. 11, 2024).

### B. Equitable Tolling

**\*8**  New York's equitable tolling provision can also toll the limitations period for a Section 1983 claim. *Kane*, 80 F.4th at 109. However, Plaintiff does not explicitly argue for the application of equitable tolling to her claims; rather, she abstractly refers to the doctrine to attack the line of argument in *Kane* that not applying "tort-specific revival or tolling provisions" like the CVA is consistent with Supreme Court precedent seeking "to avoid time consuming litigation and uncertainty caused by 'an analysis of the particular facts' for each claim to determine the applicable statute of limitations.' " *Id.* (quoting *Wilson v. Garcia*, 471 U.S. 261, 272, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). For instance, she argues that "contrary to the Second Circuit, rejection of a state tolling provision will not avoid time-consuming litigation. On the contrary, laws tolling statutes of limitations are frequently dependent upon analyses of the particular facts for each claim. This is especially true when an individual civil rights plaintiff claims equitable tolling ...." ECF No. 240 at 36–37. She later argues that "[i]f a civil rights plaintiff raises a claim of equitable tolling[,] ... the [C]ourt must make an individualized factual determination as to whether the statute of limitations has been tolled for that particular plaintiff." *Id.* at 37. For the reasons already explained, those are arguments for the Court of Appeals to revisit *Kane*'s doctrinal foundations, not arguments this Court can endorse.

In any event, even if the Court reads Plaintiff's argument to suggest that equitable tolling does apply to her case, the Court disagrees. "Under New York law, the doctrine[ ] of equitable tolling ... may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon*,

480 F.3d 636, 642 (2d Cir. 2007). And it is an "essential element" of a claim of equitable tolling that a plaintiff has exercised "[d]ue diligence ... in bringing an action." *Id.* However, the Court agrees with Concord Defendants, *see* ECF No. 247 at 8, that this case does not implicate the "rare and exceptional circumstances" in which equitable tolling applies, *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005).

On this point, the Court takes seriously Plaintiff's argument that "[s]ome victims of sexual and physical assault, like Plaintiff, are so traumatized by their experiences that they remain unable to file lawsuits for redress until after the period of limitations has expired." ECF No. 240 at 37. Recent Second Circuit authority buttresses that point. *See Doe v. United States*, 76 F.4th 64, 72 (2d Cir. 2023) ("[S]everal courts have recognized that the psychological impact of long-term or extreme sexual abuse can constitute an extraordinary circumstance that prevents a victim from coming forward for some time after the abuse has ceased."); *see also Clark v. Hanley*, 89 F.4th 78, 102–03 (2d Cir. 2023) (in assessing applicability of equitable tolling, district court appropriately considered effect of abuse on plaintiff's delay in filing suit). And the TAC also alleges that the abuse Plaintiff alleges to have experienced at the hands of Maria Rodriguez prior to 2002 was intended to "conceal" Juan Rodriguez's alleged sexual abuse, and that Maria Rodriguez "threatened to kill [P]laintiff" if Plaintiff reported the abuse. *See* TAC ¶¶ 83, 110, 113. However, this allegation, which does not relate to filing *this* suit, coupled with Plaintiff's generalized reference to the effect of trauma, "fail to describe her impairment with particularity and also fail to demonstrate a causal connection between how she felt and her ability to pursue her rights," leading the Court to decline to exercise its discretion to toll the statute of limitations. *Levin*, 2024 WL 4026966, at *19, 747 F.Supp.3d 645; *see also Doe 1 v. Congregation of the Sacred Hearts of Jesus & Mary*, No. 23-cv-5294, 2024 WL 4276174, at *6 n.2 (E.D.N.Y. Sept. 24, 2024) (declining to apply equitable tolling where the complaint "d[id] not allege any specific actions ... that somehow kept plaintiffs from timely bringing suit"). Therefore, the Court dismisses without prejudice Plaintiff's federal constitutional claims as time-barred. [15]

[15]  As described further below, the Court will grant Plaintiff leave to replead these Counts, including, if possible, so that she can assert facts needed to support a request for equitable relief. *See Ellis v. Kelly*, No. 17-cv-6656, 2019 WL 1243760, at *1 (E.D.N.Y. Mar. 18, 2019) (describing grant of leave to amend, "in an abundance of caution," to allow plaintiff to plead facts related to equitable tolling).

**III. State Constitutional Claims** [16]

[16]  Even though the Court has dismissed Plaintiff's sole federal claim under Section 1983, Plaintiff's remaining claims, all brought under New York law, come within the Court's limited subject-matter jurisdiction because Plaintiff has adequately pled complete diversity of citizenship and damages in excess of $75,000 pursuant to 28 U.S.C. § 1332. *See* TAC ¶¶ 2–7.

**\*9**  In addition to each of her federal constitutional claims, Plaintiff asserts parallel claims under the New York State Constitution in Counts VI, VII, and VIII. *See* TAC ¶¶ 309–42. City and HeartShare Defendants say that these claims must be dismissed because Plaintiff has alternative common law remedies. *See* ECF No. 232-1 at 19–20; ECF No. 228 at 24–26. It is well established that "[t]he New York State Constitution provides a private right of action where remedies are otherwise unavailable at common law or under § 1983." *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (citing *Brown v. New York*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1141 (N.Y. 1996)).

In Opposition, Plaintiff concedes that she has alternative remedies for these state constitutional tort claims and reframes them as brought in the alternative: "Even if the Court finds that Plaintiff's federal constitutional claims and/or common law claims *are time-barred or otherwise fail*, Plaintiff's causes of action under the New York State Constitution would still come into play." *See* ECF No. 240 at 38 (emphasis added) (citing Fed. R. Civ. P. 8(d)(2)–(3)). She goes on to argue that City and HeartShare Defendants, who argue for dismissal of her common law and Section 1983 claims elsewhere, "cannot have it both ways" because the failure of those other claims would mean she has no alternative but to resort to state constitutional tort law. *Id.* at 39. The Court rejects that argument, which misunderstands the "narrow remedy" provided by the New York State Constitution. *Brown*, 674 N.E. at 1141. "[I]t is the *availability* of remedies under Section 1983, and not their *success*, that precludes a New York State Constitution claim." *Sullivan v. Metro. Transit Auth. Police Dep't*, No. 13-cv-7677, 2017 WL 4326058, at *10 (S.D.N.Y.

2025 WL 676090

Sept. 13, 2017) (emphasis added), *reconsideration denied*, 2017 WL 5202951 (S.D.N.Y. Oct. 18, 2017). Because, by her own concession, those alternative remedies are available to her, the Court dismisses the state constitutional claims with prejudice.

**IV. Breach of Contract**

Plaintiff's Count IV is for breach of contract, in which she alleges that there were contractual agreements between the City and Concord and the City and HeartShare. *See* TAC ¶¶ 285, 290. Concord's contract required it "to provide safe, competent[,] and professional supervision of children in foster care and to protect children in [its] care from abuse and maltreatment." *Id.* ¶ 287. HeartShare's contract required it to "provide safe, competent[,] and professional supervision of children in foster care and to protect children in [its] care from sexual, physical, and emotional abuse." *Id.* ¶ 291. Plaintiff alleges that she was a beneficiary of these agreements, *id.* ¶¶ 288, 292, and that they were breached while she was in the care of the respective agencies, *id.* ¶¶ 289, 293. The TAC does not make clear which Defendants Plaintiff seeks to hold liable for this breach, although Plaintiff states in opposition that the claim applies to the City, Concord, and HeartShare. ECF No. 240 at 29.

*A. Timeliness*

Moving Defendants argue that the breach of contract claim is time-barred. *See* ECF No. 228 at 21–22; ECF No. 231-1 at 11; ECF No. 232-1 at 10–11. HeartShare Defendants additionally argue that the breach of contract allegations are insufficiently specific. *See* ECF No. 228 at 22. All parties agree that New York's general six-year statute of limitations for breach of contract actions applies here. *See Bainbridge Fund Ltd. v. Republic of Argentina*, 37 F.4th 847, 850 (2d Cir. 2022) (citing N.Y. C.P.L.R. § 213(2)). As previously explained, Plaintiff's claims from childhood began to run in 2010 when she turned eighteen, meaning that a breach of contract claim arising from that time period needed to be brought no later than 2016. For claims that may have accrued after she reached the age of eighteen in 2010, the limitations period started to run no later than February 2012, when she left foster care. *See* TAC ¶ 179. Accordingly, those claims needed to be filed no later than 2018.

**\*10** Plaintiff again does not disagree with this basic timeliness analysis, but instead argues that her breach of contract claims were tolled pursuant to the CVA and ASA. However, Moving Defendants point to *Kaul v. Brooklyn Friends School*, 198 N.Y.S.3d 380, 220 A.D.3d 939 (N.Y. App. Div. 2023), for the proposition that the CVA did not revive expired breach of contract claims. In that case, plaintiff alleged that a school "breached its harassment policy," which injured her. *Id.* at 382. The Appellate Division concluded that the complaint should have been dismissed because "plaintiff failed to establish ... that [her] cause of action was revived by the [CVA]." *Id.* Plaintiff retorts that *Kaul* does not govern here because in that case, "plaintiff failed to allege that her cause of action was revived by the [CVA]," nor was *Kaul* based on qualifying sex crimes under the CVA and ASA. ECF No. 240 at 29–30. The Court agrees with Plaintiff that *Kaul* provides no escape hatch out of this claim.

The question of whether the CVA and ASA can revive expired breach of contract claims has not been squarely addressed by the New York Court of Appeals. Therefore, this Court, sitting in diversity, "must predict, if reasonably possible, how the New York Court of Appeals would rule on the question." *Sutton v. Tapscott*, 120 F.4th 1115, 1119 (2d Cir. 2024). In this instance, the Court concludes that the statutory text provides the answer. *See Anonymous v. Molik*, 32 N.Y.3d 30, 109 N.E.3d 563, 568 (N.Y. 2018) ("Where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning."). The CVA and ASA apply to "every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in" the Penal Law. N.Y. C.P.L.R. §§ 214-g, 214-j. "The term 'every,' modifies the statutory phrase 'civil claim or cause of action' and means all without limitation." *Levin*, 2024 WL 4026966, at \*9, 747 F.Supp.3d 645. This capacious phrasing "definitively encompasses" a "civil claim or cause of action" brought for breach of contract, so long as it "arise[s] out of conduct that constitutes a sexual offense," a predicate uncontested by Moving Defendants here. *See Doe v. N.Y.C. Dep't of Educ.*, 669 F. Supp. 3d 160, 165–66 (E.D.N.Y. 2023) (collecting cases and concluding that the CVA revived claims under the New York State Human Rights Law and New York City Human Rights Law).

Moving Defendants' responses are unpersuasive. First, they overread *Kaul*, which, contrary to their suggestion, did not hold that the CVA cannot revive a breach of contract claim as a matter of law; rather, the Appellate Division merely determined that plaintiff "failed to establish" as much in that case. 198 N.Y.S.3d at 382. Concord Defendants confusingly argue in Reply that "[s]ince the [*Doe*] [c]ourt has held sexual harassment allegations are actionable under the CVA, Plaintiff cannot distinguish *Kaul* from this case." ECF No. 247 at 5. But the conclusion that *Kaul* is therefore like this case is a *non sequitur*. It just does not follow from the *Doe* court's conclusion that the gender discrimination claims arose from "conduct which would constitute a sexual offense," as required under the CVA and ASA. 669 F. Supp. 3d at 166. Second, City Defendants argue that Plaintiff's construction of the revival statutes are "blatantly false and [P]laintiff cites to no case law to support this argument." ECF No. 246 at 5. That is hyperbole. And Plaintiff has something even better than on-point case law; she has the statutory text on her side. *See Anonymous*, 109 N.E.3d at 568 ("The literal language of the statute is generally controlling ...."). Third, HeartShare Defendants claim that "[a] breach of contract action is not a sexual offense." ECF No. 245 at 9. However, that view ignores the statutes' bifurcation of "every civil claim or cause of action" and the underlying conduct animating the claim or cause of action. *See Doe*, 669 F. Supp. 3d at 166 ("[A] narrow reading of the CVA requiring the civil claim to be synonymous with the Penal Code would produce an absurd result by excluding claims at the very heart of the statute."). Accordingly, because Moving Defendants do not claim that the breach of contract claim is otherwise untimely, the Court finds no time bar.

### B. Pleading Adequacy

**\*11** The Court also easily disposes of HeartShare Defendants' remaining arguments that the breach of contract cause of action "is conclusory and lacks specifics." ECF No. 228 at 22. To be sure, the TAC is no model of clarity when it comes to the breach of contract claim. But HeartShare Defendants' perfunctory argument, which does not even describe the elements of the cause of action, does not compel dismissal. Although they contend that "Plaintiff fails to point to a specific ... contract provision that was not adhered to in this case," *id.*, the TAC does identify specific contracts with the City and the provisions contained therein requiring Concord and HeartShare to provide, *inter alia*, "safe, competent[,] and professional supervision" of the children, like Plaintiff, in their care, TAC ¶¶ 287, 291. Accordingly, and contrary to their contention, this is not a case in which the allegation of a "specific breached promise or obligation" is so lacking as to warrant dismissal. *See* ECF No. 228 at 22 (quoting *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998)). Moving Defendants' motions to dismiss Count IV are denied.

### V. Gender-Motivated Violence Act

#### A. Statutory Framework

Plaintiff's Count V alleges that Defendants City, Concord, Floyd, Moseley, Barnwell, [17] HeartShare, Lewis, and Ellis violated New York City's Gender-Motivated Violence Act ("GMVA"). *See* TAC ¶¶ 298, 301, 304. The current version of the GMVA ("Amended GMVA"), N.Y.C. Admin. Code §§ 10-1101 *et seq.*, provides, in relevant part, that "any person claiming to be injured by a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party," *id.* § 10-1104. With respect to the statute of limitations, it provides:

> A civil action under this chapter shall be commenced within seven years after the alleged crime of violence motivated by gender occurred. If, however, due to injury or disability resulting from an act or acts giving rise to a cause of action under this chapter, or due to infancy as defined in the civil procedure law and rules, a person entitled to commence an action under this chapter is unable to do so at the time such cause of action accrues, then the time within which the action must be commenced shall be extended to nine years after the inability to commence the action ceases. Notwithstanding any provision of law that imposes a period of limitation to the contrary, any civil claim or cause of action brought under this chapter that is barred because the applicable period of limitation has expired is hereby revived and may be

commenced not earlier than six months after, and not later than two years and six months after, September 1, 2022.

*Id.* § 10-1105(a). The window for filing otherwise time-barred claims ran from March 1, 2023, to March 1, 2025. *Dixon v. Reid*, 744 F. Supp. 3d 323, 327 n.4 (S.D.N.Y. 2024). Prior to amendment in 2022 ("Unamended GMVA"), the GMVA's substantive provisions were narrower, making liable exclusively "an individual who commits a crime of violence motivated by gender." *See* N.Y.C. Admin. Code § 10-1104 (2021), *amended by* N.Y.C. Admin. Code § 10-1104 (2022). It also had a shorter limitations period of seven (rather than nine) years for a plaintiff to commence an action and had no revival mechanism. *See* N.Y.C. Admin. Code § 10-1105(a) (2021), *amended by* N.Y.C. Admin. Code § 10-1105(a) (2022).

17    Barnwell's inclusion in connection with a Concord foster care placement appears to be an error. *See* TAC ¶¶ 298, 301.

### *B. Retroactivity*

Moving Defendants raise different arguments in favor of dismissal, but all posit that any claim brought pursuant to the Amended GMVA is untimely. *See* ECF No. 228 at 26–29; ECF No. 231-1 at 12–14; ECF No. 232-1 at 20–21. They pick up on Plaintiff's allegations that the Defendants she now seeks to hold liable "enabled the commission of crimes of violence" in the Rodriguez, Shields, Hoyte, and Shore homes. *See* TAC ¶¶ 298, 301, 304, 307. Because she does not allege that any Defendant "commit[ted]" a gender-motivated crime of violence against her, she must rely on the Amended GMVA's broadened "enabl[ing]" language. In her Opposition, Plaintiff concedes that liability for this claim hinges on the availability of the amendment. *See* ECF No. 240 at 30. But Moving Defendants contend that the Amended GMVA "does not provide for retroactive liability against one who 'enabled' a crime of violence." *See* ECF No. 231-1 at 12. They are correct.

**\*12**  Unlike the CVA and the ASA, the GMVA is not just "a means to an end" of reviving certain otherwise-expired claims. *Giuffre*, 2020 WL 2123214, at *2. Rather, in addition to creating a revival period, the "GMVA [also] establishes a standalone claim." *Dixon*, 744 F. Supp. 3d at 327 n.4. Under the Amended GMVA in effect today, a plaintiff may ground such a standalone claim in the "enabling" liability previously discussed. The relevant question, then, is whether that liability reaches pre-GMVA amendment conduct. Under New York Law, "[i]t is a fundamental canon of statutory construction that retroactive operation is not favored by courts and statutes will not be given such construction unless the language expressly or by necessary implication requires it." *Jeter v. Poole*, No. 82, 2024 WL 4874353, at *4 (N.Y. Nov. 25, 2024). The New York Court of Appeals' major decision in *Regina Metropolitan Co. v. New York State Division of Housing & Community Renewal*, 35 N.Y.3d 332, 154 N.E.3d 972 (N.Y. 2020), guides this Court's analysis. In that case, the state legislature amended the Rent Stabilization Law through the Housing Stability and Tenant Protection Act of 2019 ("HSTPA"). *Id.* at 976, 154 N.E.3d 972. Part F of the HSTPA "include[d] amendments that, among other things, extend[ed] the statute of limitations, alter[ed] the method for determining legal regulated rent for overcharge purposes and substantially expand[ed] the nature and scope of owner liability in rent overcharge cases." *Id.* Although certain overcharges took place "well before" enaction of the HSTPA, tenants asked the Court of Appeals to "apply certain [Part F] amendments ... with respect to [their] overcharge claims." *Id.* at 986, 154 N.E.3d 972. They pointed to the language of Part F, which provided that it "shall take effect immediately and shall apply to any claims pending or filed on and after such date," while the property owners argued that language did not "evince a clear legislative intent to apply the new overcharge calculation provisions retroactively." *Id.* at 987, 154 N.E.3d 972.

In assessing whether Part F had retroactive effect, the Court of Appeals considered whether " 'it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed,' thus impacting 'substantive' rights." *Id.* at 988, 154 N.E.3d 972 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 278–80, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). The court concluded that "[r]etroactive application of the overcharge calculation provisions in Part F implicates all three *Landgraf* retroactivity criteria." *Id.* at 991, 154 N.E.3d 972. That "triggered" "the presumption against retroactivity." *Id.* Noting that "[r]etroactive legislation is viewed with great suspicion" because of the

"elementary considerations of fairness" involved, the court explained that "it takes a clear expression of the legislative purpose to justify a retroactive application of a statute." *Id.* at 991–92, 154 N.E.3d 972. Although no "particular words" are required, "the expression of intent must be sufficient to show that the Legislature contemplated the retroactive impact on substantive rights and intended that extraordinary result." *Id.* at 992, 154 N.E.3d 972. And "an even clearer expression of legislative intent" is necessary "[i]f retroactive application would not only impose new liability on past conduct but also revive claims that were time-barred at the time of the new legislation." *Id.* at 992, 154 N.E.3d 972.

As applied to the facts of that case, the Court of Appeals concluded that Part F's "generic reference to 'any claims pending' upon enactment d[id] not provide the requisite textual assurance" to revive time-barred claims. *Id.* at 994, 154 N.E.3d 972. The absence of that language notwithstanding, the Court went on to conclude that "read in the specific context of this legislation, the 'claims pending' language [was] sufficiently clear to evince legislative intent to apply the amendments to at least some timely overcharge claims that were commenced prior to enactment." *Id.* The court pointed to the fact that of the HSPTA's fifteen parts, only Part F referred to prior claims, and that Part F also "relate[d] almost entirely to the calculation of overcharge claims, and any such claim that was pending at the time the HSTPA was enacted necessarily involved conduct that occurred prior to the statute's enactment." *Id.* Thus, Part F did not revive time-barred claims, but it did apply to pending claims. *Id.* at 995, 154 N.E.3d 972.

In Opposition, Plaintiff contends that the Amended GMVA's lookback window—reviving "any civil claim or cause of action brought under this chapter that is barred because the applicable period of limitation has expired"—"expressly" demands retroactive application of the entire Amended GMVA. *See* ECF No. 240 at 30–31. That position, however, confuses the Amended GMVA's provision expanding substantive liability with its provision reviving certain claims. *Cf. Regina*, 154 N.E.3d at 992 ("Even within the same legislation, language may be sufficiently clear to effectuate application of some amendments to cases arising from past conduct but not others with more severe retroactive effect."). To be sure, unlike in *Regina*, the Amended GMVA expressly provides for claim revival, but only as to "any ... claim ... that is barred because the applicable period of limitation *has* expired." N.Y.C. Admin. Code §§ 10-1105(a) (emphasis added). Critically, though, at the time of the Amended GMVA's enactment, Plaintiff's claim "ha[d]" not "expired"; rather, it did not, and never had, existed. *See Expire*, Merriam-Webster, https://www.merriam-webster.com/dictionary/expire [https://perma.cc/PT9A-SKS3] (last visited Mar. 3, 2025) ("to come to an end"). Accordingly, the Amended GMVA's claim revival language not only fails to "unequivocally convey the aim of reviving" enabling claims, but by its own wording and structure, actually points in the opposite direction: claims that never existed cannot be "revived." *See Regina*, 154 N.E.3d at 992. Nor can the Amended GMVA's separate provision expanding substantive liability help because it identifies no specific class of claims whatsoever, in contrast to, for example, the "claims pending" identified by the statute in *Regina*. *Id.* at 994, 154 N.E.3d 972. Therefore, it is "presumed to apply only prospectively." *Id.* at 991, 154 N.E.3d 972.

**\*13** The Court further notes that this outcome is consistent with Chief Judge Swain's decision in *Louis v. Niederhoffer*, No. 23-cv-6470, 2023 WL 8777015 (S.D.N.Y. Dec. 19, 2023). In that case, plaintiff sued defendant for conduct that took place between 1974 and 1979. *Id.* at \*1. Observing that the Unamended GMVA was not passed until 2000, the court found that the presumption against retroactivity described in *Regina* controlled. *Id.* (citing *Adams v. Jenkins*, No. 115745/03, 2005 WL 6584554 (N.Y. Sup. Ct. Apr. 22, 2005)). The court further explained that the claim-revival provisions of the Amended GMVA did not change this outcome, reasoning that there is a difference between a *timely* claim under a newly enacted law and whether that newly enacted law reaches the past conduct in the first place. *Id.* (citing *Adams*, in which the court declined to give retroactive effect to the Unamended GMVA even though plaintiff's claim would have been timely). Plaintiff attempts to distinguish *Louis* by arguing that plaintiff in that case sought to bring claims for conduct that took place "prior to the passage of the law," referring to the "initial version" of the GMVA (the Unamended GMVA). *See* ECF No. 240 at 31. But that is not a principled distinction. In *Louis*, plaintiff sought to hold defendant liable for conduct not prohibited by the GMVA at the time it took place. *Louis*, 2023 WL 8777015, at \*1. The same is true here. The Amended GMVA "create[d] a new substantive cause of action"—enabling liability—which did not exist at the time Plaintiff alleged the violative conduct took place in the foster homes. *Adams*, 2005 WL 6584554, slip op. at 7. And for the reasons already explained, that new strand of liability does not reach back to retroactively make such conduct illegal with respect to these Defendants. Thus, the Court dismisses the GMVA claim with prejudice. [18]

18    The Court therefore does not reach Moving Defendants' alternative bases for dismissing this claim.

#### VI. Failure to Report Child Abuse

Plaintiff's Count III, brought against all Defendants, alleges failure to report child abuse. TAC ¶¶ 252–83. Plaintiff asserts this as both a statutory, *see id.* ¶ 254, and as a common law, *see id.* ¶ 255, claim. On the statutory side, New York law requires "mandated reporter[s]," including "foster care worker[s]," to

> report or cause a report to be made in accordance with this title when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child, or when they have reasonable cause to suspect that a child is an abused or maltreated child where the parent, guardian, custodian or other person legally responsible for such child comes before them in their professional or official capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child an abused or maltreated child ....

N.Y. Soc. Serv. Law § 413(1)(a). It further provides that "[a]ny person, official or institution required by this title to report a case of suspected child abuse or maltreatment who knowingly and willfully fails to do so shall be civilly liable for the damages proximately caused by such failure." *Id.* § 420(2).

#### *A. Distinguishing Statutory from Common Law Duty*

As mentioned, Plaintiff also argues that Defendants breached a common law duty to report. *See* ECF No. 240 at 27. She primarily relies on *BL Doe 3 v. Female Academy of the Sacred Heart*, in which the Appellate Division explained that "a school owes a common-law duty to adequately supervise its students, which requires that the school exercise such care of them as a parent of ordinary prudence would observe in comparable circumstances." 158 N.Y.S.3d 474, 478–79, 199 A.D.3d 1419 (N.Y. App. Div. 2021). The Appellate Division agreed with the New York Supreme Court that plaintiff could state a claim for breach of that duty where she alleged that her former school "fail[ed] to notify law enforcement or another appropriate governmental agency" about alleged sexual abuse by a teacher. *Id.* And it rejected defendants' argument that Section 420, the statute providing for civil liability by mandated reporters, "subsumed" plaintiff's common law cause of action. *Id.* at 479–80. [19] Although Plaintiff provides no precedent standing for the proposition that this common law duty extends to Defendants here, including foster care agencies, at least one Appellate Division has held as much. *See Matarazzo v. CHARLEE Fam. Care, Inc.*, 192 N.Y.S.3d 755, 760, 218 A.D.3d 941 (N.Y. App. Div. 2023) (explaining that a "negligent failure to report claim" brought by a former foster child is "recognized under New York law"). No Moving Defendant contends otherwise. Therefore, the Court concludes that Plaintiff may seek to advance both claims independently. That said, the common law strand of this argument sounds in negligence. *See id.*; *see also Doe ex rel. Hickey v. Jefferson Cnty.*, 985 F. Supp. 66, 70 (N.D.N.Y. 1997). The Court therefore discusses it in the context of its broader negligence analysis below.

19    The Court recognizes that the court in *Zubko-Valva v. County of Suffolk*, No. 20-cv-2663, 2022 WL 2197136, at *6– 7 (E.D.N.Y. June 17, 2022), reached the opposite conclusion. Nevertheless, the underlying case motivating that court's view, *Kimberly S.M. ex rel. Mariann D.M. v. Bradford Central School*, 226 A.D.2d 85, 649 N.Y.S.2d 588, 589–92 (N.Y. App. Div. 1996), involved the dismissal of the negligent failure to report claim based on the elements of that claim and not because it was preempted by the statutory reporting obligation under Section 413. As such, it does not undermine the *BL Doe 3* court's view of the interplay between the causes of action.

*B. Statutory Analysis*

### i. Timeliness

**\*14** As a threshold defense to the Section 420(2) claim, City Defendants argue this count is untimely. *See* ECF No. 232-1 at 18–19. They observe that Plaintiff did not bring this count until she filed the FAC on November 22, 2023, but the window for bringing claims under the CVA closed on August 14, 2021. *See id.* In Opposition, Plaintiff concedes that she must rely on the CVA for her Section 420(2) claim to be timely. *See* ECF No. 240 at 27.[20] She goes on to argue, however, that under Rule 15(c)(1)(B), the Section 420(2) claim relates back to the original complaint filed on August 9, 2020, which was within the CVA revival window. *See id.* That Rule provides that "[a]n amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." For their part, City Defendants concede that if the Section 420(2) claim relates back to the original complaint, it was timely pursuant to the CVA. *See* ECF No. 246 at 4–5; *see Doe 1*, 2024 WL 4276174, at \*5–6 (analyzing how a claim brought after the close of the revival window could relate back to a timely complaint filed within that window). On this point, the Court agrees with Plaintiff that her Section 420(2) claim plainly "arose out of the conduct" described in the original complaint, which is largely unchanged in the TAC. *See* ECF No. 240 at 27–28. Indeed, the original complaint even alleged that "foster care agency staff are required to report to the government when they have reason to believe that a foster child has been abused, neglected, or endangered" and that they must "defer to the City to investigate the reports." *See* ECF No. 1 ¶¶ 9jj–9kk. Accordingly, the Court concludes that Plaintiff's allegations relate back to the original complaint and are timely under the CVA.

[20] Notably, neither Plaintiff nor City Defendants identify when the statute of limitations actually ran on the Section 420(2) claim, and there is a dearth of case law on the applicable statute of limitations for such claims *See, e.g., Matarazzo*, 192 N.Y.S.3d at 758–60 (finding that the CVA revived Section 420(2) and negligent failure to report claims without stating when the statute of limitations ran on the claims). Because the parties agree as to the material issues here, it is unnecessary for the Court to reach the question of the relevant statute of limitations, especially where no state court appears to have spoken directly on it. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 510, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (O'Connor, J., concurring) (warning against "[s]peculation by a federal court about the meaning of a state statute in the absence of prior state court adjudication").

### ii. Pleading Adequacy

On the merits, Plaintiff must adequately plead that a Defendant (1) was a mandated reporter, (2) the child or person legally responsible for the child "c[a]me before [the mandated reporter] in [that person's] professional or official capacity"; and (3) the mandated reporter had "reasonable cause" to suspect that Plaintiff was an "abused or maltreated child" or that a person legally responsible for her "state[d] from personal knowledge facts, conditions or circumstances which, if correct, would [have] render[ed] [her] an abused or maltreated child." N.Y. Soc. Serv. Law § 413(1)(a). Plaintiff must also adequately plead (4) that a Defendant's failure to report was "knowing[ ] and willful. *Diana G-D ex rel. Ann D. v. Bedford Cent. Sch. Dist.*, 33 Misc.3d 970, 932 N.Y.S.2d 316, 329 (N.Y. Sup. Ct. 2011) (citing N.Y. Soc. Serv. § 420), *aff'd*, 104 A.D.3d 805, 961 N.Y.S.2d 305 (N.Y. App. Div. 2013).

Concord Defendants also argue that "[e]stablishing 'reasonable cause' ... requires proof that the defendant had notice of the alleged abuse." ECF No. 231-1 at 16. For that proposition, they rely on *Easterbrooks v. Schenectady County*, 194 N.Y.S.3d 173, 218 A.D.3d 969 (N.Y. App. Div. 2023). But to the extent that Concord Defendants are arguing that actual notice of the abuse is required to state a claim under Section 420(2), that overreads *Easterbrooks*. To be sure, actual notice is *sufficient*. *See id.* at 177; *see also Brave v. City of New York*, 188 N.Y.S.3d 179, 181–82, 216 A.D.3d 728 (N.Y. App. Div. 2023) (under state law,

2025 WL 676090

plaintiff stated a claim where he allegedly told defendants' employees about sexual abuse. But *Easterbrooks* does not go as far as to state that actual notice is *necessary*; at most, it suggests that, in a way similar to a negligence claim, a complaint must have "allegations of fact that would have provided the ... defendants with notice that the [alleged abuser] presented a foreseeable harm." 194 N.Y.S.3d at 177. That reading is also more consistent with the statute, which requires a mandated reporter to have "reasonable cause," and not, for example, "knowledge." *Cf. Diana G-D*, 932 N.Y.S.2d at 328–29. ("Defendants could not rely on the third-hand hearsay statements of [another student's mother] or the general concern of [plaintiff's mother] regarding [plaintiff]'s behavior at home to support 'reasonable cause' to believe she was being abused.").

**\*15** Moving Defendants all advance similar arguments in favor of dismissal. City Defendants contend that "Plaintiff fails to adequately allege any Defendant's reasonable suspicion of abuse or their willful or knowing failure to file a report of such abuse." ECF No. 232-1 at 19.[21] Concord Defendants state that "[t]he TAC is devoid of factual allegations to establish that Defendants had *any* notice that either Mr. Rodriguez or Ms. Shields' foster son had an alleged propensity to abuse Plaintiff sexually, yet placed Plaintiff in those homes regardless." ECF No. 231-1 at 16. And HeartShare Defendants argue that, in relation to the alleged abuse in the Hoyte and Shore homes, "Plaintiff fails to provide any specificity regarding when she revealed her alleged abuse to [HeartShare] Defendants' employees" and "fails to allege that she revealed her alleged abuse to [HeartShare] Defendants' employees while the sexual abuse and assaults were occurring." ECF No. 228 at 21. Plaintiff's response is thin, merely stating that she states a claim under Section 420(2) because "agents and employees of Defendants City, Concord, and HeartShare, including the individually named Defendants, failed on numerous occasions to report that Plaintiff may have been abused" and citing disparate provisions of the TAC without further explication. *See* ECF No. 240 at 27 (citing TAC ¶¶ 88–94, 96–98, 103–08, 111–12, 134–37, 141–52, 155–60, 165–68, 257–76). The Court now assesses their sufficiency.

[21]    They also argue, without citation, that "[i]n several instances, the [TAC] fails to plead that [City] Defendants placed Plaintiff in the care of the alleged abuser." ECF No. 232-1 at 19. But that argument is unlinked to the elements of the statutory cause of action. Without such articulation, the Court cannot conclude that the allegations fail as a matter of law.

With respect to Plaintiff's allegations concerning the Rodriguezes, Plaintiff alleges that "[u]pon information and belief, in early 1998, [P]laintiff's brother disclosed the Rodriguezes' abuse to a mental health professional. Upon information and belief, said professional, or a coworker, advised [D]efendants City and Concord of said disclosure." TAC ¶ 88. She also alleges that "after Juan Rodriguez began sexually abusing [her], staff at [her] elementary school reported to [D]efendants City and Concord that [she] was abused and neglected." *Id.* ¶ 103. Although those factual allegations are somewhat vague, the Court, accepting them as true and construing them in the light most favorable to Plaintiff, finds that she has adequately pled that the City received actual notice of Juan Rodriguez's alleged sexual abuse. *See id.*[22] This conclusion is primarily driven, due to Plaintiff's unclear timing allegations, by the alleged disclosure by school personnel, since the first disclosure took place in 1998, prior to the time period in which Plaintiff alleges that Juan Rodriguez began to sexually abuse her.[23] It is a closer call with respect to whether the City's failure to report was willful and knowing. However, the City's single sentence on this point—merely asserting that Plaintiff fails to "adequately" allege as much, without citation to authority—is unpersuasive. *See* ECF No. 232-1 at 19. Where, as here, Plaintiff has adequately alleged that the City received actual notice of Juan Rodriguez's sexual abuse, the Court can draw the inference in her favor that the subsequent failure to report was knowing and willful. *See Bartels v. Westchester Cnty.*, 76 A.D.2d 517, 429 N.Y.S.2d 906, 909 (N.Y. App. Div. 1980) (suggesting that "actual notice of conduct by the foster parents" by defendants is sufficient to trigger liability under Section 420(2)). The City is of course free to test this allegation in discovery, but the claim against it survives for now, even if just barely.

[22]    The Court does not directly address Defendant Concord here or elsewhere, as it is a non-movant and is in default.

[23]    Plaintiff alleges that the sexual abuse began when she "was approximately eight years old," TAC ¶ 74, or around the year 2000 based on Plaintiff's 1992 birth year, *id.* ¶ 12.

At the same time, Plaintiff fails to state a claim with respect to Defendants Casner, Antonsanti, Cruz, and Floyd with these allegations. As to these individual Defendants, she merely suggests in the passive voice that they were required to file reports

"[u]pon receiving notice," without actually alleging that they received notice. *See id.* ¶ 90. [24] Even setting notice aside, Plaintiff points to no other allegations that any of these individual Defendants had "reasonable cause to suspect" that Plaintiff was the victim of Juan Rodriguez's alleged sexual abuse, much less that any "knowingly and willfully" failed to report it, as just discussed. *See* N.Y. Soc. Serv. Law §§ 413(1)(a), 420(2). On a motion to dismiss, it is insufficient for Plaintiff merely to group all these Defendants together under the City or Concord banner, as it is a basic requirement that she "must plead enough facts *with respect to each defendant* to state a claim." *Stora v. Don't Ask Why Outfitters*, No. 15-cv-7106, 2016 WL 10571885, at *7 (E.D.N.Y. Dec. 7, 2016) (emphasis added), *report and recommendation adopted,* 2017 WL 1034637 (E.D.N.Y. Mar. 17, 2017); *see also Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [plaintiff]'s complaint failed to satisfy th[e] minimum standard [under Rule 8].")). Plaintiff therefore fails to state a claim against the individual Defendants based on the allegations concerning Juan Rodriguez.

[24]    And to the extent that she alleges that they received "actual notice of Maria Rodriguez's physical abuse of plaintiff by an eyewitness to said abuse," TAC ¶ 93, the claim is time-barred for the reasons already explained. *See supra* § I. The same is true with respect to Plaintiff's allegation that Plaintiff's father "showed [D]efendants Frank and Barnwell ... the bruises on the bodies of [P]laintiff and her siblings, complaining that the bruises had been caused by child abuse and demanding that [D]efendant Concord investigate. TAC ¶ 111.

**\*16** With respect to the allegations related to the Shields home, City Defendants' and Concord Defendants' motions are granted as to the Section 420(2) claim. *See* ECF No. 231-1 at 16; ECF No. 232-1 at 19. Unlike with the Juan Rodriguez allegations, Plaintiff just asserts that "City, Concord, Floyd, Barnwell, Moseley-Harris, Diggs, Haynes, and Frank had actual notice or knowledge that [P]laintiff was being abused ... in the Shields foster home." TAC ¶¶ 261–64. That claim is entirely conclusory and the lack of "factual content" makes it impossible for the Court "to draw the reasonable inference that the defendant[s] [are] liable" for statutory failure to report. *Matzell*, 64 F.4th at 433.

City and HeartShare Defendants, *see* ECF No. 228 at 21; ECF No. 232-1 at 19, argue that the same analysis applies with respect to Plaintiff's allegations concerning her time in the Hoyte home, and the Court mostly agrees. *See* TAC ¶ 269 ("Upon information and belief, [D]efendants City, HeartShare, Barnwell, Ellis, and Lewis had actual notice or knowledge that [P]laintiff was being abused in the Hoyte foster home."). However, Plaintiff points to her allegation that "Plaintiff and [her] brother informed [D]efendant Lewis of ... Hoyte's behavior on numerous occasions." *Id.* ¶ 151. To be sure, that allegation is factually flimsy, but it is not inappropriately conclusory. At this juncture, the straightforward allegation that Lewis (and HeartShare) received notice of Hoyte's "behavior" from Plaintiff herself allows the Court to draw the inference that he had reasonable suspicion of Hoyte's sexual abuse, which, as previously explained, is sufficient to state a claim. *See Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (on a motion to dismiss, "detailed factual allegations" are not required). Similar analysis applies to Defendant Ellis (and HeartShare), insofar as Plaintiff alleges that "Hoyte even sexually harassed [D]efendant Ellis when she came to the Hoyte home to visit the foster children on her caseload, including [P]laintiff." TAC ¶ 142. Based on that alleged fact, taken as true, the Court can also draw the reasonable inference that Ellis (and HeartShare) had reasonable suspicion that Hoyte was sexually abusing Plaintiff, a minor he was obligated to care for.

There is little factual content pled with respect to the Shore home. There, Plaintiff alleges that "[w]hen [P]laintiff ran away from the Shore home, [p]laintiff advised employees of [D]efendant HeartShare that the Shore home was not safe." TAC ¶ 160. Nevertheless, even accepting as true that Plaintiff told HeartShare employees that the home was "not safe," the Court cannot reasonably infer, without further factual allegations, that HeartShare employees should have had "reasonable cause to suspect" that Plaintiff was being subjected to sexual abuse within the CVA's scope. This allegation stands in notable contrast to, for example, Plaintiff's allegations with respect to the Rodriguezes, in which she alleges specific disclosures of "abuse" to certain Defendants. *See* TAC ¶¶ 88, 103.

The Court also agrees with City Defendants that any Section 420(2) claim based on the conduct in the Bell home must be dismissed. *See* ECF No. 232-1 at 19. The allegations related to that conduct, *see* TAC ¶¶ 134–37, lack a predicate sex crime

as contemplated by the CVA; thus, they are time-barred as to all Defendants, as previously discussed. *See supra* § I & 35 n.24. The same is true with respect to the later allegations concerning the Lacy home. *See* TAC ¶¶ 165–67. Plaintiff's mere allegation that "Helen Lacy had many male guests" does not allege a predicate sex crime. *See id.* ¶ 166.

Summing up on the Section 420(2) claim, Moving Defendants' motions to dismiss are granted, except as to Plaintiff's claim against Defendant City based on Plaintiff's allegations concerning Juan Rodriguez and Plaintiff's claim against Defendants Lewis, Ellis, and HeartShare based on Plaintiff's allegations concerning Hoyte.

## VII. Negligence

### A. Introduction

**\*17**  Plaintiff's Counts I and II assert negligence against all Defendants. *See id.* ¶¶ 195–251. Although Plaintiff asserts that these Counts are brought pursuant to the CVA and ASA, respectively, those references to the revival vehicles are relevant only as to whether the alleged conduct took place before or after Plaintiff turned eighteen, and the underlying theories of negligence are the same. *See id.* ¶ 235 (alleging that Plaintiff remained in the custody of the City and HeartShare after she turned eighteen). All Moving Defendants seek the dismissal of all negligence claims. *See* ECF No. 228 at 13–19; ECF No. 231-1 at 15–17; ECF No. 232-1 at 10. As is well-established, "[t]o establish a prima facie case of negligence, a plaintiff must establish the existence of a duty owed by a defendant to the plaintiff, a breach of that duty, and that such breach was a proximate cause of injury to the plaintiff." *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F. Supp. 3d 176, 205 (E.D.N.Y. 2014).

At the threshold, the Court must identify the relevant universe of conduct. As explained in detail in the prior Section, Plaintiff alleges predicate sex crimes only with respect to the conduct in four homes. *See* TAC ¶ 114 (Juan Rodriguez); *id.* ¶ 123 (boy in the Shields home); *id.* ¶ 149 (Hoyte); *id.* ¶ 158 (Max Shore). The negligence claims brought with respect to the Bell, *id.* ¶ 212, and Lacey, *id.* ¶ 225, homes are time-barred and have already been dismissed. *See* ECF No. 228 at 12–13.

### i. Governmental Function Immunity and General Negligence Claims

City Defendants argue that the negligence claims "must fail because Plaintiff fails to plead the existence of a special duty." ECF No. 232-1 at 23. Curiously, they advance an immunity argument without using the word "immunity," but the idea under state law is that when a municipality exercises a "governmental function, the municipality is immune from suit if the conduct was discretionary, and if the conduct was ministerial, the municipality is immune unless it owed a special duty to the injured party." *Q.G. v. City of New York*, 199 N.Y.S.3d 62, 62, 222 A.D.3d 443 (N.Y. App. Div. 2023) (cited by City Defendants, ECF No. 232-1 at 22). [25] City Defendants then place themselves into the latter ministerial bucket by referring to their "oversight and management of the foster care system," ECF No. 232-1 at 22, like in *Q.G.*, where it was undisputed that the City's "management of the foster care system" was ministerial in nature, 199 N.Y.S.3d at 62–63. Further, as explained in *Q.G.*, such "[a] special duty exists where either (1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition." *Id.* at 62. At bottom, City Defendants say this case is like *Q.G.*, in which the Appellate Division, First Department, analyzing the first criterion for establishing a special duty, concluded that the Social Services Law ("SSL") did not create a special duty for the municipality vis-à-vis a foster child, 199 N.Y.S.3d at 63. The Appellate Division, Fourth Department, also reached the same conclusion because, following the New York Court of Appeals' decision in *Mark G. v. Sabol*, 93 N.Y.2d 710, 695 N.Y.S.2d 730, 717 N.E.2d 1067 (N.Y. 1999), there is no private right of action under the SSL, as needed to form a "special duty," and thus, "plaintiff c[ould not] establish a special duty based upon the County's alleged violation of its duties under the [SSL]." *Weisbrod-Moore v. Cayuga Cnty.*, 189 N.Y.S.3d 345, 349, 216 A.D.3d 1459 (N.Y. App. Div. 2023) ("*Weisbrod-Moore I*"). The court further rejected the argument that the defendant county voluntarily assumed "a

duty that generated justifiable reliance on [plaintiff's] part," in part because the county's alleged failure to follow the SSL, a "statutory duty," "c[ould] not be equated with the breach of a duty voluntarily assumed." *Id.*

25    City Defendants suggest that this immunity applies to "any common-law claim," as well as the GMVA. ECF No. 232-1 at 22. It is unclear the authority from which that argument emerges. For the reasons already explained, the Court need not reach it with respect to any GMVA claim. To the extent City Defendants intended to assert this immunity with respect to the breach of contract claim, that argument is never made, and their Reply does not even discuss it, ECF No. 246 at 4. So the Court's analysis of immunity is confined, like City Defendants' own analysis, to the negligence claims in Counts I and II, which is consistent with New York precedent. *See Ferreira v. City of Binghamton*, 38 N.Y.3d 298, 194 N.E.3d 239, 245–46 (N.Y. 2022) (discussing the special duty rule in the context of "any common-law *negligence* case" (emphasis added)).

**\*18**  Plaintiff resists this defense, pointing to authority from the Appellate Division, Second Department, concluding that plaintiff, a former child in foster care, stated a claim for negligence against the county. *See Grabowski v. Orange Cnty.*, 196 N.Y.S.3d 113, 114–15, 219 A.D.3d 1314 (N.Y. App. Div. 2023) (cited by Plaintiff, ECF No. 240 at 24); *see also Keizer v. SCO Fam. of Servs.*, 120 A.D.3d 475, 991 N.Y.S.2d 103, 104 (N.Y. App. Div 2014) ("[C]ounties and foster care agencies may be sued to recover damages for negligence in the selection of foster parents and in supervision of the foster home."). She also identifies consistent authority from the Third Department. *See* ECF No. 240 at 24. *See, e.g.*, *Grant v. Temple*, 189 N.Y.S.3d 806, 809, 216 A.D.3d 1351 (N.Y. App. Div. 2023). [26]

26    Plaintiff contends that this Court is bound to *Grabowski*'s holding because it is "located completely within the Second Department of the New York Appellate Division." ECF No. 240 at 24. Although the issue is no longer relevant, the Court observes for future motion practice in this case that she is incorrect. As previously mentioned, it is the federal district court's duty to "predict, if reasonably possible, how the New York *Court of Appeals* would rule on the question." *Sutton*, 120 F.4th at 1119 (emphasis added). As to the decisions of intermediate courts like the Appellate Division, they are "a basis for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* at 1119–20. It follows that this Court is "not bound" to a decision of the Appellate Division, Second Department. *See, e.g.*, *Reply All Corp. v. Gimlet Media, Inc.*, No. 15-cv-4950, 2024 WL 3855907, at \*3 (E.D.N.Y. May 23, 2024).

On February 18, 2025, the New York Court of Appeals reversed the Appellate Division in *Weisbrod-Moore I*, holding that "municipalities owe a duty of care to the children the municipalities place in foster homes because the municipalities have assumed custody of those children." *See Weisbrod-Moore v. Cayuga Cnty.*, No. 7, 2025 WL 515393, at \*1 (N.Y. Feb. 18, 2025) ("*Weisbrod-Moore II*"). The Court of Appeals explained that the special categories identified in *Q.G.* do not apply in this context, where the foster child was in "governmental custody," and the government "effectively t[ook] the place of parents and guardians." *Id.* at \*3–4. Thus, in light of the New York Court of Appeals' pronouncement, the Court must reject the City's immunity argument, at least as formulated in its papers, and proceed to the merits. [27]

27    On February 25, 2025, Plaintiff filed a notice of supplemental authority alerting the Court to *Weisbrod-Moore II*. *See* ECF No. 253. Although the Court gave Moving Defendants the opportunity to file responses to Plaintiff's notice, they did not do so. *See* Feb. 25, 2025, Text Order.

### ii. Governmental Function Immunity and Negligent Failure to Report

The Court must first close the loop on the negligent failure to report theory discussed above. Recall that this is the common law variety of the statutory failure to report claim. *See supra* at 29–30. City Defendants do not explain how their governmental function immunity would apply specifically to this strand of Plaintiff's failure to report claim. In any event, it does not matter for this motion, as the Court has rejected that argument. Because the Court has found that Plaintiff stated a claim as to the statutory

violation, *see supra* at 34–35, it also finds that she states a common law negligence claim against the City for failure to report. As previously discussed, state precedent makes clear that the two causes of action are cumulative. *See BL Doe 3*, 158 N.Y.S.3d at 479–80; *Matarazzo*, 192 N.Y.S.3d at 760. And because the statutory requirement is more demanding than the negligence counterpart, requiring "willfulness," it follows that, for the purposes of a motion to dismiss, adequately pleading the former should satisfy the latter. *See BL Doe 3*, 158 N.Y.S.3d at 480 (framing the statutory claim as subsumed by the common law claim and applying the same factual analysis to both in concluding that plaintiff stated a claim under state law). Accordingly, for the reasons previously provided, the negligent failure to report claim survives against the City. The same is true with respect to Lewis, Ellis, and HeartShare concerning the alleged failure to report Hoyte's conduct. *See supra* at 36–37. However, the negligent failure to report claim is dismissed as to the remaining Moving Defendants, as Plaintiff neither provides nor tries to identify additional allegations related to her reporting theory of liability so as to distinguish the statutory claim from the negligence-based claim.

### iii.  Supervisory Negligence

**\*19**  Moving Defendants principally argue that Counts I and II must be dismissed because the actions of third-party foster parents were not foreseeable. *See* ECF No. 228 at 14–15; ECF No. 231-1 at 15–16; ECF No. 232-1 at 22. Under New York law, "[i]n order to find that a child care agency breached its duty to adequately supervise the children entrusted to its care," as Plaintiff alleges here, "[she] must establish that the agency had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated." *Lopez v. City of New York*, 99 N.Y.S.3d 381, 383–84, 172 A.D.3d 703 (N.Y. App. Div. 2019); *accord Adams v. Suffolk Cnty.*, 222 N.Y.S.3d 501, 515–16, 234 A.D.3d 1 (N.Y. App Div. 2024) (applying the same standard to a municipal defendant). Plaintiff agrees that the "sufficiently specific" notice requirement applies to a case like this one. *See* ECF No. 240 at 16. [28] As previously, the Court proceeds in chronological order.

[28]  Plaintiff relies extensively on state pleading standards. *See* ECF No. 240 at 16–18. For the avoidance of doubt, "New York pleading requirements do not apply to a case in federal court," regardless of the federal or state nature of the underlying claim. *See Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 163–64 (E.D.N.Y. 2014).

With respect to Juan Rodriguez and the boy in the Shields home, Concord Defendants raise two main arguments. First, they state that the TAC lacks allegations that they had any notice that either Rodriguez or the boy had a "propensity to abuse Plaintiff sexually, yet placed Plaintiff in those homes regardless." ECF No. 231-1 at 16. Specifically with respect to Juan Rodriguez, they claim that "[t]he TAC contains no allegations to suggest Defendants knew [he] was 'regularly' abusing Plaintiff sexually." *Id.* Second, they argue that "[t]he TAC does not even allege that [Juan] Rodriguez or [the boy in the Shields home] engaged in or were even accused of sexual abuse before Plaintiff's alleged abuse." *Id.* As an initial matter, the Court agrees with Plaintiff that the second prong of that argument goes too far. *See* ECF No. 240 at 18. Concord Defendants' own authority does not support the proposition that knowledge of prior accusations of abuse, or actual abuse, are necessary in order for a plaintiff to demonstrate a third-party's propensity to engage in sexual abuse, even if the *absence* of such allegations may support an argument that Plaintiff fails to state a claim. *See Fuller v. Fam. Servs. of Westchester, Inc.*, 177 N.Y.S.3d 141, 143, 209 A.D.3d 983 (N.Y. App. Div. 2022) (referring only to propensity); *A.M. v. Holy Resurrection Greek Orthodox Church of Brookville*, 135 N.Y.S.3d 823, 824, 190 A.D.3d 470 (N.Y. App. Div. 2021) (same). For their part, City Defendants largely echo the arguments concerning a lack of foreseeability. *See* ECF No. 232-1 at 22. [29]

[29]  In her notice of supplemental authority, Plaintiff also argues that *Weisbrod-Moore II* stands for the proposition that Plaintiff is not "required to plead that her abuser had sexually assaulted another child before sexually assaulting her." *See* ECF No. 253 at 1. Although the Court ultimately agrees with Plaintiff's view on this issue, as the foregoing analysis makes clear, its rationale is not based on *Weisbrod-Moore II*, which Plaintiff relies upon without any reference to the

text of the decision. *See id.* To be sure, that decision discussed foreseeability as an element of a negligence claim, but it did not speak with nearly as much specificity as Plaintiff suggests. *See Weisbrod-Moore II*, 2025 WL 515393, at *3.

With respect to the foreseeability of Juan Rodriguez's sexual abuse, Plaintiff highlights two allegations previously discussed. She points to the allegation that "[P]laintiff's brother disclosed the Rodriguezes' abuse to a mental health professional," who in turn (either directly or through a coworker) "advised [D]efendants City and Concord of said disclosure." TAC ¶ 88. She also highlights the claim that "after Juan Rodriguez began sexually abusing [P]laintiff, staff at [P]laintiff's elementary school reported to [D]efendants City and Concord that [P]laintiff was abused and neglected." *Id.* ¶ 103. The problem with those allegations, though, is that they say nothing at all about what Concord Defendants—as opposed to Concord—knew about Juan Rodriguez, contrary to Plaintiff's assertion. *See* ECF No. 240 at 19. No authority supports her attempt to reverse-impute the organization's alleged knowledge to its individual employees. *See Doe (G.N.C.) v. Uniquest Hosp., LLC*, No. 23-cv-7980, 2024 WL 4149251, at *5 (S.D.N.Y. Sept. 11, 2024) (under Rule 8, knowledge not imputable to all defendants "lump[ed]" together into a defendant group without any "descri[ption] [of] their roles"). Plaintiff also now claims, with respect to her brother's disclosure, that the mental health professional "informed Concord and its employees, including Defendant Floyd." ECF No. 240 at 19 (citing TAC ¶¶ 88–89). But that citation to the TAC is misleading because the allegation about Defendant Floyd is not in there. *See Soules v. Connecticut*, 882 F.3d 52, 56 (2d Cir. 2018) ("Ordinarily, parties may not amend the pleadings through motion papers."). Plaintiff intimates that Defendant Floyd was on notice because, as Concord's Executive Director, he "should have been particularly attuned to reports of abuse," ECF No. 240 at 19, but that paints with too broad of a brush. *See Moss v. Bd. of Educ. of Sachem Cent. Sch. Dist.*, No. 22-cv-6212, 2024 WL 3328637, at *12 (E.D.N.Y. July 8, 2024) ("A bald allegation that a defendant served as a superintendent is insufficient to allege personal involvement; instead, one needs to include plausible factual allegations detailing the defendant's role ...."). And, as already discussed, *see supra* at 34 & n.23, Plaintiff's brother's disclosure predated the onset of the alleged sexual abuse by Rodriguez by some time, rendering it implausible that that disclosure, absent any factual enhancement, was enough to put Floyd on notice of Rodriguez's propensity for sexual abuse.

**\*20** Separately, Plaintiff suggests that Defendant Frank (and Barnwell) acted negligently by failing to take "any action" after "Plaintiff's father directly showed [them], along with other Concord employees, the physical evidence of abuse—bruises on the children's bodies—while demanding an investigation." ECF No. 240 at 20 (citing TAC ¶ 111). Although undoubtedly disturbing, that allegation is also too imprecise to overcome dismissal as it relates to this specific cause of action. As has been discussed numerous times, these claims are untimely under the CVA because they lack a sex abuse predicate. *See supra* § 1. Nor, as just discussed, does this allegation demonstrate Juan Rodriguez's propensity to commit sexual abuse prior to the infliction of such injury.

A different outcome is required with respect to the City. Even if Plaintiff stated a claim against the City for negligent failure to report, a claim for negligent supervision of the sort asserted by Plaintiff here specifically requires that the City knew of Rodriguez's propensity for sexual abuse "*prior* to [any] injury's occurrence." *PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551, 566 (E.D.N.Y. 2021) (emphasis added). The TAC does not explicitly allege any discrete acts of sexual abuse by Rodriguez following either of the alleged disclosures to the City. TAC ¶¶ 88, 103. Nevertheless, Plaintiff alleges that Juan Rodriguez's sexual abuse "continued regularly, sometimes every day, until [P]laintiff left the Rodriguez home." *Id.* ¶ 74. Accepting that factual assertion as true, the Court can draw the reasonable inference that at least some act of sexual abuse by Juan Rodriguez took place after the City received notice of his abuse. Although the timing allegations with respect to Rodriguez are generally vague, Plaintiff has provided just enough factual matter to "nudge[ ] [her] claim" for negligence "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

That said, the TAC remains deficient when it comes to the individual City Defendants because, as previously discussed, there are no such allegations of their notice. Plaintiff's retort that her allegations that such sexual abuse was "foreseeable," *see* ECF No. 240 at 22 (citing TAC ¶ 207), is just a "threadbare recital[ ]" of an element of the negligence and is thus insufficient to state a claim, *see Iqbal*, 566 U.S. at 678, 132 S.Ct. 2073.

Similar problems require dismissal of Plaintiff's claims against Concord Defendants and City Defendants as they relate to the boy in the Shields home. *See* ECF No. 231-1 at 16. This claim is subject to dismissal on the sole basis that Plaintiff effectively

2025 WL 676090

abandoned it in Opposition. *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims ... that are not defended have been abandoned."). In any event, the claim is subject to dismissal because Plaintiff pleads no facts suggestive of the boy's propensity to sexually abuse Plaintiff. All Plaintiff alleges is that "[p]rior to placing [P]laintiff in the Shields home, [D]efendants City and Concord and its employees knew or should have known that the boys posed a danger to [P]laintiff." TAC ¶ 119. [30] However, that allegation, which does not even relate to the conduct of Concord Defendants, is another "threadbare recital[ ]" of negligence and must fail. *Iqbal*, 566 U.S. at 678, 132 S.Ct. 2073. Thus far, Count I survives against the City based on negligent failure to report and negligent supervision with respect to the Rodriguez home only. With respect to the Rodriguez and Shields homes, Count I is otherwise dismissed and Count II [31] is also dismissed.

[30]    Although Plaintiff refers to two boys in the Shields' home, she alleges only that the conduct of one boy constituted a sex crime within the scope of the CVA. *See* TAC ¶ 123.

[31]    Plaintiff does not bring claims under the ASA against Concord or the Concord Defendants, presumably because she was released from Concord's custody before she turned eighteen, the point at which the claim revival mechanism shifts from the CVA to the ASA. TAC ¶¶ 133, 153.

**\*21** Moving on to HeartShare Defendants' motion, they argue for the dismissal of negligence claims based on Gary Hoyte's alleged conduct. *See* ECF No. 228 at 15. The argument on this front is somewhat more complex. First, they argue that because Plaintiff fled to the Hoyte home and because they never selected him as a foster parent, they "owed her no duty as respects the Hoyte home." *Id.* at 14–15. With respect to the duty of care, foster care agencies like HeartShare have a "duty to adequately supervise the children entrusted to [their] care." *Liang*, 799 N.Y.S.2d at 71. In Opposition, Plaintiff makes a fact-based response to HeartShare Defendants' legal contention, arguing that a duty existed because Plaintiff alleges that HeartShare Defendants "ratified" her placement in Hoyte's home when she "continued to stay" there. *See* ECF No. 240 at 21 (citing TAC ¶ 139). That is not really relevant because HeartShare Defendants provide no authority for the proposition that a foster agency's duty of care vis-à-vis the children in its care, which they accept as a matter of first principles, dissipates when those children do not act in accordance with the dictates of the agency by, for example, running away from their assigned foster home. After all, foster agencies are required to "adequately supervise the children entrusted to [their] care." *Liang*, 799 N.Y.S.2d at 71. Here, the problem for HeartShare Defendants is that the crux of their argument—that they cannot be held liable because they "never selected" Hoyte, ECF No. 228 at 14—more logically sounds in foreseeability than in duty. As the New York Court of Appeals has explained in a related context, although "[s]chools are under a duty to adequately supervise the students in their charge," they "are not insurers of safety ... for they cannot reasonably be expected to continuously supervise and control all movements and activities of students" and are therefore only liable "for foreseeable injuries proximately related to the absence of adequate supervision." *Mirand v. City of New York*, 84 N.Y.2d 44, 614 N.Y.S.2d 372, 637 N.E.2d 263, 266 (N.Y. 1994); *see also Weisbrod-Moore II*, 2025 WL 515393, at \*3. In other words, the relevant limitation on liability is couched in the element of foreseeability, not duty, which persists. *See Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (N.Y. 2001) ("Foreseeability, alone, does not define duty—it merely determines the scope of the duty once it is determined to exist.").

The Court therefore proceeds to foreseeability. HeartShare Defendants argue that the "TAC does not contain any allegation that [they] were aware of prior specific instances of sexual and physical abuse in the Hoyte foster home." ECF No. 228 at 15. City Defendants advance the same argument. ECF No. 232-1 at 22. As an initial mater, the Court again reiterates that a defendant need not be "aware of prior specific instances of sexual ... abuse" in order for Hoyte's acts to have been foreseeable to Defendants. *See* ECF No. 228 at 22. On this point, Plaintiff isolates three key allegations. First, Plaintiff alleges that "Hoyte was a sexual predator, and [D]efendants HeartShare, Barnwell, Lewis, and Ellis knew that he was a sexual predator." TAC ¶ 141. However, that is just a bald assertion without factual support. *See Read v. Corning Inc.*, 371 F. Supp. 3d 87, 92 (W.D.N.Y. 2019) ("[W]here a defendant's knowledge of some fact or circumstance is an element of a tort claim, a bare assertion that a defendant 'knew or should have known' of that fact or circumstance is insufficient to state a claim.").

Second, Plaintiff alleges that she and her brother "informed [D]efendant Lewis of ... Hoyte's behavior on numerous occasions." TAC ¶ 151. Even though Plaintiff stated a claim against Lewis and HeartShare for statutory failure to report based in part on this allegation, the Court cannot conclude that Plaintiff has pled enough to establish foreseeability with respect to Hoyte's conduct. *See supra* at 36–37. Unlike the allegations concerning Juan Rodriguez, in which Plaintiff alleges that he abused her "sometimes every day" for years, *see* TAC ¶ 74, the Court can only speculate here as to whether Lewis and HeartShare received notice of Hoyte's conduct prior to any acts of sex abuse by Hoyte. That is insufficient to state a claim for supervisory negligence. *See Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. [32]

[32]    If Plaintiff chooses to replead this claim, the allegations concerning Hoyte should, if possible, more clearly state when notice was provided, the nature of that notice, and when the alleged sex crimes within the scope of the CVA took place.

Third, Plaintiff alleges that "Hoyte even sexually harassed [D]efendant Ellis when she came to the Hoyte home to visit the foster children on her caseload, including [P]laintiff." TAC ¶ 142. In the TAC, Plaintiff makes that allegation before alleging that Hoyte sexually abused and harassed Plaintiff "for a period of at least six months" and detailing the sex abuse. *See id.* ¶¶ 143–48. Drawing all inferences in Plaintiff's favor, as the Court must at this stage, that allegation contains sufficient factual specificity, if just barely, for Plaintiff to state a claim against Ellis and her employer HeartShare. Although Plaintiff's factual allegation is thin, accepting as true that Hoyte sexually harassed Ellis during Ellis's home visits, the Court can draw the reasonable inference that Ellis and HeartShare were "on notice" of Hoyte's "propensity" for sexual abuse with respect to the children he was responsible for caring for in his own home before some act of sex abuse toward Plaintiff took place. *PC-41 Doe*, 590 F. Supp. 3d at 566–67; *see also Curtis v. Gates Cmty. Chapel of Rochester, Inc.*, No. 20-cv-06208, 2023 WL 1070650, at *4–5 (W.D.N.Y. Jan. 27, 2023) (although allegation that "students and others had complained about sexual abuse committed by [the alleged perpetrator] prior to his abuse of [P]laintiff" presented a "close call," concluding that plaintiff sufficiently stated a negligent supervision claim). Because there are no other allegations related to other Moving Defendants, only Plaintiff's claim against Ellis and HeartShare based on Hoyte's conduct survives.

**\*22**  The next set of relevant allegations concerns Max Shore. HeartShare Defendants and City Defendants raise the familiar argument regarding foreseeability. *See* ECF No. 228 at 15–16; ECF No. 232-1 at 22. Although the allegations concerning Shore's conduct are heinous, Plaintiff fails to state a claim for negligence for reasons already described; namely, with respect to foreseeability, she alleges only that *after* she ran away from the Shore home, "[s]he advised employees of [D]efendant HeartShare that the Shore home was not safe." TAC ¶ 160. Plaintiff reiterates that chronology in her Opposition, *see* ECF No. 240 at 21, meaning that she fails to allege the necessary notice or knowledge "prior" to any injury's occurrence. *PC-41 Doe*, 590 F. Supp. 3d at 566–67. The negligence claims based on Max Shore's conduct are thus dismissed.

Summing up, Plaintiff has stated a claim for negligence against the City with respect to its alleged failure to report Juan Rodriguez's abuse and for failure to supervise with respect to that abuse. Plaintiff has also stated negligent failure to report claims against Lewis, Ellis, and HeartShare as well as a supervisory negligence claim against Ellis and HeartShare based on the conduct of Hoyte. Because those claims relate to conduct that took place when Plaintiff was a child, they can be revived only pursuant to the CVA (Count I) and not the ASA (Count II). [33] Count I is therefore dismissed without prejudice, except as to those four specific groups of claims, which survive. Count II is dismissed entirely and without prejudice.

[33]    The ASA would only potentially revive claims only arising from the Shore home and later, where Plaintiff alleges that Max Shore may have committed sexual offenses against her after she turned eighteen. *See* TAC ¶ 156.

**VIII. Leave to Amend**

Only Concord Defendants discuss leave to amend in their motion. *See* ECF No. 231-1 at 17–18. They argue that "[p]ermitting [P]laintiff to replead her time-barred or preempted claims would be futile since she cannot cure such deficiencies." *Id.* at 17. They further argue that, with respect to Count I (negligence pursuant to the CVA) and Count III (failure to report child abuse), Plaintiff "cannot rectify" her failure to plead adequate notice. *Id.* at 18. Plaintiff seeks leave to replead, arguing primarily that "the state of the law in New York regarding negligence claims by abused foster children is very much in flux." ECF No. 240 at 40.

The Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022). Under Rule 15, "[a] court should freely give leave when justice so requires, but it may, in its discretion, deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." *In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 175 (2d Cir. 2021). Amendment is futile where the issues with the causes of action are "substantive." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

The Court denies Plaintiff leave to amend as to Count V alleging violations of the GMVA. As discussed in detail above, the provision of that law Plaintiff relies on does not function retroactively and, as such, does not and cannot reach the conduct she seeks to hold Defendants liable for. Repleading such a claim would be futile. *Cf. Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015) (denying leave to amend as futile where relevant statutes did not provide plaintiff with a private right of action). The Court also denies Plaintiff leave to amend her claims in Counts VI, VII, and VIII brought pursuant to the New York State Constitution because, for the reasons explained above, she has an adequate alternative remedy under Section 1983. *See Chan v. City of New York*, No. 19-cv-7239, 2024 WL 1452381, at *10 (E.D.N.Y. Feb. 15, 2024) (denying motion to amend New York State Constitution claim where plaintiff "d[id] not dispute the adequacy of § 1983 as a remedy"), *report and recommendation adopted*, Mar. 25, 2024, Text Order.

**\*23** It is a closer call with respect to whether granting leave to amend the remaining claims would be futile. The Court will not grant leave to amend solely on the basis that New York law is "in flux" on issues relevant to this case, both because the principal issue she identifies in *Weisbrod-Moore I* has now been received by the Court of Appeals, and because allowing Plaintiff to repeatedly amend in the face of shifting state law would risk running afoul of other factors relevant to the Rule 15 analysis like undue delay and undue prejudice. *MSP*, 66 F.4th at 90. And the Court is hesitant to grant leave to amend where Plaintiff has already amended three times. *See Sung v. DeJoy*, No. 22-cv-07682, 2024 WL 4107212, at *14 (E.D.N.Y. Sept. 5, 2024). That is especially so here, where Plaintiff "requested leave to amend without specifying what additional facts, if any, [she] might assert in a new pleading." *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011).

At the same time, the Court is cognizant that this is the first time Plaintiff has "the benefit of a ruling," thereby putting her "in a position to weigh the practicality and possible means of curing [the] specific deficiencies" outlined in detail in this Order. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). In addition, at least some of the problems with the TAC's pleading appear to arise from imprecise drafting and insufficient focus on the elements of her claims in favor of developing a broad narrative about systemic problems in the foster care system. *See Redfern-Wallace v. Buffalo News*, No. 12-cv-471, 2013 WL 3777139, at *11 (W.D.N.Y. July 17, 2013) (granting plaintiff leave to amend to, *inter alia*, provide an "organized chronology of alleged events"). Additionally, the Court credits Plaintiff's argument, made elsewhere, that it may be difficult for child victims of sexual abuse which took place long in the past to recall facts about that abuse. *See* ECF No. 240 at 18. Against this backdrop, justice favors granting her the opportunity to try to cure the defects she may not have previously been aware of. Fed. R. Civ. P. 15(a)(2). In conclusion, the Court cannot conclude that such amendment would be futile, and grants her leave to file a Fourth Amended Complaint. *See Levin*, 2024 WL 4026966, at *26, 747 F.Supp.3d 645. [34]

[34]    If Plaintiff chooses to file a Fourth Amended Complaint, the Counts must remain ordered in the same way as in the TAC for the ease of all parties and the Court in resolving any future motion to dismiss.

## CONCLUSION

To sum up:

• Count I, alleging negligence and brought pursuant to the CVA, based on negligent failure to report child abuse and failure to supervise with respect to the allegations concerning Juan Rodriguez only, survives against Defendant City. Count I also survives against Defendants Lewis, Ellis, and HeartShare for negligent reporting, and Ellis and HeartShare (but not Lewis) for negligent supervision, with respect to the allegations concerning Gary Hoyte only. Count I is otherwise dismissed without prejudice and with leave to amend.

• Count II, alleging negligence and brought pursuant to the ASA, is dismissed without prejudice and with leave to amend.

• Count III, alleging statutory failure to report child abuse based on the allegations concerning Juan Rodriguez only, survives as to Defendant City. Count III also survives against Defendants Lewis, Ellis, and HeartShare based on the allegations concerning Hoyte only. Count III is otherwise dismissed without prejudice and with leave to amend.

• Count IV, alleging breach of contract, survives as to the City, Concord, and HeartShare (the only Defendants Plaintiff brings this claim against).

• Count V, alleging violations of the GMVA, is dismissed with prejudice and without leave to amend, as to all Moving Defendants.

**\*24**  • Counts VI, VII, and VIII, alleging violations of federal constitutional rights pursuant to Section 1983, are dismissed without prejudice as to all Moving Defendants. Plaintiff is granted leave to amend to assert allegations needed to support a request for equitable relief, among any other amendments she may have to these Counts.

• Counts VI, VII, and VII, alleging violations of the New York State Constitution, are dismissed with prejudice and without leave to amend, as to all Moving Defendants.

If Plaintiff intends to file a Fourth Amended Complaint, she must do so on or before April 2, 2025. If Plaintiff chooses not to amend the TAC, then Defendants shall answer the non-dismissed portions of the TAC on or before April 16, 2025. If Plaintiff does file a Fourth Amended Complaint, any Defendant who then seeks to dismiss it shall file a pre-motion letter in accordance with Section IV.A of the Court's Individual Practices, or answer, on or before April 16, 2025.

Given the age and complexity of this case, and the likelihood of additional protracted motion practice, the Court encourages the parties to consider attempting to resolve this action by participating in the Court-Annexed Mediation Program. The Court reminds the parties that Plaintiff and some or all Defendants may seek referral to that program at any time by filing a letter on the docket.

SO ORDERED.

## All Citations

Slip Copy, 2025 WL 676090

---

**End of Document**                                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Doe v. Columbia University, Not Reported in Fed. Supp. (2024)

2024 WL 4149252

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 147 of 160

2024 WL 4149252

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

John DOE, Plaintiff,

v.

COLUMBIA UNIVERSITY, et al., Defendants.

John Doe, Plaintiff,

v.

Marcus Jeremy Hunter, et al., Defendants.

John Doe, Plaintiff,

v.

Neel H. Kachalia, et al., Defendants.

23 Civ. 10393 (DEH), 23 Civ. 10394 (DEH), 23 Civ. 10395 (DEH)

|

Signed September 11, 2024

**Attorneys and Law Firms**

John Doe, Buffalo, NY, Pro Se.

Gabrielle Tenzer, Anna Collins Peterson, Hecker Fink LLP, New York, NY, for Defendant Trustees of Columbia University in 23 Civ. 10393, 23 Civ. 10395.

**OPINION AND ORDER**

DALE E. HO, United States District Judge:

**\*1** In the above-captioned cases, *pro se* Plaintiff John Doe brings claims against various defendants under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1985(3) ("Section 1985"), and state law. *See Doe v. Columbia*, No. 23 Civ. 10393, ECF No. 1; *Doe v. Hunter*, No. 23 Civ. 10394, ECF No. 10; *Doe v. Kachalia*, No. 23 Civ. 10395, ECF No. 1. Plaintiff has been granted *in forma pauperis* ("IFP") status in each of these matters. *See Columbia*, No. 23 Civ. 10393, ECF No. 4; *Hunter*, No. 23 Civ. 10394, ECF No. 4; *Kachalia*, No. 23 Civ. 10395, ECF No. 3. Before the Court are various motions and requests for relief, including:

(1) an August 16, 2024, letter from Plaintiff seeking various forms of relief, including reconsideration of previous rulings by the Court to permit the redaction of certain documents, and sanctions against counsel for Defendant the Trustees of Columbia University ("Columbia"), *see Columbia*, No. 23 Civ. 10393, ECF No. 44 (the "August 16 Letter");

(2) motions by Non-Party Eugene Volokh ("Volokh") to intervene and to unseal the Complaints in *Columbia* and *Kachalia*, *see Columbia*, No. 23 Civ. 10393, ECF No. 15 and *Kachalia*, No. 23 Civ. 10395, ECF No. 11;

(3) a suggestion to dismiss this case *sua sponte*, made via letter briefs submitted by Columbia, *see Columbia*, No. 23 Civ. 10393, ECF Nos. 12 and 17; and

(4) various other requests for relief made by Plaintiff via letter briefs, including a motion for a preliminary injunction, *see Columbia*, No. 23 Civ. 10393, ECF No. 37.

Case 9:23-cv-01465-DNH-TWD   Document 72   Filed 12/12/25   Page 148 of 160

Doe v. Columbia University, Not Reported in Fed. Supp. (2024)

2024 WL 4149252

For the reasons set forth below,

(1) Plaintiff's various requests for relief made in his August 16 Letter are **DENIED**;

(2) Volokh's motion to intervene for the limited purpose of unsealing the Complaints in *Columbia*, No. 23 Civ. 10393 and *Kachalia*, No. 23 Civ. 10395 is **GRANTED**, and his motion to unseal the Complaints in those cases is **GRANTED IN PART**;

(3) the Complaints in this case are **DISMISSED** *sua sponte*, as Plaintiff's federal claims are time-barred and the Court declines to exercise its supplemental jurisdiction over Plaintiff's state law claims; and

(4) Plaintiff's various other requests for relief, including a preliminary injunction and other relief described below, are **DENIED** as moot.


## BACKGROUND

### I. Factual Background

Much of these cases' factual background of these cases is set forth in Chief Judge Swain's *sua sponte* Order dismissing the original Complaint in *Hunter*, No. 23 Civ. 10394, *see* ECF No. 5 at 3-6. The Court will not recount those allegations other than to note that, as relevant here, these cases concern allegations of sexual assault and that the events in question occurred from 2012 to 2014 or 2015, around the time that Plaintiff was an undergraduate student at Columbia University.


### II. Procedural Background

The procedural background of these cases is somewhat complicated, and is set forth in relevant part below.

Prior to the Complaints in these cases, there was litigation in 2019 over substantially the same events. *See Doe v. Columbia*, No. 19 Civ. 11328 (JPO) (S.D.N.Y.) ("*Doe I*"). After a settlement agreement, that action was voluntarily dismissed with prejudice against Columbia in 2020. *See Doe I*, ECF No. 32-1.

 **\*2** The three above-captioned Complaints were filed on November 24, 2023. *See Columbia*, No. 23 Civ. 10393, ECF No. 1; *Hunter*, No. 23 Civ. 10394, ECF No. 1; *Kachalia*, No. 23 Civ. 10395, ECF No. 1. On the same day, Plaintiff filed requests to proceed *in forma pauperis*. *See Columbia*, No. 23 Civ. 10394, ECF No. 2; *Hunter*, No. 23 Civ. 10394, ECF No. 2; *Kachalia*, No. 23 Civ. 10395, ECF No. 2. Plaintiff also filed identical letters seeking to proceed pseudonymously in each case; the letters are dated July 2, 2023 (i.e., before the Complaints were filed), but were docketed on November 24, 2023 in two of the cases, *see Columbia*, No. 23 Civ. 10393, ECF No. 3 and *Hunter*, No. 23 Civ. 10394, ECF No. 3; and on December 5, 2024 in the third case, *see Kachalia*, No. 23 Civ. 10395, ECF No. 4.

In his letter motions seeking pseudonymous status, Plaintiff noted that his "Complaint includes sensitive health information regarding a sexual assault, and medical and psychiatric treatment for these assaults, which could have deleterious consequences if this information became public record." *Columbia*, No. 23 Civ. 10393, ECF No. 3. Plaintiff did *not* request that the Complaints be sealed altogether, but the Clerk of Court, as a precaution given Plaintiff's motions to proceed under a pseudonym, limited electronic docket access to Plaintiffs' Complaints to "court users and case participants."

The Court granted IFP status in all three cases. *See Columbia*, No. 23 Civ. 10393, ECF No. 4; *Hunter*, No. 23 Civ. 10394, ECF No. 4; *Kachalia*, No. 23 Civ. 10395, ECF No. 3.

With respect to Plaintiff's request to proceed pseudonymously, this Court granted the request in two of the cases on December 5 and 6, 2023, respectively. *See Columbia*, No. 23 Civ. 10393, ECF No. 6; *Kachalia*, No. 23 Civ. 10395, ECF No. 6. While

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 149 of 160
Doe v. Columbia University, Not Reported in Fed. Supp. (2024)
2024 WL 4149252

Plaintiff did not request that the Complaints be filed under seal, this Court, following a decision in the earlier *Doe I* litigation, *see Doe I*, 19 Civ. 11328, ECF No. 9, *sua sponte* ordered that the Complaints in these two cases be placed under seal. *See Columbia*, No. 23 Civ. 10393, ECF No. 6 and *Kachalia*, No. 23 Civ. 10395, ECF No. 6.

On January 3, 2024, Columbia filed a letter requesting a conference with the Court and suggesting *sua sponte* dismissal of the Complaints in *Columbia* and *Kachalia*, in light of "a confidential settlement agreement between pro se plaintiff John Doe and Columbia" in *Doe I. See Columbia*, No. 23 Civ. 10393, ECF No. 12 (the "*Sua Sponte* Dismissal Request").

On January 3, 2024, Non-Party Volokh filed motions to intervene for the limited purpose of seeking unsealing of the Complaints in *Columbia* and *Kachalia. See Columbia*, No. 23 Civ. 10393, ECF No. 15; *Kachalia*, No. 23 Civ. 10395, ECF No. 11.

On January 10, 2024, *Hunter*, No. 23 Civ. 10394, which was not yet assigned to the undersigned, was dismissed *sua sponte* by Chief Judge Swain. *See Hunter*, No. 23 Civ. 10394, ECF No. 5. [1]

[1] Plaintiff subsequently filed an Amended Complaint in *Hunter*, No. 23 Civ. 10394, ECF No. 10, and the case was eventually reassigned to the undersigned as related to the other two above-captioned cases. *See* July 2, 2024 Minute Order. This Court subsequently granted Plaintiff's request to proceed pseudonymously in *Hunter. See Hunter*, No. 23 Civ. 10394, ECF No. 22.

On January 18, 2024, Columbia filed a two-and-a-half-page letter drawing the Court's attention to Chief Judge Swain's *sua sponte* dismissal of the Complaint in *Hunter*, No. 23 Civ. 10394, and again suggesting *sua sponte* dismissal of *Columbia* and *Kachalia*, in light of, *inter alia*, the parties' settlement in the *Doe I* litigation and the statute of limitations with respect to the federal claims in these cases. *See Columbia*, No. 23 Civ. 10393, ECF No. 17. With respect to the latter point, Columbia noted that Plaintiff's federal claims are time-barred, and that the New York Adult Survivor's Act "does not revive his federal claims." *Id.* at 2. The letter also requested that the Court hold these cases in abeyance while it considers these issues. *Id.* at 2-3.

**\*3** On January 24, 2024, the Court ordered that all deadlines in *Columbia*, No. 23 Civ. 10393 and *Kachalia*, No. 23 Civ. 10395 be stayed pending further order, and directed Plaintiff to file a response addressing the issues raised in Columbia's letters, with a letter not to exceed four pages, by February 24, 2024. *See Columbia*, No. 23 Civ. 10393, ECF No. 18.

Later the same day, Plaintiff filed a letter requesting an extension of the deadlines to respond to Volokh's Motions to Intervene and Unseal the Complaints, and to Columbia's letter, stating that he was recently involved in a car accident and sustained a concussion. *See id.*, ECF No. 19. In the letter, Plaintiff also requested the appointment of pro bono counsel. *See id.*

Two days later, on January 26, 2024, the Court granted Plaintiff's request for an extension and ordered that Plaintiff's responses be filed in sixty days, or by March 26, 2024, but the Court denied Plaintiff's application for the appointment of pro bono counsel. *See id.*, ECF No. 20. Plaintiff subsequently requested a second extension for these filings, and on March 28, 2024, the Court granted Plaintiff's request, this time with an extension to May 27, 2024. *See id.*, ECF No. 23.

On May 28, 2024, Plaintiff's Opposition to Volokh's intervention motion and his response to Columbia's letter were docketed. *See Columbia*, No. 23 Civ. 10393, ECF No. 25 (docketed in redacted form at ECF No. 40-2) ("Pl.'s Intervention Opp'n") and ECF No. 24 (docketed in redacted form at ECF No. 40-1) ("Pl.'s Opp'n to *Sua Sponte* Dismissal"). Notwithstanding the Court's directive that Plaintiff's response to Columbia's *Sua Sponte* Dismissal Request be limited to four pages, Plaintiff's filing, styled as a "MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS" totaled 16 single-spaced pages (excluding a cover page and a two-page table of contents). *See* Pl.'s Opp'n to *Sua Sponte* Dismissal. Plaintiff's Opposition to *Sua Sponte* Dismissal—which, as explained below, was subsequently placed under seal and filed in redacted form, *see Columbia*, No. 23 Civ. 10393, ECF No. 39-1—acknowledged that "the ASA does not revive the [Plaintiff's] federal claims," but argued that the Court "has supplemental jurisdiction" over Plaintiff's state law claims. Pl.'s Opp'n to *Sua Sponte* Dismissal 14-15.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 150 of 160

Doe v. Columbia University, Not Reported in Fed. Supp. (2024)
2024 WL 4149252

On May 30, 2024, Columbia filed a letter requesting that various documents, including Plaintiff's Oppositions, be placed under seal temporarily, until such time that appropriate redactions can be proposed to protect "sensitive information previously omitted from the public docket, including identifying by name a non-party who has otherwise been pseudonymous in this action," as well as "details of a confidential agreement which, to date, have remained confidential pursuant to the agreement's terms." *Columbia*, No. 23 Civ. 10393, ECF No. 26 (the "May 30 Redaction Request"). On May 31, 2024, the Court granted the motion to temporarily seal ECF Nos. 24 and 25 until the issues of sealing and redaction could be decided by the Court, and gave Columbia until June 14, 2024, to reply to Plaintiff's Opposition to *Sua Sponte* Dismissal. *See id.*, ECF No. 27.

On June 3, 2024, Volokh filed a reply to Plaintiff's Intervention Opposition, *see Columbia*, No. 23 Civ. 10393, ECF No. 28. On June 13, 2024, Defendant Columbia filed its own response letter to Plaintiff's Intervention Opposition. *See id.*, ECF No. 29, rendering the Motions to Intervene and to Unseal fully briefed.

 **\*4** Plaintiff did not file a response to Columbia's May 30 Redaction Request. On August 1, 2024, more than two months after Columbia had made its request, the Court granted it and, *inter alia*, ordered that Plaintiff's Oppositions at ECF Nos. 24 and 25 remain sealed. *See Columbia*, No. 23 Civ. 10393, ECF No. 36 (the "August 1 Order"). After applying the requisite *Olson* three-part inquiry to determine whether to seal or redact a document, *see Olson v. Major League Baseball*, 29 F.4th 59, 87-88 (2d Cir. 2022), the Court determined that Columbia's unopposed motions to redact were warranted because the documents contained sensitive information related to non-party students and to the contents of the parties' confidential settlement agreement. *See* August 1 Order 5-6 (citing *In re Application of Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990)). The Court set a deadline of August 7, 2024 for Columbia to file redacted versions of those filings to account for the aforementioned confidentiality concerns, and gave Plaintiff until August 23, 2024 to object to any proposed redactions as overbroad via letter motion identifying which portions of his filings he believes should be unredacted. *Id.* at 6-7.

On August 5, 2024, Plaintiff filed a letter seeking to "bring to the Court's urgent attention Columbia University's ongoing failure to properly investigate my sexual assault complaint filed on July 1, 2024." *Columbia*, No. 23 Civ. 10393, ECF No. 37 (the "Preliminary Injunction Letter") at 1. In his letter, Plaintiff states, "I respectfully renew my request for leave to amend the complaint to add claims arising from Columbia's July 2024 misconduct .... I also request that the Court order targeted discovery into Columbia's handling of other sexual assault complaints .... Further, I move for a preliminary injunction ordering Columbia to properly investigate my complaint." Preliminary Injunction Letter 2.

On August 7, 2024, Columbia filed the required materials pursuant to the Court's August 1 Order, proposing various redactions to Plaintiff's Intervention Opposition and his Opposition to *Sua Sponte* Dismissal. *See Columbia*, No. 23 Civ. 10393, ECF Nos. 39-40. In light of that filing, on August 8, 2024, the Court issued an Order directing Volokh to reply to the redacted version of Plaintiff's Intervention Opposition by August 16, 2024. *See Columbia*, No. 23 Civ. 10393, ECF No. 42.

On August 16, 2024,[2] Plaintiff filed a letter seeking five forms of relief and stating that the "court's recent orders and Columbia's sweeping redactions have severely prejudiced [his] ability to present [his] case." *See Columbia*, No. 23 Civ. 10393, ECF No. 44 (the "August 16 Letter") at 1. In his August 16 Letter, Plaintiff seeks various forms of relief, including that the Court: (1)"[r]econsider the scope of Columbia's redactions"; (2) vacate the August 16 deadline for Professor Volokh; (3) "[o]rder Columbia to remove the preposterous and unwarranted redactions and refile the documents in unredacted form to the maximum extent possible"; (4) appoint Plaintiff a pro bono counsel; and (5) "[r]efer Columbia's counsel's conduct to the Court's disciplinary committee to consider sanctions for litigation abuse." August 16 Letter 3-4. In his letter, Plaintiff warned "[i]f the Court is unwilling or unable to address these serious due process and fairness concerns, I will have no choice but to seek emergency relief from the Second Circuit, including a writ of mandamus." August 16 Letter 4. He further warned: "I will seek public accountability by sharing my story with the media and exposing Columbia's efforts to conceal the truth about sexual assault on its campus both through institutional abuse and bad faith litigation tactics." *Id.*

2      While Plaintiff filed his letter on August 16, 2024, the letter was docketed on August 19, 2024.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 151 of 160

Doe v. Columbia University, Not Reported in Fed. Supp. (2024)

2024 WL 4149252

## DISCUSSION

### I. Plaintiff's August 16 Letter

The Court begins by addressing the various forms of relief sought by Plaintiff in his August 16 Letter. For the reasons stated below, each of Plaintiff's requests for relief is **DENIED**.

**\*5** First, as to Plaintiff's requests that the Court reconsider the scope of Columbia's redactions and order Columbia to remove them, that request is denied as both unnecessary and premature. Plaintiff expresses the concern that the redactions are overbroad, "making it impossible for the Court to fairly evaluate my claims." *Id.* at 1. But the Court and the parties in this matter have access to the full, unredacted versions of Plaintiff's Intervention Opposition, *see Columbia*, No. 23 Civ. 10393, ECF No. 25, and Plaintiff's Opposition to *Sua Sponte* Dismissal, *see Columbia*, No. 23 Civ. 10393, ECF No. 24. These redactions restrict only the *public's* access to the full documents, not the *Court's* consideration of them. To be clear, with respect to the Court's consideration of the merits of these issues, Plaintiff is not prejudiced in any way by the redactions. As explained below, the Court considers Plaintiff's unredacted filings in their entirety in deciding these issues on the merits.

To the extent Plaintiff objects to the scope of Columbia's redactions as overbroad in light of the presumption of public access to judicial documents, the Court notes that, as a practical matter, these redactions were only provisional, as the Court offered Plaintiff an opportunity to contest them as overbroad. As the Court noted in its August 1 Order, Plaintiff had the opportunity, by August 23, 2024, to file a letter arguing that Columbia's redactions are overbroad, such that the presumption of public access outweighs the privacy concerns identified by Columbia with respect to any specific redactions. *See* August 1 Order 7.

Plaintiff did not avail himself of that option and instead filed his August 16 Letter, requesting reconsideration of the Court's previous rulings. But to the extent Plaintiff opposes any and all redactions to the documents in question, such opposition is waived because Plaintiff did not timely oppose Columbia's motion to redact his Opposition briefs. Columbia filed its letter-motion to redact them on May 30, 2024. *See Columbia*, No. 23 Civ. 10393, ECF No. 26. Plaintiff did not file an opposition in the ensuing months, and the Court subsequently issued its order permitting redactions on August 1, 2024. As it stated in its motion, Columbia sought redactions to, *inter alia*, protect the privacy of third parties, *see Columbia*, No. 23 Civ. 10393, ECF No. 26—just as Plaintiff previously sought and successfully obtained pseudonymous status to protect his own privacy, *see Columbia*, No. 23 Civ. 10393, ECF Nos. 3, 6. The Court concluded that, for the same reasons that it was appropriate to grant Plaintiff pseudonymous status, it made sense to afford similar privacy protections to other individuals where possible, given the sensitive nature of the allegations in these lawsuits. *See generally* August 1 Order. The Court also determined that redactions were appropriate to protect confidentiality interests related to the parties' settlement of the *Doe I* litigation.

Although Plaintiff did not, in accordance with the Court's August 1 Order, make a timely filing identifying specific redactions that he contests, in light of Plaintiff's *pro se* status, the Court will extend his deadline to object to any redactions to his Oppositions as overbroad, by filing a letter motion identifying which specific portions of those filings Plaintiff believes should be unredacted, by **September 27, 2024**. If any such letter motion is filed, Defendants may file an opposition by **October 11, 2024**. The process for submitting such filings is specified in the Conclusion of this Order. The Court will consider the parties' respective filings, and if appropriate, will order the removal of any redactions that are not narrowly tailored to protect the privacy and confidentiality interests identified in the August 1 Order, permitting public access to those portions of the documents in question. *See* August 1 Order 6.

**\*6** Second, as to Plaintiff's request that the Court vacate its August 8, 2024 Order giving proposed Intervenor Volokh an August 16, 2024 filing deadline to file a Reply brief, *see Columbia*, No. 23 Civ. 10393, ECF No. 42, that request is denied as moot. August 16, 2024, has passed, and Volokh has not filed an additional Reply brief. In any event, the Court acknowledges that its Order directing Volokh to file a Reply to the redacted version of Plaintiff's Opposition brief was issued in error. When the Court issued its Order, Volokh had already filed his Reply (based on Plaintiff's unredacted Opposition brief), on June 3, 2024. *See Columbia*, No. 23 Civ. 10393, ECF No. 28. And Columbia had already filed its own response to Plaintiff's Intervention

2024 WL 4149252

Opposition, on June 14, 2024. *See Columbia*, No. 23 Civ. 10393, ECF No. 29. Thus, Volokh's Motions to Intervene and Unseal have been fully briefed since June 14, 2024. Again, to be clear, the Court considers Plaintiff's unredacted Opposition brief in its entirety in deciding the merits of Volokh's motion to intervene, as explained below.

Next, as to Plaintiff's request for pro bono counsel, the Court has previously considered and denied such a request. *See Columbia*, No. 23 Civ. 10393, ECF No. 20. In his latest filing, Plaintiff states "[a]s an indigent plaintiff asserting claims related to sexual assault and Title IX violations, I believe appointment of counsel is justified here." *See* August 16 Letter 4. But there is nothing new in Plaintiff's latest pro bono counsel request that would alter the Court's previous decision. As noted, unlike in criminal cases, in civil cases, there is no requirement that courts supply indigent litigants with counsel. *See Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986). Even if a court believes a litigant should have a pro bono counsel, a court has no authority to "appoint" counsel under the IFP statute. A court may only "request" that an attorney volunteer to represent a litigant. *See Mallard v. U.S. Dist. Court for the S. Dist. of Iowa,* 490 U.S. 296, 301-310 (1989). Moreover, courts do not have funds to pay counsel in civil matters. Courts must, therefore, request the services of pro bono counsel sparingly to preserve the "precious commodity" of "volunteer lawyer time." *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 172-73 (2d Cir. 1989). For the reasons stated in the Court's previous order denying Plaintiff's first request for pro bono counsel, the Court denies Plaintiff's second request for pro bono counsel. *See Columbia*, No. 23 Civ. 10393, ECF No. 20.

Finally, as to Plaintiff's request that the Court "[r]efer Columbia's counsel's conduct to the Court's disciplinary committee to consider sanctions for litigation abuse," August 16 Letter 4, Plaintiff has not identified any litigation abuse. Columbia's counsel merely submitted proposed redactions to the filings in question, as directed by the Court, which Plaintiff remains free to oppose. The Court, therefore, denies Plaintiff's sanctions request.

### II. Volokh's Motions

The Court next turns to Non-Party Volokh's motions to intervene and to unseal the Complaints in *Columbia*, 23 Civ. 10393, ECF No. 1 and *Kachalia*, 23 Civ. 10395, ECF No. 1 (for purposes of this section, "the Sealed Complaints"). For the reasons set forth below, the Court **GRANTS** Volokh's motion to intervene in *Columbia* and *Kachalia*, and his motion to unseal the Complaints in those cases is **GRANTED IN PART**. *See Columbia*, No. 23 Civ. 10393, ECF No. 15; *Kachalia*, No. 23 Civ. 10395, ECF No. 11 (collectively "Intervention Motions").

### A. Intervention

### 1. Legal Standard

Rule 24(b) governs permissive intervention (which appears to be the only form of intervention relevant here) and provides in relevant part that "on timely motion, the court may permit anyone to intervene who has a claim or defense that shares with the main action a common question of law or fact." [3] The Second Circuit has recognized "the broad discretion of the district court when considering permissive intervention." *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 561 (2d Cir. 2005). *See also H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 89 (2d Cir. 1986) ("The district court's discretion under Rule 24(b)(2) is very broad.").

[3]    All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

**\*7** In considering a motion for permissive intervention under Rule 24(b), "the court's primary consideration is whether intervention will unduly delay or prejudice the adjudication of the rights of the parties whose lawsuits are being invaded." *Calderon v. Clearview AI, Inc.*, No. 20 Civ. 1296, 2020 WL 2792979, at \*7 (S.D.N.Y. May 29, 2020). In addition, courts consider "the nature and extent of the intervenors' interests, whether their interests are adequately represented by the other parties, and

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 153 of 160

Doe v. Columbia University, Not Reported in Fed. Supp. (2024)

2024 WL 4149252

whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191-92 (2d Cir. 1978).

### 2. Application

Here, Plaintiff submitted a memorandum of law in opposition to Volokh's motions (which the Court considers in its entirety, not only in its publicly available redacted form), but the substance of his arguments goes entirely to the relief that Volokh seeks (i.e., unsealing of the Complaints), rather than to the propriety of intervention. *See generally Columbia*, No. 23 Civ. 10393, ECF No. 39-2.

Nevertheless, the Court considers the factors governing permissive intervention and, as explained below, concludes that it is appropriate here, as it was in *Giuffre v. Dershowitz*, No. 19 Civ. 3377, 2021 WL 5233551, at *3-4 (S.D.N.Y. Nov. 10, 2021), which involved a motion for intervention by a newspaper to unseal various documents that contained sensitive information similar to that at issue in this case.

Volokh is "a law professor who runs the Volokh Conspiracy, a legal blog hosted by Reason Magazine" and who "regularly writes on Title IX issues." Intervention Motions 2. Volokh represents that he "seeks access to the Complaints so he can write and educate the public on a Title IX case involving a prominent university," *id.*, and there is no dispute as to that representation, *see* Pl.'s Intervention Opp'n 1 ("I respect Professor Volokh's academic interest in these cases"). That is a sufficient interest to support intervention, which "is the proper mechanism for a non-party ... to gain access to information generated through judicial proceedings." *United States v. Alex. Brown & Sons, Inc.*, 169 F.R.D. 532, 537 (S.D.N.Y. 1996), *aff'd sub nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998). *See also Giuffre*, 2021 WL 5233551, at *4.

As to the adequacy of representation, Volokh's "interest as a purveyor of news is" not in the outcome of the merits of the litigation, and thus is "distinct from the interests of [the parties]." *Giuffre*, 2021 WL 5233551, at *4. His "interests are not adequately represented by either party in this case." *Id.* Finally, as to the most important factor, the possibility of delay, permissive intervention is sought solely for the limited purpose of seeking unsealing of certain documents (here, the Sealed Complaints), and thus "will not delay the lawsuit or prejudice the adjudication of the rights of the original parties." *Id.*

The parties do not meaningfully dispute these points. As noted *supra*, the Court considers Plaintiff's unredacted Opposition in full, and to the extent that Plaintiff raises objections to Volokh's filing, these go to Volokh's request to unseal the Complaints rather than to intervention. Accordingly, for the reasons discussed above, permissive intervention for the limited purposes of seeking to unseal the Sealed Complaints is **GRANTED**.

### B. Unsealing

### 1. Legal Standard

Courts in the Second Circuit apply a three-part inquiry to determine whether to seal or to redact a document. *See Olson*, 29 F.4th at 87-88. First, a court determines whether a document is a "judicial document," subject to a presumptive public right of access. *See id.* at 87. A judicial document is "a filed item that is relevant to the performance of the judicial function and useful in the judicial process." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016).

**\*8** Second, a court determines the weight of the presumption of public access that attaches to the document, looking to "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 154 of 160

Doe v. Columbia University, Not Reported in Fed. Supp. (2024)

2024 WL 4149252

monitoring the federal courts." *Olson*, 29 F.4th at 87-88. "The presumption of public access exists along a continuum. The strongest presumption attaches where the documents determine litigants' substantive rights [(e.g., where the documents are attached in connection with a dispositive motion)] and is weaker where the documents play only a negligible role in the performance of Article III duties," *id.* at 89-90, for example, when documents are attached in connection with discovery disputes. However, documents do not "receive different weights of presumption based on the extent to which they [are] relied upon in resolving the motion." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 123 (2d Cir. 2006).

"Finally, once the weight of the presumption has been assessed, the court is required to balance competing considerations against it." *Olson*, 29 F.4th at 88. "[C]ontinued sealing of the documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124. A court may deny public disclosure of the record only "if the factors counseling against public access outweigh the presumption of access afforded to that record." *Olson*, 29 F.4th at 88.

### 2. Application

First, there is no doubt that complaints are judicial documents. "A complaint, which initiates judicial proceedings, is the cornerstone of every case, the very architecture of the lawsuit, and access to the complaint is almost always necessary if the public is to understand a court's decision." *Bernstein*, 814 F.3d at 140.

Second, a strong presumption of public access attaches to complaints. "Complaints have historically been accessible by default, even when they contain arguably sensitive information" and "public access to the complaint and other pleadings has a significant positive role ... in the functioning of the judicial process." *Id.* at 141. Under common law, because complaints are "highly relevant to the exercise of Article III judicial power," "the presumption of access is at its zenith." *Id.* at 142.

Third, the Court considers Plaintiff's unredacted Opposition in full, and agrees that there are important countervailing privacy interests identified by Plaintiff, but concludes that these concerns can be accommodated via pseudonymity rather than through complete sealing of the Complaints. Indeed, Plaintiff publicly filed his Complaints and did not affirmatively request sealing of them, but rather sought only pseudonymity to protect his privacy interests. *See Columbia*, 23 Civ. 10393, ECF No. 6; *Kachalia*, 23 Civ. 10395, ECF No. 6. It was only in an abundance of caution that the Court, following a decision in the previous case brought by the Plaintiff, *Doe I*, ordered *sua sponte* that the Complaints be sealed, *see Columbia*, 23 Civ. 10393, ECF No. 6; *Kachalia*, 23 Civ. 10395, ECF No. 6. But the Second Circuit and district courts within it have generally addressed the type of serious privacy concerns raised by the Plaintiff by permitting pseudonymity and other limited redactions to protect personal information, while otherwise leaving the relevant judicial documents publicly available in redacted form. *See Brown v. Maxwell*, 929 F.3d 41, 48 n.22 (2d Cir. 2019) (unsealing summary judgment record in a "a minimally redacted version ... to protect personally identifying information such as personal phone numbers, contact lists, birth dates, and social security numbers" as well as "the names of alleged minor victims of sexual abuse" and "deposition responses concerning intimate matters where the questions were likely only permitted—and the responses only compelled—because of a strong expectation of continued confidentiality"); *Davis v. Rumsey Hall Sch., Inc.*, No. 20 Civ. 1822, 2023 WL 6379305, at *3 n.3 (D. Conn. Sept. 29, 2023) (unsealing documents but "accommodat[ing] the countervailing consideration of privacy for alleged victims of sexual abuse by omitting alleged victims' names and identifying information that could allow a reasonable person who does not have personal knowledge of the relevant circumstances to identify with reasonable certainty [these] individuals").

**\*9** For its part, Defendant Columbia states it does not oppose unsealing as long as redactions can made to protect the privacy of others and the terms of the parties' confidential settlement. *See Columbia*, 23 Civ. 10393, ECF No. 29 at 3. That point is consistent with Plaintiff's own request for pseudonymity.

Nevertheless, Plaintiff—despite having affirmatively sought only pseudonymity and not complete sealing of the Complaints —now argues that pseudonymity is insufficient to protect his interests, because (1) "[u]nsealing the complaints detailing my

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 155 of 160
Doe v. Columbia University, Not Reported in Fed. Supp. (2024)
2024 WL 4149252

abuse would likely trigger a relapse of [my] symptoms and retraumatize me all over again," Pl.'s Intervention Opp'n 1; and (2) even with pseudonymity, unsealing the details "of these allegations themselves could lead to the identification of plaintiff," *id.* at 2. The Court takes concerns of this nature seriously. But they are difficult to credit in this dispute, in light of the fact that Plaintiff himself has made his allegations publicly on numerous occasions: as noted, Plaintiff filed the Complaints publicly and did not request that they be sealed, and he has publicly filed multiple other documents describing his allegations—such as his Intervention Opposition and his Opposition to *Sua Sponte* dismissal—and as noted, he *opposes* redactions to those documents. *See supra.* [4]

[4] In his August 16 Letter, Plaintiff also threatened to "shar[e] my story with media" if the Court did not reconsider, *inter alia*, its previous decision allowing Columbia to redact the Oppositions. *See Columbia*, No. 23 Civ. 10393, ECF No. 44 at 4.

More fundamentally, Plaintiff cites no legal authority supporting the proposition that redactions to protect pseudonymity are insufficient, and that complete sealing of the Complaints is necessary. Plaintiff cites several cases, *see Columbia*, No. 23 Civ. 10393, ECF No. 25 at 1-2, but each of these cases considered only the issue of pseudonymity and not the complete sealing of the relevant judicial documents—and several of the cases did not even grant pseudonymous status. *See Doe v. Townes*, 2020 WL 2395159, at *6-7 (S.D.N.Y. May 12, 2020) (recommending denial of pseudonymous status); *Doe v. Skyline Autos. Inc.*, 375 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (denying plaintiff anonymous status); *Doe v. Colgate Univ.*, 2016 WL 1448829, at *3 (granting pseudonymous status). Plaintiff cites *Townes*, and purports to quote it as follows:

> Redacting my name would be insufficient to protect my privacy, as "the public filing of a complaint containing detailed allegations of sexual assault, even with names redacted, can still lead to exposure of the plaintiff's identity." *Id.* [*Townes*, 2020 WL 2395159] at *6.

Pl.'s Intervention Opp'n 1-2. The Court cannot locate this purported quotation in *Townes*, which as noted, recommended *denying* pseudonymous status. Nor can the Court locate this quotation in the other cases cited by Plaintiff, or in any case at all on Westlaw or LEXIS. [5]

[5] This is troubling, and is not the only instance of Plaintiff offering quotations or summaries of cases that appear to be inaccurate or non-existent. *See infra* n.7. *Cf. Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023) ("Many harms flow from the submission of fake opinions."). In light of Plaintiff's *pro se* status, however, the Court will not impose sanctions at this time.

**\*10** Perhaps the best case for Plaintiff is *Doe v. Town of Lisbon*, 78 F.4th 38 (1st Cir. 2023), in which the First Circuit affirmed a district court's decision denying a similar motion by Volokh. But there, the First Circuit made clear that *Town of Lisbon* was *not* a "sealing/unsealing case," as a version of the complaint in that case was available on the public docket, with only the Doe plaintiff's name redacted, such that "the public ha[d] full access to all information contained in the docket other than one party's name." *See id.* at 45-46. Volokh's motion in that case was denied because it sought to pierce pseudonymity, which his motion in this case does not.

In light of the discussion above, the Court concludes that continued sealing of the Sealed Complaints is inappropriate. Volokh's motion to unseal the Complaints is therefore **GRANTED**, but only **IN PART**. The Court agrees that some redactions may remain appropriate to address privacy and confidentiality concerns. But such redactions must be "narrowly tailored" to protect the privacy interests of the Plaintiff and non-parties. *Bernstein*, 814 F.3d at 144. They may include "alleged victims' names and identifying information that could allow a reasonable person who does not have personal knowledge of the relevant circumstances to identify with reasonable certainty [these] individuals." *Rumsey Hall Sch., Inc.*, 2023 WL 6379305, at *3 n.3.

The Court's directions to the parties as to the process for proposing and then finalizing redactions to the Complaints at issue (i.e., those in *Columbia*, No. 23 Civ. 10393 and *Kachalia*, No. 23 Civ. 10395) is set forth in the Conclusion of this Order.

### III. *Sua Sponte* Dismissal

The Court next considers whether *sua sponte* dismissal is appropriate, and, for the reasons stated below, concludes that it is, and the Complaints are hereby **DISMISSED**.

#### A. Legal Standard

Rule 8 requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Id.* But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Id.* (citing *Twombly*, 550 U.S. at 555). After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible—not merely possible—that the pleader is entitled to relief. *Id.* at 679.

The Court must *sua sponte* dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction over the claims raised. *See* Rule 12(h)(3). "Section 1915(d) is designed largely to discourage the filing of, and waste of judicial and private resources upon, baseless lawsuits that paying litigants generally do not initiate because of the costs of bringing suit and because of the threat of sanctions for bringing vexatious suits under Federal Rule of Civil Procedure 11." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

**\*11**  "Because the failure to file an action within the limitations period is an affirmative defense, a plaintiff is generally not required to plead that the case is timely filed." *Clinton v. Houston*, No. 22 Civ. 10188, 2023 WL 2758433, at \*2 (S.D.N.Y. Apr. 3, 2023) (citing *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007)). But "district courts may dismiss an action *sua sponte* on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted." *Walters v. Indus. and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (affirming *sua sponte* dismissal of complaint as frivolous on statute of limitations grounds); *see also Abbas*, 480 F.3d at 640 (concluding that district court should grant notice and opportunity to be heard before dismissing complaint *sua sponte* on statute of limitations grounds).

While the law mandates dismissal on various grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475, has its limits—to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief. *See Jones v. Nat'l Commc'ns & Surveillance Networks*, 266 F. App'x 31, 33 (2d Cir. 2008).

#### B. Application

It is evident from the face of the Complaints that Plaintiffs' federal claims are time-barred. The applicable statute of limitations for Plaintiff's various federal claims is either three or four years. While "Title IX [itself] does not contain a statute of limitations," *Curto v. Edmundson*, 392 F.3d 502, 504 (2d Cir. 2004), courts in New York apply a three-year statute of limitations to Title IX claims. As the Supreme Court has explained, where a federal statute does not "expressly suppl[y] a limitations period," courts "generally 'borrow' the most closely analogous state limitations period." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 414 (2005) (collecting cases). "The most analogous state limitations period

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 157 of 160

Doe v. Columbia University, Not Reported in Fed. Supp. (2024)

2024 WL 4149252

for Title IX claims brought in New York state is New York's three-year limitations period for personal injury claims." *Doe v. State Univ. of N.Y. Purchase Coll.*, 617 F. Supp. 3d 195, 205 (S.D.N.Y. 2022) (citing, *inter alia*, *Curto*, 392 F.3d at 504; N.Y. C.P.L.R. 214(5)). For the same reasons, a three-year statute of limitations also applies to claims brought under Section 1985. *See Hernandez-Avila v. Averill*, 725 F.2d 25, 27 n.3 (2d Cir.1984). And finally, claims under Section 1981 "are governed by the catchall four-year statute of limitations prescribed by 28 U.S.C. § 1658." *Fernandez v. M & L Milevoi Mgmt., Inc.*, 357 F. Supp. 2d 644, 649 (E.D.N.Y. 2005).

Here, the events giving rise to these lawsuits occurred from 2012 to 2014 or 2015. *See generally Columbia*, No. 23 Civ. 10393, ECF No. 1; *Hunter*, No. 23 Civ. 10394, ECF No. 10; *Kachalia*, No. 23 Civ. 10395, ECF No. 1. The Complaints were not filed until 2023. *Id.* Accordingly, Plaintiff's federal claims are time-barred.

The Court gives full consideration to the entirety of Plaintiff's Opposition to *Sua Sponte* Dismissal (not just the publicly available redacted version) and finds in it no reason to refrain from dismissing his federal claims *sua sponte* as untimely. *See generally* Pl.'s Opp'n to *Sua Sponte* Dismissal. In addressing the statute of limitations issues, Plaintiff references the New York Adult Survivors Act, N.Y. C.P.L.R. § 214-j ("ASA"), which "created a one-year revival period, starting November 24, 2022, during which adult survivors of sexual assault could sue their abusers despite the expiration of the previously applicable [state-law] statutes of limitation." *Carroll v. Trump*, 650 F. Supp. 3d 213, 218 (S.D.N.Y. 2023). *See* Pl.'s Opp'n to *Sua Sponte* Dismissal 13-14. But he concedes "that the ASA does not revive [Plaintiff's] federal claims," and that "it is true that the ASA does not revive Title IX claims." *See id.* Those concessions are fatal to Plaintiff's federal claims, which are time-barred. [6]

[6]  *Cf. Austin v. Fordham Univ.*, No. 21 Civ. 6421 (JPO), 2022 WL 4626485, at *11 n.6 (S.D.N.Y. Sept. 30, 2022) (noting, in the Title IX context, that "the Court is not persuaded that the [ASA] will have any impact on the statute of limitations and tolling analysis central to this opinion."). There is no authority for the proposition that the ASA revives other federal claims; the most direct guidance from the Second Circuit is that the analogous New York Child Victims Act, ("CVA"), N.Y. C.P.L.R. § 214-g, does not. *See Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 104 (2d Cir. 2023); *see also id.* at 108 (noting that every other Court of Appeals that has addressed a similar state claim-revival statute in this context has held "that a specialized statute for sexual abuse claims does not render an otherwise untimely Section 1983 or Title IX claim timely."); *BL Doe 3 v. Female Acad. of the Sacred Heart*, 199 A.D. 3d 1419 (4th Dep't 2021) (holding that the CVA did not revive 1983 or Title IX claims, because it is "not a revival statute related to the residual personal injury statute of limitations").

 **\*12**  The Court is mindful that it must be cautious with respect to *sua sponte* dismissal. This is particularly true where it is on the basis of an affirmative defense such as the statute of limitations, which ordinarily should not be raised *sua sponte*, as doing so "may be unfair to the plaintiff by rejecting the suit after considerable time and expense has been invested." *Pino*, 49 F.3d at 53-54. But "[n]o such concern arises where, as here, the suit is dismissed at the threshold." *Id.* Here it is "plain from the face of the pleading" that Plaintiff's federal claims are time-barred. *Clinton*, 2023 WL 2758433, at *2. A court should grant notice and opportunity to be heard before dismissing complaint *sua sponte* on statute of limitations grounds, *see Abbas*, 480 F.3d at 640, and the Court has done so here. Columbia's letter on January 18, 2024 raised the issue of the statute of limitations, *see Columbia*, No. 23 Civ. 10393, ECF No. 17; the Court offered Plaintiff an opportunity to respond with a four-page letter (i.e., equal to the length of Columbia's submission), *see Columbia*, No. 23 Civ. 10393, ECF No. 18 (directing response); the Court granted Plaintiff a 60-day extension for this four-page letter, *see Columbia*, No. 23 Civ. 10393, ECF No. 20 (extending time to respond by 60 days); then granted Plaintiff a second 60-day extension, *see id.* ECF No. 23 (granting second 60-day extension); and has fully considered Plaintiff's 16-page letter in opposition (notwithstanding the Court's Order that Plaintiff's submission be limited to four pages). And Plaintiff has conceded that the ASA does not revive his federal claims. *See supra*. [7]

[7]  Although Plaintiff does not explicitly raise the doctrine of equitable tolling with respect to his federal claims in these cases, the Court considers it because Plaintiff stated that Columbia and his limited-scope attorneys in the *Doe I* litigation "incorrectly advised [Plaintiff] his claims were time-barred" in February 2020. Pl.'s Opp'n to *Sua Sponte* Dismissal 4-5. Under New York law, equitable tolling "may be invoked to defeat a statute of limitations defense when the plaintiff was

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 158 of 160

Doe v. Columbia University, Not Reported in Fed. Supp. (2024)

2024 WL 4149252

induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas*, 480 F.3d at 642. The Second Circuit has noted that equitable tolling applies only in "rare and exceptional circumstances." *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005). The plaintiff "bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling ... claim have ceased to be operational." *Abbas*, 480 F.3d at 642. Plaintiff has not made such a showing here. While Plaintiff contends that he settled the *Doe I* litigation based on purportedly incorrect legal advice about the statute of limitations for some of his claims in that case, this has no bearing on the timeliness of his federal claims in *these cases*, which were all filed in 2023, approximately seven or eight years after the events in question. Plaintiff also states that he did not become aware of his claims in the *Kachalia* case until sometime "after the 2023 settlement," Pl. Opp'n to *Sua Sponte* Dismissal 5, citing a case identified as "2022 WL 2917890" which purports to indicate that the ASA revives otherwise time-barred claims where delay is attributable to repressed memories. *See id.* at 6 ("*See Doe*, 2022 WL 2917890, at *5 (ASA revives claims that were not previously brought due to repressed memory of abuse)"); *id.* at 12 ("*See Doe*, 2022 WL 2917890, at *5 (ASA revives claims that were not previously brought due to repressed memory of abuse)"). This point is irrelevant because, as noted *supra*, the ASA does not revive federal claims. The Court notes, however, that there is no case on Westlaw that the Court can identify with the citation "2022 WL 2917890." Plaintiff's short citation is apparently in reference to a case he fully cites as "*Doe v. Poly Prep Country Day Sch.*, No. 20 Civ. 3628, 2022 WL 2917890 (E.D.N.Y. July 25, 2022)." While the Court was able to identify a similarly captioned case from the same year, *Doe v. Poly Prep Country Day Sch.*, No. 20 Civ. 4718, 2022 WL 4586237, at *1 (E.D.N.Y. Sept. 29, 2022), that case makes no reference to repressed memories or tolling. In any event, setting aside the ASA—which, as noted, is irrelevant to Plaintiff's federal claims—as a general matter, "[i]n other repressed-memory child abuse cases, New York has consistently refused to toll the statute of limitations." *Overall v. Est. of Klotz*, 52 F.3d 398, 400 (2d Cir. 1995).

**\*13** As to Plaintiff's state law claims, the Court cannot assert diversity jurisdiction over them, as both Plaintiff and at least some defendants in all three cases are alleged to be citizens of New York State. *See Columbia*, No. 23 Civ. 10393, ECF No. 1 ¶¶ 21, 22; *Hunter*, No. 23 Civ. 10394, ECF No. 1 ¶¶ 11, 14; *Kachalia*, No. 23 Civ. 10395, ECF No. 1 ¶ 10. And because all federal claims in these actions are dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction."); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered ... will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 404 (2d Cir. 2017) (Calabresi, J., concurring) ("[A]fter all federal claims have been dismissed, the default rule is that federal courts should not decide related state-law claims unless there is good reason for doing so."). [8]

[8]    Because the Court dismisses the federal claims in these cases as time-barred and declines to exercise its supplemental jurisdiction over Plaintiff's state law claims, it does not address Columbia's argument that Plaintiff's claims are barred by the settlement in *Doe I*, and should be dismissed on that basis. *See Columbia*, No. 23 Civ. 10393, ECF Nos. 12, 17, 29.

### IV. Other Matters

In addition to the issues addressed above, there are a number of other requests from Plaintiff remaining on the dockets in these cases. Specifically:

• Plaintiff makes a request to "remove Defendant Trustees of Columbia University in the City of New York" as a defendant and to "reconsider sua sponte dismissal" in *Hunter*, No. 23 Civ. 10394,[9] but filed this request in all three matters, *see Columbia*, No. 23 Civ. 10393, ECF No. 31; *Hunter*, No. 23 Civ. 10394, ECF No, 16; and *Kachalia*, No. 23 Civ. 10395, ECF No. 23;[10]

• Plaintiff requests to appoint pro bono counsel in *Hunter*, No. 23 Civ. 10394, ECF No. 15; and

• Plaintiff requests a Preliminary Injunction and various other forms of relief related to a 2024 complaint he made to Columbia, which are not pleaded in any of his Complaints, in *Columbia*, No. 23 Civ. 10393, ECF No. 37.

Case 9:23-cv-01465-DNH-TWD    Document 72    Filed 12/12/25    Page 159 of 160

Doe v. Columbia University, Not Reported in Fed. Supp. (2024)
2024 WL 4149252

In light of the Court's dismissal of these actions, these requests are **DENIED** as moot.

9     This motion was apparently filed in an effort to prevent this Court from accepting reassignment of *Hunter*, No. 23 Civ. 10394 as related to the other two cases, in which Columbia is also a named defendant. Plaintiff cannot have meant to drop Columbia as a defendant in *Columbia*, No. 23 Civ. 10393, as Columbia is the only defendant in that case.

10     The Court notes that, even if Columbia were dropped as a defendant in the *Hunter* litigation, there would still be no jurisdiction in that case, as several of the other defendants are alleged by Plaintiff to be citizens of New York. *See supra*.

## CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's various requests for relief in his August 16, 2024 Letter in *Columbia*, No. 23 Civ. 10393, ECF No. 44. Nevertheless, with respect to the redacted versions of Plaintiff's Opposition to *Sua Sponte* Dismissal, *see Columbia*, No. 23 Civ. 10393, ECF No. 39-1, and his Intervention Opposition, *see Columbia*, No. 23 Civ. 10393, ECF No. 39-2, Plaintiff may file a letter brief identifying specific portions of those filings Plaintiff believes should be not be redacted, setting forth his reasons and attaching versions of those documents with the portions that he seeks to unredact by highlighting them. Plaintiff shall file any such letter brief under seal by emailing HoNYSDChambers@nysd.uscourts.gov by **September 27, 2024**. If any such letter brief is filed, Defendants may file an opposition under seal, by **October 11, 2024**. The Court will place these filings under seal, consider the parties' respective filings in full, and, if appropriate in light of governing case law, will order the removal of any redactions to the documents in question that are not narrowly tailored to protect the privacy and confidentiality interests identified in the August 1 Order.

 **\*14**  The Court **GRANTS** Volokh's motion to intervene and **GRANTS IN PART** his motion to unseal the Complaints in *Columbia*, No. 23 Civ. 10393 and *Kachalia*, No. 23 Civ. 10395. By **September 27, 2024**, Defendant shall file a letter brief and proposed redactions to the Complaint by attaching highlighted versions of the Complaints with proposed redactions, and providing both to Plaintiff and Chambers (via email at HoNYSDChambers@nysd.uscourts.gov). By **October 11, 2024**, Plaintiff may file a letter brief proposing any additional redactions he believes are necessary, via the same means. The Parties are reminded that proposed redactions must be narrowly tailored and must be justified with specificity. After considering the Parties' submissions, the Court will make an independent assessment as to the propriety of the proposed redactions to the Complaints, consistent with this Order. *See Travelers Indem. Co. v. Excalibur Reins. Corp.*, No. 11 Civ. 1209, 2013 WL 4012772, at \*11 (D. Conn. Aug. 5, 2013) ("Even if the parties were able to agree to which materials should be deemed 'confidential,' ... it remains incumbent on the court to make particularized findings demonstrating that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons.").

The Court *sua sponte* **DISMISSES** the Complaints in all three cases because Plaintiff's federal claims are time-barred and the Court declines to consider Plaintiff's state law claims under its supplemental jurisdiction.

The Court **DENIES** all other pending requests for relief as moot in light of the dismissal of the Complaints.

To the extent Plaintiff believes the defects in his Complaints identified in this Opinion and Order may be cured via amended pleadings, he may file a motion for leave to amend in any of the above-captioned cases, attaching a proposed Amended Complaint as an exhibit, within **30 days** of the date of this Opinion.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith,' and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is respectfully requested to docket this order in the three above-captioned cases, to mail this order to *pro se* Plaintiff, and to terminate the following:

2024 WL 4149252

• ECF No. 31 in *Columbia*, No. 23 Civ. 10393.

• ECF Nos. 15, 16 in *Hunter*, No. 23 Civ. 10394.

• ECF No. 23 in *Kachalia*, No. 23 Civ. 10395.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4149252

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.